**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

_____
                                              )
THE HOLMES GROUP, INC.,                       )
                                              )
            Plaintiff,                        )      CA No. 05-CV-11367-WGY
                                              )      (Alexander, M.J.)
      v.                                      )
                                              )
WEST BEND HOUSEWARES, LLC and                 )
FOCUS PRODUCTS GROUP, LLC                      )
                                              )
            Defendants.                       )
_____)


**DEFENDANTS' MEMORANDUM IN SUPPORT**
**OF THEIR PROPOSED CLAIM CONSTRUCTION**

Michael E. Husmann
Joseph T. Miotke
MICHAEL BEST & FRIEDRICH LLP
100 East Wisconsin Avenue, Suite 3300
Milwaukee, Wisconsin  53202-4108
Tel:  (414) 271-6560

Charles A. Laff
Martin L. Stern
MICHAEL BEST & FRIEDRICH LLP
180 North Stetson Avenue, Suite 2000
Chicago, Illinois  60601
Tel:  (312) 222-0800

Lee Carl Bromberg, BBO # 058480
Erik Paul Belt, BBO # 558620
BROMBERG & SUNSTEIN LLP
125 Summer Street
Boston, MA  02110-1618
Tel:  (617) 443-9292


*Attorneys for the Defendants*

September 5, 2006

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………..………………………………………….………… .iii

INTRODUCTION……………………………….………………………….………………..1

ARGUMENT…………………….…………………………………………….…………..1

I.    The Proper Interpretation Of The '483 Patent……………………………….....2

    A.    The Term "Programmable Slow-Cooker Appliance" Is Not A Claim 13
        Limitation That Requires Interpretation…………………………………….....3

    B.    The Term "Programmable Slow-Cooker Appliance" Means A Food
        Cooking Device That Can Be Set To Operate In At Least Two
        Different Cooking Modes..…………………………………………………..3

    C.    The Claim Term "Programmable Controller" Does Not Include The Output
        And Input Devices Such As The Heating Element, Control Panel,
        LEDs, Displays, Push Buttons, And Switches……………………………....5

    D.    The Phrase "Fixedly Mounted To A Heating Unit" Means That The
        Programmable Controller Housing Is Both Mounted To and Located
        On The Outside Of The Heating Unit…………………….……………………8

        (1)    The '483 Patent Prosecution History Limited The Scope Of
            The '483 Patent To Cookers With Programmable Controllers
            Mounted To A Housing Outside The Heating Unit………………………9

        (2)    The Specification Of The '483 Patent Also Defines And Limits
            The Scope Of Claim 13 To Cookers With Programmable Controllers
            Mounted To Housings Outside The Heating Unit……..……...……......11

II.    The Proper Interpretation Of The '855 Patent…………………………………14

    A.    The Claim Language "Programmable Slow-Cooker Appliance" Is Not A Claim
        Limitation That Requires Interpretation…………………………...…….14

    B.    The Term "Fixedly Mounted To And Projecting Outside A Continuous
        Sidewall of The Heating Unit Means That The Programmable Circuit
        Housing Is Both Mounted To And Projects From The Outside Of
        The Heating Unit……………………………………………………………14

C.    The Claim Term "Programmable Circuit" Does Not Include The Output And Input Devices Such As The Heating Element, Control Panel, LEDs, Displays, Push Buttons, And Switches……………………….......................................16

D.    The Claim Term "Programmable Circuit Positioned Within Said Housing" Requires That The Entire Circuit Be Located Inside The Housing…………....…18

# TABLE OF AUTHORITIES

## Cases

*Alloc, Inc. v. ITC,* 342 F.3d 1361 (Fed. Cir. 2003), *cert. denied,* 541 U.S. 1063…………………..…...19

*Apex v. Raritan Computer, Inc.*, 325 F.3d 1364 (Fed. Cir.)……………………………………………....18

*Apple Computer, Inc. v. Articulate Systems, Inc.*, 234 F.3d 14 (Fed. Cir. 2000)………………………..3

*Bristol-Myers Squibb Company v. Ben Venue Laboratories, Inc.,* 246 F.3d 1368
    (Fed. Cir. 2001)………………………………………………………………………………………3

*Hockerson-Halberstadt, Inc. v. Avia Group Int'.l,* 222 F.3d 951 (Fed. Cir. 2000)……………………15

*Honeywell International, Inc. v. ITT Industries, Inc.,* 452 F.3d 1312 (Fed. Cir. 2006)………………..13

*Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*, 450 F.3d 1350 (Fed. Cir. 2006)………………….13

*Microsoft Corp. v. Multi-Tech Sys., Inc.,* 357 F.3d 1340     (Fed. Cir. 2004),
    *cert. denied* 125 S.Ct. 61……………………………………………………………………………14

*Phillips v. AWH Corp.,* 415 F.3d 1303(Fed. Cir. 2005)………………………………1, 2, 7, 8, 9, 16, 17

*Plant Genetic Systems, N.V. v. DeKalb Genetics Corp.,* 315 F.3d 1335
    (Fed. Cir. 2003)……………………………………………………………………………………….9

*Rowe v. Dror,* 112 F.3d 473 (Fed. Cir. 1997)……………………………………………………………...3

*Spectrum Int'l., Inc. v. Sterilite Corp.,* 164 F.3d 1372 (Fed. Cir. 1998)………………………………15

*TI Group Automotive Systems v. VDO North America L.L.C.*, 375 F.3d 1126
    (Fed. Cir. 2004)……………………………………………………………………………………...18

*Watts v. XL Sys., Inc.,* 232 F.3d 877 (Fed. Cir. 2000)………………………………………………8, 14

## Other

*The Authoritative Dictionary of IEEE Standard Terms (7 Ed. 2000)*……….………………………..8

*Manual of Patent Examining Procedure §§ 2111.02-2111.03 (May 2004)*.............................................3

## INTRODUCTION

Holmes accuses defendants of infringing two patents:  U.S. Patent Nos. 6,573,483 (the '483 patent) and 6,740,855 (the '855 patent), both entitled "Programmable Slow-Cooker Appliance."  J.A.[1] at MKM0001-17, the '483 patent, and MKM0120-38, the '855 patent.  These patents address an overheating problem encountered with programmable controllers in prior art slow cookers resulting from the location of the controllers.  As explained by the patents, in prior art slow cookers the programmable controllers "suffer because the controller inevitably must be placed near the heating unit."  Thus, according to the patents, "what is needed is a slow cooker unit in which the controller does not become overheated and damaged by the heating element."  J.A. at MKM0014, col. 1, ll. 23-27.  The patents purport to meet this need by mounting the programmable controller outside the heating unit in a housing that conveys heat away from the controller, thereby protecting the controller from overheating.  *Id.* at col. 1, ll. 38-43.

## ARGUMENT

As the Court ordered, counsel have discussed their interpretations of the asserted claims in an effort to narrow the claim terms and interpretation issues in dispute.  The charts included as Appendices A and B set forth the terms of the asserted claims that the parties believe are in dispute along with their proposed interpretation of each disputed claim term.  As can be seen, the disputes center on the meanings of the claim terms relating to the claimed "programmable controller," "programmable circuit," and the location of the housing for the programmable controller and circuit.

The Federal Circuit's recent seminal *en banc Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed. Cir. 2005), decision provides the framework for patent claim construction.  The starting point for claim construction is a review of the words of the claims themselves.  *Phillips,* 415 F.3d at 1312.

---

[1] "J.A." refers to the Joint Appendix For Markman Briefing filed by the parties.  All pages of the Joint Appendix are sequentially Bates numbered with the prefix "MKM."

The review, however, is not to be a myopic exercise. "We cannot look at the ordinary meaning of the term . . . in a vacuum." *Phillips,* 415 F.3d at 1313. The context in which the words of the claim are used is key. *Phillips,* 415 F.3d at 1314. ("The context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms.").

Context is also provided by the other claims of the patents-in-suit (both asserted and nonasserted). *Phillips*, 415 F.3d at 1314-15. ("Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims. . . ."). Similarly, we must look at the meaning of a claim term in the context of the written description and the prosecution history. "As we stated in *Vitronics,* the specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips,* 415 F.3d at 1315 (citation omitted). Analysis of the prosecution histories of the patents-in-suit is of particular significance to this case in light of the claim amendments and arguments Holmes made to distinguish the prior art. *Phillips,* 415 F.3d at 1315.

Claim interpretation analysis must also be conducted from the viewpoint of those skilled in the art. *Phillips*, 415 F.3d at 1317. Again, however, that viewpoint must take into account the specification and other context of the words of the claim. "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips,* 415 F.3d at 1313.

## I.    The Proper Interpretation Of The '483 Patent

Claim 13 is the only independent claim of the '483 patent asserted by Holmes. The only terms at issue from claim 13, and thus requiring construction, are "programmable slow cooker appliance," "programmable controller," and "fixedly mounted to a heating unit."

**A.    The Term "Programmable Slow-Cooker Appliance" Is Not A Claim 13 Limitation That Requires Interpretation**

Patent claims begin with a preamble that generally ends with the word "comprising." Manual Of Patent Examining Procedure, §§ 2111.02-2111.03 (May 2004). The language of the preamble does not serve to limit the scope of a claim unless the preamble language is required to give meaning to the limitations that follow. *Id.* Where a patentee defines a complete invention in the claim body and thereby uses the preamble only to state a purpose or intended use for the invention, the preamble is not a claim limitation. *Rowe v. Dror*, 112 F.3d 473, 478-79 (Fed. Cir. 1997). *See also Apple Computer, Inc. v. Articulate Sys., Inc.,* 234 F.3d 14, 17-18 (Fed. Cir. 2000). Here, claim 13 defines a complete method for using a slow-cooking appliance and the preamble term "programmable slow-cooker appliance" does not give meaning to any limitations that follow. The steps of the claimed method are performed the same way regardless of how the term "programmable slow-cooker appliance" is defined. *See Bristol-Myers Squibb Company v. Ben Venue Laboratories, Inc.*, 246 F.3d 1368, 1375 (Fed. Cir. 2001). As such, the preamble term "a programmable slow-cooker appliance" is not a claim limitation that requires interpretation by the Court.

**B.    The Term "Programmable Slow-Cooker Appliance" Means A Food Cooking Device That Can Be Set To Operate In At Least Two Different Cooking Modes**

If the preamble term "programmable slow-cooker appliance" requires interpretation by the Court, the parties dispute its meaning. Holmes seeks to graft unwarranted and vague limitations on this term. Indeed, the '483 specification expressly contradicts the narrow definition that Holmes proposes and, instead, uses the term in a broad sense.

There is no explanation in the '483 specification to define the "relatively low cooking temperature" or "relatively long period of time" limitations which Holmes seeks to add to claim 13. As evident from Holmes' proposed language itself, these terms are relative and highly

subjective, providing no guidance for the jury as to meaning of claim 13. First, the specification

makes clear that "the user may adjust the desired cooking temperature in 25-degree increments"

with no temperature limit (high or low) suggested. J.A. at MKM0016, col. 6., ll. 56-59. Thus,

there is no basis in the intrinsic record for Holmes' proposal that a "programmable slow-cooker

appliance" must operate at a "relatively low temperature." Second, the '483 specification makes

clear that the claimed slow cooker is not limited to a "relatively long period" such as a four hour

cooking time as Holmes proposes. *Id.* at MKM0014, col. 1, ll. 57-58. In fact, the specification

specifically points out that the cooking time can be set for less than four hours. *Id.* at

MKM0016, col. 6, ll. 63-65.

As to the "ceramic" cooking unit and the location of the heating element "within the

heating unit," the '483 specification only suggests that these are preferred embodiments. *Id.* at

MKM0014, col. 2, ll. 44-47 and 66-67. The claims of the '855 patent (a continuation of the '483

patent) make clear that the claimed "programmable slow-cooker appliance" is not limited to only

those that use a ceramic cooking unit. Dependent claim 11 specifically adds a limitation to

independent claim 1's "programmable slow-cooker appliance" that the cooking unit be "made

from a ceramic material." Claim differentiation dictates that unless qualified the claimed

"programmable slow-cooker appliance" is not limited to only those using a ceramic cooking unit,

contrary to Holmes' proposed interpretation.

A programmable slow cooker is an appliance where "a user may set a time or

temperature desired" using a programmable controller "to ensure that food is cooked according

to the desires of a user." J.A. at MKM0014, col. 1, ll. 23-25, 50-55. Put another way, it is a

cooker in which a user has the choice of at least two different cooking modes (*i.e.*, selection of at

least two different cooking times or temperatures) for operation of the appliance. Accordingly, a

"programmable slow-cooker appliance" in the context of claim 13 means a cooking device that

can be set (i.e., "programmed") to operate in at least two different cooking modes.

**C.      The Claim Term "Programmable Controller" Does Not Include The Output and Input Devices Such As The Heating Element, Control Panel, LEDs, Displays, Push Buttons, And Switches**

Claim interpretation begins with the claim language itself.  In the context of the '483 patent, a "controller" is a device that controls other devices, *i.e.*, a device that generates output signals to control the operation of other parts of the slow cooker.  The devices being controlled, therefore, are not part of the claimed "controller."  A "programmable" controller is one that can be programmed, *i.e.*, capable of receiving and acting upon instructions from a user to control the operation of the slow cooker in accordance with the user-chosen cooking time and temperature.  As explained in the specification of the '483 patent:

> Another aspect of the invention is a method of using the programmable controller to ensure that food is cooked according to the desires of a user. The user provides a food item and places the food item into the slow-cooker appliance, as described above. The user sets a cooking time and temperature for the programmable slow-cooker unit, using the controls to set both the time and the temperature.

J.A. at MKM0014, col. 1, ll. 50-56.

The '483 specification defines the claimed "programmable controller" by distinguishing it from the other components that comprise the input devices (e.g., buttons and associated switches used to input cooking settings) and output devices (e.g., digital readouts and LEDs that display cooking information and the heating element).  The input devices are the means by which the programmable controller is provided instructions by a user, *i.e.*, programmed.  They are not part of the programmable controller.  Similarly, the output devices are not part of the programmable controller.  They include the devices that are operated by the controller to communicate cooking information to the user and also the heating element.

Beginning at line 48 of column 4, the '483 patent specification states that the components mounted on circuit board 254 include those that are necessary for "allowing the user of the appliance 10 to electronically control and program cooking cycles and temperature."  J.A. at MKM0015, col. 4. ll. 48-50.  A schematic diagram of the preferred circuitry is then provided in

-5-

Figure 10 of the patent. The microprocessor controller 302 is identified in Figure 10 as the claimed "controller." "[A]s shown in the diagram, the preferred circuit 300 is preferably built around an EPROM/ROM-based CMOS microprocessor **controller 302**." *Id.* at col. 4, ll. 61-64.



FIG. 10

As shown in the above figure, the controller is separate and apart from the input and output devices, *e.g.*, contact switches S1 and S2 for inputting cooking settings, thermistor 310 for inputting temperature readings, and LEDs 262 to display cooking information. Likewise, patent Figure 13 shows an alternative embodiment of the circuitry where controller 302 is depicted (and described in the specification) separate and apart from the input and output devices, including thermistor 310, digital readout 57, LEDs 263 and 265, and contact switches 227, 229, 231, and 233. J.A. at MKM0016, col. 6, ll. 36-47.

In accordance with the '483 patent, a user sets a cooking time and temperature with the control panel's user interface using the cantilevered portions 264 and 266 to activate electrical switches S1 and S2, which provide signals that communicate the user-chosen cooking settings to the programmable controller 302. J.A. at MKM0016, col. 5, l. 44 to col. 6, l. 67. *See* Figures 5

and 11 (cantilevered portions and switches 264, S1 and 265, S2) and Figures 12 and 13 (switches

227-233). These input devices are part of the "control panel," **not** the programmable controller.

> **The control panel 224 includes** a plurality of indicator lights, such as LEDs 262,
> spaced on the front panel 224. As is well-known in the art, a variety of other
> indicator devices may be provided, including digital readouts, audible alarms,
> liquid crystal displays, incandescent lamps or fluorescent readouts. Preferably, the
> **control panel 224 also includes** a plurality of cantilevered portions 264 and 266
> as shown in FIG. 5. The cantilevered portions 264, 266 preferably include
> rearwardly projecting fingers 268 (shown in FIG. 7) which translate the
> depression of the portions 264, 266 toward the rear portion of the housing 210.
> The fingers 268 are preferably used to depress pushbutton switch portions located
> on the circuit board 254.

J.A. at MKM0015, col. 3 ll. 34-46.

The programmable controller 302 is the device that receives the cooking settings (*i.e.*,

instructions) chosen by a user from the input devices (e.g., control panel 224 and cantilevered

portions 264, 266) and then acts upon the instructions by generating output signals to power the

heating element 24 "on and off as necessary to supply heat at a maintained temperature" in

accordance with the chosen cooking temperature and time. J.A. at MKM0015, col. 3, *ll.* 9-12.

The controller also operates various other output devices, such as "indicator devices" to display

cooking information including the digital readouts, LEDs and audible alarms, such as buzzer

315. *Id.* at col. 3, *ll.* 34-40; MKM0016, col. 6, *ll.* 37-42; MKM0017, col. 7, *ll.* 10-21. The

specification thus draws a distinction between programmable controller 302 and the input and

output devices. J.A. at MKM0015, col. 3, *ll.* 39-51; MKM0016, col. 4, *ll.* 48-51, 61-64;

MKM0017 col. 6, *ll.* 30-44.

The inventors of the '483 patent attributed no special meaning to the term

"programmable controller" different from that derived by giving the words "programmable" and

"controller" their ordinary and customary meanings. *Phillips*, 415 F.3d at 1318. Thus, one of

ordinary skill in the art would understand that the "programmable controller" called for by claim

13 is controller 302, which receives from the control panel user interface the chosen time and

temperature cooking settings, acts upon those instructions, and generates output signals to control operation of the cooker in accordance with such settings. As such, the user input and output devices are not part of the claimed "programmable controller."

This definition of "programmable controller" is confirmed by dictionaries used in the electronics field, which are "unbiased source[s]" that the Court is free to consult "at any time in order to better understand the underlying technology." *Phillips,* 415 F.3d at 1322-1323. A "controller" is defined as a device that generates output signals to control the operation of another device. *See, e g.,* App. C, *The Authoritative Dictionary of IEEE Standard Terms (7 Ed. 2000)* at 234. The term "programmable" is defined and understood to mean a device that is capable of accepting and acting upon instructions and generating output signals in accordance with the instructions. *Id.* at 875.

Accordingly, the Court should construe the claim term "programmable controller" as follows:

> An electrical circuit that is programmed by the user and controls the slow cooker appliance in accordance with the user-selected cooking parameters. The programmable controller does not include the output and input devices such as the heating element, control panel, LEDs, displays, buttons, and switches.

### D. The Phrase "Fixedly Mounted To A Heating Unit" Means That The Programmable Controller Housing Is Both Mounted To and Located On The Outside Of The Heating Unit

The specification and prosecution history of the '483 patent present a clear claim disavowal restricting the limitation describing the location of the programmable controller housing as "fixedly mounted to a heating unit" to cookers with programmable controllers mounted to housings that are mounted to and located on the outside of the heating unit. *Phillips,* 415 F.3d at 1303, 314; *See Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

     **(1)**    **The '483 Patent Prosecution History Limited The Scope Of The '483 Patent To Cookers With Programmable Controllers Mounted To A Housing Outside The Heating Unit**

Where, as in this case, there has been a clear disavowal of claim coverage during the patent's prosecution, a patent's claims are properly interpreted as narrower than their ordinary meaning. *Plant Genetic Systems, N.V. v. DeKalb Genetics Corp.*, 315 F.3d 1335, 1345 (Fed. Cir. 2003).

> [T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be.

*Phillips,* 415 F.3d at 1317.

To obtain allowance of the '483 patent, Holmes repeatedly argued that the prior art did not disclose the claimed cooker because the prior art did not mount the programmable controller within a housing mounted to and located on the outside of the heating unit.

In each of the first two office actions during the prosecution of the '483 patent, claim 13 was rejected as being invalid in view of, *inter alia,* the prior art Rivelli patent (U.S. Patent No. 3,904,852 entitled "Deep Fat Frying Cooking Control Module"). MKM0072-74; MKM0089-91; MKM0291-296. As originally filed, claim 13 in pertinent part claimed the method step of "using a programmable controller mounted to a heating unit." MKM0042-43. The prior art Rivelli patent discloses a deep fat fryer that includes a programmable controller housing (computer module 26). The controller housing 26 is mounted to a heating unit (enclosure housing 14), but is **located within that heating unit**.



In response to the Examiner's prior art rejections, Holmes amended claim 13 and then argued why the amended claim was different from Rivelli.  The claim was amended by adding the underlined and bolded language as follows to describe the location of the programmable controller:

> a programmable controller **mounted to a housing fixedly** mounted to a heating unit.

J.A. at MKM0092-97.

Holmes argued that Rivelli's controller housing was different from the claimed housing in view of the new amendment because:

> [e]ven if combined, the combination [of cited references] does not yield a cooking implement having a controller housing fixedly mounted **to an outside of the housing** [heating unit], since the control module of Rivelli is contained within the single housing [heating unit] . . . .

J.A. at MKM0094.  More directly, Holmes specifically defined what is meant by the added claim language explaining that:

> [a]pplicants have amended the claims to better describe the fixed mounting of the [programmable controller] housing **to the exterior of the heating unit**.

J.A. at MKM0095.

Holmes' patent prosecution arguments for the patentability of claim 13 emphatically and repeatedly relied on the mounting and location of the programmable controller housing (and

therefore the programmable controller) on the **<u>outside</u>** of the heating unit as the primary feature that distinguished the claimed cooker from the prior art:

- "[T]he combination [of cited references] does not yield the claimed invention of Claims 1, 11 and 13, which is a programmable slow-cooker appliance comprising a heating unit, a cooking unit, a controller housing **<u>mounted outside the heating unit and a programmable controller mounted to the housing</u>** . . ."

- "The combination [of cited references] does not describe or suggest a device having a controller housing **<u>mounted outside the heating unit</u>**."

- "As mentioned above, neither Rivelli nor Frey describe [sic] a housing for a programmable controller fixedly **<u>mounted to the outside of the heating unit</u>**."

- "Therefore, even an improper combination of [cited references] does not describe or suggest the claimed invention, including a controller housing **<u>mounted fixedly to the outside of the heating unit</u>**."

J.A. at MKM0094-96 (emphasis added).

Holmes' repeated characterization of claim 13 as limited to a cooker with a programmable controller housing mounted to and located on the outside of the heating unit is a disavowal of any claim scope covering a cooker where the programmable controller housing (and hence the programmable controller) is located inside the heating unit.

> **(2) The Specification Of The '483 Patent Also Defines And Limits The Scope Of Claim 13 To Cookers With Programmable Controllers Mounted To Housings Outside The Heating Unit**

To protect the programmable controller from overheating, the '483 patent's only solution is to mount the controller to a housing located outside the heating unit to convey heat away from the controller. No other way of solving the problem is contemplated. J.A. at MKM0014, at col. 1, *ll*. 9-28. Thus, the '483 specification describes a single slow-cooker embodiment (as illustrated in patent Figure 4) with a programmable controller mounted to a housing **<u>outside</u>** the heating unit. No alternative locations for the programmable controller are described or contemplated in the patent.

- "The appliance includes a programmable controller **mounted on its outside**, and preferably mounted via a controller housing . . . ." *Id.* at col. 1, *ll.* 38-40.

- "The housing, **on the side of the slow cooker** appliance. . .". *Id.* at Col. 1, *ll.* 43-47.

- "The control 200 preferably includes a circuit board housing 210, a control panel 220, and an insulation shield 222 assembled together for **attachment to the outer sidewall 18 of the heating unit 12**." J.A. at MKM0015, col. 3, *ll.* 12-15.



- "To further protect the electric componentry within the housing 210 from the heat generated by the appliance 10, the annular shield member 222 is preferably sized for interposition **between the heating unit 12 and the housing 210**." *Id.* at Col. 3, *ll.* 53-56.

- "The shield 222 acts as a ventilated spacer to hold the electronic components and the housing 210 **at a distance away from [sic] sidewall of the cooking unit 12**." *Id.* at Col. 3, *ll.* 60-61.

Patent Figure 7 (annotated and colored) shows the circuit board 254 (red), on which the programmable controller is located, mounted to the interior of housing 210 (green), which is mounted **outside** the heating unit 12. The housing 210 is mounted to an insulation heat shield 222 (blue) interposed between the outer sidewall 18 of the heating unit 12 and the housing. J.A. at MKM0015, col. 3, *ll.* 12-18 and 53-56; col. 4, *ll.* 48-51.



FIG. 7

The need identified by the inventors of the '483 patent was a "slow-cooker unit in which the controller does not become overheated and damaged by the heating element."  J.A. at MKM0014, col. 1, ll. 25-27.  The only solution to that "need" disclosed by inventors in the '483 patent is to mount the programmable controller in a housing **outside** the heating unit.  The statements in the '483 patent concerning the necessity of mounting the controller within a housing located outside the heating unit to avoid overheating "are not limited to describing a preferred embodiment, but more broadly describe the overall" invention of the patents-in-suit.  *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1348 (Fed. Cir. 2004), *cert. denied*, 125 S.Ct. 61; *see also Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*, 450 F.3d 1350, 1355 (Fed. Cir. 2006).

"[I]f the written description could talk, it would say," put the programmable controller and its housing outside, not inside, the heating unit.  *See Honeywell International, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1320 (Fed. Cir. 2006).  "The public is entitled to take the patentee at his word." *Id.* at 1318  Consequently, even if one were to misconstrue the term "programmable controller" to include the input and/or output devices as Holmes suggests, the requirement that

this controller be "mounted to a housing fixedly mounted to a heating unit" does not allow for just a portion of that controller to be so mounted and certainly requires that the most important electronic component, *i.e.*, microprocessor 302, be mounted to a housing outside the heating unit. See Section (II.D) *infra*.

## II.  The Proper Interpretation Of The '855 Patent

Claim 20 is the only independent claim of the '855 patent asserted by Holmes. The only terms at issue from claim 20, and thus requiring construction, are "programmable slow cooker appliance," "fixedly mounted to and projecting outside a continuous sidewall of the heating unit," "programmable circuit," and "circuit positioned within said housing."

### A.  The Claim Language "Programmable Slow-Cooker Appliance" Is Not A Claim Limitation That Requires Interpretation

The term "programmable slow-cooker appliance" that appears in the preamble of the '855 patent is not a claim limitation for the reasons set forth in Section (I.A) above. The body of claim 20 defines a structurally complete invention and the disputed preamble term adds nothing substantive to the claimed invention. The term "programmable slow-cooker appliance" does not describe or refer to any specific structural limitation that follows in the body of claim 20. If the term is to be interpreted, it should be interpreted consistently with the interpretation stated above in Section (I.B).

### B.  The Term "Fixedly Mounted To And Projecting Outside A Continuous Sidewall of The Heating Unit" Means That The Programmable Circuit Housing Is Both Mounted To And Projects From The Outside Of The Heating Unit

The arguments made above in Section (I.D) concerning the location of the claimed programmable controller housing apply with equal force to the programmable circuit housing of the '855 patent and are incorporated herein. *See Watts*, 233 F.3d at 884; *Microsoft*, 357 F.3d at 1349-50. Only one such housing is disclosed in the '855 patent, and the housing for the programmable controller and programmable circuit are the same.

That these housings are the same is conclusively shown in the prosecution history of the '855 patent.  When application claim 53, which later issued as '855 patent claim 20 (hereinafter "claim 20") was rejected by the patent examiner in light of the same Rivelli patent, Holmes amended the claim.  J.A. at MKM0213-214 and MKM0252.  In pertinent part, the claim was amended by adding the underlined and bolded language below to the definition of the claimed "housing" to more specifically describe its location outside the heating unit as follows:

a housing **fixedly** mounted to **and projecting outside** said continuous sidewall of said heating unit;

Holmes then explained how this housing, within which the programmable circuit is positioned, differs from the housing of Rivelli.  "The module 26 [of Rivelli] housing the circuit board is mounted within the compartment [heating unit 14] rather than **projecting from an outer sidewall as described in the independent claims** of the present application."  J.A. at MKM0242-243; MKM0251. (Emphasis added).  The claim amendment and Holmes' arguments thus make clear that the claimed programmable circuit housing is not mounted within the heating unit.  It is mounted to and projects from the outside of the heating unit's sidewall.

Thus, consistent with its theme from the '483 patent application, Holmes continued to focus on housing the programmable circuit **outside** the heating unit as the primary reason for patentability.  The prosecution history of each of the patents-in-suit presents a clear disavowal of claim scope, limiting the programmable circuit housing, and thus the housing for the programmable controller, to a housing mounted to and located on the outside of the heating unit.  When Holmes repeatedly declared during prosecution of the patents-in-suit that its claims do not cover cookers where the programmable circuit (and hence, the programmable controller) is housed inside the heating unit, it expressly disclaimed any claim coverage over such cookers.  *Hockerson-Halberstadt, Inc. v. Avia Group Int'l.*, 222 F.3d 951, 957 (Fed Cir. 2000); *Spectrum Int'l., Inc. v. Sterlite Corp.*, 164 F.3d 1372, 1378-79 (Fed Cir. 1998).

For these reasons, as well as those set forth in Section (I.D) above, the phrase describing the location of the programmable circuit housing as "fixedly mounted to and projecting outside a continuous sidewall of the heating unit" means the programmable circuit housing is both mounted to and projects from the outside of the heating unit.

>       **C.    The Claim Term "Programmable Circuit" Does Not Include The Ouput And
>             Input Devices Such As The Heating Element, Control Panel, LEDs, Displays,
>             Push Buttons, And Switches**

As with the term "programmable controller," the dispute between the parties over the term "programmable circuit" centers upon what structure is encompassed by the claim term. West Bend's construction excludes the input and output devices. Holmes' construction does not.

It is clear from the context of claim 20, and particularly the other claims in the '855 patent, that the term "programmable circuit" excludes the input devices which allow the circuit to be programmed, as well as the output devices that the circuit controls. *Phillips*, 415 F.3d at 1314-15 (citations omitted).

Claim 20 expressly distinguishes "the control panel" and its "user interface" from the "programmable circuit." Claim 20 requires "a control panel . . . including a user interface **connected to said programmable circuit**." J.A. at MKM0137, col. 9, ll. 17-38 (Emphasis added). Clearly, the control panel and its user interface are not part of the "programmable circuit" – they are separate from and "connected to" that circuit. The control panel, as noted above, includes:

> [A] plurality of indicator lights, such as LEDs 262, spaced on the front panel 224. As is well-known in the art, a variety of other indicator devices may be provided, including digital readouts, audible alarms, liquid crystal displays, incandescent lamps or fluorescent readouts. Preferably, **the control panel 224 also includes** a plurality of cantilevered portions 264 and 266 as shown in FIG. 5. The cantilevered portions 264, 266 preferably include rearwardly projecting fingers 268 (shown in FIG. 7) which translate the depression of the portions 264, 266 toward the rear portion of the housing 210. The fingers 268 are preferably used to depress pushbutton switch portions located on the circuit board 254.

J.A. at MKM0134, col. 3 ll. 34-46.  These user input and output devices are thus not part of the "programmable circuit."

Similarly, claim 20 also recites the heating element – an output device – and programmable circuit as separate limitations.  Thus, claim 20 consistently draws a distinction between the input and output devices and the claimed "programmable circuit," defining the input and output devices as distinct limitations that are not part of the claimed "programmable circuit."

Claims 27 and 28, which depend from claim 20, require that in addition to claim 20's "programmable circuit," the slow cooker includes "a switch operatively associated with said control panel, the programmable circuit being configured such that subsequent pushes of said switch activate different cooking modes."  Claim differentiation dictates that the pushbutton switches, activated by cantilevered portions 264 and 266 on the control panel, are not part of the "programmable circuit" of claim 20.  They are input devices.  *Phillips*, 415 F.3d at 1314-15 ("Differences among claims can also be a useful guide in understanding the meaning of particular claim terms.").

The other claims of the '855 patent also make it clear that the "programmable circuit" of the '855 patent does not include the input and output devices such as the control panel, buttons, switches, and LEDs.  Both claims 1 and 12 of the '855 patent require that the same "programmable circuit" of claim 20 be "electrically connected to said heating element" (an output device) and a "control panel" (an input device).  Dependent claims 3, 16 and 23 additionally require that a "Triac" (an output device) be connected between the programmable circuit and the heating element.

The '855 specification confirms the above construction of "programmable circuit." Controller 302 is the only "programmable" component disclosed.  The input and output devices of the user interface, including the control panel, digital readout, power and time LED's, and time and temperature switches, are specifically described as distinct components separate from

controller 302.   J.A. at MKM0134, col. 3, ll. 39-51; MKM0135, col. 6, ll. 30-44.   The input devices enable a user to communicate with and instruct the "programmable circuit" by sending signals to the "programmable circuit" corresponding to the chosen cooking time and temperature settings.   *Apex v. Raritan Computer, Inc.*, 325 F.3d 1364, 1374 (Fed. Cir. 2003).   The output devices on the control panel receive signals from the "programmable circuit" to provide the user with information about the operation of the cooker.

For these reasons, as well as those set forth in section (I.C) above, the claimed "programmable circuit" does not include the input and output devices of the user interface, such as the control panel, LEDs, displays, cantilevered portions, buttons and switches.

Accordingly, the Court should construe the claim term "programmable circuit" as follows:

> An electrical circuit that is programmed by the user and controls the slow cooker appliance in accordance with the user-selected cooking parameters.   The programmable circuit does not include the output and input devices such as the heating element, control panel, LEDs, displays, buttons, and switches.

### D.    The Claim Term "Programmable Circuit Positioned Within Said Housing" Requires That The Entire Circuit Be Located Inside The Housing

The term "a programmable circuit positioned within said housing" means precisely what it says.   The programmable circuit, not just a part of that circuit, is located inside the housing. *See*, *e.g., TI Group Automotive Systems v. VDO North America, L.L.C.*, 375 F.3d 1126,1135-36 (Fed Cir.2004).   The language of claim 20 places no qualification that would exclude any portion of the claimed programmable circuit from inside the housing.   This conclusion is confirmed when claim 20 is read in the context of the specification, where all of the electronic components, including the most important component, *i.e.*, the programmable controller, are positioned inside the housing so as to locate all of the components outside of the heating unit.   Nowhere does the patent suggest placing only a portion of the circuit in the housing.   Holmes seeks to rewrite the claim by adding limitations that have no basis in the intrinsic record.

-18-

As discussed above, the patents-in-suit address the overheating problem caused by placing prior art programmable controllers near the heating element within the heating unit. To solve this purported problem, and as shown and described throughout the specification and drawings, **<u>all</u>** of the electronic components, including the microprocessor controller 302, are positioned within housing 210 that is mounted to and located on the outside of the heating unit 12. "The interior of the housing 210 contains a printed circuit board 254 (shown in Fig. 7) containing the electronic components of the control." J.A. at MKM0134, col. 3, ll. 20-22. As the specification points out, to protect the electronic components from overheating, all such components are located "within the housing 210 away from a significant amount of the heat generated by appliance 10." *Id.* at col. 3, ll. 32-35. The object is to hold the electronic components within housing 210 "at a distance away from [sic] sidewall of the cooking unit 12." *Id.* at col. 3, ll. 64-65.

The inventors of the patents-in-suit explained the very nature of their invention at col. 1, lines 44-47 of the '855 patent:

> The appliance includes a programmable controller mounted on its outside, and preferably mounted via a controller housing, which acts to insulate the controller from the heat of the appliance . . . .

J.A. at MKM0133.

Thus, regardless of whether only "a portion" of the programmable circuit is required to be positioned within the claimed housing outside the heating unit, the programmable controller, such as microprocessor 302, must be positioned within the housing. Any other interpretation would be inconsistent with the very nature of the claimed invention, *Alloc, Inc. v. ITC*, 342 F.3d 1361, 1370 (Fed. Cir. 2003), *cert. denied*, 541 U.S. 1063.

## CONCLUSION

For the foregoing reasons, defendants respectfully requests that the Court adopt the claim constructions offered by them and summarized in Appendix A.

WEST BEND HOUSEWARES, LLC
FOCUS PRODUCTS GROUP, LLC

*By their attorneys*,

/s/ Erik P. Belt
Erik Paul Belt, BBO # 558620
BROMBERG & SUNSTEIN LLP
125 Summer Street
Boston, Massachusetts 02110
Tel:  (617) 443-9292
Facsimile:  (617) 443-0004
ebelt@bromsun.com

| Of Counsel: | Michael E. Husmann |
| | Joseph T. Miotke |
| Charles A. Laff | MICHAEL BEST & FRIEDRICH LLP |
| Martin L. Stern | 100 E. Wisconsin Avenue |
| MICHAEL BEST & FRIEDRICH LLP | Milwaukee, Wisconsin 53202 |
| 401 N. Michigan Ave. – Ste. 1900 | Tel: (414) 271-6560 |
| Chicago, Illinois 60611 | mehusmann@michaelbest.com |
| Tel:  (312) 222-0800 | |
| calaff@michaelbest.com | |
| | |

## CERTIFICATE OF SERVICE

I certify that, on September 5, 2006, this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/  Erik Paul Belt
Erik Paul Belt

# APPENDIX A

## APPENDIX A

### Claim 13 of the '483 Patent

| Claim Term | Defendants' Proposed Interpretation |
|---|---|
| Programmable slow-cooker appliance | The term "programmable slow-cooker appliance" as it appears in the preamble is not a claim limitation which the Court need interpret. |
| programmable controller | An electrical circuit that is programmed by the user and controls the slow cooker appliance in accordance with the user-selected cooking parameters. The programmable controller does not include the output and input devices such as the heating element, control panel, LEDs, displays, buttons, and switches. |
| fixedly mounted to a heating unit | Mounted to and located on the outside of the heating unit. |

### Claim 20 of the '855 Patent

| Claim Term | Defendants' Proposed Interpretation |
|---|---|
| Programmable slow-cooker appliance | The term "programmable slow-cooker appliance" appears only in the preamble and is not a claim limitation which the Court need interpret. |
| fixedly mounted to and projecting outside the heating unit | Mounted to and projecting from the outside of the heating unit. |
| programmable circuit | An electrical circuit that is programmed by the user and controls the slow cooker appliance in accordance with the user-selected cooking parameters. The programmable circuit does not include the output and input devices such as the heating element, control panel, LEDs, displays, buttons, and switches. |
| circuit positioned within said housing | The circuit, not just a portion of the circuit, resides in the housing. |

# **<u>APPENDIX B</u>**

# HOFFMANN & BARON, LLP

ATTORNEYS AT LAW
6900 JERICHO TURNPIKE
SYOSSET, NEW YORK 11791-4407
(516) 822-3550
FACSIMILE (516) 822-3582
www.hoffmannbaron.com

CHARLES R. HOFFMANN
RONALD J. BARON
DANIEL A. SCOLA, JR.*
SALVATORE J. ABBRUZZESE*
ALAN M. SACK

STEVEN T. ZUSCHLAG*

SUSAN A. RIGGS
KEVIN E. MCDERMOTT
RODERICK S.W. TURNER
ANNA-LISA GALLO
JAMES F. HARRINGTON
STEPHEN CANNAVALE*
JAMIE M. LARMANN*
GORDON P. BELCHER

IRVING N. FEIT
R. GLENN SCHROEDER
GLENN T. HENNEBERGER
ANTHONY E. BENNETT
LUDOMIR A. BUDZYN

JOHN S. SOPKO*

ANDREA M. WILKOVICH
BARTHOLOMEW J. DIVITA
TONY A. GAYOSO
D.W. DARREN FANG*
NICHOLE E. MARTIAN
LAUREN T. EHR
LINDA D. CHIN

PATENT AGENTS
GLORIA K. SZAKIEL, PH.D.      EDNA I. OERGEL, PH.D

NEW JERSEY OFFICE
1055 PARSIPPANY BLVD.
PARSIPPANY, N.J. 07054-1278
(973) 331-1700
FAX (973) 331-1717

SCIENTIFIC ADVISOR
DANIEL A. SCOLA, SR., PH.D.

* NOT ADMITTED IN N.J.
* SENIOR ATTORNEY

September 1, 2006

**VIA E-MAIL ONLY**

Joseph T. Miotke, Esq.
Michael Best & Friedrich LLP
100 E. Wisconsin Avenue
Suite 3300
Milwaukee, Wisconsin 53202-4108

> Re:  *The Holmes Group v. West Bend Housewares, et al.*
> Civil Case No.: 1:05-CV-11367-WGY

Dear Joe:

Below is Plaintiff's finalized claim construction chart identifying the limitations which we believe the Court needs to construe based upon our discussions to narrow the claim construction issues. In view of our discussions, the remainder of the asserted claim limitations do not require construction by the Court since the parties do not have any disagreement as to their meaning.

### *Claim 13 of the '483 Patent*

| *Claim Term* | *Plaintiff's Claim Construction* |
| --- | --- |
| a programmable slow-cooker appliance | A slow-cooker as commonly referred to in the cooking industry, namely a cooking device which is designed for cooking food at a constant, relatively low cooking temperature for a relatively long period of time, such as four to ten hours, the slow-cooker including a heating unit having a heating element provided within the heating unit and a ceramic cooking unit which fits within the heating unit, the slow-cooker being programmable to operate in a variety of different cooking modes and cooking times. |

Joseph T. Miotke, Esq.
September 1, 2006
Page 2

| *Claim Term* | *Plaintiff's Claim Construction* |
|---|---|
| selecting a cooking temperature and time using a programmable controller | A programmable controller in the form of an electrical circuit including user actuated input devices and output devices which permit an operator to select a cooking temperature and cooking time. |
| a housing fixedly mounted to a heating unit | An enclosure affixed to the outer sidewall of a heating unit, the heating unit including an inner and outer sidewall and a bottom which defines a well-like heating chamber to support a cooking unit. |

### Claim 20 of the '855 Patent

| *Claim Term* | *Plaintiff's Claim Construction* |
|---|---|
| a programmable slow-cooker appliance | A slow-cooker as commonly referred to in the cooking industry, namely a cooking device which is designed for cooking food at a constant, relatively low cooking temperature for a relatively long period of time, such as four to ten hours, the slow cooker including a heating unit including a heating element provided within the heating unit and a ceramic cooking unit which fits within the heating unit, the slow cooker being programmable to operate in a variety of different cooking modes and cooking times. |
| a housing fixedly mounted to and projecting outside said continuous sidewall of said heating unit | An enclosure affixed to the outer sidewall of the heating unit and extending at least beyond an outer surface of the sidewall of the heating unit. |
| a programmable circuit positioned within the housing and configured to automatically switch said heating element from a cook mode to a lower temperature warm mode at the end of a set cooking time | A circuit including an assemblage of electronic components which allows the user to program both the temperature and desired time for cooking and which can automatically change the heating element from a cooking mode to a warm mode once a set cooking time has expired, the circuit being positioned within the enclosure in that at least a portion of the circuit resides in the enclosure. |

Joseph T. Miotke, Esq.
September 1, 2006
Page 3

      Please provide me with West Bend's finalized claim construction chart as soon as possible.

Sincerely,

Glenn T. Henneberger

GTH:ejw
226296.1

# APPENDIX C

MICHAEL, BEST & FRIEDRICH

RECEIVED MAY 1 0 2002

# IEEE 100
# The Authoritative Dictionary of
# IEEE Standards Terms

## Seventh Edition



Published by
Standards Information Network
IEEE Press

**Trademarks and disclaimers**

*IEEE believes the information in this publication is accurate as of its publication date; such information is subject to change without notice. IEEE is not responsible for any inadvertent errors.*

*Other tradenames and trademarks in this document are those of their respective owners.*

*The Institute of Electrical and Electronics Engineering, Inc.*
*3 Park Avenue, New York, NY, 10016-5997, USA*

*Copyright © 2000 by the Institute of Electrical and Electronics Engineers, Inc. All rights reserved. Published December 2000. Printed in the United States of America.*

*No part of this publication may be reproduced in any form, in an electronic retrieval system or otherwise, without the prior written permission of the publisher.*

*To order IEEE Press publications, call 1-800-678-IEEE.*

*Print: ISBN 0-7381-2601-2*            *SP1122*

See other standards and standards-related product listings at: http://standards.ieee.org/

*The publisher believes that the information and guidance given in this work serve as an enhancement to users, all parties must rely upon their own skill and judgement when making use of it. The publisher does not assume any liability to anyone for any loss or damage caused by any error or omission in the work, whether such error or omission is the result of negligence or any other cause. Any and all such liability is disclaimed.*

*This work is published with the understanding that the IEEE is supplying information through this publication, not attempting to render engineering or other professional services. If such services are required, the assistance of an appropriate professional should be sought. The IEEE is not responsible for the statements and opinions advanced in this publication.*

Library of Congress Cataloging-in-Publication Data

IEEE 100 : the authoritative dictionary of IEEE standards terms.—7th ed.
    p. cm.
  ISBN 0-7381-2601-2 (paperback : alk. paper)
    1. Electric engineering—Dictionaries. 2. Electronics—Dictionaries. 3. Computer engineering—Dictionaries. 4. Electric engineering—Acronyms. 5. Electronics—Acronyms. 6. Computer engineering—Acronyms. I. Institute of Electrical and Electronics Engineers.

TK9 .I28 2000
621.3'03—dc21                                        00-050601

**Conten**

**Introducti**

**How to Us**

**Categories**

**Trademark**

**The Autho**

**Abstracts a**

**Non-IEEE**

*The Authoritativ*

**controlled-speed axle generator** An axle generator in which the speed of the generator is maintained approximately constant at all vehicle speeds above a predetermined minimum. *See also:* axle-generator system.    (EEC/PE) [119]

**controlled system (automatic control)** The apparatus, equipment, or machine used to effect changes in the value of the ultimately controlled variable. *See also:* control system.    (PE/EDPG) [3]

**controlled vented power fuse** (installations and equipment operating at over 600 volts, nominal) A fuse with provision for controlling discharge circuit interruption such that no solid material may be exhausted into the surrounding atmosphere. The discharge gases shall not unite or damage insulation in the path of the discharge nor shall these gases propagate a flashover to or between grounded members or conduction members in the path of the discharge when the distance between the vent and such insulation or conduction members conforms to manufacturer's recommendations.
    (NESC/NEC) [86]

**controller (1) (electric pipe heating systems)** A device that regulates the state of a system by comparing a signal from a sensor located in the system with a predetermined value and adjusting its output to achieve the predetermined value. Controllers, as used in electric pipe heating systems, regulate temperatures on the system and can be referred to as temperature controllers or thermostats. Controller sensors can be mechanical (bulb, bimetallic) or electrical (thermocouple, resistance-temperature detector [RTD] thermistor).
    (PE/EDPG) 622A-1984r, 622B-1988r
**(2)** A device or group of devices that serves to govern, in some predetermined manner, the electric power delivered to the apparatus to which it is connected. (NESC/NEC) [86] **(3) (packaging machinery)** A device or group of devices that serves to control in some predetermined manner the apparatus to which it is connected.    (IA/PKG) 333-1980w
**(4)** The component of a system that functions as the system controller. A controller typically sends program messages to and receives response messages from devices.
    (IM/AIN) 488.2-1992r
**(5) (A)** A functional unit in a computer system that controls one or more units of the peripheral equipment. *Synonym:* peripheral control unit. *See also:* input-output controller; subchannel controller. **(B)** In robotics, a processor that takes as input desired and measured position, velocity or other pertinent variables and whose output is a drive signal to a controlling motor or actuator. **(C)** A device through which one can introduce commands to a control system.
    (C) 610.10-1994
**(6)** The entity that initiates RamLink transactions. There is exactly one controller on each RamLink ringlet.
    (C/MM) 1596.4-1996
**(7)** A device or group of devices used to control in a predetermined manner the electric power delivered to the apparatus to which it is connected.    (IA/MT) 45-1998
**(8) (CAMAC system)** *See also:* CAMAC crate.
**(9)** *See also:* SBus Controller.    (C/BA) 1496-1993w
**Controller** *See:* SBus Controller.
**controller, automatic** *See:* automatic controller.
**controller characteristics (thyristor)** The electrical characteristics of an ac power controller measured or observed at its input or output terminal.    (IA/IPC) 428-1981w
**controller current (thyristor)** The current flowing through the terminals of the controller.    (IA/IPC) 428-1981w
**controller diagram (electric-power devices)** A diagram that shows the electric connections between the parts comprising the controller and that shows the external connections.
    (IA/IAC) 270-1966w, [60]
**controller equipment (thyristor)** An operative unit for ac power control comprising one or more thyristor assemblies together with any input or output transformers, filters, other switching devices and auxiliaries required by the thyristor ac power controller to function.    (IA/IPC) 428-1981w

**controller faults (thyristor)** A fault condition exists if the conduction cycles of some semiconductors are abnormal.
    (IA/IPC) 428-1981w
**controller ON-state interval (thyristor)** The time interval in which the controller conducts. *Note:* It is assumed that the starting instant of the controller ON-state interval is coincident with the starting instant of the trigger pulse.
    (IA/IPC) 428-1981w
**controller power transformer (thyristor)** A transformer within the controller employed to provide isolation or the transformation of voltage or current, or both.
    (IA/IPC) 428-1981w
**controller section (thyristor)** That part of a controller circuit containing the basic control elements necessary for controlling the load voltage.    (IA/IPC) 428-1981w
**controller, self-operated** *See:* self-operated controller.
**controllers for steel-mill accessory machines** Controllers for machines that are not used directly in the processing of steel, such as pumps, machine tools, etc. *See also:* electric controller.    (IA/IAC) [60]
**controllers for steel-mill auxiliaries** Controllers for machines that are used directly in the processing of steel, such as screwdowns and manipulators but not cranes and main rolling drives. *See also:* electric controller.    (IA/IAC) [60]
**controller, time schedule** *See:* time schedule controller.
**control line** The line, connected to the memory transistor control element, that provides the reference voltage to the memory cell during a read and may provide a high voltage during a write cycle.    (ED) 1005-1998
**controlling element, final** *See:* final controlling element.
**controlling elements** The functional components of a controlling system. *See also:* feedback control system.
    (IM/PE/EDPG) [120], [3]
**controlling elements, forward** *See:* forward controlling elements.
**controlling means** (of an automatic control system) Consists of those elements that are involved in producing a corrective action.    (PE/PSE) 94-1970w
**controlling section** A length of track consisting of one or more track circuit sections, by means of which the roadway elements or the device that governs approach to or movement within a block are controlled.    (EEC/PE) [119]
**controlling system (1) (automatic control system without feedback)** That portion of the control system that manipulates the controlled system.    (IM/PE/EDPG) [120], [3]
**(2) (control system feedback)** The portion that compares functions of a directly controlled variable and a command and adjusts a manipulated variable as a function of the difference. *Note:* It includes the reference input elements; summing point; forward and final controlling elements; and feedback elements. *See also:* feedback control system.
    (IM/PE/EDPG) [120], [3]
**controlling voltage, composite** *See:* composite controlling voltage.
**control loopback** Loopback of output from one function to be control for another function in the same diagram. *Synonym:* feedback.    (C/SE) 1320.1-1998
**control machine (A) (railroad practice)** An assemblage of manually operated levers or other devices for the control of signals, switches, or other units, without mechanical interlocking, usually including a track diagram with indication lights. *See also:* car retarder. **(B) (railroad practice)** A group of levers or equivalent devices used to operate the various mechanisms and signals that constitute the car retarder installation. *See also:* centralized traffic-control system; car retarder.    (EEC/PE) [119]
**control, manual** *See:* manual control.
**control mechanism (control systems for steam turbine-generator units)** Includes all systems, devices, and mechanisms between a controller and the controlled valves.
    (PE/EDPG) 122-1985s

*[partial right column cut off]*

**control met**

**control met** tering equ for the pu distribution **(2) (electr** of power f

**control mod** ON-state only for st several co phase cont

**control oper** performs a following &
&&
(
)
;
;;
(newline)
I
II

The end-of considered ((is a cont

**control pane automatic** An assembl

**(2)** The pa and indicat
**control point** in time or applied to t e.g., an app code.
**control point** ment(s) tha

**control point equipment** proper stim under test, i ming device
**control positi** indication o trol surface for wing fla ing gears, e
**control positi (numericall** reproducibil ing system *Note:* May l cision, or re
**control posi function nu** switch, circ purpose of source of co ment. *Note:* power whic heaters.
**control-power** ers) The wit tors, relays, *onym:* contr low-voltage

**:sign language**

ning parameter,
efractive index
)0) 812-1984w
g a Futurebus+
with Profile S,
; + slot.
\) 896.10-1997
ments made up
oackplane, card
ving with other
S systems and
quirements, and
iperset of those
\) 896.10-1997
tic equipment)
:m or equipment
(MIL) [2]
transmitted for
SP) 151-1965w
solving a prob-
ely, a routine.
lan for solving a
osely, to write a
program; object
m; programmed
-1987, 162-1963
instructions ar-
the performance
)M) 312-1977w
at when true en-
nmable read only
T/C) 662-1980s
.
C) 610.12-1990
he system to ac-
in POSIX.2 en-
Command Lan-
r example, awk,

'A) 9945-2-1993
ta onto an inte-
') 610.10-1994w
ner to accomplish
/MM) 855-1990
) the floating gate
(ED) 1005-1998
: in parallel with
pace and possibly
(C) 1003.5-1999

ture and relation-
ter program. The
program's inter-
c also: computer
C/SE) 729-1983s

nted languages, a
; to group related
: allocation, delin-
paths of the com-
o; computer pro-
C/SE) 729-1983s

sing unit that con-
be executed. Syn-
C) 610.10-1994w
(C) 610.12-1990
ograms are stored
(C) 1003.5-1990w
design language.
, specification lan-
times, verification

protocols, used to develop, analyze, and document a program design. *See also:* hardware design language.
(C) 610.12-1990

**(2) (software)** *See also:* design language.

**(3)** A specification language with special constructs and verification protocols, used to develop, analyze, and document a program design. *Contrast:* hardware design language.
(C) 610.13-1993w

**program disturb** The corruption of data in one location caused by the programming of data at another location.
(ED) 1005-1998

**program editor** A text editor user to enter, alter, and view source code for computer programs. Such an editor may have features that make it sensitive to the syntax of the source language on which it operates. *Contrast:* document editor.
(C) 610.2-1987

**program-erase cycle** The event of writing a memory cell from the programmed state to the erased state and back to the programmed state. *Note:* This event may be used as a unit of measurement for endurance. Within a sequence, program-erase cycles are indistinguishable from erase-program cycles. *See also:* erase-program cycle.
(ED) 1005-1998

**program evaluation and review technique (PERT) (1)** A variation of the critical path method in which minimum, maximum, and most likely times are used to estimate the mean and standard deviation of each activity item; these values are used to compute estimated path times and to find the critical path; and the critical path values are used to find the standard deviation of the completion time for the whole project.
(C) 610.2-1987

**(2)** A diagrammatic method for establishing program goals and tracking.
(PE/NP) 933-1999

**program extension (software)** An enhancement made to existing software to increase the scope of its capabilities. *See also:* software; enhancement.
(C/SE) 729-1983s

**program flowchart** *See:* flowchart.

**program instruction** A computer instruction in a source program. *Note:* A program instruction is distinguished from a computer instruction that results from assembly, compilation, or other interpretation process.
(C) 610.12-1990

**program instrumentation (A) (software)** Probes, such as instructions or assertions, inserted into a computer program to facilitate execution monitoring, proof of correctness, resource monitoring, or other activities. **(B) (software)** The process of preparing and inserting probes into a computer program. *See also:* computer program; execution; instruction; proof of correctness; assertion.
(C/SE) 729-1983

**program level** The magnitude of program in an audio system expressed in volume units.
(SP) 151-1965w

**program library** *See:* software library.

**program listing** A printout or other human readable display of the source and, sometimes, object statements that make up a computer program.
(C) 610.12-1990

**program loading** Placing executable instructions into the memory of a computer where they can be executed.
(C) 610.10-1994w

**Programmable (1) (programmable instrumentation)** That characteristic of a device that makes it capable of accepting data to alter the state of its internal circuitry to perform a specific task(s).
(IM/AIN) 488.1-1987r

**(2)** Pertaining to a device such as a circuit or a keyboard that can accept instructions that alter its basic functions. *Contrast:* hardwired. *See also:* user-programmable computer; micro-programmable computer.
(C) 610.10-1994w

**Programmable array logic** A programmable, two-level logic device in which the input decode (AND array) logic is programmable, but the output (OR array) is fixed. *Contrast:* programmable logic array.
(C) 610.10-1994w

**Programmable breakpoint** A breakpoint that automatically invokes a previously specified debugging process when initiated. *See also:* prolog breakpoint; dynamic breakpoint; data

breakpoint; epilog breakpoint; code breakpoint; static breakpoint.
(C) 610.12-1990

**programmable connection** A connection in which information is sent over data type circuits. *See also:* RJ-11; permissive connection.
(C) 610.7-1995

**programmable controller** Solid state control system with programming capability that performs functions similar to a relay logic system.
(PE/EDPG) 1020-1988r

**programmable digital computer (programmable digital computer systems in safety systems of nuclear power generating stations)** A device that can store instructions and is capable of the execution of a systematic sequence of operations performed on data that is controlled by internally stored instructions.
7432-1982w

**programmable equipment (supervisory control, data acquisition, and automatic control)** A remote or master station having one or more of its operations specified by a program contained in a memory device.
(SWG/PE/SUB) C37.100-1992, C37.1-1994

**programmable function key** *See:* user-definable key.

**programmable logic array** A general-purpose integrated circuit that consists of an array of gates that can be programmed to perform various functions. *Contrast:* programmable array logic. *See also:* field programmable logic array.
(C) 610.10-1994w

**programmable measuring apparatus (programmable instrumentation)** A measuring apparatus that performs specified operations on command from the system and may transmit the results of the measurement(s) to the system.
(IM/AIN) 488.1-1987r

**programmable read-only memory** A type of read-only memory whose contents can be initialized, or burned, only once, and cannot thereafter be altered. *See also:* erasable programmable read-only memory; PROM burner; electrically erasable programmable read-only memory.
(C) 610.10-1994w

**programmable stimuli (test, measurement, and diagnostic equipment)** Stimuli that can be controlled in accordance with instructions from a programming device.
(MIL) [2]

**programmable terminal** *See:* intelligent terminal.

**program margin** The minimum measured difference between the programmed states and the sensing level for the array.
(ED) 1005-1998

**programmed acceleration** A controlled velocity increase to the programmed rate.
(IA/EEC) [61], [74]

**programmed check** A check procedure designed by the programmer and implemented specifically as a part of his program. *See also:* check problem; mathematical check.
(C) [20], [85]

**programmed control** A control system in which the operations are determined by a predetermined input program from cards, tape, plug boards, cams, etc. *See also:* feedback control system.
(IA/ICTL/IAC) [60]

**programmed deceleration (numerically controlled machines)** A controlled velocity decrease to a fixed percent of the programmed rate.
(IA) [61]

**PRogrammed Electronics Patterns (PREP)** A programming language for use in designing integrated circuits. *Note:* PREP is conceptually similar to APT, except that it involves description of two-dimensional figures.
(C) 610.13-1993w

**Programmed Inquiry, Learning Or Teaching (PILOT)** A programming language designed for writing computer-aided instruction applications; PILOT is simple and well-suited to support an interactive "question and answer" type of system.
(C) 610.13-1993w

**programmed input-output** A method for transferring data between an interface and memory in which the program polls the input-output device to see if data is available. *Contrast:* direct memory access. *See also:* direct memory transfer.
(C) 610.10-1994w

**programmed instruction** A self-instructional method using materials that lead the student through a systematic sequence

**programmed instruction**