# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

-----------------------------------------------------X

THE HOLMES GROUP, INC.,                          :
                                                 :
                          Plaintiff,             :        Civil Action No.  05-CV-11367 WGY
                     v.                          :        (Alexander, M.J.)
                                                 :
WEST BEND HOUSEWARES, LLC and                    :
FOCUS PRODUCTS GROUP, L.L.C.,                    :
                                                 :
                          Defendants.            :

-----------------------------------------------------X

**PLAINTIFF'S CLAIM CONSTRUCTION BRIEF**

  
# TABLE OF CONTENTS

Page(s)

I.   INTRODUCTION ........................................................................................1

II.  PRINCIPLES OF CLAIM CONSTRUCTION ......................................................2

III. CONSTRUCTION OF CLAIM LIMITATIONS IN DISPUTE ........................................6

  A.   Brief Description Of The Claimed Invention ..........................................6

  B.   Construction Of Limitations At Issue In Claim 13
       Of The '483 Patent.....................................................................9

         l.   Holmes Construction of the "Programmable
              Slow-Cooker Appliance" Limitation ................................9

         2.   West Bend's Contention that No Construction
              Is Necessary is in Error.................................................11

         3.   Holmes' Construction of the Limitation Related
              to the "Selecting" Step.................................................12

         4.   West Bend's Proposed Construction of the Programmable
              Controller Improperly Restricts the Claim Language...................14

         5.   Holmes' Proposed Construction for "A Housing
              Fixedly Mounted to a Heating Unit" .............................15

         6.   West Bend's Construction for the Housing Mounted
              to the Heating Unit Improperly Adds Limitations
              Not Present....................................................................17

  C.   Construction Of Limitations At Issue In Claim 20 Of The '855 Patent ...............18

         1.   Holmes' Construction for the Programmable
              Slow-Cooker Appliance Limitation.................................19

         2.   West Bend Contends the Preamble is Not a
              Claim Limitation...........................................................20

         3.   Holmes' Construction for the Limitation of a
              Housing Fixedly Mounted to the Heating Unit..............................20

4.    West Bend Improperly Construes the Limitation of the Housing Mounted to the Heating Unit..................................23

5.    Holmes' Proposed Construction of the Programmable Circuit Limitation ...................................................24

6.    West Bend's Proposed Construction for the Programmable Circuit Is Improperly Limited and Ambiguous ............................................................................27

IV.    CONCLUSION..............................................................................................................29

## TABLE OF AUTHORITIES

Page(s)

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
   365 U.S. 336 (1961)..................................................................................................3

*Bell Communications Research, Inc. v. Vitalink Communications Corp.*,
   55 F.3d 615 (Fed. Cir. 1995).....................................................................................10

*Burke, Inc. v. Bruno Indep. Living Aids, Inc.*,
   183 F.3d 1334 (Fed. Cir. 1999)..............................................................................4, 23

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
   388 F.3d 858 (Fed. Cir. 2004)....................................................................................5

*DeMarini Sports, Inc. v. Worth, Inc.*,
   239 F.3d 1314 (Fed. Cir. 2001)..................................................................................3

*Desper Prods., Inc. v. QSound Labs, Inc.*,
   157 F.3d 1325 (Fed. Cir. 1998)..................................................................................4

*Eaton Corp. v. Rockwell Int'l Corp.*,
   323 F.3d 1332 (Fed. Cir. 2003)............................................................................10, 11

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*,
   381 F.3d 1111 (Fed. Cir. 2004)..................................................................................2

*Interactive Gift Express, Inc. v. Compuserve, Inc.*,
   256 F.3d 1323 (Fed. Cir. 2001)..................................................................................6

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004)....................................................................................5

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996)....................................2, 4, 6

*McCarty v. Lehigh Valley R.R.Co.*,
   160 U.S. 110 (1895)..................................................................................................3

*Medrad, Inc. v. MRI Devices Corp.*,
   401 F.3d 1313 (Fed. Cir. 2005)..................................................................................3

*Merrill v. Yeomans*,
  94 U.S. 568 (1876).................................................................................................................3

*Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*,
  370 F.3d 1354 (Fed. Cir. 2004).............................................................................................4

*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
  133 F.3d 1473 (Fed. Cir. 1998).............................................................................................4

*NTP Inc. v. Research In Motion Ltd.*,
  418 F.3d 1282 (Fed. Cir. 2005)...........................................................................................10

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ......................................................2, 3, 4, 5, 6, 13, 21

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
  182 F.3d 1298 (Fed. Cir. 1999)......................................................................................10, 19

*Schumer v. Lab. Computer Sys., Inc.*,
  308 F.3d 1304 (Fed. Cir. 2002).............................................................................................5

*Spectra-Physics, Inc. v. Coherent, Inc.*,
  827 F.2d 1524 (Fed. Cir. 1987)...........................................................................................13

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*,
  375 F.3d 1341 (Fed. Cir. 2004) .............................................................................................4

*Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n*,
  366 F.3d 1311 (Fed. Cir. 2004).............................................................................................5

*V-Formation, Inc. v. Benetton Group SpA*,
  401 F.3d 1307 (Fed. Cir. 2005).............................................................................................3

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996)....................................................................................2, 3, 4, 5

*White v. Dunbar*,
  119 U.S. 47 (1886).................................................................................................................3

## I.    INTRODUCTION

Plaintiff, The Holmes Group, Inc., now known as Sunbeam, Inc., d/b/a/ Jarden Consumer Solutions, (hereinafter "Holmes") brought this action against Defendants West Bend Housewares, LLC and Focus Products Group, LLC (collectively referred to as "West Bend") for infringement of Holmes' U.S. Patent Nos. 6,573,483 and 6,740,855 ("the '483 patent" and "the '855 patent," respectively).  The Holmes patents relate to a structure and method of using a programmable slow-cooker appliance.  Subsequent to the market introduction of a programmable slow-cooker by Holmes covered by the Holmes patents, West Bend began marketing and selling programmable slow-cookers which Holmes contends infringe the '483 and '855 patents.

Holmes markets and sells its slow-cooker under the brand names Rival® Crockpot®. Holmes is the undisputed market leader in the slow-cooker appliance industry and has for decades provided customers with innovative, high-quality products.  While Holmes has long known great success in the sales of slow-cooker appliances, in the early 2000's, Holmes was the first in the industry to recognize the benefits of a programmable slow-cooker over traditional, mechanically controlled slow-cookers and bring such a product to market.

Mechanical slow-cookers provide the consumer with a choice of cooking temperatures, generally low and high and the appliance remains in a cooking mode until shut-off or unplugged. Holmes recognized the benefit of a programmable slow-cooker in which the consumer would have better control over the cooking process.  Several alternative designs for the programmable slow-cooker appliance are disclosed in the '483 and '855 patents.  Generally, the programmable slow-cooker covered by the Holmes patents permits the consumer to select a cooking time and temperature.  At the expiration of the set cooking time, the appliance automatically reduces

power to the heating element to place it in a keep warm mode.  Thus, the cooked food is

maintained at a serving temperature and prevents spoilage in the event the user is not available at

the end of the set cooking time to attend to the appliance.

The '483 and '855 patents also disclose and claim novel structure for cooling the

electrical circuit for the programmable slow-cooker.  However, Holmes has not asserted any

claims directed to the cooling feature in this lawsuit.

Through discussions, counsel for the parties have narrowed the number of claim

limitations which require construction by the Court.  A chart prepared by Holmes setting forth

the claim limitations at issue as well as its proposed construction is attached as Exhibit A.  West

Bend's chart identifying the claim limitations at issue and its proposed construction is attached as

Exhibit B.  The parties have agreed that the remainder of the claim limitations in the asserted

claims, both independent and dependent, do not require construction by the Court since there is

no dispute as to their meaning.

## II.    PRINCIPLES OF CLAIM CONSTRUCTION

It is a "bedrock principle" of patent law that "the claims of a patent define the invention

to which the patentee is entitled the right to exclude."  *Phillips v. AWH Corp*., 415 F.3d 1303,

1312 (Fed. Cir. 2005) (*en banc*), *citing Innova/Pure Water, Inc. v. Safari Water Filtration

Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004); *see also Vitronics Corp. v. Conceptronic,

Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("we look to the words of the claims themselves… to

define the scope of the patented invention"); *Markman v. Westview Instruments, Inc*., 52 F.3d

967, 980 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996) ("The written description part of

the specification itself does not delimit the right to exclude.  That is the function and purpose of

claims.")  The Supreme Court has made clear that the claims are "of primary importance, in the effort to ascertain precisely what it is that is patented."  *Merrill v. Yeomans*, 94 U.S. 568, 570 (1876).  The Court further held that since the patentee is required to "define precisely what his invention is" it is "unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms."  *White v. Dunbar*, 119 U.S. 47, 52 (1886); *see also McCarty v. Lehigh Valley R.R.Co*., 160 U.S. 110, 116 (1895) ("if we once begin to include elements not mentioned in the claim, in order to limit such claim,… we should never know where to stop"); *Aro Mfg. Co. v. Convertible Top Replacement Co*., 365 U.S. 336, 339 (1961) ("the claims made in the patent are the sole measure of the grant").

   The Federal Circuit has frequently followed the course set by the Supreme Court in holding that "the words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips*, 415 F.3d at 1312, citing *Vitronics*, 90 F.3d at 1582.  The Federal Circuit has also made clear that "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application.  *Id*. at 1313.  The person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification.  *Id*. *See also Medrad, Inc. v. MRI Devices Corp*., 401 F.3d 1313, 1319 (Fed. Cir. 2005); quoting *DeMarini Sports, Inc. v. Worth*, *Inc.,*  239 F.3d 1314, 1324 (Fed. Cir. 2001) ("We cannot look at the ordinary meaning of the term… in a vacuum.  Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."); *V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1310 (Fed. Cir. 2005) (intrinsic record "usually provides the technological and temporal context to enable the court to ascertain the meaning of the claim

to one of ordinary skill in the art at the time of invention"); *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1351 (Fed. Cir. 2004) (proper definition is the "definition that one of ordinary skill in the art could ascertain from the intrinsic evidence in the record").

The court examines the intrinsic record of the patent specification and the prosecution history. This "intrinsic evidence" provides the court with "the most significant source of the legally operative meaning of disputed claim language." *Vitronics*, 90 F.3d at 1582. When examining the intrinsic evidence, the court starts by looking to the words of the claims themselves. *Desper Prods., Inc. v. QSound Labs, Inc*., 157 F.3d 1325, 1333 (Fed. Cir. 1998). The specification serves as "a sort of dictionary, which explains the invention and may define terms used in the claims." *Markman*, 52 F.3d at 979. Thus, the specification is "always highly relevant to the claim construction analysis" and "it is the single best guide" to construing a claim. *Vitronics*, 90 F.3d at 1582. *See also Multiform Desiccants, Inc. v. Medzam, Ltd*., 133 F.3d 1473, 1478 (Fed. Cir. 1998) ("The best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history."); *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1360 (Fed. Cir. 2004) ("In most cases, the best source for discerning the proper context of claim terms is the patent specification wherein the patent applicant describes the invention."). However, "limitations cannot be read into the claims from the specification or the prosecution history." *Burke, Inc. v. Bruno Indep. Living Aids, Inc*., 183 F.3d 1334, 1340 (Fed. Cir. 1999). Moreover, it is not proper to limit the claimed invention to the preferred embodiment described in the specification. *Id*. at 1341.

Furthermore, other claims of the patent in question can also be valuable sources of enlightenment as to the meaning of a claim term. *Phillips*, 415 F.3d at 1314, citing *Vitronics*, 90 F.3d at 1582. Differences among claims can also be useful in understanding the meaning of

particular claim terms. For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim. *Phillips*, 415 F.3d at 1315; s*ee also Liebel-Flarsheim Co. v. Medrad, Inc*. 358 F.3d 898, 910 (Fed. Cir. 2004).

The prosecution history may also limit claim language to exclude any interpretation surrendered during the prosecution of the patent. *Schumer v. Lab. Computer Sys., Inc*., 308 F.3d 1304, 1313 (Fed. Cir. 2002). However, this can occur "only where the accused infringer can demonstrate that the patentee surrendered that interpretation 'with reasonable clarity and deliberateness.'" *Id*. (citation omitted). If the patent owner's "proffered interpretation is not inconsistent with what he argued during prosecution to obtain allowance[, then]…the prosecution history does not compel a limitation of the claim language different from its plain meaning…" *Id*. at 1314.

In order to determine the ordinary meaning of a claim term to one of skill in the art, the court may rely on extrinsic evidence such as dictionaries, technical treatises and the like available at the time the patent issued. *Vitronics*, 90 F.3d at 1584. However, the Federal Circuit has held that extrinsic evidence is "less significant than the intrinsic record in determining the 'legally operative meaning of disputed claim language.'" *C.R. Bard, Inc. v. U.S. Surgical Corp*., 388 F.3d 858, 862 (Fed. Cir. 2004), quoting *Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n*, 366 F.3d 1311, 1318 (Fed. Cir. 2004). Furthermore, when using a dictionary to construe claims, courts may not rely on dictionary definitions that are contrary to definitions found in the intrinsic evidence. *See Vitronics*, 90 F.3d at 1584 n.6 ("Judges…may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.").

If the meaning of the claim terms is apparent from the totality of the ordinary meaning and intrinsic evidence, then the claim has been construed and the use of extrinsic evidence (such as expert or inventor testimony) is not needed. *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1332 (Fed. Cir. 2001). Furthermore, "extrinsic evidence may never be used 'for the purpose of varying or contradicting the terms [of] the claims.'" *Id.*, *quoting Markman*, 52 F.3d at 981. Thus, extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence. *Phillips*, 415 F.3d at 1319.

## III.    CONSTRUCTION OF CLAIM LIMITATIONS IN DISPUTE

### A.    *Brief Description Of The Claimed Invention*

U.S. Patent No. 6,573,483 entitled "Programmable Slow-Cooker Appliance" issued on June 3, 2003, from an application filed on March 8, 2001. The application claimed priority to two provisional applications filed on March 15, 2000 and April 5, 2000. U.S. Patent No. 6,740,855 filed on March 11, 2003 is a continuation of the '483 patent, i.e., the specification and drawings are identical to that in the '483 patent, only the claims differ. The '855 patent issued on May 25, 2004.[1]

The claims at issue are Claims 13, 14, 17 and 19 of the '483 patent and Claims 20, 24, 26, 27 and 29 of the '855 patent. Only Claim 13 in the '483 patent and Claim 20 in the '855 patent are independent claims. The remainder of the claims are dependent, i.e., they include every limitation of the independent claim from which they depend as well as the limitations set forth

---

[1]  The parties have filed with the Court a Joint Appendix for Markman Briefing which includes copies of the patents at issue, their associated prosecution histories, and the references cited. Pages in the Joint Appendix have been consecutively numbered with the prefix "MKM". References to the Joint Appendix appear throughout the brief.

therein. The invention defined in the independent claims relate to a programmable slow-cooker

appliance as shown, for example, in Figure 7 of the '483 patent.



FIG. 7

MKM0007.

The programmable slow-cooker includes a heating unit 12 and a removable cooking unit

14 which is made of ceramic. MKM0014-0015; Col. 3, lines 8-12; Col. 2, lines 63-67. The

thermal and heat retaining properties of the ceramic cooking unit 14 allow it to conduct heat

from the heating chamber, providing an even heat to the food being cooked. The heating unit 12

has a bottom 16 and a continuous outer sidewall 18. The bottom 16 and an interior sidewall 17

define a well-like heating chamber 20. MKM0014; Col. 2, lines 38-40. The interior sidewall 17,

which is shown but not labeled in Fig. 7, consists of the upstanding wall extending vertically

from bottom 16 and spaced internally from the outer sidewall 18. Interior sidewall 17 is shown

in Fig. 11 (MKM0011) which illustrates the heating elements 24 in thermal contact with and wrapped around the interior sidewall 17 of the heating unit 12.

The programmable slow-cooker is provided with a programmable control 200 (see Fig. 4, MKM0004), which preferably includes a circuit board housing 210, a control panel 220, and an insulation shield 222 assembled together for attachment to the outer sidewall 18 of the heating unit 12.  The interior of the housing 210 contains a printed circuit board 254 containing electronic components.  MKM0015; Col. 3, lines 12-18.  The housing 210 preferably includes a control panel user interface 224 located on a front surface of the housing.  MKM0015; Col. 3, lines 19-21.

In operation, the user, through the control panel interface 224, sets both a time and temperature for cooking using the programmable circuitry 300 (Figs. 10 and 13).  MKM0010; MKM0013; MKM0016; Col. 5, lines 44-46.  After the user selects the desired settings, the slow-cooker appliance starts the cooking operation.  Once the time setting has expired, the slow-cooker appliance automatically reduces power to the heating element to put the unit in a keep warm mode of operation.  MKM0016; Col. 6, lines 8-19.

Other non-asserted claims in the '483 and '855 patents are directed to a structural configuration to prevent the programmable circuitry from being adversely affected by heat generated by the slow-cooker appliance.

### B.    Construction Of Limitations At Issue In Claim 13 Of The '483 Patent

Claim 13 of the '483 patent is set forth below:

> 13.  A method of using a programmable slow-cooker appliance, the method comprising:
>
> providing a food item;
>
> placing the food item into a cooking unit of the slow-cooker appliance;
>
> selecting a cooking temperature and time using a programmable controller mounted to a housing fixedly mounted to a heating unit; and
>
> changing the heating unit temperature automatically to a lower temperature after the selected time.

MKM0017; Col. 8, lines 26-36.

The parties have agreed that only several limitations require construction by the Court.

### l.    Holmes Construction of the "Programmable Slow-Cooker Appliance" Limitation

Plaintiff's contend that the first limitation to be construed is "a programmable slow-cooker appliance" which appears in the preamble of Claim 13 as well as providing antecedent basis for the element "the slow-cooker appliance" in the body of the claim.  Plaintiff's proposed claim construction is as follows:

*Claim 13 of the '483 Patent*

| *Claim Term* | *Plaintiff's Claim Construction* |
| --- | --- |
| a programmable slow-cooker appliance | A slow-cooker as commonly referred to in the cooking industry, namely a cooking device which is designed for cooking food at a constant, relatively low cooking temperature for a relatively long period of time, such as four to ten hours, the slow-cooker including a heating unit having a heating element provided within the heating unit and a ceramic cooking unit which fits within the heating unit, the slow-cooker being programmable to operate in a variety of different cooking modes and cooking times. |

Holmes contends that the preamble of Claim 13 is "necessary to give life, meaning, and vitality" to the claim. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999). The Federal Circuit has held that if the preamble helps to determine the scope of the patent claim, then it is construed as part of the claimed invention. *NTP Inc. v. Research In Motion Ltd.*, 418 F.3d 1282, 1305 (Fed. Cir. 2005) citing *Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995) ("[W]hen the claim drafter chooses to use *both* the preamble and the body to define the subject matter of the claimed invention, the invention so defined, and not some other, is the one the patent protects.")

Moreover, as is the case here, where the limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention. *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003). In Claim 13, the term "a programmable slow-cooker appliance" provides the antecedent basis for "the slow-cooker appliance" in the body of the claim. Accordingly, it is proper to consider the preamble in construing Claim 13 of the '483 patent.

Plaintiff's proposed claim construction relies on the general understanding of a slow-cooker appliance to those skilled in the art, namely a cooking device which is designed for cooking food at a constant, relatively low cooking temperature for a relatively long period of time. The '483 patent specification defines the major components of the slow-cooker appliance as including a heating unit having a heating element provided within the heating unit and a ceramic cooking unit which fits within the heating unit. (See e.g. MKM0014; Col. 2, lines 38-67). The "programmable" slow-cooker appliance adds the feature that the slow-cooker is programmable to operate in a variety of different cooking modes and cooking times. (See e.g. MKM0016-0017; Col. 5, line 44 - Col. 6, line 20). Plaintiff's proposed construction follows the Federal Circuit precedent and provides meaning to the claim based upon the invention described in the specification and should be adopted.

### 2. *West Bend's Contention that No Construction Is Necessary is in Error*

West Bend contends that the term "programmable slow-cooker appliance" appears only in the preamble and is not a claim limitation. West Bend is incorrect since the term "the slow-cooker appliance" relies upon the "programmable slow-cooker appliance" recited in the preamble for its antecedent basis. Thus, the terms in the preamble and body of the claim relate to the same "programmable slow-cooker appliance." *Eaton*, 323 F.3d at 1339. Accordingly, since West Bend does not offer any interpretation, Holmes proposed construction for the "programmable slow-cooker appliance" should be adopted.

### 3.    Holmes' Construction of the Limitation Related to the "Selecting" Step

The parties disagree on the interpretation of several aspects of the "selecting" step of Claim 13.  The step states:  "selecting a cooking temperature and time using a programmable controller mounted to a housing fixedly mounted to a heating unit."  MKM0017; Col. 8, lines 32-34.  The parties have agreed to break down the contested limitation into two parts as set forth below with Holmes proposed claim construction provided next to the claim language at issue:

### Claim 13 of the '483 Patent

| Claim Term | Plaintiff's Claim Construction |
|---|---|
| selecting a cooking temperature and time using a programmable controller | A programmable controller in the form of an electrical circuit including user actuated input devices and output devices which permits an operator to select a cooking temperature and cooking time. |
| a housing fixedly mounted to a heating unit | An enclosure affixed to the outer sidewall of a heating unit, the heating unit including an inner and outer sidewall and a bottom which defines a well-like heating chamber to support a cooking unit. |

Looking first to the selecting step using a programmable controller, Holmes proffers that its claim construction provides the limitation with its ordinary and customary meaning as would be understood by those skilled in the art in view of the teachings in the specification.  Specifically, Holmes asserts that the programmable controller is in the form of an electrical circuit including user activated input devices and output devices which permit an operator to select a cooking temperature and cooking time.  This construction is also supported by the specification which identifies the programmable circuitry 300 to include, among other electronic components, the user activated input devices in the form of buttons on a control panel which

activate switches in the programmable circuit as well as output devices such as the microprocessor, thermistor, and Triac.  MKM0016; Col. 5, lines 44-48.

The specification notes that the programmable circuit shown, in Figure 10 is in the form of a schematic diagram of the electronic circuitry and components.  MKM0015; Col. 4, lines 51-53.  The specification further states that "[t]he [schematic] diagram shows a preferred exemplary circuit incorporating preferred components as utilized in the preferred embodiment of the present invention.  One skilled in the art will recognize that the componentry illustrated herein is exemplary only and that many other components may be substituted to achieve the functions described herein."  MKM0015; Col. 4, lines 53-58.  The specification also states that while examples of the circuitry have been provided, "the circuitry may be implemented in numerous ways, as is well-known in the art, to accomplish the varying programming modes described."  MKM0016; Col. 5, lines 16-19.  Accordingly, the specification is clear as to the meaning of the "selecting" step using a programmable controller.

Nothing in the specification limits the programmable controller to any particular circuitry or components and no such limitations should be read into the claim.  The Federal Circuit has held that "[t]o avoid importing limitations from the specification into the claims, it is important to keep in mind that the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so."  *Phillips*, 415 F.3d at 1323.  *See also Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1533 (Fed. Cir. 1987).  Thus, no limitations should be read into this unambiguous claim language.

Holmes also notes that nothing in the prosecution history relates to any surrender of subject matter with respect to the step of selecting a cooking temperature and time using a programmable controller.

### 4. West Bend's Proposed Construction of the Programmable Controller Improperly Restricts the Claim Language

West Bend seeks to have the Court effectively restrict the construction of the programmable controller element which is used to select a cooking temperature and time to the microprocessor component of the programmable circuit. West Bend's proposed construction limits the programmable controller to: "an electrical circuit that is programmed by the user and controls the slow-cooker appliance in accordance with the user-selected cooking parameters. The programmable controller does not include the output and input devices such as the heating element, control panel, LED's, displays, buttons, and switches." See Exhibit B.[2] Thus, West Bend seeks to define the programmable controller by what it is not, rather than what it is. However, West Bend fails to identify all components which it contends are not part of the programmable controller using the ambiguous and meaningless language "such as" rather than definite language for its claim construction. In essence, it appears that West Bend contends that the programmable controller consists only of the microprocessor, a component of an electrical circuit, rather than an electrical circuit designed to accomplish a given task. Such a proposed construction is not supported by any intrinsic evidence.

Contrary to West Bend's proposal, neither the patent specification nor the file history limits the programmable controller to a microprocessor device, eliminating the remainder of the

---

[2]  West Bend has asserted that both the "programmable controller" in Claim 13 of the '483 patent and the "programmable circuit" in Claim 20 of the '855 patent be construed the same. The patent specification clearly identifies the programmable controller 200 and programmable circuit 300 as including different structure.

programmable circuit 300 as shown in the electrical schematics found in Figs. 10 and 13 of the '483 patent. To the contrary, the specification clearly states that it is the programmable circuit not merely the microprocessor which permits the user to select the cooking temperature and time. ("The programmable circuitry 300 allows the user to set both the temperature and desired time for cooking.") MKM0016; Col. 5, lines 44-46). In fact, it would not be possible to operate the microprocessor in a vacuum without the suitable input components, output components and interrelated circuitry.

Furthermore, the specification identifies that the programmable control 200, includes, among other things a circuit board housing 210 which contains "a printed circuit board 254 (shown in Fig. 7) containing electronic components of the control." MKM0015; Col. 3, lines 12-18. Thus, any attempt to restrict the claim limitation to only one component of the programmable circuit, the microprocessor, is in direct conflict with the plain and ordinary meaning a person of ordinary skill in the art would glean from the claim language when viewed in the context of the specification.

### 5.    *Holmes' Proposed Construction for "A Housing Fixedly Mounted to a Heating Unit"*

Holmes proffers that the limitation of "a housing fixedly mounted to a heating unit" be construed as:

> an enclosure affixed to the outer sidewall of the a heating unit, the heating unit including an inner and outer sidewall and a bottom which defines a well-like heating chamber to support a cooking unit.

The '483 patent specification describes the programmable control 200 as including a circuit board housing 210. The interior of the housing 210 contains a printed circuit board 254

containing electronic components.  MKM0015; Col. 3, lines 12-18.  Thus, the housing provides an enclosure for some of the components of the programmable control 200.

With respect to the heating unit, the specification describes and illustrates in the Figures a heating unit 12 which includes inner 17 and outer 18 sidewalls and a bottom 16 such that the bottom and interior sidewall define a well-like heating chamber 20 to support a cooking unit 14.  MKM0014; Col. 2, lines 34-60.  As discussed with respect to the "programmable slow-cooker appliance" limitation, the cooking unit 14 is made of ceramic to achieve good heat conduction and provide even heating during the relatively long cooking time.  Thus, from a reading of the claim in the context of the specification, Holmes proffers that the customary and ordinary meaning should be accorded this claim limitation, i.e., that the housing is affixed to the outer sidewall of the heating unit.

In the prosecution of the '483 patent, the examiner issued a first Office Action rejecting Claims 1-7, 9, 11, 12 and 13 as being anticipated by U.S. Patent No. 3,904,852 to Rivelli, et al. ("Rivelli").  MKM0072-0075.  The Office Action also rejected Claims 8, 10 and 14-19 as being obvious over Rivelli in view of U.S. Patent No. 6,196,113 to Yung ("Yung").  In response to the first Office Action, Holmes did not amend the claims but merely traversed the rejections and requested they be withdrawn.  See MKM0081-0083.

In response, the examiner issued a second Office Action, again rejecting all pending Claims 1-19.  MKM0089-0091.  Holmes amended Claim 13 in response to the second Office Action to add the term "fixedly" mounted.  In the remarks, Holmes stated that none of the cited references in the Office Action "describe a housing for a programmable controller fixedly mounted to the outside of the heating unit."  MKM0095.  Furthermore, Holmes argued that the

- 16 -

combination of cited references (failed to describe nor suggest the claim inventions. "While Rivelli and Yung disclose controllers mounted to a single housing, Skutt discloses a kiln in which a controller is not fixedly mounted on the outside of the kiln, but is connected via hinges… Therefore, even an improper combination does not describe or suggest the claimed invention, including a controller housing mounted fixedly to the outside of the heating unit." MKM0096. Thus, Holmes proposes that the limitation, although not specifically stated in the claim, should be construed such that the housing is affixed to the outer sidewall of the heating unit, i.e., the outside of the heating unit, as set forth in the prosecution history. Holmes proposed construction also considers that the housing, although affixed to the outer sidewall, is not limited to be mounted exclusively to an outside surface. Thus, the housing may be affixed to either an interior surface or exterior surface of the outer sidewall of the heating unit, or both. Nothing in either the specification or the prosecution history limit the claim to be construed to only permit attachment to an outside surface as will be discussed below with respect to West Bend's proposed construction.

### 6.    *West Bend's Construction for the Housing Mounted to the Heating Unit Improperly Adds Limitations Not Present*

With respect to the housing being fixedly mounted to a heating unit, West Bend offers that the housing must be attached so that it is located on the outside of the heating unit. While certain statements were made in the prosecution history which distinguished the claims from the prior art, Holmes vigorously disputes that West Bend's proposed construction adequately construes the claim limitation in a meaningful way. Specifically, it is unclear and ambiguous as to what is meant by "the housing mounted to and located on the outside of the heating unit." Must the entire housing be entirely outside or can a portion of the housing extend through the sidewall to the interior of the heating unit as specifically shown and described in the '483 patent?

- 17 -

Holmes contends that a proper construction must account for the fact that a portion of the housing may be located within and to the inside the outer sidewall of the heating unit. Figure 7 and the text in the specification clearly show that flange 246 extends into the outer sidewall 18 of the heating unit 12 to allow passage of control and power wiring between the interior of the heating unit 12 and the interior of the housing 210. MKM0015; Col. 4, lines 5-10. A proper construction must consider the teaching in the specification regarding a portion of the housing extending into the interior of the heating unit. Thus, West Bend's construction is flawed and the Court should adopt Holmes' proposed construction to avoid the mischief of a vague and ambiguous claim construction.

### C.    Construction Of Limitations At Issue In Claim 20 Of The '855 Patent

The parties have agreed that only a few claim limitations in Claim 20 of the '855 patent require construction by the Court. A chart providing Holmes' proposed claim constructions appears in Exhibit A and West Bend's proposed construction is set forth in Exhibit B. Claim 20 of the '855 patent states:

> 20. A programmable slow-cooker appliance comprising:
>
> a heating unit including a bottom and a continuous sidewall extending from said bottom, said bottom and said continuous sidewall defining a well-like chamber, said continuous sidewall including an outer sidewall and an interior sidewall;
>
> a heating element mounted to said heating unit and disposed between said outer sidewall and said interior sidewall;
>
> a housing fixedly mounted to and projecting outside said continuous sidewall of said heating unit;
>
> a programmable circuit positioned within said housing and configured to automatically switch said heating element from a cook mode to a lower temperature warm mode at the end of a set cooking time;

- 18 -

a control panel mounted to said housing and including a user interface
connected to said programmable circuit for selecting a cooking
temperature and cooking time; and

a cooking unit removably positioned in said well-like chamber.

MKM0137; Col. 9, lines 17-38.


### 1.    *Holmes' Construction for the Programmable Slow-Cooker Appliance Limitation*

Similar to Claim 13 of the '483 patent, Claim 20 of the '855 includes in the preamble the

term "a programmable slow-cooker appliance."  While the preamble does not provide an

antecedent basis for the term in the body of the claim, Holmes proffers that the preamble

limitation should be construed by the Court since it breathes life and meaning to the claim.

*Pitney Bowes*, 182 F.3d t 1305.  In order to fully understand the metes and bounds of the claim, it

must be considered in the context of the invention.  The Holmes '855 patent is specifically

directed to a programmable slow-cooker appliance which has a certain meaning to those skilled

in the art.  Thus, the preamble term "programmable slow-cooker appliance" should form a part

of the claimed subject matter.  Holmes proposed construction is as follows:


**Claim 20 of the '855 Patent**

| **Claim Term** | **Plaintiff's Claim Construction** |
|---|---|
| a programmable slow-cooker appliance | A slow-cooker as commonly referred to in the cooking industry, namely a cooking device which is designed for cooking food at a constant, relatively low cooking temperature for a relatively long period of time, such as four to ten hours, the slow cooker including a heating unit including a heating element provided within the heating unit and a ceramic cooking unit which fits within the heating unit, the slow cooker being programmable to operate in a variety of different cooking modes and cooking times. |

Therefore, by viewing the term in the context of the specification and to distinguish over traditional, mechanical slow-cookers as understood by those skilled in the art, Holmes proffers that the "programmable slow-cooker appliance" defines a structure as set forth above.

### 2.    West Bend Contends the Preamble is Not a Claim Limitation

West Bend has taken the position that the preamble is not a claim limitation which the Court need interpret. For the reasons stated above, Holmes believes that the preamble should be considered as a claim limitation and that its construction should be adopted.

### 3.    Holmes' Construction for the Limitation of a Housing Fixedly Mounted to the Heating Unit

Claim 20 of the '855 patent is an apparatus claim which defines certain structure and their relationships. The parties could not reach agreement on the construction of the limitation related to the orientation of the housing. Holmes proposed construction is as follows:

*Claim 20 of the '855 Patent*

| Claim Term | Plaintiff's Claim Construction |
|---|---|
| a housing fixedly mounted to and projecting outside said continuous sidewall of said heating unit | An enclosure affixed to the outer sidewall of the heating unit and extending at least beyond an outer surface of the sidewall of the heating unit. |

Holmes proposes that the claim terms be given their ordinary and customary meanings. For example, the housing should be construed to be an enclosure and the limitation that the housing project outside the sidewall of the heating unit should be construed as the enclosure extending at least beyond an outer surface of the sidewall of the heating unit. This limitation should not be construed to require that the entire housing project from the outer surface of the heating unit. The specification and drawings clearly illustrate and describe that the preferred

housing includes a portion which extends through the outer sidewall and into the interior of the heating unit.  In the described preferred embodiment, the housing includes a circuit board housing 210, a control panel 220 located on a front surface of the housing and an insulation shield 222 forming the rear of the housing.  As shown in Figure 7, the shield 222 includes a rearwardly projecting cylindrical flange 246 that extends into the outer sidewall 18 of the heating unit 12 to allow passage of control and power wiring between the interior of the heating unit 12 and the interior of the housing 210.  MKM0134; Col. 4, lines 9-14.

Further support for a claim construction wherein the housing only needs a portion extending beyond the outer sidewall of the heating unit is provided by dependent Claim 29, which depends from Claim 20.  Claim 29 states as follows:

> 29.  A programmable slow-cooker appliance as described in Claim 20 wherein said housing includes a thermoplastic portion **adjoining and extending into** said continuous sidewall of said heating unit.  (emphasis added).

MKM0137; Col. 10, lines 6-9.

In view of the scope of dependent Claim 29, it would clearly be improper to construe the housing limitation of Claim 20 to be limited to being located entirely outside the heating unit.  Such a construction would render Claim 29 meaningless in contrast to the controlling law which gives rise to a presumption that the limitation set forth in the dependent claim is not present in the independent claim.  *See e.g., Phillips*, 415 F.3d at 1315.

With respect to the prosecution history, amendments to the claim included adding the term "fixedly" mounted and that the housing "projects outside" the sidewall of the heating unit. Issued Claim 20 was Claim 53 during the prosecution of the '855 patent.  The only remark in the

amendment related to the housing was in distinguishing the Rivelli reference.  Holmes stated that Rivelli "does not have applicability to slow cookers" and that "the module 26 having the circuit board is mounted within the compartment rather than projecting from an outer sidewall as described in the independent claims of the present application."  MKM0251.  Accordingly, no subject matter was expressly surrendered in the prosecution history with respect to the mounting of the housing to the heating unit which would prohibit a portion extending into the heating unit.

The remarks with respect to Claim 20 were specifically directed to the fact that none of the references suggest "to provide a warming mode following a cooking mode in a slow cooker as recited."  MKM00253.  Furthermore, the remarks make clear that Claim 53 (issued Claim 20) as well as claims 64 and 70 (issued Claims 31 and 37, respectively) "are directed to slow cookers that are caused to automatically switch from a cook mode to a lower temperature warm mode at the end of a set cooking time.  Ventilation of the housing for a programmable circuit is not an element of Claim 53 [issued Claim 20] or 70, though a vent is required in dependent Claims 54, 61, 72 and 73."  MKM0252.  Thus, both the prosecution history and the specification as well as the unambiguous claim language mandate a construction in which the housing is an enclosure extending at least beyond an outer surface of the sidewall of the heating unit, without further limitation.

In response to the amendment filed by Holmes, the examiner issued a Notice of Allowability and Notice of Allowance and Issue Fee Due.  MKM0279-0283.  In the Notice of Allowability, the examiner made the following statement of reasons for allowance:  "the prior art of record does not teach:... as per Claims 53 (issued Claim 20)-75 use of a separate control housing of thermoplastic material which projects outward from the sidewall and is fixedly mounted to control the slow cooker."  MKM0280.  Accordingly, the examiner did not restrict the

housing from being partially within the heating unit but having a portion extending beyond the sidewall. Nor did the examiner restrict the claim to a housing located entirely outside the heating unit. Thus, Holmes' proposed construction using the ordinary and customary meaning of the claim limitations at issue should be adopted.

### 4. *West Bend Improperly Construes the Limitation of the Housing Mounted to the Heating Unit*

West Bend proffers that the limitation related to mounting of the housing be construed as: a housing "mounted to and projecting from the outside of the heating unit." See Exhibit B. It appears that the parties agree that at least a portion of the housing must extend or project beyond the outer surface of the sidewall of the heating unit. Holmes proposed claim construction provides the requisite detail to avoid ambiguities in the ultimate construction by the Court.

West Bend also appears to seek a construction such that the housing be "mounted" outside the heating unit. Holmes contends that such language is not used in the claims, specification or prosecution history and is unclear for purposes of claim construction. It appears that West Bend's construction seeks to have the entire housing mounted outside of the heating unit. As discussed above, such a construction would render dependent Claim 29 meaningless and would also be contrary to the teachings in the specification. Furthermore, the claim does not restrict the mounting of the housing to an exterior surface. Holmes contends that the housing may be mounted to either the outside surface, inside surface, or both of the outer sidewall. To construe the claim otherwise, would entail impermissible reading of limitations from the specification and prosecution history into the claim. *Burke*, 183 F.3d at 1340. Accordingly, for the reasons set forth above, the Court should adopt Holmes' clear and unambiguous proposed construction.

     **5.**     *Holmes' Proposed Construction of the Programmable Circuit Limitation*

Holmes proposed claim construction is as follows:

### Claim 20 of the '855 Patent

| <u>Claim Term</u> | <u>Plaintiff's Claim Construction</u> |
|---|---|
| a programmable circuit positioned within the housing and configured to automatically switch said heating element from a cook mode to a lower temperature warm mode at the end of a set cooking time | A circuit including an assemblage of electronic components which allows the user to program both the temperature and desired time for cooking and which can automatically change the heating element from a cooking mode to a warm mode once a set cooking time has expired, the circuit being positioned within the enclosure in that at least a portion of the circuit resides in the enclosure. |

The programmable circuit is designed to permit the user to program both a time and temperature for cooking as well as be configured to automatically switch the heating element from a cook mode to a lower temperature keep warm mode at the expiration of a set cooking time. The programmable circuit is described in the specification with reference to an electrical schematic. The '855 patent includes two alternative programmable circuits (Fig 10 and Fig. 13 which are reproduced below) and also notes that the selected components of the circuit are merely exemplary. MKM0134; Col. 4, lines 53-60. See also MKM0135; Col. 5, lines 18-21 ("Note that while examples are given, the circuitry may be implemented in numerous ways, as is well-known in the art to accomplish the varying programming modes described below.")



FIG. 10

MKM0129.



FIG. 13

MKM0132.

The electrical circuit includes input devices in the form of push-button switches, (S1, S2, 227, 229, 231, 233), displays in the form of LED's (D3-D8), or a digital display (57), a microprocessor (303), a thermistor (310) and a Triac (304), among other electronic components (resistors, capacitors, diodes, etc). The specification also states that some components of the programmable circuit are connected externally of the circuit board. For example, the specification states, "[t]he temperature of the cooking appliance is measured using a thermistor 310, which is connected externally of the circuit board to the underside of the bottom of the heating chamber." MKM0135; Col. 5, lines 22-25. Similarly, the Triac 304, which switches power applied to the heating elements is preferably "mounted separately to one of the mounting holes... of the heat sink 256." MKM0135; Col. 5, lines 29-38; MKM0129, 0130 and 0132; Figures 10, 11 and 13. The specification further states that "[m]ost of the other components of the circuit 300 are mounted on a conventional printed circuit board 254." MKM0135; Col. 5, lines 38-40. Thus, the specification clearly contemplates that some components of the programmable circuit may be provided within the housing while other components may be mounted external to the housing, and that the disclosed preferred embodiments are only examples. Therefore, a proper claim construction will clearly define that only a portion of the programmable circuit be positioned within the housing.

No discussion of this limitation is provided in the prosecution history. Accordingly, the Court should look to the ordinary meaning of the claims, read in the context of the clear discussion of the programmable circuit set forth in the specification. Thus, Holmes' proposed construction should be adopted.

### 6.    West Bend's Proposed Construction for the Programmable Circuit Is Improperly Limited and Ambiguous

West Bend seeks a claim construction for the programmable circuit limitation which ignores the teachings in the specification and conflates the ordinary meaning of the claim terms. West Bend's construction provides that the programmable circuit is:  "an electrical circuit that is programmed by the user and controls the slow cooker appliance in accordance with the user-selected cooking parameters.  The programmable circuit does not include the output and input devices such as the heating element, control panel, LED's, displays, buttons, and switches.  The circuit, not just a portion of the circuit, resides in the housing."  See Exhibit B.

West Bend's proposed construction is fundamentally flawed since it is vague and ambiguous.  West Bend attempts once again to define the claim limitations by what it does not include, rather than an affirmative recitation of the parts of the circuit which are included.  West Bend's use of "such as" to list excluded components is open ended and, through discussions with counsel for West Bend, not an exhaustive list.  Thus, it is unclear what constitutes the proposed circuit by West Bend.

Furthermore, West Bend's proposed construction cannot accomplish the clear and unambiguous functions defined in the claim, namely, programming a cooking time and temperature and automatically switching from a cook mode to a lower temperature warm mode at the end of a set cooking time.  By excluding components of the circuit, such as the heating element, control panel, LED's, displays, buttons, and switches, as well as potentially other components such as the Triac and thermistor, the portion of the circuit that remains cannot accomplish the functions of setting a cooking time and temperature nor automatically switching from a cooking mode to a warm mode at the end of a preset cooking time.

Moreover, West Bend's proposed construction ignores the specific teachings to the skilled artisan set forth in the specification regarding the claimed programmable circuit. The specification makes clear that the programmable circuit 300 includes an assemblage of electronic components to accomplish the stated functions. MKM0134-0136; Col. 4, lines 51 - Col. 7, line 23. West Bend identifies in its claim construction a "circuit". However, by excluding components of the described circuit, a circuit no longer exists. By its very nature, an electrical circuit must be complete or it cannot work. West Bend's construction is clearly improper since it does not define an electrical circuit.

Contrary to the specification, West Bend further seeks to construe the programmable circuit as entirely residing within the housing. As discussed above in support of Holmes' proposed construction, the specification clearly describes and contemplates that some components of the programmable circuit may be externally mounted. Additionally, the specification states that "most" not all, of the components of the programmable circuit 300 are mounted on a circuit board. MKM0135; Col. 5, lines 38-40. Thus, a proper construction of the programmable circuit provided within the housing will take into consideration these unambiguous teachings from the specification that only a portion of the circuit be provided in the housing.

West Bend's proposed construction is also vague by relying on an undefined circuit and contrary to the teaching in the patent as stated above in requiring "the circuit, not just a portion of the circuit" to reside in the housing. Thus, West Bend's construction does not affirmatively state which components of the circuit reside in the housing and is ambiguous. Accordingly, in order to avoid further need for additional claim construction, the Court should reject West

Bend's proposal and adopt Holmes' proposed construction for the limitations related to the programmable circuit.

**CONCLUSION**

For the foregoing reasons, the Court should adopt Holmes' proffered claim construction which is supported by the intrinsic evidence in accordance with the controlling legal authority.

Respectfully submitted,

THE HOLMES GROUP, INC.
By its Attorneys,

Dated:  September 5, 2006

/s/ Charles R. Hoffmann
Charles R. Hoffmann, Esq. (*Pro Hac Vice*)
CRHDocket@hoffmannbaron.com
Glenn T. Henneberger, Esq. (*Pro Hac Vice*)
GTHDocket@hoffmannbaron.com
Hoffmann & Baron, LLP
6900 Jericho Turnpike
Syosset, New York  11791-4407
Telephone:  (516) 822-3550
Facsimile:  (516) 822-3582

and

Nicholas J. Nesgos (BBO No. 553177)
nnesgos@pbl.com
Joseph W. Corrigan (BBO No. 647393)
jcorrigan@pbl.com
Posternak Blankstein & Lund LLP
Prudential Tower, 800 Boylston Street
Boston, Massachusetts  02199-8004
Telephone:  (617) 973-6100

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on September 5,

2006.

/s/ Glenn T. Henneberger
                Glenn T. Henneberger

# EXHIBIT A

# HOFFMANN & BARON, LLP

ATTORNEYS AT LAW

6900 JERICHO TURNPIKE

SYOSSET, NEW YORK 11791-4407

(516) 822-3550

FACSIMILE (516) 822-3582

www.hoffmannbaron.com

CHARLES R. HOFFMANN
RONALD J. BARON
DANIEL A. SCOLA, JR.*
SALVATORE J. ABBRUZZESE*
ALAN M. SACK

STEVEN T. ZUSCHLAG†

SUSAN A. SIPOS
KEVIN E. MCDERMOTT
RODERICK S.W. TURNER
ANNA-LISA GALLO
JAMES F. HARRINGTON
STEPHEN CANNAVALE*
JAMIE M. LARMANN*
GORDON F. BELCHER

IRVING N. FEIT
R. GLENN SCHROEDER
GLENN T. HENNEBERGER
ANTHONY E. BENNETT
LUDOMIR A. BUDZYN

JOHN S. SOPKO†*

ANDREA M. WILKOVICH*
BARTHOLOMEW J. DIVITA
TONY A. GAYOSO
D.W. DARREN KANG*
NICHOLE E. MARTIAK
LAUREN T. EMR
LINDA D. CHIN

NEW JERSEY OFFICE
1055 PARSIPPANY BLVD.
PARSIPPANY, N.J. 07054-1272
(973) 331-1700
FAX (973) 331-1717

SCIENTIFIC ADVISOR
DANIEL A. SCOLA, SR., Ph.D.

* NOT ADMITTED IN N.Y.
† SENIOR ATTONEY

PATENT AGENTS

GLORIA K. SZAKIEL, Ph.D.    EDNA I. GERGEL, Ph.D.

September 1, 2006

**VIA E-MAIL ONLY**

Joseph T. Miotke, Esq.
Michael Best & Friedrich LLP
100 E. Wisconsin Avenue
Suite 3300
Milwaukee, Wisconsin 53202-4108

Re:    *The Holmes Group v. West Bend Housewares, et al.*
       Civil Case No.: 1:05-CV-11367-WGY

Dear Joe:

Below is Plaintiff's finalized claim construction chart identifying the limitations which we believe the Court needs to construe based upon our discussions to narrow the claim construction issues. In view of our discussions, the remainder of the asserted claim limitations do not require construction by the Court since the parties do not have any disagreement as to their meaning.

### *Claim 13 of the '483 Patent*

| *Claim Term* | *Plaintiff's Claim Construction* |
|---|---|
| a programmable slow-cooker appliance | A slow-cooker as commonly referred to in the cooking industry, namely a cooking device which is designed for cooking food at a constant, relatively low cooking temperature for a relatively long period of time, such as four to ten hours, the slow-cooker including a heating unit having a heating element provided within the heating unit and a ceramic cooking unit which fits within the heating unit, the slow-cooker being programmable to operate in a variety of different cooking modes and cooking times. |

Joseph T. Miotke, Esq.
September 1, 2006
Page 2

| *Claim Term* | *Plaintiff's Claim Construction* |
|---|---|
| selecting a cooking temperature and time using a programmable controller | A programmable controller in the form of an electrical circuit including user actuated input devices and output devices which permit an operator to select a cooking temperature and cooking time. |
| a housing fixedly mounted to a heating unit | An enclosure affixed to the outer sidewall of a heating unit, the heating unit including an inner and outer sidewall and a bottom which defines a well-like heating chamber to support a cooking unit. |

**Claim 20 of the '855 Patent**

| *Claim Term* | *Plaintiff's Claim Construction* |
|---|---|
| a programmable slow-cooker appliance | A slow-cooker as commonly referred to in the cooking industry, namely a cooking device which is designed for cooking food at a constant, relatively low cooking temperature for a relatively long period of time, such as four to ten hours, the slow cooker including a heating unit including a heating element provided within the heating unit and a ceramic cooking unit which fits within the heating unit, the slow cooker being programmable to operate in a variety of different cooking modes and cooking times. |
| a housing fixedly mounted to and projecting outside said continuous sidewall of said heating unit | An enclosure affixed to the outer sidewall of the heating unit and extending at least beyond an outer surface of the sidewall of the heating unit. |
| a programmable circuit positioned within the housing and configured to automatically switch said heating element from a cook mode to a lower temperature warm mode at the end of a set cooking time | A circuit including an assemblage of electronic components which allows the user to program both the temperature and desired time for cooking and which can automatically change the heating element from a cooking mode to a warm mode once a set cooking time has expired, the circuit being positioned within the enclosure in that at least a portion of the circuit resides in the enclosure. |

Joseph T. Miotke, Esq.
September 1, 2006
Page 3 _____

     Please provide me with West Bend's finalized claim construction chart as soon as possible.

Sincerely,

Glenn T. Henneberger

GTH:ejw
226296_1

# EXHIBIT B



**Michael Best & Friedrich LLP**
**Attorneys at Law**
100 East Wisconsin Avenue
Suite 3300
Milwaukee, WI  53202-4108
Phone  414.271.6560
Fax  414.277.0656

**Joseph T. Miotke**
Direct  414.225.4976
Email  jtmiotke@michaelbest.com

September 1, 2006

**VIA EMAIL**

Glenn T. Henneberger, Esq.
HOFFMANN & BARON, LLP
6900 Jericho Turnpike
Syosset, NY  11791-4407

Re:    The Holmes Group, Inc. v. West Bend Housewares, LLC and
        Focus Products Group, LLC
        Civil Action No. 05-CV-11367 WGY
        File No. 095511-9088

Dear Glenn:

Below is West Bend's final claim construction chart identifying the limitations we believe the
Court needs to construe based upon our discussions.

### Claim 13 of the '483 Patent

| Claim Term | West Bend's Proposed Interpretation |
|---|---|
| Programmable slow-cooker appliance | The term "programmable slow-cooker appliance" as it appears in the preamble is not a claim limitation which the Court need interpret. |
| programmable controller | An electrical circuit that is programmed by the user and controls the slow cooker appliance in accordance with the user-selected cooking parameters.  The programmable controller does not include the output and input devices such as the heating element, control panel, LEDs, displays, buttons, and switches. |
| fixedly mounted to a heating unit | Mounted to and located on the outside of the heating unit. |



Glenn T. Henneberger, Esq.
September 1, 2006
Page 2

### Claim 20 of the '855 Patent

| Claim Term | West Bend's Proposed Interpretation |
|---|---|
| Programmable slow-cooker appliance | The term "programmable slow-cooker appliance" appears only in the preamble and is not a claim limitation which the Court need interpret. |
| fixedly mounted to and projecting outside the heating unit | Mounted to and projecting from the outside of the heating unit. |
| programmable circuit | An electrical circuit that is programmed by the user and controls the slow cooker appliance in accordance with the user-selected cooking parameters.  The programmable circuit does not include the output and input devices such as the heating element, control panel, LEDs, displays, buttons, and switches. |
| circuit positioned within said housing | The circuit, not just a portion of the circuit, resides in the housing. |

Sincerely,

**MICHAEL BEST & FRIEDRICH LLP**

Joseph T. Miotke