# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

THE HOLMES GROUP, INC.,     :
       :
   Plaintiff/Counterclaim-Defendant,  :     Civil Action No.  1: 05-CV-11367 WGY
       :     (Alexander, M.J.)
       v.       :
       :
WEST BEND HOUSEWARES, LLC and  :
FOCUS PRODUCTS GROUP, L.L.C.,  :
       :
   Defendants/Counterclaim-Plaintiffs. :

## LOCAL RULE 56.1 CONCISE STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED IN SUPPORT OF HOLMES' MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT OF WEST BEND'S DESIGN PATENTS

Charles R. Hoffmann, Esq. (*Pro Hac Vice*)
CRHDocket@hoffmannbaron.com
Glenn T. Henneberger, Esq. (*Pro Hac Vice*)
GTHDocket@hoffmannbaron.com
Alan M. Sack, Esq. (*Pro Hac Vice*)
AMSDocket@hoffmannbaron.com
Hoffmann & Baron, LLP
6900 Jericho Turnpike
Syosset, New York 11791

and

Nicholas J. Nesgos (BBO No. 553177)
nnesgos@pbl.com
Joseph W. Corrigan (BBO No. 647393)
jcorrigan@pbl.com
Posternak Blankstein & Lund LLP
Prudential Tower, 800 Boylston Street
Boston, Massachusetts  02199-8004
Telephone:  (617) 973-6100
Facsimile:  (617) 367-2315

*Attorneys for Plaintiff*

December 1, 2006

Pursuant to Local Rule 56.1, Plaintiff/Counterclaim Defendant The Holmes Group, Inc.

("Holmes") submits the following statement of material facts as to which there is no genuine

issue to be tried and which support Holmes' Motion for Summary Judgment of non-infringement

of the West Bend design patents.

## I.    INTRODUCTION

1.    Holmes Group, Inc. ("Holmes") filed a Complaint against West Bend

Housewares, LLC ("West Bend") and Focus Products Group, LLC ("Focus") on June 28, 2005

alleging infringement of U.S. Patent No. 6,573,483 ("the '483 patent") and U.S. Patent No.

6,740,855 ("the '855 patent"), both owned by Holmes.[1]

2.    Focus filed its Answer to Complaint and Counterclaim on August 24, 2005.  West

Bend filed its Answer to Complaint and Counterclaim on August 24, 2005.  Count V of West

Bend's counterclaim alleged that "certain slow-cooker appliances" sold by Holmes infringe

design patents owned by West Bend without specifically identifying which of Holmes slow-

cookers were at issue.  (Exhibit E)[2]

3.    Holmes markets and sells its slow-cooker units under the brand names Rival®

and Crockpot®.  (Exhibit T)

4.    Holmes has obtained numerous patents on its slow-cooker technology, including

the Letters Patents at issue in this suit related to programmable slow-cookers as well as design

---

[1]  Subsequent to the filing of this lawsuit, The Holmes Group, Inc. was purchased by and merged into Jarden
Corporation under the name JCS/THG, LLC d/b/a The Holmes Group.  Jarden Corporation later merged
JCS/THG, LLC into Sunbeam, Inc. d/b/a Jarden Consumer Solutions, which is referred to in this motion as
"Holmes."
[2]  Exhibits referred to herein are attached to the Declaration of Glenn T. Henneberger (Exhibits A-R) and the
Declaration of Charles L. Mauro Declaration (Exhibits S and T) filed concurrently herewith.

Patent Nos. Des 429, 596 ("the '596 patent") and Des 434,940 ("the '940 patent") both entitled

"Slow Cooker." (Henneberger Decl., Exhibits J and K, respectively). These design patents

owned by Holmes are directed to oval-shaped slow-cookers and are prior art to all three of the

design patents now being asserted by West Bend.

5.      The '596 and '940 patents owned by Holmes show all of the basic components of

an oval slow cooker, including a rounded off rectangular-shaped heating unit, a translucent lid

with a knob, a cooking vessel having a lip which includes outwardly flared end handles at

opposite ends thereof, the cooking vessel lip being supported on an upper edge of the heating

unit, handles attached to each side of the heating unit, and feet that raise the heating unit up off

of a supporting surface. Figures 1 and 2 of the Holmes '596 patent are shown below:



Exhibit J.

6.      Furthermore, in the Spring of 1997, Holmes sold a slow-cooker Model No. 3755

HG covered by the '596 and '940 patents. (Henneberger Decl., ¶ 13). A photograph of a front

elevation view, top plan view and bottom plan view are shown below:

 



7.    West Bend initially asserted that two models of slow-cookers infringed the West Bend design patents which cover separate ornamental aspects of a single slow-cooker design, i.e., the primary design in all three patents are the same, only minor details as will be discussed below are different among the three patents. (Henneberger Decl., ¶ 6, 7, Exhibit F). By way of an expert report dated November 3, 2006 and supplemental interrogatory responses, West Bend now identifies thirty-four (34) allegedly infringing models of slow-cookers sold by Holmes. These model numbers are set forth in Exhibit 6 of the Expert Report of Cooper C. Woodring, an expert witness retained by West Bend in the field of industrial design. (Henneberger Decl., ¶ 8, Exhibit G).

8.    The named inventors, William Dobson and Scott Pollnow testified during depositions conducted on November 28, 2006 that the accused Holmes products were different in all respects, i.e., shape of heating unit and cooking vessel, shape of knob, shape of cooking vessel lip and shape and arrangement of feet, to the claimed designs. (Exhibits N and O).

9.      The design patents asserted by West Bend include:  U.S. Patent No. Des 434,266 ("the '266 patent"); U.S. Patent No. D444,993 ("the '993 patent") and U.S. Patent No. D444,664 ("the '664 patent") (collectively referred to herein as "West Bend patents-in-suit").  (Exhibits A, B and C, respectively).  The parent patent from which the West Bend patents-in-suit make a claim of priority, U.S. Patent No. Des. 425,360 has not been asserted by West Bend. (Henneberger Decl., ¶ 2, Exhibit D).

10.      Slow-cookers are manufactured in several shapes and sizes and are manufactured with different shaped lids, handles and knobs.  Photographs or catalog sheets depicting the accused Holmes slow-cookers are attached to the Mauro Decl., Exhibits T1 through T34.

## II.     THE WEST BEND PATENTS-IN-SUIT
### A.     The '993 Patent
#### 1.     The '993 File History

11.      U.S. Design Patent No. D444,993 is entitled "Cooker" and issued from an application filed on March 28, 2000, claiming priority to an earlier filed patent application which is not asserted by West Bend.  The prior art cited during the application is listed on the front of the patent.  (Exhibit A).  The prosecution history was generally uneventful other than a request by the PTO to file a terminal disclaimer disclaiming the terminal part of any patent granted on the application that would extend beyond the expiration date of the then issued '266 patent or on a patent granted on Application No. 29/120,882.  The '993 patent issued on July 17, 2001. All three asserted patents cover separate ornamental aspects of a single slow-cooker design as they each rely on the same parent application. (Henneberger Decl., ¶ 2)

#### 2.     The '993 Patent Specification And Drawings

12.      The '993 patent illustrates a slow-cooker having all the basic slow-cooker components, i.e., a heating unit, a cooking vessel and lid.  Specifically, the '993 patent shows a

rounded off rectangular-shaped heating unit, cooking vessel and lid.  (Mauro Decl., ¶ 9).

13.    The text of the '993 design patent reads:  "The ornamental design for a cooker, as shown and described."  The specific claim of the '993 patent includes seven figures showing a perspective view and a front, back, side, top and bottom view of the claimed design, Figure 2 is shown below.



Exhibit A.

14.    The term "rounded off rectangular-shaped," as used herein to describe the West Bend patents-in-suit, is in contrast to a clean and flowing elliptical shape which is the dominant shape of all the accused products.  The term is intended to convey a primary shape of a rectangle having rounded off corners to create the shape as shown most clearly in Figures 6 and 7 in each of the patents-in-suit.  As shown in these figures, this shape includes essentially a first pair of opposing arcs having a first curvature, and a second pair of opposing arcs having a second curvature.  The pair of opposing arcs is turned 90 degrees to the other pair and joined at their ends, thus forming the shape shown.  One characteristic of this squared off rectangular-shape is the relatively small arcs of the four corner edges, which gives the visual impression of a near rectangle with slightly bowed out sides.  (Mauro Decl., ¶ 10).

15.    Figures 1-7 of the '993 patent show a slow-cooker having a heating unit having a smooth outer wall.  The shape of the heating unit, cooking vessel and lid is generally a rounded

off rectangle.  Figures 2-5 also show a thin band around the top of the perimeter of the walls of

the heating unit.  The band is provided on all slow-cookers during the manufacturing process.

An inner wall of the heating unit overlaps a top edge of the outer surface to form an upper edge

as shown.  The upper edge of the heating unit supports the lip of the cooking vessel.  (Mauro

Decl., ¶ 10).



*Fig. 2*

16.     Figures 1-6 of the patent illustrate the lip of the cooking vessel that is positioned

within a cavity of the heating unit.  The lip of the cooking vessel tapers downwardly and

outwardly from a top surface to a bottom surface, the taper being concave in shape.  The bottom

surface of the cooking vessel lip which rests upon the heating unit is substantially flat and

overhangs the edge of the heating unit.  Specifically, Figures 2-5 in each of the West Bend

patents-in-suit clearly illustrate the shape of the cooking vessel lip as described above.  The lip of

the cooking vessel separates the lid from the cooking unit.  (Mauro Decl., ¶ 13).

17.     Figures 1-6 also illustrate a lid having a round, disk-like skirt centrally located

thereon.  The lid is translucent and shaped such that it fits within the top surface of the lip of the

heating unit.  (Mauro Decl., ¶ 16).

18.     Figure 7 shows a flat, smooth bottom surface of the cooking unit.  (Mauro Decl., ¶

17).

19.     Figures 1-5 show the knob on the lid of the slow-cooker, the handles on the outside of the heating unit, the control panel and control knob on the heating unit, and the bottom edge of the heating unit in broken lines.  The written portion of the specification indicates that those portions of the design shown in broken lines do not form part of the claimed invention. (Mauro Decl., ¶ 19).

III.     **THE HOLMES SLOW-COOKERS ARE SIGNIFICANTLY DIFFERENT IN ORNAMENTAL APPEARANCE**

20.     The inventors of the asserted West Bend design patents admit that the designs are different.  (Exhibit N, p. 95, line 23 to p. 96, line 6 and p. 59, line 11 to p. 60 line 1; Exhibit O, p. 46, line 16 to p. 47, line 2).

### 1.     The Lip Of The Cooking Vessel

21.     The accused slow-cookers and the design patents at issue include a cooking vessel having a lip which is supported by an upper edge of the heating unit which is purely functional, i.e., to support the cooking vessel within the heating unit.  This functional feature exists in all slow-cooker appliances and is clearly seen in the prior art.  (See e.g., U.S. Patent No. Des. 429,596 (Exhibit J)).  (Mauro Decl., ¶ 5).

22.     The '993 patent illustrates and claims a lip of the cooking vessel which tapers downwardly and outwardly from a top surface to a bottom surface, the taper having a concave shape.  The bottom surface of the lip is substantially flat and overhangs the edge of the heating unit as shown below in Figure 2 of the '993 patent.  (Mauro Decl., ¶ 13).



*Fig. 2*

23.    In direct contrast to the claimed cooking vessel lip, the lip on the accused Holmes slow-cookers includes a substantially flat top surface which has a slight taper downwardly and inwardly to a bottom surface and having a slight convex contour.  Both the upper and lower surfaces have a rounded edge.  (Mauro Decl., ¶ 26).  Accordingly, the accused slow-cooker lip has a taper which is the direct opposite of the claimed ornamental feature, i.e., convex as opposed to concave contour and the directly opposite slope for the taper as shown in detail below.  (Mauro Decl., ¶¶ 39-40).



(Exhibit T4)

('993 patent, Fig. 4)

24.    As shown above, the bottom edge of the lid on the accused products does not make a smooth transition to the top surface of the cooking vessel lid as specifically illustrated and claimed in each of the West Bend patents-in-suit.  (Mauro Decl., ¶ 27).

###### 2.    Rounded Off Rectangular Shape Of The Heating Cooking Unit And Cooking Vessel

25.    The claimed slow-cooker includes a rounded off rectangular-shaped heating unit, cooking vessel and lid as most clearly illustrated in Figures 6 and 7 in each of the patents-in-suit as shown below.  (Mauro Decl, ¶ 37).

 

26.    As stated by the inventors of West Bend's patents, the accused Holmes slow-cookers clearly do not incorporate this claimed shape.  (Exhibit N, p. 95, line 23 to p. 96, line 6; Exhibit O, p. 36, lines 21-24, and p. 42, lines 21-25).

27.    The dominant shape of the accused Holmes slow-cookers is composed of a series of clean elliptical shapes combined by the designer to produce a clean and flowing elliptical shape in the dominant view of the product.  To the contrary, the same view as illustrated in Figure 6 of each of the West Bend patents-in-suit clearly shows a rounded off rectangular-shape wherein a rectangle is the dominant shape resulting in a clearly different appearance.  (Mauro Decl., ¶ 37).  Photographs of top views of representative samples (Model Nos. 3730W and 37351C) are shown below to clearly illustrate this significant difference in overall shape.

 



Fig. 6

28.     The difference in appearance of the shape of the accused devices and the West Bend patents-in-suit is supported by the opinions set forth in the Expert Report of Charles L. Mauro ("Exhibit R").  In his report , Mr. Mauro explains that humans perceive shapes as being composed of "shape features."  When two shapes do not have the same shape feature sets, the shapes will not be found to be substantially similar.  In this case, the shape feature set of illustrated in the West Bend patents-in-suit is composed of circular shapes combined and joined together by substantially straight lines to form the rounded off rectangle.  To the contrary, the accused devices are all composed of a clean and flowing elliptical shape.  Thus, the shape features are substantially different and will be perceived as being different by an ordinary observer.  (Mauro Decl., ¶ 34-37).

28.     A direct comparison was made between representative models of Holmes slow-cookers (Rival Model Nos. 37351 and 3730) photographed and converted to line drawings for

ease of comparison to the design claimed in the '993 patent to clearly illustrate the substantial differences in ornamental appearance to the overall shape.  (Mauro Decl. ¶ 39), (Exhibit S, pp. 10-11).

29.    Using invariant feature analysis, the rounded off rectangular-shaped heating unit of the claimed design is substantially different from the elliptical shaped slow-cookers by Holmes.  Application of the formal test of invariant feature analysis relating to how consumers perceive the appearance of a product heeds the counterclaim that the overall shape defined in the claimed West Bend design and the overall shape of the Holmes products "are not substantially similar on any visually salient dimensions." (Exhibit S, p. 13).

### 3.    Skirt Underneath Knob Attached To Lid

30.    The '993 patent shows a disk-like skirt centrally located on the lid.  The '993 patent shows this skirt as having a substantial thickness.  (Figs. 2-5).  The disk-like skirt is also approximately twice the diameter of the knob.  (Fig. 6).



Exhibit A.

31.    The Holmes slow-cookers include two basic types of handle for the lid.  Some include a knob as shown below:

 

Exhibit T1

 

Exhibit T6.

Some include a loop-style handle as shown below:

 

Exhibit T4.

32.    The skirts on the slow-cookers with knob-style handles are different from those with a loop-style handle. More specifically, the Holmes slow-cookers with the loop handle include a thin skirt that conforms to the dome shape of the lid as shown above.  This skirt is substantially thinner and more rounded than the skirt claimed in the '993 patent.

33.    The skirt associated with the Holmes slow-cookers having the knob has a diameter that is only slightly larger than the diameter of the knob as shown above.  Thus, the

relationship of the size of the diameter of the knob to the skirt is significantly different from the skirt shown in the '993 patent.  (Mauro Decl., ¶ 30).

### 4.    The Cooking Vessel Lip

#### a.    Handle Portions On the Cooking Vessel

34.    As shown in Figure 6 of the '993 patent below, the cooking vessel handles extend from the lip in a smooth continuous curve whereby the lip extends outwardly having concave portions which are joined by a convex portion to form the handle portion.



Fig. 6

Exhibit A.

35.    The entire lip of the cooking vessel, including the handles, slope downwardly and outwardly from a top surface to a bottom surface, the slope being slightly concave as shown in Figure 2 below.



Fig. 2

Exhibit A.

36.    The handles on the cooking vessels of the accused Holmes slow-cookers differ significantly in appearance from the claimed design.  Representative photographs of the handles on the cooking vessels of the accused slow-cookers are shown below.

    

Exhibit T1.

37.    The handles on the accused cooking vessels extending outwardly from the lip to permit the cooking vessel to be removed from the heating unit and carried.  The handles taper downwardly and inwardly from a top surface to a bottom surface, the taper being slightly concave.  The top surface of the handle is substantially flat.  Thus, the handle portions of the accused products are substantially different in ornamental appearance from the handle portions shown in the West Bend patents-in-suit.  (Mauro Decl., ¶ 32).

**b.    The Cooking Vessel Lip and Lid**

38.    The lip of the cooking vessel of the patented design and a representative photograph of an accused Holmes slow-cooker are shown below.


    

Exhibit T4.           Exhibit A, Fig. 4

- 15 -

39.     The lip of the cooking vessel of the patented design slopes from a top surface to a bottom surface downwardly and outwardly and includes a slight concave shape from the top surface to the bottom surface, the bottom surface being substantially flat as shown in detail above.  In direct contrast, the lip of the cooking vessel on the accused slow-cooker slopes from a top surface to a bottom surface downwardly and inwardly and includes a slight convex shape from a top surface to a bottom surface, the top surface being substantially flat.  In essence, the contours of the cooking vessel lip on the accused devices and the patented design are direct opposites as clearly seen above.  (Mauro Decl., ¶¶ 39-40; 45).

### 5.     Heating Unit Having A Smooth, Flat Bottom Surface

40.     West Bend has included in its claimed design the bottom surface of the heating unit shown in Figure 7, which is smooth and flat.  (Mauro Decl., ¶ 44).



Exhibit A.

41.     The bottom surface of the accused of Holmes slow-cookers is neither smooth nor flat.  The Holmes slow-cookers either have an indentation in the surface of the bottom or a protrusion as well as a series of holes around the perimeter and fastening devices which are clearly visible.  Representative photographs of the bottom surface of the accused Holmes slow-cookers are shown below:

    

Exhibit T1                                    Exhibit T26

### 6.    The Ordinary Observer Test Is Not Satisfied

42.    Comparing the ornamental elements of the patented design in their entirety with the accused Holmes slow-cookers, any perceived similarity between these designs would not be based on these ornamental elements since they are all substantially different in appearance.  The only similarity stems from the fact that the accused products and patented designs are both slow-cookers.  Focusing on the ornamental features of the slow-cookers alone, and considering all of the views provided in the patent figures, there is no substantial similarity between the patented design and any of the accused designs to the ordinary observer.  (Mauro Decl., ¶¶ 33-38).

### B.    The Holmes Slow Cookers Do Not Infringe The '993 Patent Under The "Point Of Novelty" Test

43.    The claimed features of a rounded off rectangular-shaped heating unit having a thin, flush band at an upper edge, a rounded off rectangle-shaped cooking vessel supported by the upper edge of the heating unit by a lip are shown in U.S. Patent Nos. D 429,596 particularly Figures 2 and 4, as set forth below.



44.    The features set forth in paragraph 43 above are also shown in a prior art slow-cooker sold by Holmes, Model No. 3755 HG as shown below:

 

45.    The claimed features defined as the smaller ends of the rounded off rectangular-shaped cooking vessel the lip extending outwardly forming concave portions which are joined by a convex portion forming handle portions is shown in U.S. Patent No. Des. 416,434, Figure 6, (Exhibit M); Des. 420,246 Figure 4 (Exhibit L); the '596 patent, Figure 4 (Exhibit J) as well as the prior art slow-cooker, Model No. 3755 HG as shown above.  (Henneberger Decl., ¶ 13).




46.     The claimed features defined as the lip of the cooking vessel sloping from a top surface to a bottom surface downwardly and outwardly throughout its perimeter and including a slight concave shape from the top surface to the bottom surface, the bottom surface being substantially flat, the flat bottom surface of the lip of the cooking vessel overhanging and being positioned adjacent to the upper edge of the heating unit is substantially shown in U.S. Patent No. D 420,246, Figure 3 (Exhibit L) except for the lip of the cooking vessel sloping from a top surface to a bottom surface downwardly and outwardly throughout its perimeter.



47.     The claimed a rounded off rectangular-shaped, domed lid is shown in U.S. Patent No. Des. 429,596, Figures 2 and 4.  (Exhibit J).



48.     The claimed features of a centrally located, round disc-like member provided on

the lid is shown in the D416,434 patent, See e.g. Figures 2 and 6.  (Exhibit M).



49.    The claimed features of a rounded off rectangular-shaped bottom, the bottom being smooth and flat is shown in U.S. Patent No. Des. 434,940, Figure 3.  (Exhibit K).



50.    The only features of the claimed design which arguably are not shown in the prior art are:

a.    the lip of the cooking vessel sloping from a top surface to a bottom surface downwardly and outwardly throughout its perimeter and including a slight concave shape from the top surface to the bottom surface, the bottom surface being substantially flat; and

b.    the domed lid being shaped to make a smooth transition from its outer periphery to the upper edge of the cooking vessel lip.

51.    None of the accused Holmes slow cookers incorporate either of the features

identified in paragraph 50.  Specifically, the lip on the cooking vessel of the accused slow

cookers have a flat top surface.  The contour of the lip from a top surface to the bottom surface is

downwardly and inwardly having a convex shape, the direct opposite of the claimed point of

novelty.  The shape of the cooking vessel lip on the accused devices creates a very different

visual appearance from that shown and claimed in the '993 patent as is readily apparent from the

comparison below.  (Mauro Decl., ¶¶ 38-40).



Exhibit T4              Exhibit A, Fig. 4        Exhibit T1

52.     As shown above, on the accused devices, the transition between the lid and the lip results

in an abrupt change in angle.  This is very distinguishable from the smooth transition between

the lid and upper edge of the top surface of the cooking vessel lip as illustrated in the claimed

design.  (Mauro Decl., ¶ 41).

## IV.     THE '266 PATENT

### A.     The File History

53.     U.S. Design Patent No. 434,266 is entitled "Cooker" and issued from U.S. Patent

Application No. 29/120,985 filed on March 28, 2000.  The '266 patent is a continuation of

Application No. 29/097,446, filed December 7, 1998, now U.S. Patent No. D425,360.  The

patent issued on November 28, 2000.  (Exhibit B).

### B.    The '266 Patent Specification And Drawings

54.    The '266 Patent shows the same claimed elements as the '993 patent and adds

additional elements.  The additional elements include a thin band around the bottom perimeter of

the heating unit, the bottom of the heating unit being at a right angle with respect to the side wall

of the heating unit and a disk-like knob mounted on a cylinder shaped smaller diameter pedestal

are claimed as shown in Figures 2 and 6 below.



Fig. 2            Fig. 6

Exhibit B.

### C.    The Holmes Slow-Cookers Are Not Substantially The Same
###       As The Design Claimed In The '266 Patent

55.    None of the accused Holmes slow-cookers are substantially the same in overall

appearance when compared to the claimed design in the '266 patent for the same reasons as set

forth with regard to the '993 patent.

56.    The knob shown in the '266 patent is disk-like with a flat and smooth upper

surface and a sharp upper edge which tapers downwardly and inwardly to a flat bottom surface.

The handle used on the accused Holmes slow-cooker lids are either a loop-style or a knob as

shown below.



Exhibit T1




Exhibit T6




Exhibit T4

57.    The knobs on the accused Holmes slow-cookers do not include a disk-like knob having a flat and smooth top surface and a sharp upper edge as shown in the '266 patent.  Instead, one style of knobs as shown above (top pictures) has a rounded or domed top and rounded edges. Additionally, the stem is much shorter in height than the elongated stem shown in the '266 patent giving a very different overall appearance.  Furthermore, the top of the knob of the accused devices includes ornamental circumferentially spaced grooves which are not shown in the '266 patent figures which define the claimed subject matter.  (Mauro Decl., ¶¶ 28, 42).

58.    A second styled knob (middle pictures) has a dome shaped top surface which is almost the same diameter as the skirt.  Furthermore, the transition from the upper edge to the

lower edge is a straight line slope downwardly and inwardly as opposed to the convex contour illustrated in the patented design.

59.    The additional features added by the '266 patent do not provide any further distinctions over the prior art.  The claimed knob of the '266 patent is found in the prior art including Des. 416,434 (Exhibit M, Figures 1 and 2) and a West Bend catalog sheet depicting a prior art slow-cooker identified by document production numbers WB00516-17.  (Exhibit R).

## V.    THE '664 PATENT

### A.    The File History

60.    U.S. Design Patent No. D 444,664 is entitled "Cooker" and was issued from U.S. Patent Application No. 29/120,882 filed on March 28, 2000.  The file history of the '664 patent is essentially the same as that of the '993 patent.  The '664 patent issued on July 10, 2001.  (Exhibit C).

### B.    The '664 Patent Specification And Drawings

61.    The '664 patent also claims the same ornamental design for a slow-cooker as that in the '266 patent, with the exception of adding four small cylindrical feet in a rectangular pattern on the bottom of the heating unit.  (See Figures 2 and 7 as shown below).  Like the '993 patent, the bottom edge of the heating unit is shown in broken lines and does not form a part of the claimed invention.


Fig. 2


Fig. 7

Exhibit C

**C.    The Holmes Slow-Cookers Are Not Substantially The Same s The Design Claimed In The '664 Patent**

62.    The design of the Holmes slow cookers is not substantially the same as the design claimed in the '664 patent for the same reasons as set forth with regard to the '266 and '993 patents.

63.    None of the accused Holmes slow-cookers includes cylindrical-shape feet provided in a rectangular arrangement on the bottom of the heating unit as specifically claimed in the '664 patent, Figure 7.  The feet of the '664 patent are functional, and serve to raise the heating unit from the surface on which the slow-cooker rests.  None of Holmes' slow-cookers include the four cylindrical feet as shown in the '664 patent.  To the contrary, the accused Holmes slow-cookers include cone-shaped feet generally not arranged in a rectangular pattern. (See e.g., Exhibit T1 and T4).

64.    The feet claimed in the '664 patent do not distinguish the design from the prior art and are not a point of novelty.  The cylindrical feet of the claimed design are disclosed in U.S. Patent No. Des. 416,434, Figures 3 and 7.  (Exhibit M).

**VI.    WEST BEND IS NOT ENTITLED TO DAMAGES PRIOR TO ACTUAL NOTICE**

65.    West Bend admits that it sells products that are covered by its design patents-in-suit.  (Exhibit P).

66.    West Bend further admits that it does not mark any of its products with the patent numbers of the design patents-in-suit.  (Exhibit Q).

67.    West Bend's first notice to Holmes of its design patents was contained in a

counterclaim filed on August 24, 2005.

The Counterclaim stated as follows:

### COUNT V - Patent Infringement

On information and belief, Holmes has manufactured, imported, distributed, marketed, offered for sale and sold certain slow cooker appliances (hereinafter "the accused products") that embody the inventions and are covered by the claims of the '266, '664 and '993 patents (hereinafter collectively referred to as "the West Bend Housewares patents-in-suit") and has caused others to offer to sell, sell and use the accused products.

(Exhibit E).

68.    On or about September 2, 2005, counsel for West Bend verbally identified two (2)

models of Holmes slow-cookers alleged to be infringing.  (Henneberger Decl., ¶.6).

69.    West Bend continued its verbal identification of the accused products seven

months later in their response to Holmes Interrogatory No. 8 dated March 31, 2006.

### RESPONSE TO INTERROGATORY NO. 8:

West Bend objects to this interrogatory as premature because fact discovery has just commenced and is ongoing and as calling for expert opinion.  Subject to these and its general objections, West Bend states that Holmes' Rival Model Nos. 3730 and 37351 slow cookers infringe each of the West Bend patents-in-suit.  Investigation continues.

(Exhibit F)

70.    On November 6, 2006, over a year after the West Bend Counterclaims
were served, West Bend identified thirty-two (32) additional models of Holmes' slow-
cookers alleged to infringe the design patents-in-suit.  (Exhibit G).

SUNBEAM PRODUCTS, INC.,
d/b/a JARDEN CONSUMER SOLUTIONS
f/k/a THE HOLMES GROUP

By its Attorneys,

Dated:  December 1, 2006

/s/Glenn T. Henneberger
Charles R. Hoffmann, Esq. (*Pro Hac Vice*)
CRHDocket@hoffmannbaron.com
Glenn T. Henneberger, Esq. (*Pro Hac Vice*)
GTHDocket@hoffmannbaron.com
Alan M. Sack, Esq. (*Pro Hac Vice*)
AMSDocket@hoffmannbaron.com
HOFFMANN & BARON, LLP
6900 Jericho Turnpike
Syosset, New York  11791-4407
Telephone:  (516) 822-3550
Facsimile:  (516) 822-3582

and

Nicholas J. Nesgos (BBO No. 553177)
nnesgos@pbl.com
Joseph W. Corrigan (BBO No. 647393)
jcorrigan@pbl.com
Posternak Blankstein & Lund LLP
Prudential Tower, 800 Boylston Street
Boston, Massachusetts  02199-8004
Telephone:  (617) 973-6100
Facsimile:  (617) 367-2315

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 1, 2006.

/s/ Glenn T. Henneberger
Glenn T. Henneberger

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**


THE HOLMES GROUP, INC.,    :
           :
 Plaintiff/Counterclaim-Defendant, :
           :  Civil Action No.  1: 05-CV-11367 WGY
     v.      :  (Alexander, M.J.)
           :
WEST BEND HOUSEWARES, LLC and :
FOCUS PRODUCTS GROUP, L.L.C., :
           :
 Defendants/Counterclaim-Plaintiffs. :


**DECLARATION OF GLENN T. HENNEBERGER, ESQ.**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**
**OF NON-INFRINGEMENT OF WEST BEND'S DESIGN PATENTS**


I, Glenn T. Henneberger, counsel for The Holmes Group, Inc. ("Holmes") in the above-identified litigation, hereby make the following declaration:

1. I am an attorney for the Plaintiff, Holmes.  I submit this Declaration in Support of Holmes' Motion for Summary Judgment of Non-Infringement of West Bend's Design Patents U.S. Patent Nos. Des. 444,993 ("the '993 patent"); Des. 434,266 ("the '266 patent"); and Des. 444,664 ("the '664 patent").  A true and accurate copy of the West Bend design patents-in-suit are attached as Exhibits A, B and C, respectively.

2. The `993 patent is entitled "Cooker" and issued from an application filed on March 28, 2000.  The `993 patent claims priority to U.S. Patent No. Des 425,360 to Dobson, et al., which is an earlier filed patent application which is not asserted by West Bend.  A true and accurate copy

of the `360 patent is attached as Exhibit D. The prosecution history of the `993 patent was generally uneventful other than a request by the PTO to file a terminal disclaimer disclaiming the terminal part of any patent granted on the application that would extend beyond the expiration date of the then issued '266 patent or on a patent granted on Application No. 29/120,882. The '993 patent issued on July 17, 2001.

3.      The `266 patent is also entitled "Cooker" and issued from U.S. Patent  Application No. 29/120,985 filed on March 28, 2000. The '266 patent is a continuation of Application No. 29/097,446, filed December 7, 1998, now U.S. Patent No. D425,360. The patent issued on November 28, 2000. Once again, the file history was uneventful.

4.      The `664 patent is entitled "Cooker" and was issued from U.S. Patent Application No. 29/120,882 filed on March 28, 2000. The file history of the '664 patent is essentially the same as that of the '993 patent. The '664 patent issued on July 10, 2001.

5.      West Bend filed its Answer to Complaint and Counterclaim on August 24, 2005. Count V of West Bend's counterclaim alleged that "certain slow-cooker appliances" sold by Holmes infringe design patents owned by West Bend without specifically identifying which of Holmes slow-cookers were at issue. A true and accurate copy of West Bend's Answer is attached as Exhibit E.

6.      During a Local Rule 7.1 pre-motion conference in which Holmes stated it planned to file a motion under Fed. R. Civ. P. Rule 12 in view of the insufficiency of the pleading to identify a specific product alleged to infringe, West Bend orally identified two models of slow-cookers sold by Holmes alleged to infringe West Bend's design patents. This notice of infringement occurred on or about September 6, 2005.

7.      In its interrogatory responses dated March 31, 2006, West Bend continued to assert infringement of only the two previously identified Holmes slow-cooker models.  A true and accurate copy of West Bend's response to Interrogatory No. 8 is attached as Exhibit F.

8.      On November 6, 2006, West Bend served supplemental interrogatory responses which now identifies thirty-four (34) alleged infringing models.  The supplemental responses incorporate by reference the model numbers set forth in Exhibit 6 of the Expert Report of Cooper C. Woodring, an expert witness retained by West Bend in the field of industrial design.  A true and accurate copy of West Bend's Supplemental Interrogatory Answers served on November 6, 2006 is attached as Exhibit G.

9.      Attached as Exhibit H is a true and accurate copy of Holmes' U.S. Patent No. 6,573,483 to DeCobert, et al.

10.     Attached as Exhibit I is a true and accurate copy of Holmes' U.S. Patent No. 6,740,855 to DeCobert, et al. a

11.     Attached as Exhibit J is a true and accurate copy of Holmes' U.S. Patent No. Des 429,596 ("the `596 patent") to Hlava, et al.

12.     Attached as Exhibit K is a true and accurate copy of Holmes'U.S. Patent No. Des 434,940 ("the `940 patent) to Hlava, et al.

13.    In the Spring of 1997, Holmes sold a slow cooker Model No. 3755 HG covered by the

`596 and `940 patents.  A photograph of a front elevation view, top plan view and bottom plan

view of this slow-cooker which is prior art to the West Bend patents-in-suit are shown below:






14.    Attached as Exhibit L is a true and accurate copy of U.S. Patent No. Des 420,246 (the

'246 patent) to Alonge, et al.

15.    Attached as Exhibit M is a true and accurate copy of U.S. Patent No. Des 416,434 (the

'434 patent) to Pollnow, et al.

16.    The inventors of the West Bend design patents being asserted were deposed by Holmes'

counsel on November 28, 2006.  A true and accurate copy of excerpts from a preliminary

transcript of the deposition of William C. Dobson are attached as Exhibit N.  A true and accurate

copy of excerpts from a preliminary transcript of the deposition of Scott Pollnow are attached as Exhibit O.

17.    A true and accurate copy of West Bend's supplemental response to Interrogatory No. 13 served May 31, 2006 is attached as Exhibit P.

18.    A true and accurate copy of West Bend's response to Interrogatory No. 16 dated March 31, 2006 is attached as Exhibit Q.

19.    A true and accurate copy of a West Bend catalog sheet, production nos. WB000516-517, is attached as Exhibit R.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of December, 2006.

/s/Glenn T. Henneberger
Glenn T. Henneberger, Esq. (*Pro Hac Vice*)
GTHDocket@hoffmannbaron.com
HOFFMANN & BARON, LLP
6900 Jericho Turnpike
Syosset, New York  11791-4407
Telephone:  (516) 822-3550

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 1, 2006.

/s/ Glenn T. Henneberger
Glenn T. Henneberger

# EXHIBIT A



US00D444993S

(12) **United States Design Patent** (10) Patent No.: **US D444,993 S**
Dobson et al. (45) Date of Patent: ⁂ **Jul. 17, 2001**

(54) **COOKER**

(75) Inventors: **William C. Dobson; Scott T. Pollnow,** both of West Bend, WI (US)

(73) Assignee: **Premark WB Holdings, Inc.,** Wilmington, DE (US)

( * ) Notice: This patent is subject to a terminal disclaimer.

( ** ) Term: **14 Years**

(21) Appl. No.: **29/120,883**

(22) Filed: **Mar. 28, 2000**

(51) LOC (7) Cl. ..................................... **07-02**
(52) U.S. Cl. ........................................... **D7/354**
(58) Field of Search ............................ D7/323, 354–361; 99/324, 325, 340, 347, 403, 413, 419, 410, 411

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 104,914 | * 6/1937 | Coss | D7/360 |
| D. 416,434 | * 11/1999 | Pollnow | D7/360 |
| D. 420,246 | * 2/2000 | Alonge et al. | D7/360 |
| D. 425,360 | * 5/2000 | Dobson et al. | D7/360 |
| D. 429,596 | * 8/2000 | Hlava et al. | D7/360 |

* cited by examiner

*Primary Examiner*—Caron D. Veynar
(74) *Attorney, Agent, or Firm*—Michael Best & Friedrich LLP

(57) **CLAIM**

The ornamental design for a cooker, as shown and described.

**DESCRIPTION**

FIG. 1 is a perspective view of a cooker constructed in accordance with one preferred embodiment of the invention;
FIG. 2 is an elevation view of the front of the cooker shown in FIG. 1;
FIG. 3 is an elevation view of the rear of the cooker shown in FIGS. 1 and 2;
FIG. 4 is an elevation view of the right of the cooker shown in FIGS. 1, 2 and 3;
FIG. 5 is an elevation view of the left of the cooker shown in FIGS. 1, 2, 3 and 4;
FIG. 6 is a top plan view of the cooker shown in FIGS. 1, 2, 3, 4 and 5; and,
FIG. 7 is a bottom plan view of the cooker shown in FIGS. 1, 2, 3, 4, 5 and 6.
The broken line showings in FIGS. 1–7 are for illustrative purposes only and form no part of the claimed design.

1 Claim, 7 Drawing Sheets





Fig. 1

Case 1:05-cv-11367-WGY    Document 62-3    Filed 12/01/2006    Page 4 of 9



Fig. 2



Fig. 3



*Fig. 4*



*Fig. 5*



Fig. 6



Fig. 7

# EXHIBIT B

US00D434266S

# United States Patent [19]

## Dobson et al.

[11]  Patent Number:  **Des. 434,266**

[45]  Date of Patent:  ✱✱ **Nov. 28, 2000**

[54]  **COOKER**

[75]  Inventors:  **William C. Dobson; Scott T. Pollnow,** both of West Bend, Wis.

[73]  Assignee:  **Premark WB Holdings, Inc.,** Wilmington, Del.

[✱✱]  Term:  **14 Years**

[21]  Appl. No.: **29/120,985**

[22]  Filed:  **Mar. 28, 2000**

### Related U.S. Application Data

[63]  Continuation of application No. 29/097,446, Dec. 7, 1998, Pat. No. Des. 425,360.

[51]  **LOC (7) Cl.** ............................................. **07-02**
[52]  **U.S. Cl.** ...................................................... **D7/354**
[58]  **Field of Search** ...................... D7/354–361, 545; 99/324, 325, 340, 347, 403, 410, 411, 413, 419

[56]  **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 153,894 | 5/1949 | Mortrude | D7/354 |
| D. 199,747 | 12/1964 | Farber | D7/354 |
| D. 248,363 | 7/1978 | Rinaldi | D7/354 |
| D. 253,574 | 12/1979 | Anderson, Jr. | D7/356 |
| D. 254,355 | 3/1980 | Ottier | D7/545 |
| D. 275,925 | 10/1984 | Bowen et al. | D7/357 |
| D. 284,257 | 6/1986 | Greb et al. | D7/355 |
| D. 366,592 | 1/1996 | Cesaroni et al. | D7/360 |
| D. 416,434 | 11/1999 | Pollnow | D7/360 |
| D. 420,246 | 2/2000 | Alonge et al. | D7/360 |
| D. 420,247 | 2/2000 | Kaney et al. | D7/360 |
| D. 425,360 | 5/2000 | Dobson et al. | D7/360 |

*Primary Examiner*—Caron D. Veynar
*Attorney, Agent, or Firm*—Michael Best & Friedrich LLP

[57]  **CLAIM**

The ornamental design for a cooker, as shown and described.

### DESCRIPTION

FIG. **1** is a perspective view of a cooker constructed in accordance with one preferred embodiment of the invention;
FIG. **2** is an elevation view of the front of the cooker shown in FIG. **1**;
FIG. **3** is an elevation view of the rear of the cooker shown in FIGS. **1** and **2**;
FIG. **4** is an elevation view of the right of the cooker shown in FIGS. **1, 2** and **3**;
FIG. **5** is an elevation view of the left of the cooker shown in FIGS. **1, 2, 3** and **4**;
FIG. **6** is a top plan view of the cooker shown in FIGS. **1, 2, 3, 4** and **5**; and,
FIG. **7** is a bottom plan view of the cooker shown in FIGS. **1, 2, 3, 4, 5** and **6**.
The broken line showings in FIGS. **1–7** are for illustrative purposes only and form no part of the claimed design.

**1 Claim, 7 Drawing Sheets**





*Fig. 1*



Fig. 2



Fig. 3

**U.S. Patent**    Nov. 28, 2000    Sheet 4 of 7    **Des. 434,266**



*Fig. 4*



*Fig. 5*



Fig. 6



*Fig. 7*

# EXHIBIT C



US00D444664S

(12) **United States Design Patent**   (10) Patent No.:     **US D444,664 S**

Dobson et al.                          (45) Date of Patent:   ∗∗  *Jul. 10, 2001

(54) **COOKER**

(75) Inventors: **William C. Dobson; Scott T. Pollnow,** both of West Bend, WI (US)

(73) Assignee: **Premark WB Holdings, Inc.,** Wilmington, DE (US)

( ∗ ) Notice: This patent is subject to a terminal disclaimer.

(∗∗) Term: **14 Years**

(21) Appl. No.: **29/120,882**

(22) Filed: **Mar. 28, 2000**

(51) LOC (7) Cl. ........................................ **07-02**
(52) U.S. Cl. ........................................ **D7/354**
(58) Field of Search .................... D7/323, 354–361; 99/324, 325, 340, 347, 403, 413, 419, 410, 411

(56)               **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 104,914 | ∗ | 6/1937 | Coss ................................ D7/360 |
| D. 416,434 | ∗ | 11/1999 | Pollnow ............................ D7/360 |
| D. 420,246 | ∗ | 2/2000 | Alonge et al. ..................... D7/360 |
| D. 425,360 | ∗ | 5/2000 | Dobson et al. ..................... D7/360 |

| | | | |
|---|---|---|---|
| D. 429,596 | ∗ | 8/2000 | Hlava et al. ...................... D7/360 |

∗ cited by examiner

*Primary Examiner*—Caron D. Veynar
(74) *Attorney, Agent, or Firm*—Michael Best & Friedrich LLP

(57)                **CLAIM**

The ornamental design for a cooker, as shown and described.

DESCRIPTION

FIG. 1 is a perspective view of a cooker constructed in accordance with one preferred embodiment of the invention;
FIG. 2 is an elevation view of the front of the cooker shown in FIG. 1;
FIG. 3 is an elevation view of the rear of the cooker shown in FIGS. 1 and 2;
FIG. 4 is an elevation view of the right of the cooker shown in FIGS. 1, 2 and 3;
FIG. 5 is an elevation view of the left of the cooker shown in FIGS. 1, 2, 3 and 4;
FIG. 6 is a top plan view of the cooker shown in FIGS. 1, 2, 3, 4 and 5; and,
FIG. 7 is a bottom plan view of the cooker shown in FIGS. 1, 2, 3, 4, 5 and 6.
The broken line showings in FIGS. 1–7 are for illustrative purposes only and form no part of the claimed design.

**1 Claim, 7 Drawing Sheets**



U.S. Patent      Jul. 10, 2001      Sheet 1 of 7      US D444,664 S



Fig. 1



*Fig. 2*



Fig. 3

**U.S. Patent**    Jul. 10, 2001    Sheet 4 of 7    US D444,664 S



*Fig. 4*

**U.S. Patent**      Jul. 10, 2001      Sheet 5 of 7      **US D444,664 S**



*Fig. 5*



Fig. 6

Case 1:05-cv-11367-WGY     Document 62-5     Filed 12/01/2006     Page 9 of 9



Fig. 7

# EXHIBIT D

US00D425360S

# United States Patent [19]

## Dobson et al.

[11] **Patent Number:    Des. 425,360**

[45] **Date of Patent:    ** May 23, 2000**

[54] **COOKER**

[75] Inventors: **William C. Dobson; Scott T. Pollnow,** both of West Bend, Wis.

[73] Assignee: **Premark WB Holdings, Inc.,** Wilmington, Del.

[**] Term: **14 Years**

[21] Appl. No.: **29/097,446**

[22] Filed: **Dec. 7, 1998**

[51] **LOC (7) Cl.** ..................................................... **07-02**

[52] **U.S. Cl.** ............................................................. **D7/360**

[58] **Field of Search** ...................... D7/354–361; 99/324, 99/325, 340, 347, 403, 413, 419, 410, 411

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 170,575 | 10/1953 | Jepson | D7/360 |
| D. 267,388 | 12/1982 | Spoeth, Jr. et al. | D7/360 |
| D. 280,064 | 8/1985 | Obata et al. | D7/360 |
| D. 284,257 | 6/1986 | Greb et al. | D7/355 |
| D. 300,598 | 4/1989 | Ueda et al. | D7/360 |
| D. 335,063 | 4/1993 | Napolitano | D7/360 |
| D. 366,592 | 1/1996 | Cesaroni et al. | D7/360 |
| D. 376,724 | 12/1996 | Mendelson et al. | D7/360 |
| D. 404,244 | 1/1999 | Jozancy | D7/354 |
| 5,782,165 | 7/1998 | Glenboski et al. | 99/340 |

*Primary Examiner*—Caron D. Veynar
*Attorney, Agent, or Firm*—Michael Best & Friedrich LLP

[57] **CLAIM**

The ornamental design for a cooker, as shown and described.

## DESCRIPTION

FIG. 1 is a perspective view of a cooker constructed in accordance with one preferred embodiment of the invention;

FIG. 2 is an elevation view of the front of the cooker shown in FIG. 1;

FIG. 3 is an elevation view of the rear of the cooker shown in FIGS. 1 and 2;

FIG. 4 is an elevation view of the right of the cooker shown in FIGS. 1–3;

FIG. 5 is an elevation view of the left of the cooker shown in FIGS. 1–4;

FIG. 6 is a top plan view of the cooker shown in FIGS. 1–5; and,

FIG. 7 is a bottom plan view of the cooker shown in FIGS. 1–6.

**1 Claim, 7 Drawing Sheets**





Fig. 1



*Fig. 2*



Fig. 3



*Fig. 4*



*Fig. 5*



Fig. 6

Case 1:05-cv-11367-WGY    Document 62-6    Filed 12/01/2006    Page 9 of 9



Fig. 7

# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF MASSACHUSETTS**

_____

THE HOLMES GROUP, INC.,                )
                                       )
        Plaintiff,                     )       CA No. 05-CV-11367-REK
                                       )       (Alexander, M.J.)
        v.                             )
                                       )
WEST BEND HOUSEWARES, LLC and          )
FOCUS PRODUCTS GROUP, LLC              )
                                       )
        Defendant.                     )
_____)

**WEST BEND HOUSEWARES, LLC'S**
**ANSWER TO COMPLAINT AND COUNTERCLAIM**

    Defendant West Bend Housewares, LLC, ("West Bend Housewares") answers each numbered

paragraph of the complaint of plaintiff The Holmes Group, Inc. ("Holmes") as follows:

**ANSWER**

    1.      West Bend Housewares has insufficient knowledge or information to form a belief as

to the truth of the allegations of Paragraph 1 of the Complaint and denies the allegations on that basis.

    2.      West Bend Housewares admits that it is a limited liability company organized under

the laws of Illinois having a principal place of business at 2845 Wingate Street, West Bend, Wisconsin

53095.  Focus Products Group, LLC is also a limited liability company organized under the laws of

Illinois, and West Bend Housewares, LLC is a wholly-owned subsidiary of Focus Products Group,

LLC.  West Bend Housewares denies the remaining allegations of Paragraph 2 of the Complaint.

3.      Paragraph 3 of the Complaint states conclusions of law to which no answer is required.  To the extent an answer is required, however, West Bend Housewares admits the allegations of Paragraph 3 of the Complaint.

4.      Paragraph 4 of the Complaint states conclusions of law to which no answer is required.  To the extent an answer is required, however, West Bend Housewares admits the allegations of Paragraph 4 of the Complaint.

5.      West Bend Housewares admits that United States Patent No. 6,573,483 ("the '483 patent") is entitled "Programmable Slow-Cooker Appliance" and the '483 patent indicates that it was assigned to The Holmes Group, Inc.  West Bend Housewares lacks sufficient knowledge or information to admit or deny the remaining allegations of Paragraph 5 of the Complaint and thus denies them.

6.      West Bend Housewares denies the allegations of Paragraph 6 of the Complaint.

7.      West Bend Housewares admits that United States Patent No. 6,740,855 ("the '855 patent") is entitled "Programmable Slow-Cooker Appliance" and the '855 patent indicates that it was assigned to The Holmes Group, Inc.  West Bend Housewares lacks sufficient knowledge or information to admit or deny the remaining allegations of Paragraph 7 of the Complaint and thus denies them.

8.      West Bend Housewares denies the allegations of Paragraph 8 of the Complaint.

9.      West Bend Housewares has insufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 9 of the Complaint and denies the allegations on that basis.

10.     West Bend Housewares admits that Exhibit C to the Complaint purports to comprise copies of selected pages from the owner's manual for the WEST BEND® Housewares 6-Quart

Electronic Crockery Cooker, Model 84386.  West Bend Housewares denies the remaining allegations of Paragraph 10 of the Complaint.

11.    West Bend Housewares denies the allegations of Paragraph 11 of the Complaint.

12.    West Bend Housewares admits that it has no license from Holmes, but denies the remaining allegations of Paragraph 12 of the Complaint.

13.    West Bend Housewares denies the allegations of Paragraph 13 of the Complaint.

14.    West Bend Housewares denies the allegations of Paragraph 14 of the Complaint.

15.    West Bend Housewares denies the allegations of Paragraph 15 of the Complaint.

## FIRST AFFIRMATIVE DEFENSE

Each claim of the '483 and '855 patents is invalid because it fails to meet the conditions for patentability set for in 35 U.S.C. §§ 101 et seq., including, without limitation, 35 U.S.C. §§ 102 and 103, and for failing to meet the requirements of 35 U.S.C. § 112.

## SECOND AFFIRMATIVE DEFENSE

West Bend Housewares has not infringed, induced infringement of, or contributorily infringed any valid claim of the '483 or '855 patents.

## THIRD AFFIRMATIVE DEFENSE

West Bend Housewares has not willfully infringed the '483 patent or the '855 patent.

## FOURTH AFFIRMATIVE DEFENSE

West Bend Housewares reserves the right to state additional defenses as they become known during discovery in this litigation.

## COUNTERCLAIM

### The Parties and Jurisdiction

1.      West Bend Housewares, LLC ("West Bend Housewares") is a limited liability company organized under the laws of Illinois with a principal place of business at 2845 Wingate Street, West Bend, Wisconsin 53095.

2.      On information and belief and as stated in its Complaint, The Holmes Group, Inc. ("Holmes") is a Massachusetts corporation having a principal place of business at One Holmes Way, Milford, Massachusetts 01757.

3.      This Court has jurisdiction over this Counterclaim pursuant to 28 U.S.C. §§ 1331 and 1338(a).  This Counterclaim also arises under 28 U.S.C. §§ 2202 and 2202 and the Patent Laws of the United States, 35 U.S.C. § 1, et seq.

4.      Venue is proper in this district under 28 U.S.C. §§ 1391.

### COUNT I – Declaration of Invalidity of the '483 Patent

5.      West Bend Housewares incorporates by reference the allegations of paragraph 1-4 of this Counterclaim as though fully set forth herein.

6.      An actual and justiciable controversy has arisen and now exists between West Bend Housewares and Holmes concerning whether the '483 patent is valid.  By its Complaint, Holmes has asserted that the '483 patent is valid and has asserted a purported claim alleging infringement of the '483 patent by West Bend Housewares.

7.      West Bend Housewares has denied Holmes's claim of infringement and has asserted that the '483 patent is invalid for failure to meet the conditions for patentability set forth in, or requirements of, one or more provisions of the Patent Laws of the United States, including, without limitation, 35 U.S.C. §§ 101, 102, 103 and 112.

4

8.      Absent a declaration that the '483 patent is invalid, Holmes will continue to wrongfully assert the '483 patent against West Bend Housewares in violation of the laws and contrary to the public policy of the United States, and will thereby continue to cause West Bend Housewares irreparable injury and damage.

9.      Because the above activities and actions have created an actual and justiciable controversy, West Bend Housewares seeks a declaration that the '483 patent is invalid.

## COUNT II – Declaration of Noninfringement of the '483 Patent

10.     West Bend Housewares incorporates by reference the allegations of paragraphs 1-4 of this Counterclaim as though fully set forth herein.

11.     An actual and justiciable controversy has arisen and now exists between West Bend Housewares and Holmes concerning whether West Bend Housewares infringes any rights Holmes claims to have under the '483 patent.  By its Complaint, Holmes has asserted a purported claim alleging infringement of the '483 patent by West Bend Housewares.

12.     West Bend Housewares has denied Holmes's claim of infringement.  West Bend Housewares has not infringed and is not now infringing any claims of the '483 patent and has not contributorily infringed or induced infringement of the '483 patent.

13.     Because the above activities and actions have created an actual and justiciable controversy, West Bend Housewares seeks a declaration that it does not infringe the '483 patent.

## COUNT III – Declaration of Invalidity of the '855 Patent

14.     West Bend Housewares incorporates by reference the allegations of paragraph 1-4 of this Counterclaim as though fully set forth herein.

15.     An actual and justiciable controversy has arisen and now exists between West Bend Housewares and Holmes concerning whether the '855 patent is valid.  By its Complaint, Holmes has

asserted that the '855 patent is valid and has asserted a purported claim alleging infringement of the '855 patent by West Bend Housewares.

16.    West Bend Housewares has denied Holmes's claim of infringement and has asserted that the '855 patent is invalid for failure to meet the conditions of patentability in, or requirements of, one or more provisions of the Patent Laws of the United States, including, without limitation, 35 U.S.C. §§ 101, 102, 103 and 112.

17.    Absent a declaration that the '855 patent is invalid, Holmes will continue to wrongfully assert the '855 patent against West Bend Housewares in violation of the laws and contrary to the public policy of the United States, and will thereby continue to cause West Bend Housewares irreparable injury and damage.

18.    Because the above activities and actions have created an actual and justiciable controversy, West Bend Housewares seeks a declaration that the '855 patent is invalid.

## COUNT IV – Declaration of Noninfringement of the '855 Patent

19.    West Bend Housewares incorporates by reference the allegations of paragraphs 1-4 of this Counterclaim as though fully set forth herein.

20.    An actual and justiciable controversy has arisen and now exists between West Bend Housewares and Holmes concerning whether West Bend Housewares infringes any rights Holmes claims to have under the '855 patent.  By its Complaint, Holmes has asserted a purported claim alleging infringement of the '855 patent by West Bend Housewares.

21.    West Bend Housewares has denied Holmes's claim of infringement.  West Bend Housewares has not infringed and is not now infringing any claims of the '855 patent and has not contributorily infringed or induced infringement of the '855 patent.

22.    Because the above activities and actions have created an actual an justiciable controversy, West Bend Housewares seeks a declaration that it does not infringe the '855 patent.

## COUNT V – Patent Infringement

23.    West Bend Housewares incorporates by reference the allegations of paragraphs 1-4 of this Counterclaim as though fully set forth herein.

24.    West Bend Housewares is the owner by assignment of all right, title and interest in and to United States Letters Patent No. Des. 434,266 ("the '266 patent"), entitled "Cooker," which was duly and legally issued on November 28, 2000, and remains in full force and effect. A copy of the '266 patent is attached as Exhibit A.

25.    West Bend Housewares is the owner by assignment of all right, title and interest in and to United States Letters Patent No. Des. 444,664 ("the '664 patent"), entitled "Cooker," which was duly and legally issued on July 10, 2001, and remains in full force and effect. A copy of the '664 patent is attached as Exhibit B.

26.    West Bend Housewares is the owner by assignment of all right, title and interest in and to United States Letters Patent No. Des. 444,993 ("the '993 patent"), entitled "Cooker," which was duly and legally issued on July 17, 2001, and remains in full force and effect. A copy of the '993 patent is attached as Exhibit C.

27.    On information and belief, Holmes has manufactured, imported, distributed, marketed, offered for sale and sold certain slow cooker appliances (hereinafter "the accused products") that embody the inventions and are covered by the claims of the '266, '664 and '993 patents (hereinafter collectively referred to as "the West Bend Housewares patents-in-suit") and has caused others to offer to sell, sell and use the accused products.

28. The activities of Holmes constitute direct infringement, contributory infringement and/or actively inducing infringement of the West Bend Housewares patents-in-suit.

29. Holmes's infringement of the West Bend Housewares patents-in-suit has been without license from West Bend Housewares, or any of its predecessors in interest, and in violation of the patent rights of West Bend Housewares and its predecessors in interest, and it is believed that Holmes will continue such infringement unless enjoined by this Court.

30. On information and belief, Holmes's acts of infringement have been willful and deliberate.

31. As a result of Holmes's willful infringement of the West Bend Housewares patents-in-suit, West Bend Housewares has been damaged and will continue to be damaged in an amount to be determined at trial. In addition to such damage suffered by West Bend Housewares, Holmes is liable under 35 U.S.C. § 289 to West Bend Housewares to the extent of the total profit made by Holmes from the accused products. West Bend Housewares has suffered and will continue to suffer irreparable injury unless the infringing activities of Holmes are enjoined.

32. By virtue of Holmes's willful and deliberate infringement, this is an exceptional case within the meaning of 35 U.S.C. § 285.

## JURY DEMAND

West Bend Housewares demands a trial by jury on all matters and issues triable by a jury.

## REQUESTED RELIEF

**WHEREFORE**, West Bend Housewares prays that:

(a)     the Court adjudge the claims of the '483 and '855 patents to be invalid, not infringed and/or unenforceable;

(b)     the Court dismiss Holmes's Complaint with prejudice;

(c)     the Court enter an order granting West Bend Housewares a preliminary and permanent injunction enjoining Holmes, its officers, directors, agents, employees and all those in active concert or participation with them, from making, using, importing, offering for sale and selling the accused products and from otherwise infringing, contributing to infringement, and actively inducing infringement of the West Bend Housewares patents-in-suit;

(d)     the Court award West Bend Housewares compensatory damages for the infringement of the West Bend Housewares patents-in-suit by Holmes and the profits made by Holmes from the accused products;

(e)     the Court declare this to be an exceptional case under 35 U.S.C. § 285 and award West Bend Housewares its reasonable attorneys' fees and enhanced damages;

(f)     the Court award West Bend Housewares interest on any damages and its costs; and

(g)     the Court grant West Bend Housewares any further and additional relief as this Court deems just and proper.

Dated: August 23, 2005

WEST BEND HOUSEWARES, LLC

*By its attorneys*,

/s/ Erik P. Belt
Erik Paul Belt, BBO # 558620
BROMBERG & SUNSTEIN LLP
125 Summer Street
Boston, Massachusetts 02110
Tel:  (617) 443-9292
Facsimile:  (617) 443-0004
ebelt@bronsum.com

Of Counsel:

Charles A. Laff
Martin L. Stern
MICHAEL BEST & FRIEDRICH LLP
401 N. Michigan Ave. – Ste. 1900
Chicago, Illinois 60611
Tel:  (312) 222-0800

Michael E. Husmann
Joseph T. Miotke
MICHAEL BEST & FRIEDRICH LLP
100 E. Wisconsin Ave.
Milwaukee, Wisconsin 53202
Tel.:  (414) 271-6550

03032/00501 426775.1

# EXHIBIT F

**INTERROGATORY NO. 7:**

Set forth in detail the circumstances surrounding the first instance that West Bend became aware of any Holmes Programmable Slow Cooker, including but not limited to a Holmes Programmable Slow Cooker having an automatic warm mode and any investigation, examination, evaluation and testing thereof, as well as the identity of any persons conducting such investigation, examination, evaluation and testing, and identify the persons most knowledgeable with respect to the decision of West Bend to make and market its Programmable Slow Cooker.

**RESPONSE TO INTERROGATORY NO. 7:**

West Bend objects to this interrogatory as overly broad and unduly burdensome in that it

seeks information related to all "Programmable Slow Cookers" (as defined by Plaintiff) rather

than only those slow cookers manufactured by Holmes that embody the Holmes patents-in-suit.

Plaintiff defines "Programmable Slow Cooker" as "any slow cooker including a programmable

electronic control, including but not limited to West Bend's '6-Quart Electronic Crockery

Cookery, Model No. 84386 identified in the Complaint." West Bend further objects to this

interrogatory as calling for information protected by discovery by the attorney-client privilege

and work-product doctrine. Subject to these and its general objections, West Bend states that it

first became aware of the Holmes programmable slow cooker in early 2000 through trade

publications.

The persons most knowledgeable about West Bend's decision to make and market its

model no. 84386 slow cooker are Mike Carpenter, Gary Shabino, and Howard Kaney.

**INTERROGATORY NO. 8:**

Identify any products marketed, used or sold by Holmes which is accused of infringing the West Bend patents-in-suit and identify which patent(s) are allegedly infringed.

**RESPONSE TO INTERROGATORY NO. 8:**

West Bend objects to this interrogatory as premature because fact discovery has just

commenced and is ongoing and as calling for expert opinion. Subject to these and its general

objections, West Bend states that Holmes' Rival Model Nos. 3730 and 37351 slow cookers

infringe each of the West Bend patents-in-suit.  Investigation continues.

**INTERROGATORY NO. 9:**

Describe all ornamental features shown in each of the West Bend patents-in-suit and identify those ornamental features which are present in each Holmes product identified in response to Interrogatory No. 8.

**RESPONSE TO INTERROGATORY NO. 9:**

West Bend objects to this interrogatory as premature in that it calls for expert opinion.

West Bend will supplement its answer in accordance with the Federal Rules and through its

expert's report.

**INTERROGATORY NO. 10:**

Describe all functional features shown in each of the West Bend patents-in-suit and identify those functional features which are present in each Holmes product identified in response to Interrogatory No. 8.

**RESPONSE TO INTERROGATORY NO. 10:**

West Bend objects to this interrogatory as premature in that it calls for expert opinion.

West Bend will supplement its answer in accordance with the Federal Rules and through its

expert's report.

**INTERROGATORY NO. 11:**

For each of the accused products identified in response to Interrogatory No. 8, identify each of the points of novelty in the patented design shown in each of the West Bend patents-in-suit which distinguish the patent from the prior art and identify which of these points of novelty is incorporated in each accused product.

**RESPONSE TO INTERROGATORY NO. 11:**

West Bend objects to this interrogatory as premature in that it calls for expert opinion.

West Bend will supplement its answer in accordance with the Federal Rules and through its

expert's report.

# EXHIBIT G

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

THE HOLMES GROUP, INC.,

    Plaintiff,

    vs.

WEST BEND HOUSEWARES, LLC and
FOCUS PRODUCTS GROUP, LLC,

    Defendants.

Civil Action No. 05-CV-11367 WGY
(Alexander, M.J.)

**WEST BEND HOUSEWARES, LLC'S SUPPLEMENTAL ANSWERS
TO HOLMES GROUP, INC.'S INTERROGATORIES NOS. 2, 8, & 11**

---

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant West Bend
Housewares, LLC ("West Bend"), by and through its attorneys MICHAEL BEST & FRIEDRICH,
LLP, supplements its answers to Plaintiffs' Holmes Group, Inc.'s ("Plaintiffs") Interrogatory
Nos. 2, 8, and 11 as follows:

Each response is subject to all objections as to competence, relevance, materiality,
propriety and admissibility, and to any and all other objections on any grounds that would
require the exclusion of any statements contained herein if such responses were asked of, or
statements contained herein were made by, a witness present and testifying in court, all of which
objections and grounds are expressly reserved and may be interposed at the time of trial. The
responses given herein are without prejudice to West Bend's right to supplement or to revise
these responses if further investigation or discovery so indicates.

West Bend's responses shall not be deemed to constitute an admission (i) that any
particular information or document(s) exists, is relevant, non-privileged, or admissible in
evidence, or (ii) that any statement or characterization in West Bend's interrogatory response is

accurate or complete. In addition, willingness to produce documents in response to any particular request is in no way a concession that such documents exist, or that any such documents are within West Bend's possession, custody or control.

## GENERAL OBJECTIONS

A.    West Bend objects to these discovery requests to the extent they purport to impose obligations beyond those imposed by the Federal Rules of Civil Procedure and by the Local Rules of this Court.

B.    West Bend objects to these discovery requests to the extent that they seek information which does not appear reasonably calculated to lead to discovery of admissible evidence and, thus, are not within the scope of permissible discovery under Rule 26 of the Federal Rules of Civil Procedure.

C.    West Bend objects to these discovery requests to the extent the requests seek information and documents protected by the attorney-client privilege, the attorney work-product immunity, or any other privilege or immunity.

D.    West Bend objects to these discovery requests to the extent the requests seek information and documents in West Bend's possession, the disclosure of which is subject to or precluded by restrictions of confidentiality imposed by, or pursuant to an agreement with, a third party.

E.    West Bend objects to these discovery requests to the extent that they are unlimited with respect to time. Subject to its other objections, West Bend will respond to each request by producing documents dated or prepared before Plaintiffs first filed the complaint in this action, unless otherwise stated.

F.     West Bend will respond to these discovery requests based upon its current understanding of the facts of the case and the investigation it has conducted to date. West Bend specifically reserves the right to revise, correct, supplement or clarify any of these responses at any time during the discovery and trial preparation processes. West Bend objects to these discovery requests to the extent that they are inconsistent with these conditions.

G.     West Bend specifically incorporates each of these General Objections into its specific responses to each of Plaintiff's discovery requests, whether or not each such General Objection is expressly referred to in West Bend's response to a specific discovery request.

**INTERROGATORY NO.2:**

Separately for each asserted claim of each of the patents-in-suit, set forth in detail all facts to support West Bend's contention that each of the patents-in-suit are invalid and/or unenforceable pursuant to Tile 35, United States Code, §§ 101, 102, 103 and 112, as alleged in West Bend's Counterclaim, including but not limited to how each element and limitation of such claims are disclosed or taught by one or more items of alleged prior art, either taken alone or in combination, and which elements do not meet the criteria of 35 U.S.C. § 112.

**RESPONSE TO INTERROGATORY NO.2:**

West Bend responds to this interrogatory by incorporating by reference as if fully set forth herein the Expert Report of Barry N. Feinberg, Ph.D., P.E. Regarding The Invalidity of U.S. Patent Nos. 6,573,483 and 6,740,855, served on November 3, 2006.

**INTERROGATORY NO.8:**

Identify any products marketed, used or sold by Holmes which is accused of infringing the West Bend patents-in-suit and identify which patent(s) are allegedly infringed.

**RESPONSE TO INTERROGATORY NO. 1:**

West Bend responds to this interrogatory by incorporating by reference as if fully set forth herein the Expert Report of Cooper C. Woodring, FIDSA, served on November 3, 2006.

**INTERROGATORY NO.11:**

For each of the accused products identified in response to Interrogatory No. 8, identify each of the points of novelty in the patented design shown in each of the West Bend patents-in-suit which distinguish the patent from the prior art and identify which of these points of novelty is incorporated in each accused product.

**RESPONSE TO INTERROGATORY NO. 2:**

West Bend responds to this interrogatory by incorporating by reference as if fully set

forth herein the Expert Report of Cooper C. Woodring, FIDSA, served on November 3, 2006.

Dated: November 6, 2006                By: /s/ Joseph T. Miotke _____

Martin L. Stern
MICHAEL BEST & FRIEDRICH LLP
401 N. Michigan Ave. – Ste. 1900
Chicago, Illinois 60611
Tel:  (312) 222-0800
Facsimile:  (312) 222-0818
mlstern@michaelbest.com

Michael E. Husmann
Joseph T. Miotke
MICHAEL BEST & FRIEDRICH LLP
100 E. Wisconsin Ave.
Milwaukee, Wisconsin 53202
Tel.:  (414) 271-6550
Facsimile:  (414) 277-0656
mehusmann@michaelbest.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

THE HOLMES GROUP, INC.

    Plaintiffs,

  v.

WEST BEND HOUSEWARES, LLC and
FOCUS PRODUCTS GROUP, LLC

    Defendants.

No. 05-CV-11367-WGY
(Alexander, M.J.)

**CERTIFICATE OF SERVICE**

  I, Joseph T. Miotke, hereby declare under penalty of perjury that on November 6, 2006, I caused to be served a true and correct copy of the following documents by email on the person listed below:

  1.  WEST BEND HOUSEWARES, LLC'S SUPPLEMENTAL ANSWERS TO HOLMES GROUP, INC.'S INTERROGATORIES NOS. 2, 8, & 11

Glenn T. Henneberger
Hoffman & Baron, LLP
6900 Jericho Turnpike
Syosset, New York 11791
ghenneberger@hoffmannbaron.com
Fax: (516) 822-3582

/s Joseph T. Miotke
Joseph T. Miotke

## Rival's Accused Crock Pot Designs

| | Model No. | Body Finish | Knob or Loop | Size | Controls | Photo |
|---|---|---|---|---|---|---|
| 1. | 3730W | White | Knob | 3 Quart | Rotary, 2 Position | Yes |
| 2. | 37351C | Stainless | Knob | 3 1/2 Quart | Rotary, 3 Position | Yes |
| 3. | 3735W | White | Knob | 3 1/2 Quart | Rotary, 2 Position | No |
| 4. | 3735WN | White | Loop | 3 1/2 Quart | Rotary, 2 Position | Yes |
| 5. | 37401W | White | Loop | 4 Quart | Rotary, 3 Position | Yes |
| 6. | 3752SM | Floral | Knob | 5 Quart | Rotary, 2 Position | Yes |
| 7. | 37601VEG | Vegetables | Loop | 6 Quart | Rotary, 3 Position | Yes |
| 8. | 38551W | White | Loop | 5 1/2 Quart | Digital, Programable | Yes |
| 9. | 38601C | Stainless | Loop | 6 Quart | Digital, Programable | No |
| 10. | 38601W | White | Loop | 6 Quart | Digital, Programable | Yes |
| 11. | 38651C | Stainless | Loop | 6 Quart | Digital, Programable | No |
| 12. | 5070TCVG | Vegetables | Loop | 7 Quart | Rotary, 3 Position | No |
| 13. | 5070TCW | White | Knob | 7 Quart | Rotary, 3 Position | No |
| 14. | 5445BCN | Stainless | Knob | 4 1/2 Quart | Rotary, 2 Position | No |
| 15. | 6445BC | White | Knob | 6 1/2 Quart | Rotary, 2 Position | No |
| 16. | 64451C | Stainless | Loop | 6 1/2 Quart | Rotary, 2 Position | No |
| 17. | 64451LDC | Stainless | Loop | 6 1/2 Quart | Rotary, 3 Position | No |
| 18. | SCP609WS | White | Loop | 6 Quart | Digital, Programable | No |
| 19. | SCV400R | Red | Loop | 4 Quart | Rotary, 3 Position | Yes |
| 20. | SCV400SS | Stainless | Loop | 4 Quart | Rotary, 3 Position | Yes |
| 21. | SCV401BS | Stainless | Loop | 4 Quart | Rotary, 3 Position | No |
| 22. | SCV450SS | Stainless | Knob | 4 1/2 Quart | Rotary, 2 Position | No |
| 23. | SCV450SS | Stainless | Loop | 4 1/2 Quart | Rotary, 2 Position | Yes |
| 24. | SCV500SM | Floral | Knob | 5 Quart | Rotary, 2 Position | No |
| 25. | SCV551KW | White | Loop | 5 1/2 Quart | Rotary, 2 Position | No |
| 26. | SCV553KM | White | Loop | 5 1/5 Quart | Rotary, 3 Position | Yes |
| 27. | SCV601BS | Stainless | Loop | 6 Quart | Rotary, 3 Position | No |
| 28. | SCV610WM | Green Floral | Loop | 6 Quart | Rotary, 3 Position | Yes |
| 29. | SCVC604 | Stainless | Loop | 6 Quart | Digital, Programable | Yes |
| 30. | SCVP600SS | Stainless | Loop | 6 Quart | Digital, Programable | No |
| 31. | SCVP601K | Stainless | Loop | 6 Quart | Digital, Programable | No |
| 32. | SCVP601UM | Stainless | Loop | 6 Quart | Digital, Programable | Yes |
| 33. | SCVP609KLS | White | Loop | 6 Quart | Digital, Programable | Yes |
| 34. | SCVP609TG | White | Loop | 6 Quart | Digital, Programable | Yes |

# EXHIBIT H



US006573483B1

(12) **United States Patent**

DeCobert et al.

(10) Patent No.: **US 6,573,483 B1**
(45) Date of Patent: **Jun. 3, 2003**

(54) **PROGRAMMABLE SLOW-COOKER APPLIANCE**

(75) Inventors: **James E. DeCobert**, Attleboro, MA (US); **Lorens G. Hlava**, Clinton, MO (US); **Charles T. Thrasher, Jr.**, Clinton, MA (US)

(73) Assignee: **The Holmes Group, Inc.**, Milford, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/802,174**

(22) Filed: **Mar. 8, 2001**

Related U.S. Application Data

(60) Provisional application No. 60/189,443, filed on Mar. 15, 2000, and provisional application No. 60/196,273, filed on Apr. 5, 2000.

(51) Int. Cl.$^7$ .................................. **H05B 1/02**
(52) U.S. Cl. ...................... **219/506**; 219/494; 219/497; 219/435; 219/432; 99/340
(58) Field of Search .................................. 219/433, 432, 219/435, 506, 494, 518; 99/340

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,681,663 A | 8/1972 | Albers |
| 3,904,852 A * | 9/1975 | Rivelli et al. ............... 219/442 |
| 4,313,051 A | 1/1982 | Aoshima |
| 4,345,145 A | 8/1982 | Norwood |
| 4,535,386 A | 8/1985 | Frey, Jr. et al. |
| 4,551,590 A | 11/1985 | Mahon |
| 4,566,802 A | 1/1986 | Koehler |
| 4,668,878 A | 5/1987 | Wyss |
| 4,674,890 A | 6/1987 | Kojima et al. |

| | | |
|---|---|---|
| 4,695,683 A | 9/1987 | Wingler et al. |
| 4,695,710 A | 9/1987 | Yamashita et al. |
| 4,742,864 A | 5/1988 | Duell et al. |
| 4,749,874 A | 6/1988 | Meisner |
| 4,764,715 A | 8/1988 | Kowalewski et al. |
| 4,789,761 A | 12/1988 | Malone et al. |
| 4,835,349 A | 5/1989 | Weber |
| 4,841,496 A | 6/1989 | Adams et al. |
| 4,857,758 A | 8/1989 | Rigazio et al. |
| 4,959,512 A | 9/1990 | Cole et al. |
| 5,191,231 A | 3/1993 | Berry |
| 5,430,598 A | 7/1995 | Rodolfo et al. |
| 5,477,029 A | 12/1995 | Skutt et al. |
| 5,539,185 A | 7/1996 | Polster |
| 5,596,552 A | 1/1997 | Lim |
| 5,615,604 A | 4/1997 | Chenglin |
| 5,734,149 A | 3/1998 | Skutt et al. |
| 5,771,207 A | 6/1998 | Muroi et al. |
| 5,834,718 A | 11/1998 | Amonett |
| 5,910,265 A * | 6/1999 | Baker et al. ................ 219/454 |
| 6,191,393 B1 | 2/2001 | Park |
| 6,196,113 B1 * | 3/2001 | Yung ............................ 99/327 |
| 6,229,507 B1 | 5/2001 | Nakamura et al. |
| 6,274,847 B1 * | 8/2001 | Hlava et al. ................ 219/433 |

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| GB | 2061091 | * | 5/1981 | ................ 219/433 |

* cited by examiner

*Primary Examiner*—Mark Paschall
(74) *Attorney, Agent, or Firm*—Brinks Hofer Gilson & Lione

(57) **ABSTRACT**

A programmable slow-cooker appliance, in which a user sets a time and temperature for cooking a food item. A programmable controller prevents the unit from being used solely as a "keep warm" appliance, and a unique design allows cooling of the controller during cooking.

**19 Claims, 12 Drawing Sheets**





FIG. 1
PRIOR ART

FIG. 2
PRIOR ART



39

40

# FIG. 3
## PRIOR ART



FIG. 4



FIG. 5



FIG. 6



FIG. 7



FIG. 8



FIG. 9



FIG. 10



FIG. 11



FIG. 12



FIG. 13

US 6,573,483 B1

**1**

## PROGRAMMABLE SLOW-COOKER APPLIANCE

This application claims priority to Provisional Application No. 60/189,443, filed Mar. 15, 2000, and to Provisional Application No. 60/196,273, filed Apr. 5, 2000.

### BACKGROUND OF THE INVENTION

Time and convenience are in short supply for homemakers wishing to supply a home-cooked meal to family members. Some appliances, such as slow-cooker appliances, attempt to meet this need by providing all-day cooking while a homemaker is absent. Such appliances, however, tend to be of the type where only one temperature and all day cooking is possible, regardless of the food item, and thus potentially subjecting the food item to over- or under-cooking. Another option may be to use a cooking unit with a controller, where a user may set a time or temperature desired. These units, however, tend to be quite a bit larger and more expensive than slow-cooker appliances. If these units are of more reasonable size, they also suffer because the controller inevitably must be placed near the heating element.

What is needed is a cooking appliance in which the user retains control over the time and temperature of cooking, but which is small enough to be convenient. What is needed is a slow-cooker unit in which the controller does not become overheated and damaged by the heating element.

### SUMMARY OF THE INVENTION

One embodiment of the invention is a programmable slow-cooker appliance, including a heating unit, which includes upstanding sidewalls and a bottom wall. The sidewalls and bottom encompass a heating area. The appliance includes a heating element mounted on the inner surface of the interior wall of the heating unit. In one embodiment, the cooking area may also encompass a cooking unit inside the heating unit, suitable for holding food to be cooked. The appliance includes a programmable controller mounted on its outside, and preferably mounted via a controller housing, which acts to insulate the controller from the heat of the appliance, preferably via a unique system of a heat sink and ventilation. The housing, on the side of the slow-cooker appliance, utilizes ventilation holes on its bottom and top to encourage a chimney effect, in which cool air from the surroundings is drawn into ventilation slots or holes at the bottom of the housing. This air cools the controller, and the air is then expelled from ventilation holes on the top of the housing, convecting heat away from the controller.

Another aspect of the invention is a method of using the programmable controller to ensure that food is cooked according to the desires of a user. The user provides a food item and places the food item into the slow-cooker appliance, as described above. The user sets a cooking time and temperature for the programmable slow-cooker unit, using the controls to set both the time and the temperature. The cooking time according to one embodiment may not be set less than four hours, and the temperature may not be set for less than 150 degrees Fahrenheit (66 degrees Celsius). This prevents a user from accidentally setting the cooker to a "warm" temperature, in which food would only be warmed but not cooked thoroughly before consumption. In one embodiment, if the user sets no time or temperature, but merely turns the cooker on, the cooker defaults to a particular time and temperature, set by the user or the factory, such as a default setting of four hours and 175 degrees Fahrenheit or eight hours and 150 degrees Fahrenheit.

**2**

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of an embodiment of a prior art slow-cooker appliance having an oval shape that may be utilized in the present invention;

FIG. 2 is a perspective view of a prior art embodiment of a cooking unit 14 which may be utilized with the appliance of FIG. 1;

FIG. 3 is a perspective view of a prior art cooking unit 39 similar to that shown in FIG. 2, but having a circular shape;

FIG. 4 is a perspective view of a slow cooker appliance incorporating the present invention;

FIG. 5 is a detailed plan view of a portion of the control 200 of the embodiment of FIG. 4;

FIG. 6 is a bottom plan view of the embodiment of FIG. 4;

FIG. 7 is a side cutaway view of the embodiment of FIG. 4;

FIG. 8 is a plan view of a heat sink 256 as utilized in the embodiment of FIG. 4;

FIG. 9 is a side view taken along a line 9—9 of FIG. 8;

FIGS. 10 and 13 are schematic circuit diagrams showing the circuitry and components implemented in preferred embodiments;

FIG. 11 is a wiring diagram showing some of the electric componentry of the preferred embodiment; and

FIG. 12 is an embodiment of the front panel.

### DETAILED DESCRIPTION OF THE DRAWINGS AND PREFERRED EMBODIMENTS

Referring to FIG. 1, one prior art embodiment of a food-heating slow-cooker appliance 10 is shown. The appliance 10 preferably comprises a heating unit 12 and a cooking unit 14. An exemplary slow cooker appliance 10 may be a Crock-Pot® Slow Cooker made by The Rival Division of The Holmes Group® of Milford, Mass. The heating unit 12 preferably has a bottom 16 and a continuous outer sidewall 18. The bottom 16 and an interior sidewall 17 define a well-like heating chamber 20 having an oval cross-section, and the interior sidewall 17 defines an annular lip 22 at an upper edge of the outer sidewall 18 and the interior sidewall 17. The heating chamber 20 has a heating element 24 disposed therein and mounted to the heating unit 12, either under the bottom 16 or additionally between the outer sidewall 18 and the interior sidewall 17. A control switch 26 is conventionally used to provide electricity to the heating element 24. The heating element 24 functions to heat the cooking unit 14 via the heating chamber 20.

As shown in FIG. 2, the cooking unit 14 has a bottom 28 with preferably a continuous sidewall 30 upstanding therefrom. The continuous sidewall 30 preferably has an annular lip 38 projecting in flange-like fashion from the upper end thereof and a substantially oval cross-section. The cooking unit 14 is adapted to be at least partially received within the heating unit 12 with the annular lip 38 of the cooking unit 14 preferably engaging the annular lip 22 of the heating unit 12, supporting the cooking unit 14 within the heating unit 12. Preferably, the annular lip 38 further defines a pair of handle portions 38(a) and 38(b) to facilitate lifting the cooking unit 14. The cooking unit 14 is preferably made of ceramic with a coating of conventional glazing compound.

The thermal and heat retaining properties of the ceramic cooking unit 14 allow it to conduct heat from the heating chamber 20 through the sidewall 30. This provides even heating throughout the unit 14.

US 6,573,483 B1

**3**

As shown in FIG. 3, an alternative embodiment of the appliance 10 includes a cooking unit 39 having a sidewall 40 and a substantially circular cross-section. This embodiment is preferably adapted to fit within a heating unit having a complementary circular heating chamber. This cooking unit 39 is used in an embodiment of the present invention shown in FIG. 4.

In use, the heating unit 12 is provided with a first cooking unit 39. The heating element 24 (not shown) may be powered on and off as necessary to supply heat at a maintained temperature to the cooking unit 39 and the heating chamber via a programmable control 200. The control 200 preferably includes a circuit board housing 210, a control panel 220, and an insulation shield 222 assembled together for attachment to the outer sidewall 18 of the heating unit 12. The interior of the housing 210 contains a printed circuit board 254 (shown in FIG. 7) containing electronic components of the control.

As shown in FIGS. 5 and 6, the housing 210 preferably includes a control panel user interface 224 located on an inclined front surface of the housing 210. Preferably, the housing 210 and insulation shield 222 are made from a thermoplastic material such as polypropylene. A pair of side walls 226, a top wall 228, and bottom wall 230 are preferably located adjacent the control panel 224 and support the control panel 224 in an inclined position away from the front of the cooking appliance 10. This gives the user access to the control panel 224, and also locates the controls and componentry within the housing 210 away from a significant amount of the heat generated by the appliance 10. The printed circuit board 254 may be mounted via threaded screws 255 to rearwardly projecting screw receiving portions 258 on the rear side of the housing 210.

The control panel 224 includes a plurality of indicator lights, such as LEDs 262, spaced on the front panel 224. As is well-known in the art, a variety of other indicator devices may be provided, including digital readouts, audible alarms, liquid crystal displays, incandescent lamps or fluorescent readouts. Preferably, the control panel 224 also includes a plurality of cantilevered portions 264 and 266 as shown in FIG. 5. The cantilevered portions 264, 266 preferably include rearwardly projecting fingers 268 (shown in FIG. 7) which translate the depression of the portions 264, 266 toward the rear portion of the housing 210. The fingers 268 are preferably used to depress pushbutton switch portions located on the circuit board 254. A water-impermeable label membrane may be applied over the front of the control panel 224 to label the indicators 262 and cantilevered portions 264 and 266 for the user. The membrane may also protect the front control panel 224 from damage from spilled foods or liquids and facilitate cleaning.

To further protect the electronic componentry within the housing 210 from the heat generated by the appliance 10, the annular shield member 222 is preferably sized for interposition between the heating unit 12 and the housing 210. In particular, as shown in FIGS. 5 and 6, the shield 222 includes a top wall 232, a pair of side walls 234, and a bottom wall 236. The shield 222 acts as a ventilated spacer to hold the electronic components and the housing 210 at a distance away from sidewall of the cooking unit 12.

In order to dissipate heat that may otherwise be retained between the cooking unit 12 and the rear of the housing 210, an air circulation space is provided within the shield. In particular, as shown in the side cutaway view of FIG. 7, the air space 240 behind the shield 222 may vent warmer air out through an upper elongated slot 242 defined within the top

**4**

wall 232 of the shield 222. Likewise, an elongated slot 244 is defined into the air space 240 in the bottom wall 236 of the shield 222. Heated air may thus escape through the top elongated slot 242 and cooler air may enter the air space 240 through the bottom elongated slot 244. As shown in FIG. 7, the shield 222 also preferably defines a rearwardly projecting cylindrical flange 246 that extends into the outer wall 18 to allow passage of control and power wiring between the interior of the heating unit 12 and the interior of the housing 210.

In a similar fashion, air circulation is promoted through the housing 210 through a set of openings, preferably defined between the upper portion and the bottom of the housing 210. In particular, a plurality of openings 250 are defined within the bottom wall 230 of the housing 210. An elongated upper slot 252 is provided on the front face 224 of the housing 210. This allows air to freely circulate behind the control panel 224 and assist in the dissipation of heat from the circuit board 254 and its electronic componentry within the housing 210. Preferably, a heat sink 256 is provided as shown in FIG. 7 and positioned between the circuit board 254 and the front panel 224 inside the housing 210. The sink 256 preferably includes a plurality of openings defined therein to allow air to circulate between the openings 250 and 252 and through and around the heat sink 256 to dissipate additional heat therefrom. Also shown is the relative position of cooking unit 14.

FIGS. 8 and 9 show a detailed view of the heat sink 256. Preferably, the heat sink is machined from 0.063 inch thick 3003-0 anodized aluminum. The heat sink 256 is preferably bent at a 160 degree angle between a bottom flange portion 256a and an upper portion 256b. A centrally located retaining tab portion 256c is bent parallel with the lower portion 256a, and the portions 256a and 256c are used for attachment of the heat sink 256 to the rear side of the housing 210 interior via the rearwardly projecting screw receiving portions 258. To maximize the dissipation of heat, a plurality of winged sections 257 and 259 are provided on the heat sink 256 and extend outwardly from a center portion 256a of the heat sink 256. A plurality of openings are defined through the heat sink 256 to allow the fingers 258 of the control panel cantilevered portions 264, 266 to project through the heat sink and contact the circuit board 254 at the rear of the housing 210. The openings 251 also facilitate cooling air flow through and past the heat sink 256 to further dissipate heat therefrom.

The circuit board 254 mounts circuitry and logic allowing the user of the appliance 10 to electronically control and program cooking cycles and temperature. A schematic diagram of the electronic circuitry and components is shown in FIG. 10. The diagram shows a preferred exemplary circuit incorporating preferred components as utilized in the preferred embodiment of the present invention. One skilled in the art will recognize that the componentry illustrated herein is exemplary only and that many other components may be substituted to achieve the functions described herein. FIG. 10 includes labels for each of the components of the circuit, and only major components will be described herein.

First, as shown in the diagram, the preferred circuit 300 is preferably built around an EPROM/ROM-based CMOS microprocessor controller 302, such as the PIC16CR54C RISC CPU manufactured by Microchip Technology, Inc. The chip output preferably includes circuited drivers for 6 LED indicators 262 (labeled D3–D8) as shown. These LED indicators may be assigned labels as follows:

US 6,573,483 B1

| 5 | | 6 |

| LED | Indicates |
|-----|-----------|
| D3 | On |
| D4 | WARM |
| D5 | 4 HOUR |
| D6 | 6 HOUR |
| D7 | 8 HOUR |
| D8 | 10 HOUR |

Two momentary pushbutton contact switches S1 and S2 are used to trigger the "Off" and "Cook" features, respectively, as will be described in the cooking procedure below. Of course, other indicators and switches may be substituted. Note that while examples are given, the circuitry may be implemented in numerous ways, as is well-known in the art, to accomplish the varying programming modes described below.

The temperature of the cooking appliance is measured using a thermistor 310, which is connected externally of the circuit board to the underside of the bottom of the heating chamber. A retention clip 320, shown in FIG. 7, is utilized to hold the thermistor in thermal contact with the bottom 16. In a preferred embodiment, the appliance uses a model USX1732 thermistor manufactured by U.S. Sensor, Inc.

Triac 304, which is preferably a logic Triac Model L4008L6-ND manufactured by Digi-Key, Inc., is utilized to switch the power supplied to the heating elements of the appliance. Preferably, the Triac is of an isolated tab type and includes a heat sink tab that is fastenable to the heat sink 256 shown in FIGS. 8 and 9. Preferably, the Triac is mounted separately to one of the mounting holes on the center portion 256a of the heat sink 256 so that the tab is in thermal contact with the heat sink 256 to dissipate heat generated from its current controlling function. Most of the other components of the circuit 300 are mounted on a conventional printed circuit board 254.

FIG. 11 shows the wiring of the external Triac 304 in relation to the circuit board 254 and heating elements 24. As shown in the Figure, the heating elements 24 are in thermal contact with and wrapping around the interior sidewall 17 of the heating unit.

The operation of the appliance 10 is as follows. The programmable circuitry 300 allows the user to set both the temperature and desired time for cooking. The functions of the switches S1 and S2, which are activatable via the cantilevered portions 264 and 266 of the control panel 224, are as follows:

S1. OFF pushbutton—turns the appliance 10 off.

S2. COOK pushbutton—subsequent pushes of the button cycle through 4 hour, 6 hour, 8 hour and 10 hour cook times.

When the unit is plugged in, the power "on" indicator flashes. The user then pushes the COOK button (switch S2) to set the temperature and cooking time. As the user pushes the COOK switch S2, the LED's D5–D8 illuminate to indicate the corresponding time setting as follows.

LEDs

D3. POWER—on when appliance 10 is in cook or warm modes.

D5. 4 HOUR—on when appliance is in 4-hour cook mode

D6. 6 HOUR—on when appliance is in 6-hour cook mode

D7. 8 HOUR—on when appliance is in 8-hour cook mode

D8. 10 HOUR—on when appliance is in 10-hour cook mode

D4. WARM—on when appliance is in half-power mode Thus, subsequent pushes of the COOK switch S2 activate different cooking modes, as shown by the 6 HOUR, 8 HOUR and 10 HOUR LEDs 262 on the control panel 224. If the COOK switch S2 is pressed in the 10 HOUR mode, the control 200 recycles to the 4 HOUR cooking mode, and its indicator.

In general, full power will be applied to the heating element 24 until the time corresponding to the illuminated LED elapses, after which the power to the heating element 24 is reduced by half, the WARM indicator illuminates, and all cook time indicators extinguish. The choices of operation are: 4 or 6 hours on a HI temperature, and 8 to 10 hours on a lower temperature setting. Once the user selects the desired setting, the appliance 10 starts the cooking operation. Once the time setting has expired, the appliance 10 automatically reduces power to the heating element 24 to put the unit in a WARM setting. The unit will stay in the WARM setting until the user pushes the OFF button or unplugs the unit. Of course, other programming schemes are possible.

Preferably, the user cannot set the unit initially in the WARM setting. The system will only go to WARM after one of the time functions has expired. This avoids possible food safety problems that may be associated with cooking food only on the WARM setting. Pressing the OFF switch S1 any time the unit is on preferably removes power from the heating element 24 and extinguishes all indicator LEDs 262.

In another embodiment, the slow-cooker appliance utilizes four push-button switches, rather than two, to set times and temperatures for cooking. An exemplary control panel is depicted in FIG. 12, with control circuitry in FIG. 13. Four momentary pushbutton contact switches 227, 229, 231, 233 are used to trigger various power and setting functions as will be described in the cooking procedure below. Of course, other numbers or types of indicators and switches may be substituted as well. FIG. 13 shows circuitry applicable to such an embodiment, incorporating controller 302, external temperature element 310, digital readout 57, and Power LED 263 and Timer LED 265. The Power LED indicates power is present at the microprocessor controller and the Timer LED indicates that the Timer function is on and working.

The operation of the appliance is as follows. The programmable circuitry allows the user to set both the temperature and the desired cooking time. The functions of the switches 227, 229, 231, 233 on an alternative embodiment of a control panel user interface 225, are as follows:

227. ON/OFF power pushbutton—turns the appliance on and off.

229. TIMER pushbutton—activates stepped timer.

231. UP pushbutton—increases displayed numerical value.

233. DOWN pushbutton—decreases displayed numerical value.

When the unit is plugged in, the unit defaults to 150-degrees F. as shown on the digital display 57. The user may adjust the desired cooking temperature in 25-degree increments using the UP 231 button or the DOWN button 233, with 150 degrees Fahrenheit as a minimum temperature. Once the user has selected the specific temperature, the appliance will start the cooking process.

The user may also select the TIMER mode by pressing the TIMER button 229. In TIMER mode, the controller defaults to 4 hours. The user can use the UP or DOWN controls to increase or decrease the time in 15-minute increments. Once the time is set, the controller 302 will count down the time remaining for cooking in 1 minute increments until the unit

US 6,573,483 B1

7

"times out". At that time, the power is shut off from the heating element.

In all modes, the temperature is read periodically by the thermistor or other temperature element and relayed to the controller. The reading is checked at 4-second intervals. If the temperature is above or equal to the set point, power is removed. If it is below the set point, power is applied to the heating element 32. Of course, the circuitry can be modified as desired to achieve various program methods and modes.

Another embodiment of the slow cooker appliance adds a piezobuzzer to the circuitry. A piezobuzzer is simply an electrically-activated buzzer that can be programmed to emit a sound at desired moments. In one embodiment, a piezobuzzer may be installed as an output 315, controlled by the microprocessor controller 302, as shown in FIG. 13, and programmed to emit a sound when desired. In one embodiment, the buzzer may beep to provide feedback to a user when a pushbutton is pushed. The slow cooker may also be programmed to emit a sound to indicate the end of the cooking time. The buzzer may also be used to emit sounds at other desired times.

It is intended that the foregoing description illustrates rather than limits this invention, and that it is the following claims, including all equivalents, which define this invention. Of course, it should be understood that a wide range of changes and modifications may be made to the embodiments described above. Accordingly, it is the intention of the applicants to protect all variations and modifications within the valid scope of the present invention. It is intended that the invention be defined by the following claims, including all equivalents.

What is claimed is:

1. A programmable slow-cooker appliance, comprising:
   a heating unit;
   a cooking unit adapted to fit at least partially within the heating unit;
   a controller housing fixedly mounted to an outside of the heating unit; and
   a programmable controller mounted to the housing to control the heating unit, wherein said housing is configured to convect heat away from the controller.

2. The slow-cooker appliance of claim 1, wherein the housing is an enclosure for at least a portion of the controller.

3. The slow-cooker appliance of claim 2, wherein the controller housing insulates the controller from the heating unit.

4. The slow-cooker appliance of claim 3, wherein the housing further comprises a heat shield, and the heat shield is made from a material selected from at least one of thermoplastics and insulating materials.

5. The slow-cooker appliance of claim 4, wherein the housing defines ventilation openings configured to allow air to flow into and out of said housing.

8

6. The slow-cooker appliance of claim 5, wherein the housing includes at least a pair of slots defined in an upper and lower part of the housing to define airflow thru the slots and behind the controller.

7. The slow-cooker appliance of claim 1, wherein the controller further comprises control elements and a display.

8. The slow-cooker appliance of claim 7, wherein the control elements are selected from the group consisting of a control panel, push-buttons, switches, and a digital readout.

9. The slow-cooker appliance of claim 1, further comprising a temperature measuring device in communication with said controller.

10. The slow-cooker appliance of claim 1, further comprising a piezobuzzer.

11. A control housing for a slow cooker heating unit, said housing comprising:
   a front wall;
   a bottom wall defining at least one lower opening, the bottom wall attached to the front wall;
   a top wall defining at least one upper opening, the top wall attached to the front wall; and
   a circuit board mounted behind the front wall, the circuit board apart from a wall of the heating unit.

12. The control housing of claim 11, further comprising a heat sink between the circuit board and the front wall.

13. A method of using a programmable slow-cooker appliance, the method comprising:
   providing a food item;
   placing the food item into a cooking unit of the slow-cooker appliance;
   selecting a cooking temperature and time using a programmable controller mounted to a housing fixedly mounted to a heating unit; and
   changing the heating unit temperature automatically to a lower temperature after the selected time.

14. The method of claim 13, further comprising notifying a user with illuminated indicators that the slow-cooker appliance is powered and that the timer is active.

15. The method of claim 13, wherein the temperature is set by default upon selection of a cooking time.

16. The method of claim 13, wherein the time is selected from the group consisting of 4 hours, 6 hours, 8 hours and 10 hours and the temperature is selected from the group consisting of high and low.

17. The method of claim 13, wherein the temperature and time are set in increments.

18. The method of claim 13, further comprising cooling the electronic circuitry of the programmable controller via a chimney effect.

19. The method of claim 13, further comprising emitting a sound.

* * * * *

# EXHIBIT I



US006740855B1

(12) **United States Patent**　　　　(10) **Patent No.:**　　**US 6,740,855 B1**
DeCobert et al.　　　　　　　　　　　(45) **Date of Patent:**　　***May 25, 2004**

(54) **PROGRAMMABLE SLOW-COOKER APPLIANCE**

(75) Inventors: **James E. DeCobert**, Attleboro, MA (US); **Lorens G. Hlava**, Clinton, MO (US); **Charles T. Thrasher, Jr.**, Clinton, MA (US)

(73) Assignee: **The Holmes Group, Inc.**, Milford, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/386,276**

(22) Filed: **Mar. 11, 2003**

**Related U.S. Application Data**

(63) Continuation of application No. 09/802,174, filed on Mar. 8, 2001, now Pat. No. 6,573,483.

(60) Provisional application No. 60/196,273, filed on Apr. 5, 2000, and provisional application No. 60/189,443, filed on Mar. 15, 2000.

(51) Int. Cl.[7] ..................... **H05B 1/02**

(52) U.S. Cl. ...................... **219/506**; 219/429; 219/435; 219/436; 219/494; 99/340

(58) Field of Search .................... 219/506, 494, 219/497, 501, 505, 430–439, 429; 99/340

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,681,663 | A | 8/1972 | Albers |
| 4,313,051 | A | 1/1982 | Aoshima |
| 4,345,145 | A | 8/1982 | Norwood |
| 4,535,386 | A | 8/1985 | Frey, Jr. et al. |
| 4,551,590 | A | 11/1985 | Mahon |
| 4,566,802 | A | 1/1986 | Koehler |
| 4,668,878 | A | 5/1987 | Wyss |
| 4,674,890 | A | 6/1987 | Kojima et al. |
| 4,695,683 | A | 9/1987 | Wingler et al. |
| 4,695,710 | A | 9/1987 | Yamashita et al. |
| 4,742,864 | A | 5/1988 | Duell et al. |
| 4,749,874 | A | 6/1988 | Meisner et al. |
| 4,764,715 | A | 8/1988 | Kowalewski et al. |
| 4,789,761 | A | 12/1988 | Malone et al. |
| 4,835,349 | A | 5/1989 | Weber |
| 4,841,496 | A | 6/1989 | Adams et al. |
| 4,857,758 | A | 8/1989 | Rigazio et al. |
| 4,959,512 | A | 9/1990 | Cole et al. |
| 5,191,231 | A | 3/1993 | Berry |
| 5,430,598 | A | 7/1995 | Rodolfo et al. |
| 5,477,029 | A | 12/1995 | Skutt et al. |
| 5,539,185 | A | 7/1996 | Polster |
| 5,596,552 | A | 1/1997 | Lim |
| 5,615,604 | A | 4/1997 | Chenglin |
| 5,734,149 | A | 3/1998 | Skutt et al. |
| 5,771,207 | A | 6/1998 | Muroi et al. |
| 5,834,718 | A | 11/1998 | Amonett |
| 6,191,393 | B1 | 2/2001 | Park |
| 6,229,507 | B1 | 5/2001 | Nakamura et al. |
| 6,362,459 | B1 | 3/2002 | Schmidt |
| 6,570,139 | B1 | 5/2003 | Levy et al. |
| 6,573,483 | B1 | 6/2003 | DeCobert et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 05-317164 | 12/1993 |
| JP | 06-327553 | 11/1994 |
| JP | 07-051158 | 2/1995 |
| JP | 07-136059 | 5/1995 |
| JP | 07-241236 | 9/1995 |
| JP | 08-140833 | 6/1996 |
| JP | 10-225373 | 8/1998 |
| JP | 11-137419 | 5/1999 |
| JP | 11-313761 | 11/1999 |
| JP | 2001-070139 | 3/2001 |
| JP | 2001-297865 | 10/2001 |
| JP | 2002-039546 | 2/2002 |
| JP | 2003-045630 | 2/2003 |

OTHER PUBLICATIONS

Rival Crock–Pot® Slow Electric Stoneware Cooker instruction manual.
Faberware® Millennium® Use & Care Instructions Manual (1999).

*Primary Examiner*—Mark Paschall
(74) *Attorney, Agent, or Firm*—Hoffmann & Baron, LLP; Francis E. Marino

(57)　　　　**ABSTRACT**

A programmable slow-cooker appliance, in which a user sets a time and temperature for cooking a food item. A programmable controller prevents the unit from being used solely as a "keep warm" appliance, and a unique design allows cooling of the controller during cooking.

**42 Claims, 12 Drawing Sheets**





FIG. 1
PRIOR ART

FIG. 2
PRIOR ART



39

40

FIG. 3
PRIOR ART



FIG. 4



FIG. 5



FIG. 6



FIG. 7



FIG. 8



256c

256b

256

256a

# FIG. 9



FIG. 10



FIG. 11



FIG. 12



FIG. 13

US 6,740,855 B1

**1**

## PROGRAMMABLE SLOW-COOKER APPLIANCE

This application is a continuation of application Ser. No. 09/802,174, filed Mar. 8, 2001, (pending), which is hereby incorporated by reference herein.

This application claims priority to Provisional Application No. 60/189,443, filed Mar. 15, 2000, and to Provisional Application No. 60/196,273, filed Apr. 5, 2000.

This application also claims priority to U.S. patent application Ser. No. 09/802,174, filed Mar. 8, 2001, now U.S. Pat. No. 6,573,483 the entirety of which is incorporated herein.

### BACKGROUND OF THE INVENTION

Time and convenience are in short supply for homemakers wishing to supply a home-cooked meal to family members. Some appliances, such as slow-cooker appliances, attempt to meet this need by providing all-day cooking while a homemaker is absent. Such appliances, however, tend to be of the type where only one temperature and all day cooking is possible, regardless of the food item, and thus potentially subjecting the food item to over- or under-cooking. Another option may be to use a cooking unit with, a controller, where a user may set a time or temperature desired. These units, however, tend to be quite a bit larger and more expensive than slow-cooker appliances. If these units are of more reasonable size, they also suffer because the controller inevitably must be placed near the heating element.

What is needed is a cooking appliance in which the user retains control over the time and temperature of cooking, but which is small enough to be convenient. What is needed is a slow-cooker unit in which the controller does not become overheated and damaged by the heating element.

### SUMMARY OF THE INVENTION

One embodiment of invention is a programmable slow-cooker appliance, including a heating unit, which includes upstanding sidewalls and a bottom wall. The sidewalls and bottom encompass a heating area. The appliance includes a heating element mounted on the inner surface of the interior wall of the heating unit. In one embodiment, the cooking area may also encompass a cooking unit inside the heating unit, suitable for holding food to be cooked. The appliance includes a programmable controller mounted thereto via a controller housing, which acts to insulate the controller from the heat of the appliance, preferably via a unique system of ventilation. The housing utilizes ventilation holes on its bottom and top to encourage a chimney effect, in which air from the surroundings is drawn through the housing. This air cools the controller, and the air is then exits from ventilation holes near the top of the housing, convecting heat away from the controller.

Another aspect of the invention is a method of using the programmable controller to ensure that food is cooked according to the desires of a user. The user provides a food item and places the food item into the slow-cooker appliance, as described above. The user sets a cooking time and temperature for the programmable slow-cooker unit, using the controls to set both the time and the temperature. The cooking time according to one embodiment may not be set less than four hours, and the temperature may not be set for less than 150 degrees Fahrenheit (66 degrees Celsius). This prevents a user from accidentally setting the cooker to a "warm" temperature, in which food would only be warmed but not cooked thoroughly before consumption. In one embodiment, if the user sets no time or temperature, but

**2**

merely turns the cooker on, the cooker defaults to a particular time and temperature, set by the user or the factory, such as a default setting of four hours and 175 degrees Fahrenheit or eight hours and 150 degrees Fahrenheit.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of an embodiment of a prior art slow-cooker appliance having an oval shape that may be utilized in the present invention;

FIG. 2 is a perspective view of a prior art embodiment of a cooking unit 14 which may be utilized with the appliance of FIG. 1;

FIG. 3 is a perspective view of a prior art cooking unit 39 similar to that shown in FIG. 2, but having a circular shape;

FIG. 4 is a perspective view of a slow cooker appliance incorporating the present invention;

FIG. 5 is a detailed plan view of a portion of the control 200 of the embodiment of FIG. 4;

FIG. 6 is a bottom plan view of the embodiment of FIG. 4;

FIG. 7 is a side cutaway view of the embodiment of FIG. 4;

FIG. 8 is a plan view of a heat sink 256 as utilized in the embodiment of FIG. 4;

FIG. 9 is a side view taken along a line 9—9 of FIG. 8;

FIGS. 10 and 13 are schematic circuit diagrams showing the circuitry and components implemented in preferred embodiments;

FIG. 11 is a wiring diagram showing some of the electric componentry of the preferred embodiment; and

FIG. 12 is an embodiment of the front panel.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Referring to FIG. 1, one prior art embodiment of a food-heating slow-cooker appliance 10 is shown. The appliance 10 preferably comprises a heating, unit 12 and a cooking unit 14. An exemplary slow cooker appliance 10 may be a Crock-Pot® Slow Cooker made by The Rival Division of The Holmes Group® of Milford, Mass. The heating unit 12 preferably has a bottom 16 and a continuous outer sidewall 18. The bottom 16 and an interior sidewall 17 define a well-like heating chamber 20 having an oval cross-section, and the interior sidewall 17 defines an annular lip 22 at an upper edge of the outer sidewall 18 and the interior sidewall 17. The heating chamber 20 has a heating element 24 disposed therein and mounted to the heating unit 12, either under the bottom 16 or additionally between the outer sidewall 18 and the interior sidewall 17. A control switch 26 is conventionally used to provide electricity to the heating element 24. The heating element 24 functions to heat the cooking unit 14 via the heating chamber 20.

As shown in FIG. 2, the cooking unit 14 has a bottom 28 with preferably a continuous sidewall 30 upstanding therefrom. The continuous sidewall 30 preferably has an annular lip 38 projecting in flange-like fashion from the upper end thereof and a substantially oval cross-section. The cooking unit 14 is adapted to be at least partially received within the heating unit 12 with the annular lip 38 of the cooking unit 14 preferably engaging the annular lip 22 of the heating unit 12, supporting the cooking unit 14 within the heating unit 12. Preferably, the annular lip 38 further defines a pair of handle portions 38(a) and 38(b) to facilitate lifting the cooking unit 14. The cooking unit 14 is preferably made of ceramic with a coating of conventional glazing compound.

US 6,740,855 B1

**3**

The thermal and heat retaining properties of the ceramic cooking unit 14 allow it to conduct heat from the heating chamber 20 through the sidewall 30. This provides even heating throughout the unit 14.

As shown in FIG. 3, an alternative embodiment of the appliance 10 includes a cooking unit 39 having a sidewall 40 and a substantially circular cross-section. This embodiment is preferably adapted to fit within a heating unit having a complementary circular heating chamber. This cooking unit 39 is used in an embodiment of the present invention shown in FIG. 4.

In use, the heating unit 12 is provided with a first cooking unit 39. The heating element 24 (not shown) may be powered on and off as necessary to supply heat at a maintained temperature to the cooking unit 39 and the heating chamber via a programmable control 200. The control 200 preferably includes a circuit board housing 210, a control panel 220, and an insulation shield 222 assembled together for attachment to the outer sidewall 18 of the heating unit 12. The interior of the housing 210 contains a printed circuit board 254 (shown in FIG. 7) containing electronic components of the control.

As shown in FIGS. 5 and 6, the housing 210 preferably includes a control panel user interface 224 located on an inclined front surface of the housing 210. Preferably, the housing 210 and insulation shield 222 are made from a thermoplastic material such as polypropylene. A pair of side walls 226, a top wall 228, and bottom wall 230 are preferably located adjacent the control panel 224 and support the control panel 224 in an inclined position away from the front of the cooking appliance 10. This gives the user access to the control panel 224, and also locates the controls and componentry within the housing 210 away from a significant amount of the heat generated by the appliance 10. The printed circuit board 254 may be mounted via threaded screws 255 to rearwardly projecting screw receiving portions 258 on the rear side of the housing 210.

The control panel 224 includes a plurality of indicator lights, such as LEDs 262, spaced on the front panel 224. As is well-known in the art, a variety of other indicator devices may be provided, including digital readouts, audible alarms, liquid crystal displays, incandescent lamps or fluorescent readouts. Preferably, the control panel 224 also includes a plurality of cantilevered portions 264 and 266 as shown in FIG. 5. The cantilevered portions 264, 266 preferably include rearwardly projecting fingers 268 (shown in FIG. 7) which translate the depression of the portions 264, 266 toward the rear portion of the housing 210. The fingers 268 are preferably used to depress pushbutton switch portions located on the circuit board 254. A water-impermeable label membrane may be applied over the front of the control panel 224 to label the indicators 262 and cantilevered portions 264 and 266 for the user. The membrane may also protect the front control panel 224 from damage from spilled foods or liquids and facilitate cleaning.

To further protect the electronic componentry within the housing 210 from the heat generated by the appliance 10, the annular shield member 222 is preferably sized for interposition between the heating unit 12 and the housing 210. In particular, as shown in FIGS. 5 and 6, the shield 222 includes a top wall 232, a pair of side walls 234, and a bottom wall 236. The shield 222 acts as a ventilated spacer to hold the electronic components and the housing 210 at a distance away from sidewall of the cooking unit 12.

In order to dissipate heat that may otherwise be retained between the cooking unit 12 and the rear of the housing 210,

**4**

an air circulation space is provided within the shield. In particular, as shown in the side cutaway view of FIG. 7, the air space 240 behind the shield 222 may vent warmer air out through an upper elongated slot 242 defined within the top wall 232 of the shield 222. Likewise, an elongated slot 244 is defined into the air space 240 in the bottom wall 236 of the shield 222. Heated air may thus escape through the top elongated slot 242 and cooler air may enter the air space 240 through the bottom elongated slot 244. As shown in FIG. 7, the shield 222 also preferably defines a rearwardly projecting cylindrical flange 246 that extends into the outer wall 18 to allow passage of control and power wiring between the interior of the heating unit 12 and the interior of the housing 210.

In a similar fashion, air circulation is promoted through the housing 210 through a set of openings, preferably defined between the upper portion and, the bottom of the housing 210. In particular, a plurality of openings 250 are defined within the bottom wall 230 of the housing 210. An elongated upper slot 252 is provided on the front face 224 of the housing 210. This allows air to freely circulate behind the control panel 224 and assist in the dissipation of heat from the circuit board 254 and its electronic componentry within the housing 210. Preferably, a heat sink 256 is provided as shown in FIG. 7 and positioned between the circuit board 254 and the front panel 224 inside the housing 210. The sink 256 preferably includes a plurality of openings defined therein to allow air to circulate between the openings 250 and 252 and through and around the heat sink 256 to dissipate additional heat therefrom. Also shown is the relative position of cooking unit 14.

FIGS. 8 and 9 show a detailed view of the heat sink 256. Preferably, the heat sink is machined from 0.063 inch thick 3003-0 anodized aluminum. The heat sink 256 is preferably bent at a 160 degree angle between a bottom flange portion 256a and an upper portion 256b. A centrally located retaining tab portion 256c is bent parallel with the lower portion 256a, and the portions 256a and 256c are used for attachment of the heat sink 256 to the rear side of the housing 210 interior via the rearwardly projecting screw receiving portions 258. To maximize the dissipation of heat, a plurality of winged sections 257 and 259 are provided on the heat sink 256 and extend outwardly from a center portion 256a of the heat sink 256. A plurality of openings are defined through the heat sink 256 to allow the fingers 258 of the control panel cantilevered portions 264, 266 to project through the heat sink and contact the circuit board 254 at the rear of the housing 210. The openings 251 also facilitate cooling air flow through and past the heat sink 256 to further dissipate heat therefrom.

The circuit board 254 mounts circuitry and logic allowing the user of the appliance 10 to electronically control and program cooking cycles and temperature. A schematic diagram of the electronic circuitry and components is shown in FIG. 10. The diagram shows a preferred exemplary circuit incorporating preferred components as utilized in the preferred embodiment of the present invention. One skilled in the art will recognize that the componentry illustrated herein is exemplary only and that many other components may be substituted to achieve the functions described herein. FIG. 10 includes labels for each of the components of the circuit, and only major components will be described herein.

First, as shown in the diagram, the preferred circuit 300 is preferably built around an EPROM/ROM-based CMOS microprocessor controller 302, such as the PIC16CR54C RISC CPU manufactured by Microchip Technology, Inc. The chip output preferably includes circuited drivers for 6

US 6,740,855 B1

5

LED indicators 262 (labeled D3–D8) as shown. These LED indicators may be assigned labels as follows:

| LED | Indicates |
|-----|-----------|
| D3 | On |
| D4 | WARM |
| D5 | 4 HOUR |
| D6 | 6 HOUR |
| D7 | 8 HOUR |
| D8 | 10 HOUR |

Two momentary pushbutton contact switches S1 and S2 are used to trigger the "Off" and "Cook" features, respectively, as will be described in the cooking procedure below. Of course, other indicators and switches may be substituted. Note that while examples are given, the circuitry may be implemented in numerous ways, as is well-known in the art, to accomplish the varying programming modes described below.

The temperature of the cooking appliance is measured using a thermistor 310, which is connected externally of the circuit board to the underside of the bottom of the heating chamber. A retention clip 320, shown in FIG. 7, is utilized to hold the thermistor in thermal contact with the bottom 16. In a preferred embodiment, the appliance uses a model USX1732 thermistor manufactured by U.S. Sensor, Inc.

Triac 304, which is preferably a logic Triac Model L4008L6-ND manufactured by Digi-Key, Inc., is utilized to switch the power supplied to the heating elements of the appliance. Preferably, the Triac is of an isolated tab type and includes a heat sink tab that is fastenable to the heat sink 256 shown in FIGS. 8 and 9. Preferably, the Triac is mounted separately to one of the mounting holes on the center portion 256a of the heat sink 256 so that the tab is in thermal contact with the heat sink 256 to dissipate heat generated from its current controlling function. Most of the other components of the circuit 300 are mounted on a conventional printed circuit board 254.

FIG. 11 shows the wiring of the external Triac 304 in relation to the circuit board 254 and heating elements 24. As shown in the Figure, the heating elements 24 are in thermal contact with and wrapping around the interior sidewall 17 of the heating unit.

The operation of the appliance 10 is as follows. The programmable circuitry 300 allows the user to set both the temperature and desired time for cooking. The functions of the switches Si and S2, which are activatable via the cantilevered portions 264 and 266 of the control panel 224, are as follows:

S1. OFF pushbutton—turns the appliance 10 off.

S2. COOK pushbutton—subsequent pushes of the button cycle through 4 hour, 6 hour, 8 hour and 10 hour set times.

When the unit is plugged in, the power "on" indicator flashes. The user then pushes the COOK button (switch S2) to set the temperature and cooking time. As the user pushes the COOK switch S2, the LED's D5–D8 illuminate to indicate the corresponding time setting as follows:

LEDs

D3. POWER—on when appliance 10 is in cook or warm modes.

D5. 4 HOUR—on when appliance is in 4-hour cook mode

D6. 6 HOUR—on when appliance is in 6-hour cook mode

D7. 8 HOUR—on when appliance is in 8-hour cook mode

6

D8. 10 HOUR—on when appliance is in 10-hour cook mode

D4. WARM—on when appliance is in half-power mode

Thus, subsequent pushes of the COOK switch S2 activate different cooking modes, as shown by the 6 HOUR, 8 HOUR and 10 HOUR LEDs 262 on the control panel 224. If the COOK switch S2 is pressed in the 10 HOUR mode, the control 200 recycles to the 4 HOUR cooking mode, and its indicator.

In general, full power will be applied to the heating element 24 until the time corresponding to the illuminated LED elapses, after which the power to the heating element 24 is reduced by half, the WARM indicator illuminates and all cook time indicators extinguish. The choices of operation are: 4 or 6 hours on a HI temperature, and 8 to 10 hours on a lower temperature setting. Once the user selects the desired setting, the appliance 10 starts the cooking operation. Once the time setting has expired, the appliance 10 automatically reduces power to the heating element 24 to put the unit in a WARM setting. The unit will stay in the WARM setting until the user pushes the OFF button or unplugs the unit. Of course, other programming schemes are possible.

Preferably, the user cannot set the unit initially in the WARM setting. The system will only go to WARM after one of the time functions has expired. This avoids possible food safety problems that may be associated with cooking food only on the WARM setting. Pressing the OFF switch Si any time the unit is on preferably removes power from the heating element 24 and extinguishes all indicator LEDs 262.

In another embodiment, the slow-cooker appliance utilizes four push-button switches, rather than two, to set times and temperatures for cooking. An exemplary control panel is depicted in FIG. 12, with control circuitry in FIG. 13. Four momentary pushbutton contact switches 227, 229, 231, 233 are used to trigger various power and setting functions as will be described in the cooking procedure below. Of course, other numbers or types of indicators and switches may be substituted as well. FIG. 13 shows circuitry applicable to such an embodiment, incorporating controller 302, external temperature element 310, digital readout 57, and Power LED 263 and Timer LED 265. The Power LED indicates power is present at the microprocessor controller and the Timer LED indicates that the Timer function is on and working.

The operation of the appliance is as follows. The programmable circuitry allows the user to set both the temperature and the desired cooking time. The functions of the switches 227, 229, 231, 233 on an alternative embodiment of a control panel user interface 225, are as follows:

227. ON/OFF power pushbutton—turns the appliance on and off.

229. TIMER pushbutton—activates stepped timer.

231. UP pushbutton—increases displayed numerical value.

233. DOWN pushbutton—decreases displayed numerical value.

When the unit is plugged in, the unit defaults to 150-degrees F. as shown on the digital display 57. The user may adjust the desired cooking temperature in 25-degree increments using the UP 231 button or the DOWN button 233, with 150 degrees Fahrenheit as a minimum temperature. Once the user has selected the specific temperature, the appliance will start the cooking process.

The user may also select the TIMER mode by pressing the TIMER button 229. In TIMER mode, the controller defaults to 4 hours. The user can use the UP or DOWN controls to

US 6,740,855 B1

7

increase or decrease the time in 15-minute increments. Once the time is set, the controller 302 will count down the time remaining for cooking in 1 minute increments until the unit "times out". At that time, the power is shut off from the heating element.

In all modes, the temperature is read periodically by the thermistor or other temperature element and relayed to the controller. The reading is checked at 4-second intervals. If the temperature is above or equal to the set point, power is removed. If it is below the set point, power is applied to the heating element 32. Of course, the circuitry can be modified as desired to achieve various program methods and modes.

Another embodiment of the slow cooker appliance adds a piezobuzzer to the circuitry. A piezobuzzer is simply an electrically-activated buzzer that can be programmed to emit a sound at desired moments. In one embodiment, a piezobuzzer may be installed as an output 315, controlled by the microprocessor controller 302, as shown in FIG. 13, and programmed to emit a sound when desired. In one embodiment, the buzzer may beep to provide feedback to a user when a pushbutton is pushed. The slow cooker may also be programmed to emit a sound to indicate the end of the cooking time. The buzzer may also be used to emit sounds at other desired times.

It is intended that the foregoing description illustrates rather than limits this invention, and that it is the following claims, including all equivalents, which define this invention. Of course, it should be understood that a wide range of changes and modifications may be made to the embodiments described above. Accordingly, it is the intention of the applicants to protect all variations and modifications within the valid scope of the present invention. It is intended that the invention be defined by the following claims, including all equivalents.

What is claimed is:

1. A programmable slow-cooker appliance comprising:

a heating unit including a bottom and a continuous sidewall extending from said bottom, said bottom and said continuous sidewall including an outer sidewall and an interior sidewall and defining a well-like heating chamber;

a heating element mounted to said heating unit and disposed between said outer sidewall and said interior sidewall;

a cooking unit at least partially received within said well-like chamber;

a non-conductive housing fixedly mounted to and projecting outside said continuous sidewall of said heating unit, said housing having a bottom wall;

a lower vent in said bottom wall of said housing for admitting relatively cool air to said housing;

an upper vent in said housing for allowing the escape of relatively warm air from said housing;

a programmable circuit positioned within said housing such that heat is convected away therefrom as air passes through said housing and said vents and electrically connected to said heating element to electronically control and program cooking cycles and temperature; and

a control panel on said housing, said control panel being electronically connected to said programmable circuit.

2. A programmable slow-cooker appliance as described in claim 1 wherein said housing is comprised of a shield and a housing portion, said shield being interposed between and adjoining said outer sidewall of said heating unit and said housing portion, said control panel being incorporated on said housing portion.

8

3. A programmable slow-cooker appliance as described in claim 2 including a circuit board including said circuit mounted to and positioned within said housing, and a Triac electrically connected between said circuit board and said heating element.

4. A programmable slow-cooker appliance as described in claim 3 further including a heat sink position within said housing between said circuit and said control panel.

5. A programmable slow-cooker appliance as described in claim 4 wherein said Triac includes a heat sink tab in thermal contact with said heat sink.

6. A programmable slow-cooker appliance as described in claim 1 wherein said control panel includes a user interface located on an inclined front surface of said housing spaced away from said outer sidewall of said heating unit.

7. A programmable slow-cooker appliance as described in claim 6 wherein said lower and upper vents are positioned to allow air to circulate behind said control panel and assist in the dissipation of heat from said programmable circuit.

8. A programmable slow-cooker appliance as described in claim 6 wherein said housing is comprised of a shield and a housing portion, said shield being interposed between and adjoining said outer sidewall of heating unit and said housing portion, said control panel being incorporated on said housing portion.

9. A programmable slow-cooker appliance as described in claim 8 wherein said upper and lower vents are in said housing portion.

10. A programmable slow cooker appliance as described in claim 9 wherein said housing is comprised of a thermoplastic material.

11. A programmable slow-cooker appliance as described in claim 1 wherein said cooking unit is made from a ceramic material and is removably positioned in said well-like chamber.

12. A programmable slow-cooker appliance comprising:

a heating unit including a bottom and a continuous sidewall extending from said bottom, said bottom and said continuous sidewall defining a well-like chamber;

a heating element mounted to said heating unit for providing heat to said well-like chamber;

a ceramic cooking unit removably positioned in said well-like chamber;

a non-conductive housing fixedly mounted to and projecting outside said continuous sidewall of said heating unit;

a programmable circuit positioned within said housing and electrically connected to said heating element to electronically control and program cooking cycles and temperature;

means including vents in said housing for cooling said programmable circuit by convecting heat away therefrom; and

a control panel mounted to said housing and electrically connected to said programmable circuit.

13. A programmable slow-cooker appliance as described in claim 12 wherein said programmable circuit includes a microprocessor controller.

14. A programmable slow-cooker appliance as described in claim 13 wherein said housing is comprised of a shield and a housing portion, said shield being interposed between and adjoining said sidewall of said heating unit and said housing portion, said control panel being incorporated on said housing portion.

15. A programmable slow-cooker appliance as described in claim 12 including means for automatically switching said heating element from a cook mode to a warm mode.

US 6,740,855 B1

9                                                                                    10

16. A programmable slow-cooker appliance as described in claim 15 including a Triac electrically connected between said programmable circuit and said heating element.

17. A programmable slow-cooker appliance as described in claim 16 including a heat sink positioned within said housing, said Triac including a heat sink tab in thermal contact with said heat sink.

18. A programmable slow-cooker appliance as described in claim 12 wherein said means for cooking includes a lower vent in said housing for admitting relatively cool air to said housing and an upper vent in said housing for allowing the escape of relatively warm air from said housing.

19. A programmable slow-cooker appliance as described in claim 12 wherein said programmable circuit is configured to switch said heating element from a cooking mode to a warming mode at the expiration of a set cooking time.

20. A programmable slow-cooker appliance comprising:

a heating unit including a bottom and a continuous sidewall extending from said bottom, said bottom and said continuous sidewall defining a well-like chamber, said continuous sidewall including an outer sidewall and an interior sidewall;

a heating element mounted to said heating unit and disposed between said outer sidewall and said interior sidewall;

a housing fixedly mounted to and projecting outside said continuous sidewall of said heating unit;

a programmable circuit positioned within said housing and configured to automatically switch said heating element from a cook mode to a lower temperature warm mode at the end of a set cooking time;

a control panel mounted to said housing and including a user interface connected to said programmable circuit for selecting a cooking temperature and cooking time; and

a cooking unit removably positioned in said well-like chamber.

21. A programmable slow-cooker appliance as described in claim 20 wherein said housing includes a plurality of vent openings, a thermoplastic shield and a housing portion, said shield being disposed between and adjoining said outer sidewall of said heating unit and said housing portion, said housing portion including a control panel.

22. A programmable slow-cooker appliance as described in claim 21 including a heat sink positioned within said housing.

23. A programmable slow-cooker appliance as described in claim 22 including a Triac positioned within said housing and electrically connected between said programmable circuit and said heating element, said Triac being in thermal contact with said heat sink.

24. A programmable slow-cooker appliance as described in claim 20 wherein said housing is comprised of a thermoplastic material and said cooking unit is comprised of a ceramic material, said cooking unit being removably positioned in said well-like chamber.

25. A programmable slow-cooker appliance as described in claim 21 wherein said housing is comprised of a thermoplastic material and said cooking unit is comprised of a ceramic material.

26. A programmable slow-cooker appliance as described in claim 20 wherein said programmable circuit is configured such that a user cannot initially set a lower temperature warm mode.

27. A programmable slow-cooker appliance as described in claim 20 including a switch operatively associated with said control panel, said programmable circuit being configured such that subsequent pushes of said switch activates different cook modes.

28. A programmable slow-cooker as described in claim 27 wherein said housing is vented.

29. A programmable slow-cooker appliance as described in claim 20 wherein said housing includes a thermoplastic portion adjoining and extending into said continuous sidewall of said heating unit.

30. A programmable slow-cooker appliance as described in claim 20 wherein said circuit is configured to default to cause operation of said appliance at a cooking temperature when plugged into a power source.

31. A slow-cooker appliance comprising:

a heating unit including a bottom and a sidewall defining a well-like heating chamber and a heating element for providing heat to said heating chamber;

a ceramic cooking unit including a bottom, a continuous sidewall upstanding from said bottom, and a lip extending outwardly from said sidewall, said cooking unit being dimensioned to be at least partially received within said well-like heating chamber and supported by engagement of said lip with said heating unit;

a housing assembly mounted to and projecting outwardly from said sidewall of said heating unit, said housing assembly including a thermoplastic portion adjoining said outer sidewall, an inclined front surface including a control panel having a user interface, and a vent opening; and

a programmable circuit positioned within said housing assembly, said user interface being connected to said programmable circuit for selecting cooking temperature and cooking time, said programmable circuit being configured to automatically switch said heating element from a cook mode to a lower temperature warm mode at the end of a set cooking time.

32. A slow-cooker appliance as described in claim 31 wherein said thermoplastic portion of said housing assembly extends into said sidewall of said heating unit.

33. A slow-cooker appliance as described in claim 31 wherein said housing assembly includes a bottom wall including a plurality of vent openings.

34. A slow-cooker appliance as described in claim 33 wherein said housing assembly includes a plurality of upper vent openings such that heat is convected away from said programmable circuit as air flows into said housing assembly through said vent openings in said bottom wall, through said housing assembly, and out of said housing assembly through said upper vent openings.

35. A slow-cooker appliance as described in claim 31 including a switch operatively associated with said control panel, said programmable circuit being configured such that subsequent pushes of said switch activates different cook modes.

36. A slow-cooker appliance as described in claim 31 wherein said circuit is configured to default to cause operation of said appliance at a cooking temperature when plugged into a power source.

37. A programmable slow-cooker appliance comprising:

a heating unit including a bottom and a continuous sidewall defining a well-like heating chamber and a heating element positioned for providing heat to said well-like heating chamber;

a cooking unit including a lip and adapted to fit at least partially within said heating unit such that said lip engages a top portion of said heating unit;

US 6,740,855 B1

11

a housing assembly mounted to and projecting from said sidewall of said heating unit, said housing assembly including a thermoplastic portion adjoining said sidewall of said heating unit, a bottom wall adjoining said sidewall, and an inclined front surface including a control panel user interface spaced from said sidewall; and

a circuit including a programmable controller positioned within said housing assembly and operatively associated with said user interface, said circuit being configured to allow a user to set both cooking temperature and cooking time and to cause said heating element to operate in a warm mode at the expiration of a set cooking time, said control panel being electronically connected to said circuit.

**38**. A programmable slow-cooker appliance as described in claim **37** wherein said circuit is incorporated on a printed circuit board and a heat sink is positioned in said housing assembly between said printed circuit board and said control panel user interface.

12

**39**. A programmable slow-cooker appliance as described in claim **37** wherein said bottom wall of said housing assembly is vented.

**40**. A programmable slow-cooker appliance as described in claim **37** wherein said housing assembly includes an upper vent opening positioned such that, when operated, relatively cool air enters said housing assembly through said vented bottom wall, passes over said circuit, and relatively warm air exits said housing assembly through said upper vent opening.

**41**. A programmable slow-cooker appliance as described in claim **37** wherein said circuit is configured to default to cause operation of said appliance at a cooking temperature when plugged into a power source.

**42**. A programmable slow-cooker appliance as described in claim **41** including a switch operatively associated with said control panel such that subsequent pushes of said switch activates different cooking times and temperatures.

* * * * *

# EXHIBIT J

# United States Patent [19]

**Hlava et al.**

[11] **Patent Number:** **Des. 429,596**

[45] **Date of Patent:** ** **Aug. 22, 2000**

[54] **SLOW COOKER**

[75] Inventors: **Lorens G. Hlava**, Clinton, Mo.; **Gary A. Klein**, Overland Park, Kans.; **Lori D. Baker**, Pleasant Hill, Mo.

[73] Assignee: **The Rival Company**, Kansas City, Mo.

[**] Term: **14 Years**

[21] Appl. No.: **29/099,269**

[22] Filed: **Nov. 21, 1997**

### Related U.S. Application Data

[63] Continuation of application No. 29/068,020, Mar. 17, 1997, abandoned.

[51] **LOC (7) Cl.** ........................................ **07-02**
[52] **U.S. Cl.** ........................................ **D7/360**
[58] **Field of Search** ............................ D7/323, 354–361, D7/337; 99/324, 325, 331, 403, 410–413; 219/429, 432, 438, 440

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 113,632 | 3/1939 | Howlett | D7/360 |
| D. 115,168 | 6/1939 | Hadley | D7/360 |
| D. 230,935 | 3/1974 | Lloveras | D7/360 |
| 244,180 | 7/1881 | Campbell | 126/369 |
| 263,049 | 8/1882 | Krehbiel | 126/369 |
| D. 279,956 | 8/1985 | Eyck et al. | D7/354 |
| 282,587 | 8/1883 | Swink | 126/369 |

(List continued on next page.)

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 35389 | 9/1887 | Canada . |
| 1082456 | 12/1954 | France . |
| 270722 | 9/1912 | Germany . |
| 271879 | 11/1912 | Germany . |
| 75371 | 8/1917 | Germany . |
| 2329 | 2/1909 | United Kingdom . |
| 5969 | 7/1912 | United Kingdom . |
| 7612 | 11/1913 | United Kingdom . |
| 209721 | 11/1924 | United Kingdom . |

### OTHER PUBLICATIONS

West Bend Electric Steamer/Rice Cooker advertisement; believed published in 1992.
Rival Automatic Steamer and Rice Cooker operating manual and cookbook; published in 1985, pp. 1–3.
House & Home Electric Steamer & Rice Cooker packaging exterior.
Nesco Steam Cuisine operating manual and cookbook; published in 1991, pp. 1–4.
Singer Lo–Cal Cooker operating manual and cookbook; published in 1992, pp. 1–5, and 26.
West Bend Electric Steamer/Rice Cooker operating manual and cookbook; published in Dec. 1992, pp. 1, 3–5.
Black & Decker Handy Steamer operating manual and cookbook; published in 1991, pp. 1–7.
Moulinex Steam Cooker operating manual and warranty booklet; believed published in 1993, pp. 1–5.
Hamilton Beach Vegetable Steamer/Rice Cooker operating manual; published in Feb. 1993, pp. 1, 6.
Steam Cuisine operating manual and cookbook.
Contempra Table Toppers manual and cookbook.
Aroma Rice Cooker/Steamer newspaper article.
Hitachi, ChimeOmatic Models RD5083 & RD6103 specifications.

(List continued on next page.)

*Primary Examiner*—Caron D. Veynar
*Attorney, Agent, or Firm*—Brinks, Hofer, Gilson & Lione; Francis E. Marino

[57] **CLAIM**

The ornamental design for a slow cooker, as shown and described.

### DESCRIPTION

FIG. 1 is a perspective view of a slow cooker showing our new design;
FIG. 2 is a front view thereof;
FIG. 3 is a bottom view thereof;
FIG. 4 is a top view thereof;
FIG. 5 is a rear view thereof;
FIG. 6 is a right side view thereof; and,
FIG. 7 is a left side view thereof.

**1 Claim, 4 Drawing Sheets**



**Des. 429,596**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 347,356 | 5/1994 | Yim | D7/354 |
| 354,240 | 12/1886 | Roberts | 126/369 |
| D. 363,635 | 10/1995 | Cashin et al. | D7/354 |
| D. 366,592 | 1/1996 | Cesaroni et al. | D7/360 |
| 366,960 | 7/1887 | Johnson et al. | 99/444 |
| D. 376,067 | 12/1996 | Littmann | D7/354 X |
| 560,336 | 5/1896 | Willson | 126/369 |
| 607,759 | 7/1898 | Mathy | 126/376 |
| 636,528 | 11/1899 | Henderson | 126/369 |
| 776,926 | 12/1904 | Misener | 126/369 |
| 780,851 | 1/1905 | Wilson | 126/369 |
| 869,903 | 11/1907 | Harloe | 126/369 |
| 907,154 | 12/1908 | Lewis et al. | 126/376 |
| 925,781 | 6/1909 | Mathy | 220/4.21 |
| 926,028 | 6/1909 | Smith | 126/369 |
| 1,606,395 | 11/1926 | Hensel et al. | 215/298 |
| 2,089,411 | 8/1937 | Olsson et al. | 126/369 |
| 2,131,663 | 9/1938 | Hughes | 220/772 |
| 2,154,263 | 1/1939 | Huntzinger et al. | 126/369 |
| 2,554,412 | 5/1951 | Kavanagh | 99/425 |
| 2,622,591 | 12/1952 | Bramberry | 126/381 |
| 2,715,898 | 8/1955 | Michaelis et al. | 126/273 R |
| 2,718,842 | 9/1955 | Klemm | 99/351 |
| 2,761,375 | 9/1956 | Jepson | 99/344 |
| 2,947,304 | 8/1960 | Ashley | 126/381 |
| 3,078,783 | 2/1963 | Lee | 99/352 |
| 3,147,689 | 9/1964 | Sakamoto et al. | 99/331 |
| 3,275,801 | 9/1966 | Churchill | 219/468.2 |
| 3,485,163 | 12/1969 | Arita | 99/413 |
| 3,659,584 | 5/1972 | Doyle et al. | 126/369 |
| 3,869,595 | 3/1975 | Collins et al. | 219/387 |
| 4,045,653 | 8/1977 | Soper et al. | 219/438 |
| 4,052,590 | 10/1977 | Anderl et al. | 219/438 |
| 4,115,918 | 9/1978 | Anderl et al. | 29/611 |
| 4,148,250 | 4/1979 | Miki et al. | 99/403 |
| 4,197,791 | 4/1980 | Vieceli et al. | 99/339 |
| 4,452,132 | 6/1984 | Miller et al. | 99/483 |
| 4,509,412 | 4/1985 | Whittenburg et al. | 99/331 |
| 4,605,840 | 8/1986 | Koopman | 219/401 |
| 4,650,968 | 3/1987 | Williams | 219/401 |
| 4,920,251 | 4/1990 | Whitenack et al. | 219/401 |
| 5,097,753 | 3/1992 | Naft | 99/341 |

## OTHER PUBLICATIONS

Hitachi Models RD3031, RD405F, RZ1540L8 & RZ1840L/10 specifications.

Rival® Crock–Grill® Sales Brochure; Oct., 1995.

Rival® Automatic Steamer/Rice Cooker Sales Brochure; Oct., 1995.

Rival® Crock–Pot® Slow Cooker Sales Brochure; Oct., 1995.

Rival® Crock–Pot® Little Dipper Model 3204 SW Sales Brochure; Oct., 1995.

Rival® Crock–Pot® Little Dipper Model 3204D Sales Brochure; Oct., 1995.

Rival® 8–oz Potpourri Crock® Model 3206 XX Sales Brochure; Oct., 1995.

Rival® Potpourri Crock® Model 3209XX Sales Brochure; Oct., 1995.

Rival® Crock–Pot® Little Dipper Sales Brochure; Oct., 1995.



Fig. 1



Fig. 2

Fig. 3



*Fig. 4*

*Fig. 5*



*Fig.* 6



*Fig.* 7



# EXHIBIT K

US00D434940S

# United States Patent [19]

## Hlava et al.

[11] **Patent Number:**   **Des. 434,940**

[45] **Date of Patent:**   **\*\* Dec. 12, 2000**

[54] **SLOW COOKER**

[75] Inventors: **Lorens G. Hlava**, Clinton, Mo.; **Gary A. Klein**, Overland Park, Kans.; **Lori D. Baker**, Pleasant Hill, Mo.

[73] Assignee: **The Holmes Group**, Milford, Mass.

[\*\*] Term: **14 Years**

[21] Appl. No.: **29/119,618**

[22] Filed: **Feb. 25, 2000**

### Related U.S. Application Data

[63] Continuation of application No. 29/099,269, Nov. 21, 1997, which is a continuation of application No. 29/068,020, Mar. 17, 1997, abandoned.

[51] **LOC (7) Cl.** ............................................. **07-07**
[52] **U.S. Cl.** ............................................. **D7/354**
[58] **Field of Search** ............................ D7/323, 354–361, D7/545; 99/324, 325, 339, 341, 403; 219/620, 621, 624

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| D. 113,632 | 3/1939 | Howlett . |
| D. 199,747 | 12/1964 | Farber ........................................ D7/354 |
| D. 230,935 | 3/1974 | Lloveras . |
| 244,180 | 7/1881 | Campbell . |
| D. 248,363 | 7/1978 | Rinaldi ........................................ D7/354 |

(List continued on next page.)

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 35389 | 9/1887 | Canada . |
| 1.082.456 | 12/1954 | France . |
| 270722 | 9/1912 | Germany . |
| 271879 | 11/1912 | Germany . |
| 75371 | 8/1917 | Germany . |
| 2329 | 2/1909 | United Kingdom . |
| 5969 | 7/1912 | United Kingdom . |
| 7612 | 11/1913 | United Kingdom . |
| 209721 | 11/1924 | United Kingdom . |

#### OTHER PUBLICATIONS

West Bend Electric Steamer/Rice Cooker operating manual and cookbook; published in Dec. 1992, pp. 1, 3–5.

Black & Decker Handy Steamer operating manual and cookbook; published in 1991, pp. 1–7.
Moulinex Steam Cooker operating manual and warranty booklet; believed published in 1993, pp. 1–5.
Hamilton Beach Vegetable Steamer/Rice Cooker operating manual; published in Feb. 1993, pp. 1, 6.
Steam Cuisine operating manual and cookbook.
Contempra Table Toppers manual and cookbook.
Aroma Rice Cooker/Steamer newspaper article.
Hitachi, ChimeOmatic Models RD5083 & RD6103 specifications.
Hitachi Models RD3031, RD405F, RZ1540L/8 & RZ1840L/10 specifications.
Steamer packaging exterior, no date.
West Bend Electric Steamer/Rice Cooker advertisement; believed published in 1992.
Rival Automatic Steamer and Rice Cooker operating manual and cookbook; published in 1985, pp. 1–3.
House & Home Electric Steamer & Rice Cooker packaging exterior.
Nesco Steam Cuisine operating manual and cookbook; published in 1991, pp. 1–4.
Singer Lo–Cal Cooker operating manual and cookbook; no date avail. pp. 1, 5, and 26.

*Primary Examiner*—Caron D. Veynar
*Attorney, Agent, or Firm*—Brinks Hofer Gilson & Lione; Frank Marino

[57] **CLAIM**

The ornamental design for a slow cooker, as shown and described.

### DESCRIPTION

FIG. 1 is a perspective view of a slow cooker showing our new design;
FIG. 2 is a front view thereof;
FIG. 3 is a bottom view thereof;
FIG. 4 is a top view thereof;
FIG. 5 is a rear view thereof;
FIG. 6 is a right side view thereof; and,
FIG. 7 is a left side view thereof.
The broken line showings in FIGS. 1–7 are for illustrative purposes only and form no part of the claimed design.

**1 Claim, 4 Drawing Sheets**



**Des. 434,940**
Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 253,574 | 12/1979 | Anderson, Jr. | D7/356 |
| D. 254,355 | 3/1980 | Ottier | D7/545 |
| 263,049 | 8/1882 | Krehbiel . | |
| D. 275,925 | 10/1984 | Bowen et al. | D7/357 |
| D. 279,956 | 8/1985 | Eyck et al. | D7/354 |
| 282,587 | 8/1883 | Swink . | |
| D. 284,257 | 6/1986 | Greb et al. | D7/355 |
| 354,240 | 12/1886 | Roberts . | |
| D. 366,592 | 1/1996 | Cesaroni et al. | D7/360 |
| 366,960 | 7/1887 | Johnson et al. . | |
| D. 416,434 | 11/1999 | Pollnow | D7/360 |
| D. 420,246 | 2/2000 | Alonge et al. | D7/360 |
| D. 420,247 | 2/2000 | Kaney et al. | D7/360 |
| D. 425,360 | 5/2000 | Dobson et al. | D7/360 |
| 560,336 | 5/1896 | Willson . | |
| 607,759 | 7/1898 | Mathy . | |
| 636,528 | 11/1899 | Henderson . | |
| 776,926 | 12/1904 | Misener . | |
| 780,851 | 1/1905 | Wilson . | |
| 869,903 | 11/1907 | Harloe . | |
| 907,154 | 12/1908 | Lewis et al. . | |
| 925,781 | 6/1909 | Mathy . | |
| 926,028 | 6/1909 | Smith . | |
| 1,606,395 | 11/1926 | Hensel et al. . | |
| 2,089,411 | 8/1937 | Olsson et al. | 53/2 |
| 2,131,663 | 9/1938 | Hughes | 53/4 |
| 2,145,263 | 1/1939 | Huntzinger et al. | 53/6 |
| 2,554,412 | 5/1951 | Kavanagh | 99/425 |
| 2,622,591 | 12/1952 | Bramberry | 126/331 |
| 2,715,898 | 8/1955 | Michaelis et al. | 126/273 |
| 2,718,842 | 9/1955 | Klemm | 99/234 |
| 2,761,375 | 9/1956 | Jepson | 99/344 |
| 2,947,304 | 8/1960 | Ashley | 126/381 |
| 3,078,783 | 2/1963 | Lee | 99/259 |
| 3,147,689 | 9/1964 | Sakamoto et al. | 99/331 |
| 3,275,801 | 9/1966 | Churchill | 219/457 |
| 3,485,163 | 12/1969 | Arita | 99/413 |
| 3,659,584 | 5/1972 | Doyle et al. | 126/269 |
| 3,869,595 | 3/1975 | Collins et al. | 219/387 |
| 4,045,653 | 8/1977 | Soper et al. | 219/438 |
| 4,052,590 | 10/1977 | Anderl et al. | 219/438 |
| 4,115,918 | 9/1978 | Anderl et al. | 29/611 |
| 4,148,250 | 4/1979 | Miki et al. | 99/403 |
| 4,197,791 | 4/1980 | Vieceli et al. | 99/339 |
| 4,452,132 | 6/1984 | Miller et al. | 99/483 |
| 4,509,412 | 4/1985 | Whittenburg et al. | 99/331 |
| 4,605,840 | 8/1986 | Koopman | 219/401 |
| 4,650,968 | 3/1987 | Williams | 219/401 |
| 4,920,251 | 4/1990 | Whitenack et al. | 219/401 |
| 5,097,753 | 3/1992 | Naft | 99/341 |



Fig. 1



*Fig. 2*



*Fig. 3*



*Fig. 4*

*Fig. 5*





Fig. 6



Fig. 7

# EXHIBIT L

# United States Patent [19]

**Alonge et al.**

[11] **Patent Number:** **Des. 420,246**

[45] **Date of Patent:** ** **Feb. 8, 2000**

[54] **SLOW COOKER**

[76] Inventors: **Barbara Alonge**, 1512 Maeder Ave., North Merrick, N.Y. 11566; **David Sabin**, 210 N. Mayflower, Lake Forest, Ill. 60045

[**] Term: **14 Years**

[21] Appl. No.: **29/093,339**

[22] Filed: **Sep. 9, 1998**

[51] LOC (7) Cl. ............................................... **07-02**
[52] U.S. Cl. ................................................ **D7/360**
[58] Field of Search ........................... D7/323, 354–361; 220/573.1, 573.4; 99/324, 325, 403

[56]                    **References Cited**

U.S. PATENT DOCUMENTS

D. 170,575  10/1953  Jepson ...................................... D7/360
D. 280,064   8/1985  Obata et al. ............................. D7/360

D. 284,257   6/1986  Greb et al. ............................... D7/355
D. 300,598   4/1989  Ueda et al. .............................. D7/360
D. 335,063   4/1993  Napolitano ............................... D7/360
D. 376,724  12/1996  Mendelson et al. ...................... D7/360

*Primary Examiner*—Caron D. Veynar
*Attorney, Agent, or Firm*—Jerry A. Schulman

[57]                    **CLAIM**

The ornamental design for a slow cooker, as shown and described.

**DESCRIPTION**

FIG. 1 is a front elevational view of the present invention;
FIG. 2 is a right lateral elevational view thereof;
FIG. 3 is a left lateral elevational view thereof;
FIG. 4 is a top plan view thereof;
FIG. 5 is a bottom plan view thereof;
FIG. 6 is a rear elevational view thereof; and,
FIG. 7 is a perspective view thereof.

1 Claim, 4 Drawing Sheets



**U.S. Patent**       Feb. 8, 2000      Sheet 1 of 4       **Des. 420,246**



FIG. 1



FIG. 2

**U.S. Patent**    Feb. 8, 2000    Sheet 2 of 4    **Des. 420,246**



FIG.3



FIG.4



FIG. 5



FIG. 6



FIG. 7

# EXHIBIT M

# United States Patent [19]

**Pollnow**

[11] **Patent Number:** **Des. 416,434**

[45] **Date of Patent:** ** **Nov. 16, 1999**

[54] **COOKER**

[75] Inventor: **Scott Thomas Pollnow**, West Bend, Wis.

[73] Assignee: **Premark WB Holdings, Inc.,** Wilmington, Del.

[**] Term: **14 Years**

[21] Appl. No.: **29/093,383**

[22] Filed: **Sep. 9, 1998**

[51] **LOC (6) Cl.** ........................................ **07-02**

[52] **U.S. Cl.** ............................................. **D7/360**

[58] **Field of Search** ........................... D7/323, 354–361; 220/573.1, 573.4; 99/324, 325, 403

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 170,575 | 10/1953 | Jepson | D7/360 |
| D. 280,064 | 8/1985 | Obata et al. | D7/360 |
| D. 284,257 | 6/1986 | Greb et al. | D7/355 |
| D. 300,598 | 4/1989 | Ueda et al. | D7/360 |
| D. 335,063 | 4/1993 | Napolitano | D7/360 |
| D. 376,724 | 12/1996 | Mendelson et al. | D7/360 |

*Primary Examiner*—Caron D. Veynar
*Attorney, Agent, or Firm*—Michael Best & Friedrich LLP

[57] **CLAIM**

The ornamental design for a cooker, as shown and described.

**DESCRIPTION**

FIG. 1 is a perspective view of a cooker showing my new design;

FIG. 2 is an elevation view of the front of the cooker shown in FIG. 1;

FIG. 3 is an elevation view of the rear of the cooker shown in FIGS. 1 and 2;

FIG. 4 is an elevation view of the right side of the cooker shown in FIGS. 1–3;

FIG. 5 is an elevation view of the left side of the cooker shown in FIGS. 1–4;

FIG. 6 is a top plan view of the cooker shown FIGS. 1–5 ; and,

FIG. 7 is a bottom plan view of the cooker shown in FIGS. 1–6.

**1 Claim, 4 Drawing Sheets**



U.S. Patent    Nov. 16, 1999    Sheet 1 of 4    Des. 416,434



Fig. 1



*Fig. 2*



*Fig. 3*

Case 1:05-cv-11367-WGY    Document 62-15    Filed 12/01/2006    Page 5 of 6



*Fig. 4*



*Fig. 5*



*Fig. 6*

*Fig. 7*

# EXHIBIT N

DOBSONROUGH
16      identification.)

17   BY MR. HENNEBERGER:

18   Q   I'd like to mark as Dobson Exhibit 9 a photograph

19       of -- you're going to have to take my word for

20       this -- it's a Rival model number 3730W slow cooker.

21   A   I'll take your word for it.

22   Q   Okay.  I'm not going to ask you questions about

23       that, but this will help describe what you're

24       saying.

25   A   I see what you're saying.  I see what you're saying.


HALMA-JILEK REPORTING, INC.  (414) 271-4466

58

 1   Q   So looking at the top surface looking at Dobson

         Exhibit 9, the cooking vessel lid slopes downwardly

         and inwardly with a convex shape from the top

         surface to the bottom surface.  Do you see that

 5       shown in any of the figures of the '266 patent?

 6   A   No, I don't.

 7   Q   All right.  Looking at the knob on the lid of the

         Dobson Exhibit 9 and the knob on the lid of the '266

 9       patent, are those knobs the same?

10   A   No.

11   Q   Are they substantially different?

12   A   I'm going to answer it this way.  They're both round

13       knobs.

14   Q   Does the ornamental appearance of the knob in Dobson

         Exhibit 9 look like the ornamental appearance of the

16       '266 patent knob?

17   A   No.

Page 54

DOBSONROUGH

18  Q   Does the shape of the -- strike that.

19      I know I'm jumping around a little bit, and I

20      apologize.  We were talking about the lip on the

21      cooking vessel, and I believe we said that the lip

22      on Exhibit 9 is different from that shown on

23      Figure 4 of the '266 patent, is that correct?

24  A   Correct.

25  Q   Is the slow cooker shown in Dobson Exhibit 9


HALMA-JILEK REPORTING, INC.  (414) 271-4466

59

1       distinguishable from the slow cooker shown in

2       Figure 4 of the '266 patent?

3                MR. MIOTKE:  Object as to vague when you

4       use the term distinguishable.

5   BY MR. HENNEBERGER:

6   Q   To the extent you can understand my question, please

7       answer.

8   A   To me it is.

9   Q   It is distinguishable?

10  A   There's a difference.

11  Q   What are the differences between Dobson Exhibit 9

12      and the figure shown in Figure 4 of the '266 patent?

13  A   The treatment of the ceramic lip is obviously

14      different.

15  Q   Anything else?

16  A   The knob construction is -- is different.  This

17      is -- on Exhibit 9, there is a dome to the top of

18      the knob, all right?  On what is this?

19  Q   '266?

DOBSONROUGH

20  A  '266, it is either flat or concave, but it is not --

21     this is not suggestive as a dome cover.

22  Q  How about?

23  A  Also appears that the stem of the knob is much

24     narrower on this product than on this product.  The

25     other -- okay.  You were just talking about the

HALMA-JILEK REPORTING, INC.  (414) 271-4466

60

1     knob?

2  Q  No.  I mean, if there's any other difference that

3     you see, I'd like to know what that is as well.

4  A  Depending on the ultimate execution -- what you're

5     looking at here is a drawing versus an actual, okay?

6     Exhibit 9 represents an actual.  This is a drawing.

7     I do see a slight difference from the shape in the

8     dome of the cover, and I do know that manufacturers

9     have the ability to adjust that shape quite

10     significantly in many instances.

11  Q  Looking at Exhibit 9, there's two lines which

12     appears one at the upper edge of the cooking unit

13     and one at the lower edge of the cook willing unit.

14     Are you familiar with how these are constructed?

15  A  I'm familiar with how they're put together, yes.

16  Q  Do you know what those lines are on Exhibit 9 at the

17     top edge and the bottom edge of the cooking unit?

18  A  Yes.

19  Q  Can you explain those to me?

20  A  I'm trying to put this in terms that you will -- so

21     I don't have to repeat it.

Page 56

DOBSONROUGH

7   A   Yes.

8   Q   And we were focusing on this lip configuration here?

9   A   Yes.

10  Q   In Figure 4, which was the taper on the lip of the

11      cooking vessel.  And now we're looking at the lip on

12      the cooking vessel again on the front view in

13      Figure 2?

14  A   It looks to be somewhat different to me.

15  Q   Okay.  Tell me why it's different?

16  A   This has a shallower taper as opposed to the taper

17      on Exhibit 4 which appears to be steeper.

18  Q   Okay.  But they both taper downwardly and outwardly

19      from a top surface to a bottom surface?

20  A   Yes.

21  Q   And there's no figures that show a taper --

22  A   There's no upward taper at all.

23  Q   Right.  As shown in Dobson Exhibit 9 --

24  A   Yes.

25  Q   -- on the cooking vessel?


HALMA-JILEK REPORTING, INC.  (414) 271-4466

69

1   A   Yes.

2   Q   Does Dobson Exhibit 9 give a visually different

3       appearance than Figure 2 or 4 of the '266 patent and

4       Dobson Exhibit 10?  Let's do it one at a time.  '266

5       patent.

6   A   Figure -- the lip treatment on Figure 2 on '266 does

7       not reflect the lip treatment on Exhibit 9.

8   Q   Okay.  Now, what about the 84405, which is

Page 64

DOBSONROUGH

HALMA-JILEK REPORTING, INC.   (414) 271-4466

95

1          indentation -- or it's hard to tell on the

2          photograph whether it's an indentation or whether

3          it's a projection, but that oval shape that sort

4          of --

5    A     No.

6    Q     -- surrounds --

7    A     No, they don't.

8    Q     Does the West Bend patents show the holes in the

9          bottom?

10   A     No.

11   Q     Now, the West Bend patents, do they show a smooth

12         and flat bottom?

13   A     They would lead you to believe that.

14   Q     And How about the second photograph, the one on the

15         bottom?

16   A     Okay.

17   Q     We're talking about the second photograph now which

18         is representative sample of Rival's accused design

19         with loop, do you see that to be similar to any of

20         the views of West Bend design patents on the

21         left-hand side?

22   A     It's too rounded.   It's not elongated.

23   Q     So from this perspective view -- from the bottom

24         view, it looks different in shape, overall shape?

25   A     Yes.

HALMA-JILEK REPORTING, INC.   (414) 271-4466

Page 89

DOBSONROUGH

96

1    Q    Now, is this bottom view more similar to the bottom
2         view of the Figure 5 of '246 patent?  Is it more
3         similar to that shape or is it more similar to the
4         West Bend --
5    A    It's more similar to the shape on '246.  It's not
6         the same, though.
7    Q    I understand that.  In looking at the different
8         views of the Rival products, do you find them to be
9         overall similar to the views of the West Bend design
10        patent figures?
11                  MR. MIOTKE:  I'm going to object to the
12        use of the term overall similar.
13                  MR. HENNEBERGER:  Okay.
14   BY MR. HENNEBERGER:
15   Q    You can answer to the extent you understand.
16                  MR. MIOTKE:  Also to the extent it's
17        calling for expert testimony from a non-expert
18        witness.
19                  MR. HENNEBERGER:  I'm calling for fact
20        testimony from a fact witness.
21                  THE WITNESS:  I don't think any of them
22        from the profile are similar.  I, you know, the two
23        Rival units are not even similar.
24   BY MR. HENNEBERGER:
25   Q    No.  They're dissimilar themselves.


HALMA-JILEK REPORTING, INC.  (414) 271-4466

97

1    A    They're dissimilar and they -- and so they're all
                              Page 90

# EXHIBIT O

POLLNOWROUGH

6      the '246 patent?

7  A   I would agree with that statement, yes.

8  Q   I'd like to mark as Pollnow Exhibit 9 a photograph

9      of a Holmes slow cooker model number 3730W and it's

10     a top view of that slow cooker. **You just have to**

11     **take my word for it, and Mr. Miotke can object, if**

12     **he so desires, but I'm telling the truth.**

13              (Deposition Exhibit Number 9 marked for

14     identification.)

15 BY MR. HENNEBERGER:

16 Q   Mr. Pollnow, what would you call that shape as shown

17     in Exhibit 9?

18 A   I would call it an oval -- and oval shape.  I would

19     think -- I would say it's very similar to what I

20     described as Figure 4 in the '246 patent.

21 Q   So that shape would be more similar to Figure 4 in

22     the '246 patent than Figure 6 in the '266 patent, is

23     that correct?

24 A   Yes.

25 Q   Do you notice any differences in the knob on the


HALMA-JILEK REPORTING, INC.  (414) 271-4466

37

1      Pollnow Exhibit 9 and Figure 6 of the '266 patent?

2  A   The knob in Exhibit 9 has some scalloping around the

3      edges of the job that I don't see on Figure 6 of the

4      '266 patent ment.

5  Q   I'd like to mark as Pollnow Exhibit 10 a side view

6      of the same Rival model number 30 -- 3730W.

              (Deposition Exhibit Number 10 marked for
                      Page 34

POLLNOWROUGH

identification.)

9           MR. HENNEBERGER:  I don't have another for

10     you, Joe.  Can you get it from the Dobson is that

11     all right?

12           (Discussion off the record.)

13  BY MR. HENNEBERGER:

14  Q    Mr. Pollnow, I'd like to sort of direct your

15     attention to '266 patent again -- and maybe we can

16     clean up our table a little so we're not all

17     confused -- and we'll take a look at Figure 4, I

       believe is a similar side view?

19  A    Correct.

20  Q    Can you tell me if the knob on the lid is identical

       in Figure 4 to that shown in Pollnow 10?

22  A    No, it's not identical.

23  Q    Is it different?

24  A    Yes.  Yes, it's different.

25  Q    How is it different?


       HALMA-JILEK REPORTING, INC.  (414) 271-4466


                                                    38

1   A    The knob in Exhibit 10 is rounded, sloping downward

2        from the top toward the edges.  The knob in Figure 4

3        of the '266 patent, is flat on the top.  It doesn't

4        slope downward.  It's not -- it doesn't have rounded

5        edges.

6   Q    Is the knob in Pollnow 10 give a different

7        appearance than the knob in Figure 4 of the '266

8        patent?

9   A    Yeah, it looks different.
                      Page 35

POLLNOWROUGH

10    Q    You wouldn't confuse the knob in the '266 patent
11         with that shown in Pollnow 10, would you?
12    A    No.
13    Q    Now, I'd like you to focus your attention on
          Pollnow 10 and the shape of the lip on the cooking
15         vessel.
16    A    (Witness nods head.)
17    Q    I believe the top surface is somewhat flat; is that
18         correct?
19    A    That's correct.
20    Q    And then it slopes downwardly and inwardly with a
21         convex contour from a top surface to a bottom
22         surface?
23    A    Correct.
24    Q    Do you see that type of contour anywhere in the '266
25         patent for the lip on the cooking vessel?

HALMA-JILEK REPORTING, INC.  (414) 271-4466

39

1     A    No.  The shape is different.
2     Q    Is it the direct opposite of what's shown in
3          Figure 4 for the lip of the cooking vessel, what's
4          shown in Pollnow Exhibit 10?
5     A    I guess I don't know how you define opposite.  But
6          it is different.  **Immediately from the top it slopes**
7          down and away versus on -- in Exhibit 10 it's flat
8          across the top out to the outer edge and then it
9          slopes down and in.
10    Q    Okay.
11    A    I guess I --

POLLNOWROUGH

14    Q    Do you think that the shape -- do you find the side

15         view of Pollnow 10 confusingly similar to the side

16         view of Figure 4 of the '266 patent?

17              MR. MIOTKE:  I'll object to the use of the

18         term confusingly similar.

19    BY MR. HENNEBERGER:

20    Q    Okay.  You can answer if you understand.

21    A    I don't see them as being similar.

22    **Q    So you don't think you would confuse the** slow cooker

23         that's shown at least the side view shown in

24         Pollnow 10 with the slow cooker made in accordance

25         with Figure 4 of the '266 patent?


              HALMA-JILEK REPORTING, INC.  (414) 271-4466

                                                        41

1     A    No.

2     Q    And if we go back to Pollnow Exhibit 9 and Figure 6

3          of the '266 patent, would you find that the slow

           cooker having the shape as shown in Pollnow

           Exhibit 9 to be confused with a shape of a slow

           cooker shown in Figure 6 of the '266 patent?

7     A    Could you restate?

8     Q    Yeah.  That was bad.

9

10              MR. HENNEBERGER:  Is there any way I could

11         look back to see what I asked on the side?

12              MR. MIOTKE:  And before I forget, can we

13         mark this transcript as attorneys' eyes only, highly

14         confidential and under protective order as well

15         before I forget to mention that.

                        Page 38

POLLNOWROUGH

18          the side of the crock that we were just discussing.

19    Q     That's fair.  But the shapes are different, correct?

20    A     Yes.

21    Q     And I believe we established that the shape of the

22          Pollnow Exhibit 9 is more like figure 4 of the '246

23          patent than it is to Figure 6 of the '266 patent,

24          correct?

25    A     I agree, yes.


HALMA-JILEK REPORTING, INC.  (414) 271-4466

43

1     Q     I'd like to mark as Pollnow Exhibit 11 a picture of

2           a Rival 3730W slow cooker, which is a front view.

3                 (Deposition Exhibit Number 11 marked for

4           identification.)

5     BY MR. HENNEBERGER:

6     Q     I'd like you to pull out the '266 patent then and

7           we'll look at Figure 2, which is the front view as

8           well.

9     A     (Witness complies.)

10    Q     Now, would you say that's the same view in Figure 2

11          and Pollnow Exhibit 11?

12    A     Yes.

13    Q     And I believe we established previously that the

14          knob doesn't have a different appearance from the

15          front view as it does from the side view, does it?

16    A     Correct.

17    Q     And nor does the patent have a different appearance

18          from the front to the side?

19    A     Correct.

POLLNOWROUGH

20   Q   So the knobs on the Pollnow Exhibit 11 and Figure 2
21       of the '266 patent are different?
22   A   Correct.
23   Q   As we discussed before?
24   A   Yes.  Yeah.
25   Q   Now, if we can look at the shape of the lip of the


HALMA-JILEK REPORTING, INC.   (414) 271-4466

44

1        cooking vessel again, would you say that the lip on
2        the cooking vessel in Pollnow Exhibit 11 is
3        different from or similar to the shape in the lip of
         Figure 2 of the '266 patent?
5    A   I would say the shape of the lip is different
6        between the two pictures.
7    Q   And again, it's different because it slopes in a
8        different direction from a top surface to a bottom
9        surface downwardly and inwardly?
10   A   Correct.
11   Q   Ard whereas in Figure 2 of '266, the knob slopes
12       downwardly and outwardly from the top surface down
13       to a bottom surface?
14   A   Correct.
15   Q   Looking at this view in Pollnow Exhibit 11 and
16       Figure 2 in the '266 patent, do you find them
17       confusingly similar in appearance?
18   A   They're very similar.  There are the differences
19       that we just discussed between the knobs and the
20       shape of the crock and the lip.
21   Q   When you say they're very similar, I mean, is it
                        Page 41

POLLNOWROUGH

24          dotted lines on the '266 patent, does the slow

25          cooker depicted in Pollnow Exhibit 11 provide a


HALMA-JILEK REPORTING, INC.   (414) 271-4466

46

1           different overall appearance when compared to the

2           slow cooker shown in Figure 2 of the '266 patent?

3                       MR. MIOTKE:  Can you read that question

4           back?

5                       MR. HENNEBERGER:  She can.

6                       (Question read.)

7                       THE WITNESS:  I would say that they have

8           the same overall appearance, but there are

9           differences in when you look at specific detail.

10  BY MR. HENNEBERGER:

11  Q       And when you say they have the same overall

12          appearance, is that based on the fact that they're

13          generally slow cookers and have particular

14          components that make them slow cookers?

15  A       Yes.

16  Q       But there's nothing ornamentally shown that leads

17          you to believe that they are substantially similar,

18          is that correct?

19  A       Other than the construction looks the same in that

20          you've got the heating unit, you've got the crock

21          beings you've got a cover, you've got a knob.  You

22          have the same components in both cases, they're

23          similar that way.  But the detail on the particular

24          shape of, say, the knob as we discussed or the crock

25          at the rim is different between the two.

Page 43

POLLNOWROUGH

HALMA-JILEK REPORTING, INC.   (414) 271-4466

47

```
 1   Q   But the things that make them similar are things
 2       that are found in all slow cookers that have a
 3       ceramic cooking vessel; is that correct?
 4   A   I would agree.
 5   Q   So basically they're similar because they're both
 6       slow cookers?
 7   A   Sure.  Yes.
 8   Q   But looking at the two, looking at Pollnow
 9       Exhibit 11 and Figure 2 of the '266 patent, they're
10       different enough so that you wouldn't be confused
11       that one depicts the other; is that correct?
12   A   That's probably correct, yes.
13   Q   I'd like to mark as Pollnow Exhibit 12 a series of
14       photographs that were provided to us in the expert
15       report of Cooper Woodring.  I believe these are
16       Exhibits 14 through 19 of his expert report.
17               MR. MIOTKE:   Just for the record, Cooper
18       Woodring's expert is West Bend's expert.
19               (Deposition Exhibit Number 12 marked for
20       identification.)
21   BY MR. HENNEBERGER:
22   Q   I know you haven't seen this document before,
23       Mr. Pollnow, but I can explain to you what it
24       depicts.
25               On the left-hand side are the views from the
```

Page 44

POLLNOWROUGH

16  Q  The West Bend design patents included basically a

17     smooth flat surface; we --

18  A  Yes.

19  Q  -- discussed that before?

20  A  Yes.

21  Q  And there's a lot of other things with the Rival

22     slow cooker, including the holes and the some kind

23     of contour on the bottom?

24  A  Yes.

25  Q  So appearance wise they would look different; is


HALMA-JILEK REPORTING, INC.  (414) 271-4466

58

1     that correct, if you look on the bottom, the

2     Figure 7 and the accused Rival's design?

3  A  Yes.

4  Q  And the same would hold true with the bottom of the

5     Rival designed with loop as well?

6  A  Correct.

7  Q  And that's different, it has different shaped feet.

8     It has different contours.  It has different facets

9     shown; is that correct?

10  A  Correct.

11  Q  By looking at the -- at the first picture with the

12     knob, the bottom with the knob, would you be

13     confused that that's substantially similar to any of

14     the figures shown on the left-hand side of the page,

15     which is Figure 7 of the West Bend design patents?

16  A  No.

17  Q  And would you have the same answer with respect to

Page 54

POLLNOWROUGH

20  Q   And I think the thing that we were having difficulty
21      seeing before is how the lid fits into the insert
22      and what it appears like from the front view and
23      from the side view.  I think you can see that better
24      in the pictures, is that correct?
25  A   I mean, you still cannot see how the lid actually

HALMA-JILEK REPORTING, INC.  (414) 271-4466

60

1       fits into the crock from this view, but I can more
2       clearly see the shape of the dome.
3   Q   That's all right.  Because we're going to compare it
4       to the figures in the patents, which are shown on
5       the first page of the Pollnow Exhibit 12, and I
6       think we said earlier that the height of the dome
7       portion seems to be lower than that shown in the
8       patent figure, is that correct?
9   A   Correct.
10  Q   And also how it transitions into the insert lip from
11      this front view, appears to be very different from
12      that shown in the figures of the West Bend design
13      patents; is that correct?
14  A   Yes, it's different.
15  Q   And it's different because it doesn't transition
16      into the end of the insert; is that correct?  I'm
17      not trying to put words in your mouth.
18  A   Yeah.
19  Q   Maybe you can describe why, you know, what you see?
20  A   I know what you're getting at.  Basically on the
21      West Bend pictures, it's -- it's more of a

Page 56

POLLNOWROUGH

22    transition from the crock onto the cover as one line

23    kind of.  It just flows, whereas you don't see that

24    here, you know, you don't see that in Exhibits 13

25    and 14.


HALMA-JILEK REPORTING, INC.  (414) 271-4466

61

1    Q    So that aspect gives you a visually different

2         appearance than the figures shown in the West Bend

3         patents?

4    A    Yes.

# EXHIBIT P

Investigation continues regarding the date a product embodying the design of the West Bend patents-in-suit was first offered for sale, the date a product embodying the design of the West Bend patents-in-suit was first sold, and the date a product embodying the design of the West Bend patents-in-suit was first publicly displayed.

The persons with the most knowledge regarding the foregoing responses are Gary Shabino and Howard Kaney. The person with the most knowledge regarding the prosecution of the West Bend patents-in-suit, is William C. Dobson.

**INTERROGATORY NO. 13:**

For every slow cooker product of West Bend that falls within the scope of the West Bend patents-in-suit, identify the names of the three (3) persons most knowledgeable with respect to the design, research, development and marketing of that product and, if different, the three (3) persons most intimately involved in the design, research, development and marketing of the product, and for each person so named, provide the person's address and telephone number.

**RESPONSE TO INTERROGATORY NO. 13:**

Defendant objects to this interrogatory as vague and ambiguous in that it asks West Bend to "identify the names of the three (3) persons most knowledgeable with respect to the design, research, development and marketing of that product <u>and, if different, the three (3) persons most intimately involved in the design, research, development and marketing of the product, and for each person so named, provide the person's address and telephone number.</u>" West Bend does not understand the underlined portion of the foregoing interrogatory. Subject to this and its General Objections, and as West Bend understands this interrogatory, West Bend answers this interrogatory as follows.

Investigation continues regarding which West Bend products embody each of the West Bend patents-in-suit. West Bend Model Nos. 84405 and 85105 embody each of the West Bend patents-in-suit. The persons with the most knowledge regarding the design, research,

-12-

development, and marketing of the products falling within the scope of the West Bend patents-

in-suit are William Dobson and Gary Shabino.

### INTERROGATORY NO. 14:

Set forth in detail the circumstances surrounding the first instance that West Bend
became aware of any Holmes slow cooker believed to be covered by the West Bend patents-in-
suit, including but not limited to the date of such occurrence and the individuals involved in any
evaluation of the Holmes slow cookers, and identify the persons most knowledgeable with
respect to the decision to assert the West Bend patents-in-suit against Holmes.

### RESPONSE TO INTERROGATORY NO. 14:

West Bend objects to this interrogatory as calling for information protected from

discovery by the attorney-client privilege and work-product doctrine.  Subject to these and its

general objections, West Bend states that its counsel became aware of the Holmes slows cookers

that infringe the West Bend patents in suit in August 2005.  The person most knowledgeable

with respect to the decision to assert the West Bend patents-in-suit against Holmes is Mike

Carpenter.

### INTERROGATORY NO. 15:

For each calendar or fiscal year for which West Bend seeks damages, set forth separately
for each product sold by West Bend covered by the West Bend patents-in-suit:
   (a)     total number of units sold;
   (b)     list and actual sales prices for each product;
   (c)     West Bend's net profit; and
   (d)     any costs West Bend has deducted or intends to deduct to calculate net profit.

### RESPONSE TO INTERROGATORY NO. 15:

West Bend objects to this interrogatory as unduly burdensome and premature.  West

Bend's investigation continues and it will supplement its response as discovery proceeds.

### INTERROGATORY NO. 17:

Identify each and every reason West Bend contends that this is an exceptional case within
the meaning of 35 U.S.C. § 285 as set forth in West Bend's Counterclaim including each and

# EXHIBIT Q

(c)    West Bend's net profit; and

(d)    any costs West Bend has deducted or intends to deduct to calculate net profit.

## RESPONSE TO INTERROGATORY NO. 15:

West Bend objects to this interrogatory as unduly burdensome and irrelevant to any issue

in this case.  35 U.S.C. § 289 provides for the recovery of the accused infringer's lost profits, not

the lost profits of the design patentee.  As a result, information related to West Bend's sales of

products covered by the West Bend patents-in-suit is not relevant nor "reasonably calculated to

lead to the discovery of admissible evidence."

## INTERROGATORY NO. 16:

Identify all products that have been marked (as understood under 35 U.S.C. §287) with
any of the patents-in-suit, including date of first marking for each product.

## RESPONSE TO INTERROGATORY NO. 16:

West Bends states that no products have been marked with any of the West Bend patents-

in-suit.

## INTERROGATORY NO. 17:

Identify each and every reason West Bend contends that this is an exceptional case within
the meaning of 35 U.S.C. § 285 as set forth in West Bend's Counterclaim including each and
every fact and analysis supporting West Bend's allegation that the alleged infringement is willful
and deliberate.

## RESPONSE TO INTERROGATORY NO. 17:

West Bend states that this case is an exceptional case within the meaning of 35 U.S.C. §

285 because Holmes lacks a good faith basis for asserting that West Bend's model no. 84386

infringes the asserted claims of Holmes' patents-in-suit.  West Bend further states that Holmes

lacks a good faith basis for believing that any of the asserted claims of the Holmes patents-in-suit

are valid in view of West Bend's interrogatory responses.

# Exhibit R



# WEST BEND.

## THE CROCKERY™ COOKER - 6-QT.

No. 84406

- Family size 6-qt. capacity easily holds roast or chicken.
- Three heat settings – Lo, Hi and Auto for all your cooking needs.
- Glass cover for easy viewing.
- Removable crock liner makes serving and cleaning convenient.
- Crock rotates for even cooking.
- Auto setting automatically adjusts temperature during cooking.
- Cool side handles and non-skid rubber feet.
- Full Color Box. Overpacked.
- 120 volts, AC only. UL listed.
- Multiple package: Std. pk. of 2, approx. ship. wt. 26.0 lbs., approx. cube 2.53 cu. ft.
- UPC #3-72244-84406-8.
- Shipping Container Code 1-00-72244-84406-8.

THE WEST BEND COMPANY, West Bend, WI 53095 U.S.A.

© The West Bend Company '01          Made in China          3716-715 06 5

WB 000516

SUGGESTED AD SLICKS FOR 84406 CROCKERY™ COOKER - 6-QT.



**WEST BEND®**
**The Crockery™ Cooker - 6-Qt.**
- Three heat settings - Lo, Hi and Auto.
- Auto setting automatically adjusts temperature during cooking.
- Removable crock liner.
- Glass cover, side handles, on light.

$00.00

No. 84406

2 col. x 2"



**WEST BEND®**
**The Crockery™ Cooker - 6-Qt.**
- Three heat settings - Lo, Hi and Auto.
- Auto setting automatically adjusts temperature during cooking.
- Removable crock liner.
- Glass cover, side handles, on light.

No. 84406

$00.00

1 col. x 3 ½"



**WEST BEND®**
**The Crockery™ Cooker - 6-Qt.**
- Three heat settings - Lo, Hi and Auto.
- Auto setting automatically adjusts temperature during cooking.
- Removable crock liner.
- Glass cover, side handles, on light.

$00.00

No. 84406

2 col. x 3"





**WEST BEND®**
**The Crockery™ Cooker - 6-Qt.**

**WEST BEND®**
**The Crockery™ Cooker - 6-Qt.**





**WEST BEND®**
**The Crockery™ Cooker - 6-Qt.**
- Three heat settings -Lo, Hi and Auto.
- Auto setting automatically adjusts temperature during cooking.
- Removable crock liner.
- Glass cover, side handles, on light.

$00.00

No. 84406

1 col. x 5 ¼"

**WB 000517**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**


THE HOLMES GROUP, INC.,                   :
                                          :
                    Plaintiff,            :        Civil Action No.  05-CV-11367 WGY
                                          :        (Alexander, M.J.)
           v.                             :
                                          :
WEST BEND HOUSEWARES, LLC and             :
FOCUS PRODUCTS GROUP, L.L.C.,             :
                                          :
                    Defendants.           :


**<u>DECLARATION OF CHARLES L. MAURO CHFP</u>**

I, Charles L. Mauro, hereby declare as follows:

1.      I have prepared an expert report dated November 3, 2006 in this matter which has been provided to opposing counsel.  My background is fully described herein.  A copy of my C.V. is also attached to my expert report.  A copy of my expert report is attached hereto as Exhibit S.

2.      In forming my opinions in this matter, I have reviewed U.S. Patent Nos. D444, 664 S and D444,993 S, Des. 434, 266 (hereafter the '664, '993 and '266 patents, respectively) and other design patents.  I have also examined the actual physical products of Holmes at issue in this litigation and photographs of the product provided by counsel.

3.      Slow-cookers have certain common features dictated by their function.  One of the most important aspects of features which are dictated by function relate to the "basic overall configuration" of the products themselves which in the case of slow-cookers includes the overall height to width to depth ratios which are dictated by functional requirements related to liquid

volume, the size and configuration of the food types, and the need to create a product that is both stable and takes minimum counter space. These functional requirements are combined to create the "basic functional configuration" of slow-cookers. These critical aspects of slow-cookers cannot be claimed as patentable features any more than the basic configuration of the fork in *Gorham* can be claimed as patentable. What can be claimed in design patents for slow-cookers are those ornamental additions that are added to the "basic functional configuration" which may or may not produce a slow-cooker that is substantially different from prior attempts to create such differences by application of other ornamental features as indicated in prior art references. Beyond the "basic functional configuration" there are other physical aspects of slow-cookers which are further dictated by function. These include the following:

The lid of the slow-cooker is generally domed shaped. The lid is made of glass, i.e., translucent, to permit the user to see the food within the cooking vessel. The edge of the lid rests within a groove or channel formed in the upper surface of the ceramic cooking vessel lip as shown in the prior art, e.g., in U.S. Patent Nos. Des. 429,596 and Des. 434,940, Figures 1, 4 and 5. (Exhibits C and D, respectively).[1]

4.      The lid typically includes a knob or a handle centrally located thereon to facilitate lifting the lid off the ceramic cooking vessel of the slow-cooker as shown in the '596 and '940 patents.

5.      The ceramic cooking vessel of a slow-cooker includes a lip which is supported by an upper edge of the heating unit. The cooking vessel lip typically includes handle portions integrally formed therein as shown in the '596 and '940 patents, Figures 1, 2 and 4. The handles

---

[1] Exhibits A-R are attached to the Declaration of Glenn T. Henneberger. Exhibits S and T are attached hereto to the Mauro Declaration.

are functional in that they are used to remove the cooking vessel from the heating unit.

6.    Slow-cookers include handles attached to the heating unit of the slow-cooker to transport the device.  Slow-cookers also include a control knob or a control panel to select a cooking temperature, i.e., low and high.  See for example, Figures 1 and 2 of the '596 patent. (Exhibit J).

**West Bend's U.S. Patent No. D 444,993**

7.    The '993 patent discloses a slow-cooker including typical slow-cooker components, i.e., a heating unit, a ceramic cooking vessel which is positioned within the cooking unit and lid.  The text of the '993 design patent reads:  "The ornamental design for a cooker, as shown and described."  The specific claim of the '993 patent includes seven figures showing a perspective view, a front, back, side, top and bottom view of the claimed design.  (Exhibit A).

8.    The claimed slow-cooker includes basic components found in prior art slow-cookers including a heating unit, a ceramic cooking vessel supported by the heating unit and a lid supported on a lip of the cooking vessel as shown below.



Exhibit A.

9.     The claimed slow-cooker includes a rounded off rectangular-shaped cooking unit, cooking vessel and lid as shown most clearly in Figures 6 and 7 in each of the patents-in-suit.



Exhibit A.

10.     As shown above, the rounded off rectangular-shape of the heating unit, cooking vessel and lid includes essentially a first pair of opposing arcs having a first curvature, and a second pair of opposing arcs having a second curvature.  The pair of opposing arcs is turned 90 degrees to the other pair and joined at their ends, thus forming the shape shown.  One characteristic of this squared off rectangular-shape is the relatively small arcs of the four corner edges, which gives the impression of a near rectangle with slightly bowed out sides.

11.     Figures 2-5 also show a thin band around the top of the perimeter of the walls of the heating unit.  The band is provided on all slow-cookers during the manufacturing process.  An inner wall of the heating unit overlaps a top edge of the outer surface to form an upper edge as shown.  The upper edge of the heating unit supports the lip of the cooking vessel.

12.     Figures 1-6 illustrate the upper lip of the cooking vessel that is positioned within a cavity of the heating unit.  The lip of the cooking vessel is supported by an upper edge of the heating unit as shown below.  The lip provides the function of supporting the cooking vessel within the heating unit.



Exhibit A.

13.    With particular reference to Figures 2 and 4 above, the lip of the claimed cooking vessel in the West Bend design patents-in-suit is depicted to taper from a top surface to a bottom surface, downwardly and outwardly the taper being concave in shape.  The bottom surface of the cooking vessel which rests upon the heating unit is substantially flat and overhangs the edge of the heating unit.  The upper surface of the lip of the cooking vessel also supports the lid of the slow-cooker.

14.    Figures 1-6 also illustrate a convex curved lid, i.e., a domed lid.  The lid is translucent and shaped such that it fits within the lip of the heating vessel.  The lower edge of the lid transitions smoothly into the top surface of the heating vessel lip without interruption as shown below in detail from Figure 4 of the '993 patent, Exhibit A.



15.    The lid also has a round-shaped disk-like skirt centrally located thereon.  The '993 patent shows a disk-like skirt attached to the lid.  The '993 patent shows this skirt as having a

substantial thickness as shown below in the detail from Figure 2. The disk-like skirt is also approximately twice the diameter of the knob. (Fig. 6).



Exhibit A..

16.      Figure 7 of the '993 patent shows a flat, smooth, squared-off rectangular-shaped bottom surface of the heating unit.



Exhibit A.

17.      The cooking vessel also includes handles formed on opposite ends of the vessel. As shown in Figure 6, the handles extend from the lip in a smooth continuous concave curve which transitions into a convex curve.



Handle

*Fig. 6*

Exhibit A.

18.     The handles also taper from a top surface to a bottom surface downwardly and outwardly with a concave contour as shown in Figure 2 below.



Handle

*Fig. 2*

Exhibit A.

19.     Figures 1-5 of the '993 patent show the knob on the lid of the slow-cooker, the handles on the outside of the heating unit, the control panel and control knob on the heating unit, and the bottom edge of the heating unit in broken lines.  The written portion of the specification indicates that the items in broken lines do not form part of the claimed invention.

**West Bend's U.S. Patent No. Des 424,266**

20.     The '266 patent discloses the same claimed design as the '993 patent with the addition of a thin band around the bottom perimeter of the heating unit, the bottom of the heating unit being at a right angle with respect to the sidewall as shown for example in Figure 2 below.



*Fig. 2*

Exhibit B.

21.     A disk-like knob mounted on a cylindrical-shaped smaller diameter stem is also shown in the various figures including Figure 2 above and in Figure 6 set forth below.  The skirt is significantly larger in diameter than the top of the knob.



*Fig. 6*

Exhibit B.

22.     The written portion of the specification indicates that the elements shown in broken lines do not form part of the claimed invention.

**West Bend's U.S. Patent No. Des 444,664**

23      The '664 patent claims the same ornamental design for a slow-cooker as that in the '993 patent, with the addition of the knob as defined in the '266 patent and further including four cylindrical-shaped feet arranged in a rectangular pattern on the bottom of the heating unit. (Figures 2-5 and 7).  The feet are shown below in Figures 2 and 7.



Exhibit C.

**Holmes Accused Slow-Cookers**

**Overall Shape**

24.      The dominant shape of the accused Holmes slow-cookers is composed of a series of clean elliptical shapes combined by the designer to produce a clean and flowing elliptical shape in the dominant view of the product.  Photographs or catalogue sheets of the accused Holmes slow cookers are attached hereto as Exhibits T1 to T34.

25.    Photographs of top views of representative samples (Model Nos.3730W, Exhibit T1 and 37351C, Exhibit T2) are shown below to clearly illustrate this significant difference in shaped compared to that in the West Bend design patents.

Exhibit T1                                      Exhibit T2

        



**Cooking Vessel Lip**

26.    The lip of the cooking vessel on the accused slow-cooker slopes from a top surface to a bottom surface downwardly and inwardly and includes a slight convex shape from a top surface to a bottom surface, the top surface being substantially flat, ans shown for example in the detail view from Exhibit T4.



27.     Where the lid engages the upper surface of the lip, there is an abrupt change in angle.

The lid surface curves downwardly and outwardly moving from top to bottom of the lid.  The

angle of the lid surface adjacent the lip is very different from the generally horizontal upper

surface of the lip.  The creates a strong visual separation between the lid and the lip as shown

below in Exhibit T1.




**Lid Handles And Skirts**

28.     The Holmes slow-cookers include two basic types of handles.  Some have a knob-shaped handle as shown below:




Exhibit T1




Exhibit T6

Some have a loop-type handle as shown below:




Exhibit T4

29.    The skirt underneath the knobs and on top of the lid is a different shape for each knob.  More specifically, the Holmes slow-cookers with the loop knob includes a thin skirt that conforms strictly to the dome shape of the lid.  This skirt is substantially thinner and more rounded than that claimed in the `993 patent.

30.    The skirt underneath the Holmes slow-cookers having the knob, in turn, has a diameter that is only slightly larger than the diameter of the knob.  The skirt is significantly smaller in diameter in relation to the diameter of the knob when compared to the claimed design shown in the `993 patent.

### Cooking Vessel Handles

31.    The cooking vessels of the accused Holmes products include handles extending from the lip to permit the insert to be removed from the heating unit and carried.  The handles are formed by generally concave curves transitioning into a convex contour.  Representative photographs of the handles provided on the cooking vessels of the accused slow-cookers are shown below.

 

Exhibit T1

32.    The cooking vessel includes outwardly extending handles to permit the cooking vessel to be removed from the heating unit and carried.  The handles are generally tapered downwardly and inwardly from a top surface to a bottom surface, the taper being slightly

concave.  The top surface of the handle is substantially flat as shown above.

**Opinion On Substantial Similarity**

33.     I have rendered an opinion on issues relating to the ordinary observer test for design patent infringement.  In my opinion, the Holmes slow-cookers at issue are visually distinctive from the claimed designs and do not satisfy the ordinary observer test as set forth in my expert report.  (Exhibit S).

34.     Based on a detailed application of the formal principals of vision science and related design decision making, made known to me through my education and practice as a professional human factors engineer combined with my professional background in Industrial (product) Design, it is my professional opinion that in the eye of the ordinary observer, the accused Holmes products (Model Nos. 3730, Exhibit T1, and 37351, Exhibit T2) are not substantially similar in terms of overall shape, style and appearance (ornamental design) when compared to the design depicted in the '664, '993, and '266 patents.  Detailed support for this opinion is found in my expert report.  (Exhibit S).

35.     In reaching the professional opinion that "in the eye of the ordinary observer, the accused Holmes products are not substantially similar in terms of overall shape, style and appearance (ornamental design) to that depicted in the '664, '993, and '266 patents, I have employed established principals and theory from the field of cognitive science focusing specifically on the topic of human visual perception.  In forming my professional opinion that the designs at question in this litigation are not substantially similar, I employed various tests from the field of cognitive/vision science.  It should be noted that the figures in the '664, '993 and '266 patents are identical.  The only differences are that certain features are shown in dotted lines

in the '993 and '266 patents which are shown in solid lines in the '664 patent. Accordingly, my opinions set forth in my previous expert report and reiterated herein, although based on a comparison with the figures in the '664 patent, apply to the '993 and '266 patents as well.

36.    Humans perceive shapes as being composed of "shape features." These shape features are integrated into a unified whole by the human perceptual system. When humans view a shape for the first time the visual perception system proceeds in a generally step-wise fashion starting first with the overall "dominant shape". They then proceed to the "critical detail(s)" followed by viewing of "minor details". It is the process of assembling the "shape features" that leads to the creation of the overall shape, style and appearance of slow-cookers or any other product. Therefore, when two products do not have the same shape feature sets, that when combined, create the same overall shape style and appearance, the shapes will not be found to be substantially similar. In this case, the dominant shape illustrated in the West Bend '993 patent is shown most clearly and accurately in the top view of the patent (Fig. 6) which is composed of a series of circles connected by substantially straight lines to form the rounded off rectangle. This shape description creates the "dominant shape" of slow-cookers because it is the "shape feature" which contributes most to creation of the overall first impression of the West Bend Patented designs. To the contrary, the accused devices are all formed in the shape of an ellipse. For two products to be substantially similar they must have equivalent "dominant shapes". Analysis shows clearly that the West Bend designs described in the patents do not convey the same dominate shape to the eye of the ordinary observer when compared to the dominant shape conveyed in the accused products. For the purposes of professional rigor it is further shown in my analysis that the accused products do not have equivalent shapes features beyond those of the dominant shape profile.

37.    Diagrams created for my analysis clearly show the significant differences between the Holmes slow-cookers and the patented designs.  The diagrams below which demonstrate that the dominant shape of the accused products is composed of a series of clean elliptical shapes combined by the designer to produce a clean and flowing elliptical shape in the dominant view of the product.  This is contrasted by examining the same view of the product depicted in the patent Figure 6 where it can be seen from Figure 6 that the design depicted in the patents is composed of 4 circular shapes combined and then joined by the designer to create a rounded off rectangular-shaped body as compared to the overall elliptical shape of the accused products. This results in a fundamentally different dominant shape presentation to the observer and led to the opinion that the accused products and the design depicted in Figure 6 of the patent are not substantially similar.  This is shown in the following diagrams by the area enclosed by the black lined rectangle.



Exhibit S.



Exhibit S.

38.    Additional analyses set forth in my report, including the creation of line drawings from photographs of the accused devices overlaid on the patent figures, further confirm my opinions as to the overall dissimilarity between the Holmes slow-cookers and the West Bend designs.  (See Exhibit S, pp. 10, 11 and 14-21).  In my analysis of the shape features of the accused versus the patented products I then proceeded in the identification of those ornamental features which fell into the category of "critical detail". This analysis led to the identification of several shape features including the design of the lid, lip, and knob. These shape features combine to form the "critical detail" of the cookers in this litigation. Again, as in the analysis of the dominant shapes these aspects of the products show very different shape features and therefore when combined to contribute to the overall shape style and appearance of these

products results in the finding that the West Bend patented designs and the Rival accused products are not substantially similar. The following analysis summarizes these findings.

39.     In addition to the overall difference in shape, the difference in the configuration of the cooking vessel lip between the accused products and the West Bend patents is significant. The shape of the lip of the West Bend design slopes downwardly and outwardly from a top surface to a bottom surface while the accused designs have a cooking vessel lip which slopes downwardly and inwardly from a top surface to a bottom surface.

 

Compare, for example, detail views of Exhibit T4 to Exhibit A, Fig. 4.

40.     This directly opposite slope creates a very different visual appearance between the accused product and the West Bend patents as clearly illustrated in the comparisons set forth in my expert report.  (Exhibit S, pp. 14, 15, 18, and 19).

41.     Where the lid engages the upper surface of the lip, there is an abrupt change in angle.  The lid surface curves downwardly and outwardly moving from top to bottom of the lid. The angle of the lid surface adjacent the lip is very different from the generally horizontal upper surface of the lip.  The creates a strong visual separation between the lid and the lip as shown below.





Compare Exhibit T1 to Exhibit A, Fig. 4

    42.    The difference between the knobs the accused slow-cookers and the claimed design are clearly visually different.  An unsymmetrical knob with a flat top surface and a sharp edge as shown in the West Bend patents is significantly visually different from a symmetrically-shaped knob which has a crowned and rounded top and bottom surface, the top surface further including ornamentation in the form of a plurality of grooves around the outer periphery as used in the accused products.  The differences between the Holmes slow-cooker loop-style handle versions and the claimed design are even more striking.

    43.    Finally, I undertook the identification of those design features of the accused products which fall into the category of "minor details". It is my professional opinion that such details are shown in the bottom view of the West Bend patents. Again, when the appropriate shape analysis is undertaken, it can be seen that these shapes are not substantially similar. This

professional opinion is discussed below.

44.     The bottom of the patented design is shown as smooth and flat.  In direct contrast, the accused models each have very different bottoms including holes, shaped depressions or projections and fastening devices which provide a significantly different visual impression.  West Bend was not required to show a "bottom plan view" but rather chose to do so.  By so choosing, West Bend has limited its claim in each of the patents to a slow-cooker which includes a bottom having the appearance of being flat and smooth.

45.     On the critical dimension of dominant shape, all the accused slow-cookers are elliptical in shape contrary to the West Bend design patents which illustrate a slow-cooker which is a rounded off rectangle.  Turning to "critical detail", none of the newly accused models include the ornamental appearance of the cooking vessel lip which slopes downwardly and outwardly and includes a slight concave shape from an upper edge to a lower edge and having a substantially flat bottom surface, the flat surface of the lower edge overhanging and being positioned adjacent to the upper edge of the heating unit as shown in the West Bend patent figures.  To the contrary, the accused Holmes slow-cookers products generally include a lip on the cooking vessel which slopes upwardly and outwardly from a bottom edge toward a top edge providing a significantly different appearance to the ordinary observer.

46.     Furthermore, the knob and skirt on the lid of each of the accused models clearly have a different shape from that shown in the figures of the West Bend patents at issue.  These difference are significant in creating a very different overall appearance from the claimed designs.

47.     Finally, on the point of minor details, the accused designs do not show substantial similarity when compared to the same relevant details depicted in the West Bend Patents.

48.     As a result of the detailed analysis undertaken in the creation of my expert report it is my summary professional opinion that in the eye of the ordinary observer, the accused Holmes products are not substantially similar to the claimed designs.

I declare under penalty of perjury that the foregoing is true and correct and, as to matters stated to be alleged on information and belief, I believe them to be true.

Executed this 1st day of December, 2006

/s/ Charles L. Mauro
Charles L. Mauro CHFP

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on December 1,

2006.

/s/ Glenn T. Henneberger
Glenn T. Henneberger

# EXHIBIT S

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| THE HOLMES GROUP, INC., | : | |
| | : | |
| Plaintiff, | : | Civil Action No.  05-CV-11367 WGY |
| v. | : | (Alexander, M.J.) |
| | : | |
| WEST BEND HOUSEWARES, LLC and | : | |
| FOCUS PRODUCTS GROUP, L.L.C., | : | |
| | : | |
| Defendants. | : | |

## EXPERT REPORT OF CHARLES L. MAURO CHFP

I, Charles L. Mauro, hereby state as follows:

<u>Background and Qualifications</u>

1.      For the past 30 years, I have been the president of Mauro/Mauro/Design, Inc.

("MMD") of New York, N.Y., a firm providing industrial design and professional human factors

engineering research consulting services to leading U.S. and international corporations as well as

various government agencies.  My clients include:  AT&T, Apple Computer, Hewlett Packard,

General Motors, General Electric, the New York Stock Exchange, NASA, Citibank, Motorola,

Clairol, Singer and other leading corporations.  I have been named as an inventor on numerous

U.S. and foreign utility and design patents.

2.      I earned a Bachelor of Science Degree in Industrial Design from Art Center

College of Design in Los Angeles, having been awarded a full scholarship from the Ford

Foundation based for recognized academic and design excellence.  I graduated from Art Center

College with Distinction.  In 1976, I received a Masters Degree in Ergonomics and

Biomechanics from New York University ("NYU").  While at NYU I was a National Institute of

Occupational Safety and Health ("NIOSH") research fellow at the Rusk Institute of

Rehabilitation Medicine.  I am a certified Human Factors Engineering Professional (CHFP)

BPCE.  Prior to founding my own firm, I was employed by the design firms of Raymond Lowry

International and Henry Dreyfus Associates, where I managed many large scale design projects

for national and international clients.

    3.    Upon being nominated and appointed to the first Presidential Design Awards

Committee by the Reagan Administration, I selected projects that qualified for Presidential

Design Awards in the category of Industrial Design, and I established the criteria by which

designs were selected.  I have been chairman of two American National Standards Institute

("ANSI") standards committees and I have also served on numerous design awards committees,

including the Industrial Design Magazine Annual Design Review.

    4.    I have received numerous awards for both industrial design and human factors

engineering research.  I have received the Alexander C. Williams Award from the Human

Factors and Ergonomics Society for contributions to a major operational man-machine system,

the Special Service Citation from NASA, citations from the Association of Computing Machines

and the New York Art Directors Club.  I am widely published in popular and professional

literature, and have been quoted in <u>Business Week</u>, <u>Science</u>, <u>Human Factors Society Bulletin</u>,

<u>Industrial Design</u>, <u>Applied Ergonomics</u>, <u>Newsday</u>, <u>Technology Illustrated</u>, <u>Wall Street Journal</u>,

<u>Datamation</u>, <u>Byte</u>, <u>Popular</u> <u>Computer</u> and other publications.  My industrial design work has

been selected numerous times by <u>Industrial Design Magazine</u> for inclusion in the Annual Design

Review.  I am a member of numerous professional societies including the Industrial Designer

Society of America and the Human Factors and Ergonomics Society.

5.      A list of my publications is attached as Appendix B.  A copy of my CV is attached as Appendix D.

6.      I have testified as an expert on industrial design, either in deposition or at trial, in a number of matters, including cases involving design patent, trade dress and functionality issues.  A complete list of the matters in which I have testified as an expert industrial designer within the last four years is attached as Appendix C to this Declaration.

7.      The Holmes Group, Inc. ("Holmes") has agreed to compensate me at the rate of $400 per hour for my time spent working on or testifying in this matter, plus expenses.

<u>Documents and Other Information Considered</u>

8.      In forming my opinions in this matter, I have reviewed U.S. Patent Nos. D444, 664 S and D444,993 S, Des. 434, 266 (hereafter the '664, '993 and '266 patents, respectively) and other design patents.  I have also examined the actual physical products of Holmes (models 3730 and 37351) at issue in this litigation and photographs of the product provided by counsel.

9.      I have also examined other documents and materials in the process of forming my opinions.  A complete list of all matter examined is listed in Appendix A attached to this expert report.

Description of Assignment

10.     I have been retained by Holmes to render an expert opinion based on my experience as set forth above as to the similarities between the ornamental designs shown in the '664, '993, and '266 patents and Holmes' slow-cooker products designated as models 3730 and 37351. I have been asked to provide an expert opinion on the question of whether there are substantial similarities between the patented designs and the Holmes products. I have also been asked to provide an expert opinion on the issue of novelty of the ornamental design of the designs represented in the '664, '993 and '266 patents as it relates to the prior art of slow-cookers. In this regard I have reviewed the prior art references listed on the '664, '993 and '266 patents, documents depicting prior art slow-cookers and prior art slow-cookers sold by Holmes.

11.     I reserve the right to supplement this report in light of information discovered or made known to me after I prepared this report.

Summary of Opinions

After analyzing the documents and other information available to me at this time, and based upon my 30 years of professional experience as an industrial designer and human factors engineering expert, I have formed the following opinions:

a.     Summary Opinion 1: Substantial Similarity Test

Based on a detailed application of the formal principals of vision science and related design decision making, made known to me through my education and practice as a professional human factors engineer combined with my professional background in Industrial (product) Design, it is my professional opinion that in the eye of the ordinary observer, the accused Holmes products (Model Nos. 3730 and 37351) are not substantially similar in terms of overall

shape, style and appearance (ornamental design) when compared to the design depicted in the '664, '993, and '266 patents.  Detailed support for this opinion is found later in this report.

       b.        Summary Opinion 2: Points of Novelty Test

Based on a detailed comparison of the design depicted in the '664, '993 and '266 patents and the accused Holmes products (Model Nos. 3730 and 37351), it is my professional opinion that the design points of novelty presented by West Bend in its interrogatory response (a list 5 design points) and depicted in the '664, '993 and '266 patents are not novel when compared against the universe of available prior art references provided to me at the time of this analysis. Furthermore, none of the alleged points of novelty are present in the Holmes products at issue. Again, detailed support for this opinion is found later in this report.

       c.        Summary Opinion 3: Obviousness Test

Based on a detailed analysis of the design depicted in the '664, '993 and '266 patents, it is my professional opinion that the design depicted in the '664, '993, and '266 patents would have been obvious to one of ordinary skill in the art of slow-cooker design when compared against the universe of available prior art references provided to me at the time of this analysis. Again, detailed support for this opinion is found later in this report.

Detailed Support for Opinions 1 thru 3 above

       a.        Support for Opinion 1: Substantial Similarity Test

In reaching the professional opinion that "in the eye of the ordinary observer, the accused Holmes products are not substantially similar in terms of overall shape, style and appearance (ornamental design) to that depicted in the '664, '993, and '266 patents, I have employed established principals and theory from the field of cognitive science focusing specifically on the

topic of human visual perception.  In forming my professional opinion that the designs at

question in this litigation are not substantially similar, I employed various tests from the field of

cognitive/vision science.  It should be noted that the figures in the '664, '993 and '266 patents

are identical.  The only differences are that certain features are shown in dotted lines in the '993

and '266 patents which are shown in solid lines in the '664 patent.  Accordingly, my opinions,

although based on a comparison with the figures in the '664 patent, apply to the '993 and '266

patents as well.

1.     Invariant feature analysis overview:

In the human perception of shapes, it is known from established research that shapes are

perceived as being composed of "shape features".  When two shapes have the same shape feature

sets, shapes are perceptually found to be equivalent when viewed by the common observer.

Shapes which have invariant feature sets are perceptually "substantially similar".  For this test to

be robust, the "shape features" must remain invariant over the transformations noted later in this

analysis.  In order to determine if the '664, '993, and '266 patents and the accused Holmes's

products embody common and invariant feature sets I conducted the following analysis:

2.     Invariant feature analysis:  '664, '993 and '266
       Patents vs. Holmes Model Nos. 3730 and 37351:

These tests involved application of an established methodology for determining if two

shapes are perceptually equivalent.  This test is drawn from the field of vision science and is an

accepted means of determining shape equivalence.  This test involves a rigorous analysis of two

shapes by comparing elements of each shape against a series of visually relevant dimensions.

This test was used to accurately catalogue the visually salient elements of each design and to

critically determine the level of variance between the individual sets of variables.  The following

6

procedure was employed: A series of direct orthographic views of each Holmes product was captured using a high resolution digital camera. The photographs captured each Holmes product in several views which directly corresponded to the views depicted in the '664, '993, and '266 patent drawings.

The photographs were exported one at a time into an image management program (Adobe Photoshop CS1). Each image was de-saturated and saved as a JPEG file. The photographic file was moved to an image construction program (Adobe Illustrator CS1) and inserted into a unique image layer. The layer was locked. The photographs of the Holmes products were inserted into unique image files.

Following insertion of the Holmes' product photographs into each image file, the '664, '993 and '266 patent figures were converted from the patent document provided in electronic form into individual JPEG files. The patent figures were then inserted into the same image files on a second unique layer. Each patent figure was associated with the like photograph of the accused Holmes products. Through the use of an opacity function in the software program, the transparency of each patent drawing was increased to 50% so that the photographs could be clearly viewed under the patent figures. Through the use of resizing functions of the software, the photographs of the accused Holmes products and figures from the '664, '993 and '266 patents were brought into aligned scales. The resizing functions were programmed to constrain exact proportions of all objects. Therefore, no proportional distortion was introduced into the process for either the photographs or the patent figures.

A common alignment reference point was selected for overlapping each photograph with each patent figure. This allowed for establishment of a common reference point for each distinct

view of product/patent figure combinations.  The purpose of this initial process was to create a

meaningful, point by point detailed comparison of the alleged points of novelty and the actual

accused products in this litigation.  The direct and scaled overlapping of the patent figures and

corresponding photographs from the Holmes accused products provided an objective framework

for comparing the alleged points of novelty in the patents and related design attributes of the

accused products.  For the purpose of the analysis and as the basis for forming my professional

opinion, the Holmes products and figures from the patents were used to compare the ornamental

feature set (alleged points of novelty) of the patents and each respective Holmes design. The

formation of my professional opinion provided in this report involved several steps which made

use of the image files defined above.

> Step 1:        The overall ornamental design of each of the accused products was
>
> compared to the corresponding figures from the patents with a specific focus on
>
> those aspects of the patents which relate to the alleged points of novelty.  This
>
> was a step-wise process which started with an analysis of the overall dominant
>
> shape of the accused products as compared to the dominant overall shape of the
>
> product depicted in the relevant patent figures.  The dominant overall shape
>
> profile of the product depicted in the patents is represented by Figure 6 in the
>
> '664 patent. This view of the products is the high-level, first impression, of the
>
> overall shape.  This is a test of the first impression of objects and is consistent
>
> with how individuals, including those in retail settings, commonly view objects.
>
> It has been shown that normal visual perception proceeds from overall shape to
>
> shape details in a stepwise fashion.  The results of this test found the Holmes
>
> products vs Figure 6 in the patents NOT to be substantially similar. Support for

this opinion is shown in the diagrams below which demonstrate that the dominant shape of the accused products is composed of a series of clean elliptical shapes combined by the designer to produce a clean and flowing elliptical shape in the dominant view of the product.  This is contrasted by examining the same view of the product depicted in the patent Figure 6 where it can be seen from Figure 6 that the design depicted in the patents is composed of 4 circular shapes combined and then joined by the designer to create a rounded square-like shape as compared to the overall elliptical shape of the accused products.  This results in a fundamentally different dominant shape presentation to the observer and led to the opinion that the accused products and the design depicted in Figure 6 of the patent are not substantially similar.  This is shown in the following diagrams by the area enclosed by the black lined rectangle.





The analysis described above as "Step 1" was executed for all primary views of the product and related figures from the designated patents. In all instances of the analysis, it was found that the accused Holmes products are not substantially similar to the design depicted in '664, '993 and '266 patents.

As part of invariant feature analysis additional research was conducted to determine the similarities between Holmes products and the Figures in the '664, '993 and '266 patents.

Step 2:     In the next step in the analysis, the images from step 1 were kept on their independent image layers and a new layer was added to the image

construction file. This new image layer was added on top of the Holmes product's photographs and corresponding figures from the patents.  On this new layer designated "image component layer" a tracing of the critical components of each the Holmes products was executed using a Bezier tracing tool.  The selection of the components to be traced was based on established principals from visual science which dictate that perception of objects is based on the combining of certain elements of the objects in question.  These elements were traced in red line form for the purpose of making clear the fit of the tracing with respect to the related underlying image shapes.  The purpose of this step is to decompose the visually salient elements of each design into primitive shapes.  This is consistent with established principals in visual science.

Step 3:        In the next phase of the analysis, the independent image layers containing the Holmes product's photographs were "turned off" or hidden from view using a function of the image construction software.  This process revealed the features of each ornamental design in a common line drawing visual format when viewed with respect to the line art of the patent drawings.  This process of decomposing shapes into their visually salient elements is a common practice in visual science.  With the features present for each ornamental design a detailed analysis was conducted for all visually salient features.  The selection of the visually salient feature list was based on established principals of visual science and included visual elements found in the patent diagrams of like view.  The detailed line tracings were added to a new layer in the image construction software.  With the actual photograph hidden from view, the Holmes product's

line tracings and the figures from the West Bend patents-in-suit overlapped. Using this structure it was possible to view the visually salient aspects of the Holmes products in direct comparison to the same aspects and related elements depicted in the patents. The creation of a set of visually salient and common drawing style clarified the nature of the relationships between the accused products and the alleged points of novelty depicted in the patents.

This analysis further supported the formation of my professional opinion that, based on the application of the invariant feature analysis test, the ornamental design of the Holmes products as compared to the related figures from the patents support the professional opinion that the accused products and the designs depicted in the patents in suit are not substantially similar on any visually salient dimensions. Based on the application of this formal test of visual invariance, the two ornamental designs are not substantially similar and are delivering different overall and detailed visual image perception to the common observer. The results of the step 3 analysis are shown in figures below for each Holmes product and the related patent figure. Please note that Figures 3 and 5 have not been included in this report. These figures are direct reflections of the figures that come before them and were found upon analysis to reveal identical ratings. Figure 1, from the patent was not included is this report since it was not possible to produce a suitable underlying photograph of the accused Holmes products. However, an analysis of the figures not included (1, 3, 5) was conducted by me and did not in any manner alter the opinions expressed in this report.

The Holmes product 37351 vs. '664 patent figure analysis



The Holmes product 37351 vs. '664 patent figure analysis



The Holmes product 37351 vs. '664 patent figure analysis



The Holmes product 37351 vs. '664 patent figure analysis



The Holmes product 3730 vs. '664 patent figure analysis



The Holmes product 3730 vs. '664 patent figure analysis



The Holmes product 3730 vs. '664 patent figure analysis



The Holmes product 3730 vs. '664 patent figure analysis



b.    Support for Opinion 2: Points of Novelty Test

Based on a detailed analysis of the design depicted in the '664, '993 and '266 patents, it is my professional opinion that the points of novelty depicted in the claimed patents are not novel when compared against the universe of available prior art references provided to me at the time of this analysis and upon detailed reading of the alleged points of novelty provided by West Bend.  In forming my opinion, I have made specific reference to the alleged points of novelty by West Bend in their response to Interrogatory, No. 11 which explicitly defines the points of novelty depicted in the '664 patent as the following:

"Knob - (for removable lid) – an opaque, round shaped and disk-like knob mounted on a round shaped, smaller diameter pedestal or a somewhat mushroom-shaped knob."

"Skirt - (underneath knob) – An opaque, round shaped and disk-like skirt that is larger in diameter than the knob."

"Lid – (a translucent, domed and oval-shaped lid having no integral skirt or knob"

"Insert – (a translucent, domed and oval-shaped insert separating a lid from a body having a generally oval-shaped perimeter that has slight concave curves transitioning to outwardly-flared end handles and having a material thickness that thins around the insert's entire perimeter"

"Feet – four opaque, small cylindrical feet placed in a rectangular pattern around the body's bottom."

I do not agree with nor adopt West Bend's alleged points of novelty as the actual

points of novelty in the asserted patents. These points of novelty set forth by West Bend are used solely to illustrate that, notwithstanding improper identification of the points of novelty, the accused Holmes products do not include any of these alleged points of novelty.

In support of my opinion related to the alleged points of novelty, I have examined the file wrapper of the patents in suit and a body of additional designs which have been offered by counsel. I do not believe the points of novelty defined by West Bend to be valid based on the following analysis.

"Knob - (for removable lid) – an opaque, round shaped and disk-like knob mounted on a round shaped, smaller diameter pedestal or a somewhat mushroom-shaped knob." This alleged point of novelty is plainly not valid based a reading of the design depicted in the patents. This alleged point of novelty is so broadly defined as to encompass the entire universe of millions of flanged knobs in world at the time of the claimed invention. The description proffered under this point of novelty is virtually impossible to define in design terms as it completely lacks written specificity necessary to create a suitable design description. Even if such a description were put forward, the actual design configurations of the knob depicted in the patents and those shown on the Holmes products do not nearly rise to the level of being substantially similar. This alleged point of novelty is not valid.

"Skirt - (underneath knob) – An opaque, round shaped and disk-like skirt that is larger in diameter than the knob." As discussed above, this alleged point of novelty is plainly not valid based a reading of the design depicted in the patents. This alleged point of novelty is so broadly defined as to encompass the entire universe of millions of skirted knobs in production today. The description proffered under this point of novelty is virtually impossible to define in design terms as it completely lacks written specificity necessary to create a suitable design description.

Even if such a description were put forward, the actual design configurations of the skirt depicted in the patents and those shown on the Holmes products do not nearly rise to the level of being substantially similar. This alleged point of novelty is not valid.

*"Lid – a translucent, domed and oval-shaped lid having no integral skirt or knob"*. Again, this alleged point of novelty is plainly not valid based a reading of the design depicted in the patents. This alleged point of novelty is so broadly defined as to encompass the entire universe of domed lids in the marketplace. The description proffered under this point of novelty is virtually impossible to define in design terms as it completely lacks written specificity necessary to create a suitable design description. Even if such a description were put forward the actual design configurations of the lid depicted in the patents and those shown on the Holmes products do not nearly rise to the level of being substantially similar. This alleged point of novelty is not valid.

*"Insert – an opaque and oval-shaped insert separating a lid from a body having a generally oval-shaped perimeter that has slight concave curves transitioning to outwardly-flared end handles and having a material thickness that thins around the insert's entire perimeter"*. Additionally, as stated above, this alleged point of novelty is plainly not valid based a reading of the design depicted in the patents. This alleged point of novelty is so broadly defined as to make a meaningful reading of the described point of novelty onto the patents in suit is not possible. The description proffered under this point of novelty is virtually impossible to define in design terms as it completely lacks written specificity necessary to create a suitable design description. Even if such a description were put forward the actual design configurations of the insert depicted in the patents and those shown on the Holmes products do not nearly rise to the level of being substantially similar. This alleged point of novelty is not valid.

"*Feet* - *four opaque, small cylindrical feet placed in a rectangular pattern on the body's bottom*".  West Bend concedes in its response to Interrogatory No. 11 that the accused Holmes products do not include the claimed feet as shown in the '664 patent.

        c.     Support for Opinion 3: Obviousness Test

Based on a detailed analysis of the design depicted in the '664, '993 and '266 patents, it is my professional opinion that the design depicted therein would have been obvious to one of ordinary skill in the art of product design, when compared against the universe of available prior art references provided to me at the time of this analysis.

Over the past 30 years I have managed designers on a wide range of industrial design and product development projects.  It is my professional opinion that the '664, '993 and '266 patents ornamental design is simply crafted by the combining of other visual design solutions available at the time and this design makes use of a wide range of readily available design variables to create an obvious design solution.  I have examined the universe of slow-cooker designs provided by counsel.  It is my professional opinion that one of ordinary skill in the art would have found the solution depicted in the '664, '993 and '266 patents obvious.  Therefore, it is my professional opinion as an experienced manager of individuals who are "of ordinary skill in the art" that the ornamental design depicted in the '664, '993 and '266 patents is obvious and is not the result of careful and thoughtful design decision making and related refinements but is simply a combining of obvious and well understood design variables existing in the marketplace at the time of the claimed invention.

In general, slow-cookers include a heating unit on which the controls are mounted.  The heating unit forms a cavity to receive a cooking vessel, generally made of high temperature

ceramic which includes a lip or flange which rests on an upper rim of the heating unit. A lid is provided to rest upon an upper surface of the cooking vessel. The lid includes a knob to allow the user to hold the lid. Similarly, the heating unit includes handles on opposed sides for transport of the cooking appliance. The ceramic cooking vessel also includes handles to permit the vessel to be moved into and out of the cooking unit. Furthermore, the bottom surface of the cooking unit includes feet for resting on a countertop.

Each of U.S. Patent Nos. Des 429,596 (the '596 Patent) and Des 420,246 (the '246 Patent) disclose an oval-shaped slow-cooker. Specifically, the '596 Patent discloses an oval-shaped cooking unit and similarly shaped cooking vessel and lid. The oval-shaped lid is translucent and domed and includes a centrally-located mushroom-shaped knob. The oval-shaped cooking vessel separates the lid from the cooking unit and includes integrally formed, outwardly flared handles on opposed ends. The bottom surface includes three conically-shaped spaced apart feet.

The '246 Patent discloses an oval-shaped slow-cooker having an oval-shaped cooking unit, cooking vessel and lid. The cooking unit includes a pair of opposed handles and a controller on a front surface between the handles. The lid is domed and includes a centrally located mushroom-shaped knob and skirt having a diameter larger than the knob. The cooking vessel includes integrally formed handles and separates the lid from the cooking unit. The bottom of the cooking unit includes three spaced apart semi-circular feet.

U.S. Patent No. Des 416,434 (the '434 Patent) discloses a round slow-cooker. The slow-cooker includes a lid having a knob and skirt identical to that shown in the West Bend patents-in-suit. The slow-cooker also includes feet identical in shape and appearance to those shown in

the '664 Patent.

Document production numbers THG000030062-63 depict prior art oval slow-cookers sold by Holmes.  The slow-cookers include an oval-shaped lid having a mushroom-shaped knob and circular skirt which is larger in diameter than the knob.  The knob and skirt are substantially the same as that shown in the West Bend patents-in-suit.  The cooking vessel includes outwardly extending handle portions on opposite ends of the slow-cooker.

West Bend document production numbers WB000516-17 depict a round-shaped slow-cooker.  The slow-cooker includes a lid having a knob and skirt identical to that shown in the West Bend patents-in-suit.

West Bend document production number WB001165 depicts a round slow-cooker.  The slow-cooker includes a lid having a knob and skirt identical to that shown in the West Bend patents-in-suit.

West Bend document production numbers WB000080-81 depict an oval slow-cooker.  The slow-cooker includes an oval-shaped lid having a knob and skirt identical to that shown n the West Bend patents-in-suit.  The cooking vessel includes a flange which tapers downward and outwardly in a manner substantially similar to that of the cooking vessel shown in the West Bend patents-in-suit.

It is my opinion that the designs shown in the West Bend patents-in-suit are obvious in view of the slow-cooker depicted in document production numbers WB000080-81.

It is also my opinion that it would have been obvious to use the knob and skirt as shown in the '434 Patent or document production numbers WB000516-17, WB001165 and WB000080-

81 on the lid of either the '596 Patent, the '246 Patent or the prior art slow-cooker shown in document production numbers THG000030062-63.

It is my further opinion that it would have been obvious to use the tapered flange shown in document production numbers WB000080-81 on the cooking vessel of any one of the '596 Patent, the '246 Patent, or the slow-cooker depicted in document production numbers THG000030062-63.

Based upon my review of the prior art, the design of the slow-cooker shown in the West Bend patents-in-suit would have been obvious to a person of ordinary skill in the art of slow-cooker design when compared to the prior art identified above.

My considerations with respect to the subjects and opinions expressed herein are continuing, and I expect them to refine and develop.  While continued consideration may result in some expansion or modification of my opinions, the foregoing is an accurate statement of my present views.

Dated:  11/3/2006

_____

Charles L. Mauro CHFP

## APPENDIX A

- U.S. Patent No. Des. 434,266 the prosecution and the references cited in the prosecution history

- U.S. Patent No. D 442,664S and the references cited in the prosecution history

- U.S. Patent No. D 444,993S and the references cited in the prosecution history

- Rival Crockpot® slow-cooker, Model No. 3730

- Rival Crockpot® slow-cooker, Model No. 37351

- Holmes document production numbers THG000030062-63

- West Bend document production numbers WB0000516-17; WB000080-81; WB001165

- West Bend's response to Interrogatory No. 11

- Holmes response to Interrogatory No. 14

- Photographs of Rival Crockpot® slow-cooker Model Nos. 3730 and 37351

- Photographs of Rival Crockpot® slow-cooker, Model No. 3755HG

# APPENDIX B

Publications of Charles L. Mauro

(Internet publications between 2000 and 2004)

All posted on http://www.Taskz.com:

Mauro, C.L.:  "What Rich, Powerful Technologists Knew About Their Customers"

Mauro, C.L.:  "Is a high priced usability "Guru" a good investment?"

Mauro, C.L.:  "Microsoft vs. DOJ: Why the case is about usability."

Mauro, C.L.:  "Alert: Section 508 web accessibility now a Federal law!"

Mauro, C.L.:  "Repeal of OSHA ergonomics act: Good or bad?"

Mauro, C.L.:  "Gone in a flash: Why E-Com firms are in flat line mode"

Mauro, C.L.:  "Usability and online financial services: Big losses"

Publications in traditional media

Bias, G.B and Mayhew, J.M, "Cost-Justifying Usability: An Update for the Internet Age", Chapter 9: Mauro, C.L. Usability Science: Tactical and Strategic Cost Justifications in Large Corporate Settings Pg.265-295, Morgan Kaufman Publishers, New York, 2005

Mauro, C.L. "Cost-Justifying Usability in a Contractor Company", Cost-Justifying Usability, Academic Press, New York, 1994

Mauro, C.L. "User-Friendly: The quandary of Computer Competence", Journal of Graphic Design, The American Institute of Graphic Design Volume 8, Number 4, 1991

Mauro, C.L. "MauroNewMedia, Design Interface", AXIS 37 Fall 1989

Mauro, C.L. "Lead-time compression through vertical integration", Innovation Spring 1988

Mauro, C L, "Research and Design of Multinational Products", Innovation, Spring 1985

Bowen, H M, Mauro, C L and Oliver, R J, "Application of 'User Merit Index' to Tractor Cab Evaluation and Development"; paper #84-1643, Proc. Am. Soc. Ag. Engs., Winter meeting 1984

Mauro, C L, and Bowen, H M, "The User Merit Index: Evaluating a Product's Design", Innovation, Fall 1982

Mauro Associates, C L, "The ManComputer Interface: A New Priority, ManMachine 4,

Copyright 1982, C.L. Mauro Associates, Inc. Quarterly Publication

Mauro, C L, "From the Counter to the Courtroom", Metropolis, October 1981

Mauro, C L, "Human Factors Study Crucial Future Office Computers", Brief (reprint), September 1981

Mauro, C L, "Human Factors Study Crucial Future Office Computers", Industrial Design, March/April 1981

Mauro, C L, and Bowen, H M, "Why Human Factors Will Pay-Off in the 1980's: A Review of Futurist Literature and Consumer Trends", Human Factors Society Bulletin (reprint), November 1980

Mauro Associates, C L, "Women in the Workplace: Equality and Equity", WomanMachine 3, Copyright 1980, C L Mauro Associates, Inc. Quarterly Publication

Mauro Associates, C L, "Human Factors Analysis of a Multi-Function Digital Watch", Human Factors Society Annual Meeting Proceedings, 1980

Mauro, C L, and Bowen, H M, "Properly Designed Offices Must Be Worker Support Systems", Brief (reprint), May 1980

Bowen, H M and Mauro, C L, "Product Liability: The Case of the 10 Cent Ring Guard", presented at Human Factors and Industrial Design in Consumer Products Symposium, Tufts University, Medford, Massachusetts, May 1980

Coskuntuna, Semra, and Mauro, C L, "Instruction Manuals: Components of a Product's Teaching Package", presented at Human Factors and Industrial Design in Consumer Products Symposium, Tufts University, Medford, Massachusetts, May 1980

Mauro, C L, "Why Human Factors Engineering Will Pay Off in the 1980s: A Review of the Futurist Literature and Consumer Trends", presented at Human Factors and Industrial Design in Consumer Products Symposium, Tufts University, Medford Massachusetts, May 1980

Mauro Associates, C L, "Product Liability: For the PlainJPEG and for the Defense, ManMachine 2, Copyright 1980, C L Mauro Associates, Inc. Quarterly Publication

Mauro Associates, C L, "Three Mile Island: A Human Factors Problem", ManMachine 1, Copyright 1979, C L Mauro Associates, Inc. Quarterly Publication

Mauro, C L, and Bowen, H M, "Properly Designed Offices Must Be Worker Support Systems", Industrial Design, September/October 1979
Mauro, C L, "Three Mile Island: A Human Factors Problem", Industrial Design, September/October 1979

2

Mauro, C L, "How and Where to Find Research Literature", Industrial Design, March/April 1979

Mauro, C L, and Bowen, H M. "Product Liability Claims Forcing Human Factors Emphasis", Contract, September 1978

Mauro, C L, "Designing Against Product Liability Claims", Industrial Design, September/October, 1978

Mauro, C L, "Can Hair Dryers Be Safer? Research Says 'Yes' ", Industrial Design, May/June 1978

Mauro, C L, "How Human Variability Affects Design, Part II", Industrial Design, January/February 1978

Mauro, C L, "Variability of the Physical Human is a Key to Design", Industrial Design, November/December 1977

Mauro, CL, "Abstract Models Improve the Product-User Interface", Industrial Design, September/October 1977

Mauro, CL, "Advances in Application of User Data to Product Design", Industrial Design, July/August 1977

**APPENDIX C**


**Testimony in the last 4 years by Charles L. Mauro**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

------------------------------------------------------- x
                                                        :
SALTON, INC.,
                                                        :
                        Plaintiff,
                                                        :
                - against -
                                                        :
PHILIPS DOMESTIC APPLIANCES AND
PERSONAL CARE B.V.,                                     :

                        Defendant.                      :


------------------------------------------------------- :
                                                        :       No. 03-C-5660 (JHL)
PHILIPS DOMESTIC APPLIANCES AND                         :
PERSONAL CARE B.V.,
                                                        :
                        Counterclaim-
                        Plaintiff                       :

                - against -                             :

SALTON, INC.,                                           :

                        Counterclaim-                   :
                        Defendant.
                                                        :
------------------------------------------------------- x

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

|  |  |  |
|---|---|---|
| IPXL Holdings, LLC, | ) | |
| | ) | |
| *PlainJPEG*, | ) | Case No. CV-04-70 (LMB) |
| | ) | |
| v. | ) | |
| | ) | |
| Amazon.com, Inc., | ) | |
| | ) | |
| *Defendant*. | ) | |
| | ) | |

# APPENDIX D

**CV**

10/15/2006

**Charles L. Mauro CHFP**

President

MauroNewMedia, Inc.

New York, New York

Confidential
Copyright MauroNewMedia. 2006, All rights reserved

1

**Charles L. Mauro CHFP**

President

MauroNewMedia, Inc.

Mr. Charles L. Mauro holds a BS degree in industrial design from Art Center College and a Master's Degree in human factors engineering from New York University.  Mr. Mauro is a certified Human Factors Engineering Professional (CHFP) BPCE. He has received grants and fellowships from the Ford Foundation, National Institute of Occupational Safety and Health (NIOSH), and the National Endowment for the Arts.  At NYU, he was a research associate at the Rusk Institute of Rehabilitation Medicine.  Prior to the establishment of his own firm, he was Senior Program Manager for Henry Dreyfus Associates, where he directed many large scale industrial design programs for leading corporate clients.  Following his experience with the Dreyfus firm, he was retained by Raymond Loewy International.  While at the Loewy office, he managed complex, industrial design programs in the United States and Europe.  During détente, he managed the first design program undertaken by an American designer for the Soviet Union.

Since founding MauroNewMedia, Inc., in 1975 he has led the firm to an international reputation for the combined use of human factors engineering and industrial design.  Several new product development methods have resulted from his direction, including: Defensive Design Strategy and the User Merit Index (UMI).  Mr. Mauro has directed industrial design and human factors engineering research projects for many leading corporate clients including: New York Stock Exchange, Apple Computer, Motorola, AT&T, General Electric, General Motors, Sony, and leading venture capital start-ups. He has served as special consultant to McKinsey and Company in product development programs.

Mr. Mauro has received numerous awards for both industrial design and human factors engineering research. In 1985, he was appointed by the Federal Government to the first Presidential Design Awards Committee. As a key member of the PDAC committee he was responsible for development of design evaluation criteria used to determine national

Confidential
Copyright MauroNewMedia. 2006, All rights reserved

2

design awards given by the Federal Government. He has also received the Alexander C. Williams Award from the Human Factors and Ergonomics Society for contributions to a major operational man-machine system, the Special Service Citation from NASA, citations from the Association of Computing Machines and the New York Art Directors Club. Mr. Mauro is widely published in popular and professional literature, and has been quoted in Business Week, Science, Human Factors Society Bulletin, Industrial Design, Applied Ergonomics, Newsday, Technology Illustrated, Wall Street Journal, Datamation, Byte, Popular Computer and other publications. His industrial design work has been selected numerous times by Industrial Design Magazine for inclusion in their Annual Design Review.

The American Society of Mechanical Engineers appointed Charles Mauro chairman of two ANSI standards committees on ergonomic related topics. He is a member of several professional societies, including the Human Factors Society and Industrial Designers Society of America.  Mr. Mauro has lectured at leading conferences in the U.S. and abroad, and has lectured at leading graduate programs including Stanford and MIT Sloan School on product design and development.

In addition to his human factors and design related experience, he has been appointed to the Associate Council of the Museum of Modern Art. Mr. Mauro's clients include leading corporations and government agencies. He has consulted on the design of products in many industries and is widely recognized as an expert on design and human factors engineering.

Confidential
Copyright MauroNewMedia. 2006, All rights reserved

**Industrial design and human factors engineering project experience by product category** (partial)**:**

- Aerospace vehicles and support equipment
- Agricultural equipment
- Aviation instrumentation
- Banking and securities
- Childcare products and toys
- Commercial communications
- Commercial interiors
- Computer software for inexperienced users
- Consumer appliances
- Consumer cameras
- Consumer communication devices
- Consumer electronics
- Consumer product packaging
- Control display enhancement
- Correctional facilities
- CRT display formats
- Digital watches and miniature display devices
- Defense and military systems
- Energy management systems
- Large volume equities trading systems
- Executive training systems
- Fast food systems
- Feature telephones
- Fire safety products
- Games and toys
- Graphic design of documents
- Hand-held computers and communication devices
- Hazardous materials packaging
- High technology medical systems
- Instruction manuals
- Materials handling equipment
- Motor Cycles
- Office equipment and duplicating devices

Confidential
Copyright MauroNewMedia. 2006, All rights reserved

- Open office furniture systems
- Packaging, labeling and warnings
- Personal care products
- Personal computers
- Point of purchase displays (retail)
- Process control and power generation (nuclear and fossil fuels)
- Production equipment and processes
- Public spaces and parks
- Recreational equipment
- Residential interiors
- Sales and marketing presentations
- Sewing products
- Signage systems
- Systems furniture/training centers
- Small business computers
- Underwater diving systems
- VDT workstation design
- Word processing systems

Confidential
Copyright MauroNewMedia. 2006, All rights reserved

**Client List** (partial)

- AccuRay Corporation
- ADT Corporation
- Amtech Corporation
- Apple Computer
- AT&T
- Atomic Energy of Canada, Ltd.
- Centennial Computer Labs
- Chase Manhattan Bank
- Champion International Corp.
- Citibank of New York
- Citibank Advanced Development Division
- Clairol, Inc.
- Consolidated Edison of New York
- Donaldson, Lufkin, Jenrette
- Ebasco Services, Inc.
- Estee Lauder
- Florida Computer Graphics
- General Electric
- General Motors
- Goldman Sachs & Company
- Hercules Chemical
- Herman Miller
- Hewlett Packard
- Howe Furniture Corporation
- International Harvester
- J.I. Case International
- Johnson and Johnson
- K-Tel Corporation
- Knoll
- Lancome
- Longaberger Company
- Louisiana Power and Light
- Mag Instrument
- Medtek Corporation

Confidential
Copyright MauroNewMedia. 2006, All rights reserved

6

- Mitel Corporation
- Motorola, Inc.
- Museum of Modern Art
- NASA
- New York Stock Exchange
- Niagara Mohawk Power Corporation
- Nike
- Nintendo Corporation
- Nevamar Corporation
- Office of Naval Research
- OKI Electronics of America
- Pfizer Medical Electronics
- Philips Corporation NV
- Philips/Canada
- Pitney Bowes
- Public Service Gas & Electric of New Jersey
- Qualcomm, Inc.
- Radiologic Sciences, Inc.
- Raytheon Data Systems
- Raytheon Medical Electronics
- Rose Johnson
- Saxon Paints
- Sears
- Sony Corporation
- Standard and Poors
- Steelcase
- Teknion
- Thinking Machines, Inc.
- The Singer Company
- Technicare Corporation
- Tesdata Systems Corporation
- Texas Instruments, Inc.
- Torrington Roller Bearing
- Varian Associates, Inc.
- WIT Capital/Sound View

Confidential
Copyright MauroNewMedia. 2006, All rights reserved

**Media which have covered the work of Charles L. Mauro:**

- AIGA Journal
- Appliance Manufacturer
- Applied Ergonomics
- Applied Psychology
- Atlantic Monthly Magazine
- Axis Magazine (Japan)
- Brief
- Business Times (ESPN)
- Business Week Magazine
- Byte
- Chicago Tribune
- Communication Arts
- Contract Interiors
- Datamation
- Design Magazine (Britain)
- Fortune
- Human Factors Bulletin
- Industrial Design Magazine
- International Design Magazine
- Leisure Time Electronics
- Metropolis
- National Broadcasting Company (NBC)
- National Public Radio
- New Product Development News
- Newsday
- Popular Computing
- Proceedings of the Human Factors Society
- Public Broadcasting System (PBS)
- Science
- Technology Illustrated
- Vogue
- The Wall Street Journal

Confidential
Copyright MauroNewMedia. 2006, All rights reserved

8

# EXHIBIT T (1-12)

## Holmes Model No. 3730-W









## Holmes Model No. 37351-C









## Holmes Model No. 3735-W



3735-W



## 3 1/2QT OVAL CROCKPOT

ADDITIONAL PRODUCT DATA



INDIVIDUAL CARTON INFO:
Size: (L x W x H)  14.8IN x 8.9IN x 11.5IN
Weight: 9.281 LB
Cube: 0.870 FT3
UPC: 073056009174

MASTER CARTON INFO:
Size: (L x W x H)  17.9IN x 11.8IN x 15.6IN
Weight: 19.577 LB
Cube: 1.904 FT3
UPC: 20073056009178
Qty: 2

Exhibit T 3

## Holmes Model No. 3735-WN









**Holmes Model No. 37401-W**









## Holmes Model No. 3752-SM

 

 



## Holmes Model No. 37601-VEG









## Holmes Model No. 38551-W









Exhibit T 8

## Holmes Model No. 38601-C



**38601-C**



# 6 QT CHROME SMARTPOT SLW CKR

- Modern Brushed Stainless Steel Wrapper
- Programmable Touchpad Selects Time & Temp
- Auto-Shift to Warm so Dinner Is Ready When You Are(TM)
- SureGrip™ Side Handles fror Improved Grip & Comfort
- Ideal for 4 to 5 People

ADDITIONAL PRODUCT DATA

| | |
|---|---|
| Shape: | 1 |
| Programmability: | 2 |
| Wrapper: | 1 |
| Stoneware Color: | BLACK |

ACCESSORIES

| Product: | Box UPC: |
|---|---|
| 002-063 | 000000000000 |
| 002-084 | 000000000000 |
| 3004-GR | 073056008528 |
| CB10 | 073056012419 |
| 3810-X | 000000000000 |



INDIVIDUAL CARTON INFO:
Size: (L x W x H) 18.1IN x 9.5IN x 14.6IN
Weight: 15.410 LB
Cube: 1.456 FT3
UPC: 048894554360

MASTER CARTON INFO:
Size: (L x W x H) 19.3IN x 18.6IN x 15IN
Weight: 32.270 LB
Cube: 3.120 FT3
UPC: 20048894003718
Qty: 2



THC000008813

Exhibit T 9

**Holmes Model No. 38601-W**









**Holmes Model No. 38651-C**









## Holmes Model No. 5070TC-VG



THG000008816

# EXHIBIT  T (13-21)

## Holmes Model No. 5070TC-W



5070TC-W

# 7 QT OVAL SLOW COOKER W/BAG



- Subtle Pattern Fit In With Any Kitchen
- 3 Heat Settings, Including Convenient Warm Setting
- Rinse-Clean(TM) Coating for Easy Clean-Up
- Bonus Travel Case Included for Meals On The Go

ADDITIONAL PRODUCT DATA

| | |
|---|---|
| Shape: | ' |
| Programmability: | ' |
| Wrapper: | 4 |
| Stoneware Color: | WHITE |

ACCESSORIES

| Product: | Box UPC: |
|---|---|
| 002-063 | 000000000000 |
| 3004-GR | 073056008528 |
| CB10 | 073056012419 |
| 3810-X | 000000000000 |



Crock·Pot
Stoneware Slow Cooker



INDIVIDUAL CARTON INFO:
Size: (L x W x H)  17.7IN x 9.8IN x 13.6IN
Weight: 14.500 LB
Cube: 1.368 FT3
UPC: 073056012075

MASTER CARTON INFO:
Size: (L x W x H)  18.3IN x 10.5IN x 14.8IN
Weight: 16.200 LB
Cube: 1.648 FT3
UPC: 073056012075
Qty: 1

0  73056  01207  5

Holmes    BIONAIRE    Seal·A·Meal    RIVAL    MASTERGLOW    PATTON    WHITE MOUNTAIN    Crock·Pot

Exhibit T 13

## Holmes Model No. 5445-BCN





5445-BCN

# 4.5 QT OVAL
# SLOW COOKER

- Modern Brushed Stainless Steel Wrapper
- Rinse-Clean™ Coating for Easy Clean-Up
- 2 Heat Settings

ADDITIONAL PRODUCT DATA

Shape:                1
Programmability:      1
Wrapper:              1
Stoneware Color:    BLACK

ACCESSORIES

| Product: | Box UPC: |
|----------|----------|
| 3004-GR | 073056008528 |
| CB10 | 073056012419 |
| 3810-X | 000000000000 |



**Crock·Pot**
Stoneware Slow Cooker



INDIVIDUAL CARTON INFO:
Size: (L x W x H)  16IN x 9.1IN x 12.5IN
Weight: 12.000 LB
Cube: 1.057 FT3
UPC: 073056011283

MASTER CARTON INFO:
Size: (L x W x H)  13.6IN x 18.9IN x 16.7IN
Weight: 26.500 LB
Cube: 2.485 FT3
UPC: 10073056600187
Qty: 2

Holmes    BIONAIRE    Seal·a·Meal    RIVAL    MASTERGLOW    PATTON    WHITE MOUNTAIN    Crock·Pot

## Holmes Model No. 6445-BC





**6445-BC**

# 6.5 QT OVAL
# SLOW COOKER

- • Removable Stoneware
- • 2 heat settings
- • Rinse-Clean ™ Stick Resistant Coating
- • Wrap-around heat
- • 6.5 quart capacity• Auto-Protect™ Safety System

ADDITIONAL PRODUCT DATA

**INDIVIDUAL CARTON INFO:**
Size: (L x W x H)  19.7IN x 9.9IN x 13.5IN
Weight: 14.000 LB
Cube: 1.519 FT3
UPC: 073056011306

**MASTER CARTON INFO:**
Size (L x W x H) 20.3IN x 14.1IN x 20.9IN
Weight: 31.300 LB
Cube: 3.449 FT3
UPC: 10073056600200
Qty: 2



HRG000008819

Exhibit T 15

**Holmes Model No. 64451-C**



64451-C



# 6.5 QT SLOW COOKER-CHROME

- 6.5 Quart Capacity
- SureGrip™ Handles for improved grip and comfort
- 3 Heat settings, including Warm
- Ergonomically designed control knob
- Removable storewareRinse-Clean™ Stick Resistant Coating

ADDITIONAL PRODUCT DATA



INDIVIDUAL CARTON INFO:
Size: (L x W x H)  19.7IN x 9.9IN x 13.5IN
Weight: 14.000 LB
Cube: 1.520 FT3
UPC: 048894558221

MASTER CARTON INFO:
Size: (L x W x H)  20.3IN x 14.1IN x 20.9IN
Weight: 31.300 LB
Cube: 3.449 FT3
UPC: 20048894006399
Qty: 2

Exhibit T 16

## Holmes Model No. 64451LD-C



### Crock-Pot® 6.5 Quart Slow Cooker with Bonus

**Model # 64451LD-C**

- 6.5 Quart Capacity
- Removable Round Stoneware for Easy Serving and Clean-up
- 3 Heat settings (including convenient warm setting)
- Dishwasher Safe Stoneware and Lid
- Bonus Little Dipper™ Included - Perfect for Dips and Sauces!

| | Model Number | UPC Code | Qty. Pack | Height | Width | Depth | Cube | Weight | T. X H. |
|---|---|---|---|---|---|---|---|---|---|
| Master Carton | 64451 LD-C | 280488400023980 | 2 | 20.882 | 24.488 | 13.587 | 3.458 | 31.766 | |
| Individual Carton | | 048894455954 | 1 | 13.474 | 19.818 | 9.889 | 1.828 | 14.991 | |

      

THG000008821

Exhibit T 17

## Holmes Model No. SCP609-WS





SCP609-WS

# 6.0 QT OVAL SMART-POT W/ BONUS

- Programmable Touchpad Selects Time & Temp
- Auto-Shift to Warm so Dinner Is Ready When You Are(TM)
- SureGrip™ Side Handles fror Imoproved Grip & Comfort
- Ideal for 4 to 5 People
-

ADDITIONAL PRODUCT DATA



INDIVIDUAL CARTON INFO:
Size: (L x W x H)  18.1IN x 9.3IN x 14.3IN
Weight: 15.000 LB
Cube: 1.391 FT3
UPC: 048894675485

MASTER CARTON INFO:
Size (L x W x H)  19IN x 18.5IN x 14.9IN
Weight: 31.000 L3
Cube: 3.032 FT3
UPC: 20048894939543
Qty: 2

0  48894  67548  5

## Holmes Model No. SCV400-R

 

 



## Holmes Model No. SCV400-SS









# Holmes Model No. SCV401-BS



THG000008825

Exhibit T 21

# EXHIBIT  T (22-34)

## Holmes Model No. SCV450-SS



THG000008826

Exhibit T 22

## Holmes Model No. SCV450-SS









## Holmes Model No. SCV500-SM

Crock-Pot® 5 Quart Slow Cooker – Spring Meadow

### Model # SCV500-SM

- 5 Quart Capacity
- Removable Oval Stoneware for Easy Serving and Clean-up
- 2 Heat Settings
- Tempered Glass Lid
- Dishwasher Safe Stoneware and Lid





|  | Model Number | UPC Code | Case Pack | Height | Width | Depth | Cube | Weight | T.X.H |
|---|---|---|---|---|---|---|---|---|---|
| Master Carton | SCV500-SM | 2B0498268157-17 | 2 | 20.848 | 23.129 | 12.441 | 4.251 | 25.800 |  |
| Individual Carton |  | 848594749644 | 1 | 0.888 | 11.450 | 9.194 | 0.819 | 10.200 |  |

      

THG000008827

Exhibit T 24

# Holmes Model No. SCV551-KW

## Rival 5.5 Quart Slow Cooker - KLS

### Model # SCV551-KW

- 5.5 Quart Capacity in Monochromatic White
- Oval Removable Stoneware
- Rinse-Clean™ Stick Coating
- Tempered Glass Lid
- 3 Heat settings
  *(including convenient warm setting)*



| | Model Number | UPC Code | Case Pack | Height | Width | Depth | Cube | Weight | T-Xit |
|---|---|---|---|---|---|---|---|---|---|
| Master Carton | SCV551-KW | 280488408(8416 | 3 | 20.208 | 14.220 | 13.588 | 3.878 | 28.160 | |
| Individual Carton | | 048894474156 | 1 | 13.406 | 17.430 | 9.478 | 1.379 | 12.760 | |



      

THG000008828

Exhibit T 25

## Holmes Model No. SCV553-KM









## Holmes Model No. SCV601-BS



**Holmes Model No. SCV610-WM**









Exhibit T 28

## Holmes Model No. SCVC604-SS

 

 



# Holmes Model No. SCVP600-SS

## Crock-Pot® 6 Quart Smart-Pot™ Slow Cooker

### Model # SCVP600-SS

- 6 Quart Capacity
- Removable Oval Stoneware for Easy Serving and Clean-Up
- Prepares Meals with the Touch of a Button
- Cooking in Two Easy Steps:
    1. Place Ingredients in Stoneware
    2. Select Cook Time
- Four Time Settings with Automatic Temperature Settings - Automatically Shifts to Warm When Done
- Stainless Steel Exterior
- Dishwasher Safe Stoneware and Lid



|  | Model Number | UPC Code | Case Pack | Height | Width | Depth | Cube | Weight | L X H |
|---|---|---|---|---|---|---|---|---|---|
| Master Carton | SCVP600-SS | 2804584081884 | 2 | 15.618 | 19.340 | 18.878 | 3.128 | 32.270 |  |
| Individual Carton |  | 048594749426 | 1 | 14.600 | 13.140 | 9.560 | 1.456 | 15.410 |  |



     

THG000008833

Exhibit T 30

## Holmes Model No. SCVP601-K





## Holmes Model No. SCVP601-UM









## Holmes Model No. SCVP609-KLS









## Holmes Model No. SCVP609-TG









Exhibit T 34