**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

THE HOLMES GROUP, INC.,       :
                                    :
     Plaintiff/Counterclaim-Defendant,  :     Civil Action No.  1: 05-CV-11367 WGY
                                    :     (Alexander, M.J.)
              v.               :
                                    :
WEST BEND HOUSEWARES, LLC and  :
FOCUS PRODUCTS GROUP, L.L.C.,   :
                                    :
     Defendants/Counterclaim-Plaintiffs. :

**HOLMES' SECOND COUNTER-STATEMENT OF MATERIAL FACTS
AS TO WHICH A GENUINE ISSUE OF DISPUTE EXISTS IN SUPPORT
OF HOLMES' RESPONSE TO WEST BEND'S SECOND MOTION FOR
SUMMARY JUDGMENT OF NON-INFRINGEMENT**

Charles R. Hoffmann, Esq. (*Pro Hac Vice*)
Glenn T. Henneberger, Esq. (*Pro Hac Vice*)
Alan M. Sack, Esq. (*Pro Hac Vice*)
HOFFMANN & BARON, LLP
6900 Jericho Turnpike
Syosset, New York  11791-4407
Telephone:  (516) 822-3550

Nicholas J. Nesgos (BBO No. 553177)
Joseph W. Corrigan (BBO No. 647393)
POSTERNAK BLANKSTEIN & LUND LLP
Prudential Tower, 800 Boylston Street
Boston, Massachusetts  02199-8004
Telephone:  617-973-6100

*Attorneys for Plaintiff*

December 22, 2006

Pursuant to Rule 56.1 of the Local Rules for the United States District Court for the District of Massachusetts, Plaintiff submits that there exists genuine issues of material fact to be tried as set forth below:

1.    Plaintiff, The Holmes Group, Inc., now known as Sunbeam Products, Inc., d/b/a/ Jarden Consumer Solutions, (hereinafter "Holmes") brought this action against Defendants West Bend Housewares, LLC and Focus Products Group, LLC (collectively referred to as "West Bend") for infringement of Holmes' U.S. Patent Nos. 6,573,483 and 6,740,855 entitled "Programmable Slow-Cooker Applicant" ("the '483 patent" and "the '855 patent," respectively). A copy of the '483 patent was attached as Exhibit A to Plaintiff's Counter-Statement of Material Facts As To Which A Genuine Issue of Dispute Exists, docket number 48, filed on October 12, 2006, (hereinafter "Holmes' First Counter-Statement").  A copy of the '855 patent was attached as Exhibit B to Holmes' First Counter-Statement.  The '855 patent is a continuation of the '483 patent.  Thus, the specification and figures are the same, only the claims differ.  Accordingly, reference to the '483 patent specification applies equally to the '855 patent.

2.    The Holmes patents relate to a structure and method of using a programmable slow-cooker appliance.  (Ex. A, Col. 5, line 43 - Col. 6, line 27).

3.    Subsequent to the market introduction of a programmable slow-cooker by Holmes covered by the Holmes patents, West Bend began marketing and selling programmable slow-cookers (e.g., West Bend Housewares 6 Quart Oval Slow Cooker, Model 84386) which infringe the '483 and '855 patents.  A copy of the Instruction Manual for one of the accused West Bend programmable slow-cookers was attached as Appendix B to Exhibit D (Declaration of Professor David L. Trumper In Support of Plaintiff's Response to Defendants Motion for Partial Summary

Judgment of Non-Infringement to Holmes' First Counter-Statement).

4.     The programmable slow-cooker covered by the Holmes patents permits the consumer to select a cooking time and temperature.  At the expiration of the set cooking time, the appliance automatically reduces power to the heating element to place it in a keep warm mode.  Thus, the cooked food is maintained at a serving temperature and prevents spoilage in the event the user is not available at the end of the set cooking time to attend to the appliance.  ('483 patent, Col. 5, line 43 - Col. 6, line 27).

5.     The '483 and '855 patents also disclose and claim novel structure for cooling the electrical circuit for the programmable slow-cooker.  However, Holmes has not asserted any claims directed to the cooling feature in this lawsuit.  ('483 patent, Col. 1, lines 31-49).

6.     On September 27, 2006, this Court held a *Markman* Hearing to construe claim limitations to which the parties could not agree.  The Court rendered its opinion on claim construction at the Markman Hearing.  A copy of the *Markman* Hearing transcript was attached as Exhibit E to Holmes' First Counter-Statement.

7.     The '483 and '855 patents include claims at issue which are directed to a programmable slow-cooker appliance which allows a user to select a cooking temperature and a cooking time using a programmable controller.  The programmable slow-cooker automatically switches the heating element from a cooking mode to a lower temperature warm mode at the expiration of a set cooking time.  ('483 patent, Claim 13; '855 patent, Claim 20).

8.      The asserted claims in the '483 and '855 patents do not require any cooling of electronic components.  The patents-in-suit disclose and claim novel structure for cooling an electrical circuit of a programmable slow-cooker appliance; however, none of the claims directed to the cooling feature have been asserted in this lawsuit.  ('483 patent, Claims 13, 14, 17 and 19; '855 patent, Claim 20, 24, 26, 27 and 29).

9.      The "Summary of the Invention" identifies two aspects of the invention.  The first aspect is directed to the novel structure for cooling the electronic circuit of the programmable slow-cooker. "Another aspect of the invention is a method of using the programmable controller to ensure that food is cooked according to the desires of a user."  ('483 patent, Col. 1, lines 50-53).

10.      Claim 13 of the '483 patent defines a method of using a programmable slow-cooker appliance, wherein the method includes the steps of selecting a cooking temperature and time using a programmable controller and changing the heating unit temperature automatically to a lower temperature at the expiration of the selected cooking time.  ('483 patent, Claim 13; *see also* Col. 6, lines 8-19).

11.      Cooling and/or ventilation of the housing to keep electronic components from overheating does not form a part of Claim 13 of the '483 patent or Claim 20 of the '855 patent. ('483 patent, Claim 13;'855 patent, Claim 20; *Markman* Tr.).

12.    The Court construed Claim 13 to define a housing "mounted to an located on" an outer sidewall of the heating unit.  The programmable controller, in the form of an electrical circuit, is mounted to the housing.  (*Markman* Tr. pp. 20-21).

13.    Claim 13 of the '483 patent states:

> 13.  A method of using a programmable slow-cooker appliance, the method comprising:
> providing a food item;
> placing the food item into a cooking unit of the slow-cooker appliance;
> selecting a cooking temperature and time using a programmable controller
>     mounted to a housing fixedly mounted to a heating unit; and
> changing the heating unit temperature automatically to a lower
>     temperature after the selected time.

('483 patent, Claim 13).

14.    The Court held that "a programmable controller" is "a form of an electrical circuit or circuits including input and output devices which permit an operator to select a cooking temperature and cooking time."  (*Markman* Tr. p. 20, lines 19-22).

15.    The Court further held that the limitation of a programmable controller "mounted to a housing fixedly mounted to a heating unit" means the housing is "mounted to and located on the outside of the heating unit."  (*Markman* Tr. p. 20, line 23 - p. 21, line 3).  On this construction, the Court further noted that "the way you [Holmes] teach this is outside, or at least overwhelmingly or generally outside" without actually requiring such limitations to form a part of its construction.  (*Markman* Tr. p. 24 line 10 - p. 25, line 7).

16.    At the motion hearing conducted on October 18, 2006, the Court ruled that its claim construction would not be reversed.  (Motion Hearing Tr. p. 2, lines 20-22).

17.    Contrary to West Bend's assertion and the clear ruling by the Court, Holmes did not stipulate that all the asserted claims require the entire electrical circuit to be positioned within the housing.  This limitation only appears in the Court's construction of asserted Claim 20 of the '855 patent.  (Motion Hearing Tr. p. 2, line 23 - p. 3, line 12).

18.    Claim 13 of the '483 patent as construed by the Court does not include a limitation that the entire programmable circuit be positioned within the housing and the Court's granting of summary judgment of no literal infringement cannot be based on a requirement that the "entire" programmable circuit be provided in the housing.  (*Markman* Tr. pp. 20-21).

19.    The accused slow-cookers permit an operator to "select a cooking time and temperature using a programmable controller."  The programmable controller limitation as construed by the Court is literally present, i.e., the accused slow-cooker includes an electrical circuit or circuits including input and output devices which permit an operator to select a cooking temperature and cooking time.  (Ex. 1, ¶ 11).  The Declaration of Professor David L. Trumper In Support of Holmes' Response to West Bend's Second Motion for Summary Judgment of Non-Infringement is attached hereto as Exhibit 1

20.    The programmable controller mounted to a housing fixedly mounted to a heating unit has been construed by the Court to mean "a housing mounted to and located on the outside of the heating unit."  (*Markman* Tr. p.21).

21.    The accused slow-cookers include a housing formed by an inner housing shell (white plastic) and outer housing shell (black plastic) which together form an enclosure for a printed circuit board, the circuit board including input and output devices mounted thereon.  Both the inner housing shell and outer housing shell are affixed to the outer sidewall of the heating

unit by screws, wherein the inner housing shell is fastened to an inside surface of the outer

sidewall and the outer housing shell is fastened to the outside surface of the outer sidewall. The

entire outer housing shell and a portion of the inner housing shell extend beyond the outer

surface of the outer sidewall of the heating unit as shown in the photographs below.

  

Thus, the electrical circuit including input and output devices which permit an operator to select

a cooking time and temperature are mounted in a housing mounted to and located on the heating

unit such that every claim limitation is literally present in the accused slow-cookers. (Ex. 1, ¶¶

12-14).

22.     West Bend's housing includes portions which extend both into the heating unit as

well as projecting outwardly beyond the outer surface of the outer sidewall as shown in the

photos in paragraph 21 above. The function of the housing is to provide an enclosure for at least

a portion of the electrical circuit of the programmable controller as disclosed in the specification.

('483 patent, Col. 3, lines 17-18; Col. 5, lines 19-37). The way in which this function is

accomplished by the accused slow-cooker is by providing inner and outer housing portions

which are fixedly mounted to the outer sidewall of the heating unit to form an enclosure in which

a printed circuit board is mounted. The printed circuit board has input and output devices

mounted thereon to set a cooking temperature and time. The result is substantially the same

since the enclosure extends outwardly beyond an outer surface of the sidewall. (Ex. 1, ¶ 15).

23.     It is unclear whether the Court's claim construction related to the housing of Claim 13 includes the limitation of being "at least overwhelmingly or generally outside" the outer sidewall of the heating unit.  (*Markman* Tr. p. 23, line 17 - p. 24, line 3; Ex. 1, ¶ 18).

24.     The West Bend housing formed by the inner and outer shell portions is "generally outside" the outer sidewall.  The entire outer shell portion and part of the inner shell portion project outwardly beyond the outer surface of the heating unit.  Thus, contrary to West Bend's assertion that approximately 50% of the housing is inside and 50% is outside the heating unit, more than 50% of the inner and outer housing portions taken as a whole clearly extend beyond the outer sidewall; i.e., generally, overwhelmingly or largely outside the sidewall.  (Ex. 1, ¶ 16).

25.     To the extent that the West Bend slow-cooker housing does not literally meet the claim limitation, any perceived differences are clearly insubstantial.  Whether the housing extends from the outer sidewall 51%, 75% or 90% would not be considered a substantial difference by those skilled in the art and the function, way, result test is still met.  (Ex. 1, ¶ 17).

26.     During prosecution of the '483 patent, Claim 13 was amended by adding the italicized language to the selecting step:  "selecting a cooking temperature and the using a programmable controller *mounted to a housing fixedly* mounted to a heating unit."  (MKM0097).

27.    Applicants made the following arguments relevant to the issue of PHE raised by West Bend:

•    "As mentioned above, neither Rivelli nor Frey describe a housing for a programmable controller fixedly mounted to the outside of the heating unit."  (MKM0095).[1]

•    "In Yung, a programmable controller is mounted inside the [outer] housing, not outside."  (MKM0096).

•    "While Rivelli and Yung disclose controllers mounted to a single housing, Skutt discloses a kiln in which a controller is not fixedly mounted on the outside of the kiln, but is connected via hinges…   Therefore, even an improper combination does not describe or suggest the claimed invention, including a controller housing mounted fixedly to the outside of the heating unit."  (MKM0096).

28.    Following the above-noted amendment and remarks, the Examiner allowed the claims without further comment.  (MKM0099-0101).  It is clear from the specific claim language and the remarks made during the prosecution that the West Bend housing structure was not disclaimed by Holmes and no prosecution history estoppel exists which would prevent application of the DOE.  By way of the amendment and remarks, Holmes, at best, disclaimed a (1) hinged controller housing, such as disclosed in Skutt (MKM0546-54) and (2) a control module which is positioned entirely within the exterior surface of the heating unit such as disclosed in Rivelli.  (MKM0291-96).  (Ex. 1, ¶ 20).

---

[1]    Copies of the Rivelli, Frey and Yung patents discussed in the amendment are attached to the Joint Appendix for *Markman* Briefing, MKM291-6; MKM613-27; and MKM546-54, respectively.

29.    The West Bend slow-cookers include a housing formed of inner and outer shell portions.  The entire outer shell portion and part of the inner shell portion extend outward from the outer sidewall and both housing portions are fixedly mounted to the outer sidewall.  Thus, the accused slow-cooker does not fall within any potentially disclaimed subject matter since the housing is not hinged, nor is the entire housing within the outer housing or heating unit.  (Ex. 1, ¶ 21).

30.    None of the amendments or remarks distinguished the claims over the structure of the West Bend slow-cooker, i.e., an electrical circuit including input and output devices to program a cooking time and temperature mounted to a housing fixedly mounted to the outer sidewall, the housing including a portion extending outwardly from the outer surface of the heating unit and a portion extending inwardly.  No such structure is disclosed in the prior art.  Moreover, the West Bend slow-cookers literally include the elements added by amendment, namely a programmable controller *mounted to a housing fixedly* mounted to a heating unit.  Stated differently, the West Bend slow-cookers include an electrical circuit mounted in the housing which is, in turn, mounted to and located on the outer sidewall.  (Ex. 1, ¶ 22).

31.    The West Bend housing structure and electrical circuit are not identical to Rivelli.  Rivelli discloses a commercial deep fat fryer, not a slow-cooker, which does not include a housing mounted to and projecting outwardly from an outer sidewall of a heating unit.

/ / /

/ / /

/ / /

- 9 -

Furthermore, the control module 26 or housing for the electrical circuit as disclosed in Rivelli is located entirely within the deep fat fryer box-like outer housing 14 as shown below.



(MKM0292)                                    (MKM0293)

To the contrary, as discussed previously, the West Bend slow-cooker includes an electrical circuit mounted to a housing, the housing having an inner shell and outer shell mounted to the outer housing.  The entire outer housing shell and a portion of the inner housing shell extends outwardly from the outer sidewall of the heating unit.  (See photos in paragraph 21). Accordingly, the West Bend slow-cooker structure is significantly different from Rivelli and clearly closer in structure to the claimed invention in the '483 and '855 patents than the commercial fryer of Rivelli.  (Ex. 1, ¶ 23).

    32.    Claim 20 of the '855 patent states:

    20.    A programmable slow-cooker appliance comprising:

a heating unit including a bottom and a continuous sidewall extending from said bottom, said bottom and said continuous sidewall defining a well-like chamber, said continuous sidewall including an outer sidewall and an interior sidewall;

a heating element mounted to said heating unit and disposed between said outer sidewall and said interior sidewall;

a housing fixedly mounted to and projecting outside said continuous sidewall of said heating unit;

a programmable circuit positioned within said housing and configured to automatically switch said heating element from a cook mode to a lower temperature warm mode at the end of a set cooking time;

a control panel mounted to said housing and including a user interface connected to said programmable circuit for selecting a cooking temperature and cooking time; and

a cooking unit removably positioned in said well-like chamber.

('855 patent, Claim 20).

33.    The Court construed several limitations of Claim 20.  The remainder of the claim limitations are clearly literally present in the accused slow-cookers.  (Ex. 1, ¶¶ 27-29, 36 and 37).

34.    The Court construed "a housing fixedly mounted to and projecting outside said continuous sidewall of said heating unit" to mean that the housing "is mounted to and largely outside the outer sidewall of the heating unit and extending at least beyond an outer surface of the sidewall of the heating unit."  (*Markman* Tr. p. 35).

35.    The accused housing includes inner and outer housing shells fixedly attached to and extending at least beyond an outer surface of the sidewall of the heating unit.  Moreover, since the entire outer housing shell and a portion of the inner housing shell extend beyond the outer surface of the sidewall, the limitation that the housing be "largely" outside the outer sidewall is also literally met.  (Ex. 1, ¶ 30).

36.    West Bend's housing is clearly mounted to the outer sidewall (both the inner and outer housing shells are fixedly fastened to the outer sidewall) and the entire outer housing and a portion of the inner housing extend beyond the outer surface of the sidewall.  To the extent that the Court may determine that the West Bend housing is not "largely" outside, any such differences are clearly insubstantial.  Whether the housing extends 51% or 75% from the outer

sidewall does not affect the function of the housing, i.e., to provide an enclosure for at least a portion of an electrical circuit. The way in which the function is accomplished is by providing housing portions which are fixedly mounted to the outer sidewall to form an enclosure. The result is substantially the same since the enclosure projects outwardly beyond an outer surface of the sidewall. (Ex. 1, ¶ 32).

37.     The Court has construed "a programmable circuit positioned within said housing" to mean "a circuit, including an assemblage of electronic components, which allows the user to program both the temperature and desired time for cooking and which can automatically change the heating element from a cooking mode to a warm mode once the set cooking time has expired. The circuit, not just a portion of the circuit, is positioned within the housing. The programmable circuit does not include the heating element, the control panel, displays and buttons." (*Markman* Tr. p. 38).

38.     In the specification of the patents-in-suit, electronic components illustrated as being part of the programmable circuit 300 are described as being located external to the printed circuit board and outside the housing. For example, a thermistor 310 shown in both Figs. 10 and 13 is used to measure a temperature of the cooking appliance. The specification states that thermistor 310 "is connected externally of the circuit board to the underside of the bottom of the heating chamber." ('855 patent, Col. 5, lines 21-24). Similarly, the Triac 304, which switches power applied to the heating elements is preferably "mounted separately to one of the mounting holes on the center portion 256a of the heat sink 256" external to the printed circuit board. (*Id*. at Col. 5, lines 34-40; Trumper Decl. ¶ 42 (Exhibit D to Holmes' First Counter-Statement).

39.     The specification also discloses that alternative electronic components may be used to accomplish the different functions of the circuitry.  ('855 patent at Col. 5, lines 17-20). Accordingly, in view of the disclosed preferred embodiments, the specification clearly contemplates that some electronic components of the programmable circuit will be mounted on a printed circuit board provided within the housing, while other components are mounted external to the printed circuit board and housing.  (Trumper Decl., ¶ 43; Exhibit D to Holmes' First Counter-Statement).

40.     The West Bend programmable circuit includes two printed circuit boards connected by wires as well as other electronic components, such as the thermistor, mounted external to the printed circuit boards.  One of the printed circuit boards is positioned within the housing that projects outwardly from the sidewall as discussed above.  The other printed circuit board is mounted within the base portion of the heating unit.  West Bend's programmable circuit taken as a whole, including both printed circuit boards and the externally mounted thermistor and Triac, works in exactly the same way as the programmable circuit (300) disclosed in the '855 patent, i.e., permits an operator to select a cooking temperature and time and, at the end of a set cooking time, automatically switches from a cooking mode to a lower temperature warm mode. The only difference is that some of the electronic components are located external to the printed circuit board provided in the housing mounted to and projecting outwardly from the outer sidewall.  Splitting the printed circuit board component of the programmable circuit into two circuit boards connected by wires is an insubstantial change readily apparent to a person of ordinary skill in the art as specifically described in the '855 specification.  ('855 patent, Col. 4, lines 55-60; and Col. 5, lines 18-21; Ex. 1, ¶ 35).

41.     The West Bend programmable circuit performs all the claimed functions of Claim 20 of the '855 patent, i.e., allowing a user to select a cooking time and temperature and automatically changing the heating element from a cook mode to a lower temperature warm mode once the set cooking time has expired, in substantially the same way by providing an electrical circuit including an assemblage of electronic components to achieve substantially the same result.  Merely splitting one circuit board component of the programmable circuit into two circuits boards connected by wires does not change the way in which the circuit operates or the result thereof.  Thus, the way in which the programmable circuit operates, although using different electronic components as contemplated by the inventors in the specification, is substantially the same.  The West Bend programmable circuit achieves substantially the same result.  (Ex.. 1, ¶ 35).

42.     In response to an Office Action, Claim 20 of the '855 patent, i.e., Claim 53 in the original application which, when allowed, was renumbered as issued Claim 20, was amended. The amendment to Claim 53 appears below with additions underlined and deletions stricken:

53.     (Currently Amended)  A programmable slow-cooker appliance comprising:

a heating unit including a bottom and a continuous sidewall extending from said bottom, said bottom and said continuous sidewall defining a well-like chamber, said continuous sidewall including an outer sidewall and an interior sidewall;

a heating element mounted to said heating unit and disposed between said outer sidewall and said interior sidewall;

a housing fixedly mounted to and projecting outside said continuous sidewall of said heating unit;

a programmable circuit positioned within said housing including means for automatically switching and configured to automatically switch said heating element from a cook mode to a lower temperature warm mode at the end of a set cooking time;

- 14 -

~~means~~ <u>a control panel mounted to said housing and including a user interface connected to said programmable circuit</u> for selecting a cooking temperature and cooking time; <u>and</u>

~~means for ventilating said housing; and~~

a cooking unit removably positioned in said well-like chamber.

(MKM0242-43; Ex. 1, ¶ 42).

43.     In the amendment, the "means for ventilating said housing" limitation was eliminated and, in the remarks, Holmes clearly states that "ventilation of the housing for the programmable circuit is not an element of Claims 53 or 70."  (MKM0252).  Thus, there is no ventilation or cooling function associated with issued Claim 20 of the '855 patent.  (Ex. 1, ¶ 43).

44.     The arguments presented with the amendment stated that "with respect to Claims 53, 64 and 70 and the claims dependent thereon, there is no suggestion [in the prior art Rivelli and Polster references] to provide a warming mode following a cooking mode in a slow-cooker as recited."  (MKM0253).  The accused West Bend slow-cookers include the claimed warming mode following the cooking mode in a programmed cooking cycle.  (Ex. 1, ¶ 44).

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

- 15 -

45.    Holmes did not make any amendment to the limitation "a programmable circuit positioned within the housing."  The text of Claim 20 with respect to the term "positioned within" was originally presented and not amended during prosecution.  (MKM00242-43; Ex. 1, ¶ 45).

Respectfully submitted,
SUNBEAM PRODUCTS, INC.,
f/k/a THE HOLMES GROUP
By its Attorneys,

Dated:  December 22, 2006

/s/ Charles R. Hoffmann
Charles R. Hoffmann, Esq. (*Pro Hac Vice*)
CRHDocket@hoffmannbaron.com
Glenn T. Henneberger, Esq. (*Pro Hac Vice*)
GTHDocket@hoffmannbaron.com
Alan M. Sack, Esq. (*Pro Hac Vice*)
AMDocket@hoffmannbaron.com
Hoffmann & Baron, LLP
6900 Jericho Turnpike
Syosset, New York  11791-4407
Telephone:  (516) 822-3550
Facsimile:  (516) 822-3582

and

Nicholas J. Nesgos (BBO No. 553177)
nnesgos@pbl.com
Joseph W. Corrigan (BBO No. 647393)
jcorrigan@pbl.com
Posternak Blankstein & Lund LLP
Prudential Tower, 800 Boylston Street
Boston, Massachusetts  02199-8004
Telephone:  (617) 973-6100
Facsimile:  (617)-367-2315

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on December 22,

2006.

/s/ Glenn T. Henneberger
Glenn T. Henneberger

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

THE HOLMES GROUP, INC.,       :
                                      :
       Plaintiff/Counterclaim-Defendant,  :     Civil Action No.  1: 05-CV-11367 WGY
                                      :     (Alexander, M.J.)
                      v.               :
                                        :
WEST BEND HOUSEWARES, LLC and  :
FOCUS PRODUCTS GROUP, L.L.C.,    :
                                        :
       Defendants/Counterclaim-Plaintiffs. :

**DECLARATION OF PROFESSOR DAVID L. TRUMPER**
**IN SUPPORT OF HOLMES' RESPONSE TO WEST BEND'S**
**SECOND MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT**

     I, Professor David L. Trumper, Ph.D., make this declaration based upon my personal knowledge, experience and expertise, and declare as follows:

     1.     I have provided my expert declaration in support of Plaintiff's Response to Defendants' Motion For Partial Summary Judgment of Non-Infringement, which was executed by me and filed with the Court on October 12, 2006.  My prior declaration and the annexed Appendices (A-D) are incorporated by reference herein as if fully set forth in this declaration. All references made herein to Appendices A-D refer to the Appendices attached to my October 12, 2006 declaration.  I confirm and still agree with the facts and opinions set forth in my prior declaration.  A copy of my *Curriculum Vitae* summarizing my educational and professional background was attached as Appendix A to my October 12, 2006 Declaration.

2.      I have reviewed and analyzed the structure and operation of the West Bend Housewares, LLC programmable "Crockery" slow-cooker Model No. 843896 as it relates to U.S. Patent Nos. 6,573,483 ("the '483 patent") and 6,740,855 ("the '855 patent"), both entitled "Programmable Slow-Cooker Appliance."

3.      In performing my analysis, I have read the '483 and '855 patents, their prosecution file histories and the references cited during prosecution of these patents.  I have reviewed the Instruction Manual for the West Bend programmable slow-cooker (a copy of which was attached as Appendix B to my October 12, 2006 Declaration) which is provided with a West Bend Model No. 84386 6-Quart Electronic Crockery™ Oval Slow-cooker that I purchased from a Wal-Mart store in Plaistow, New Hampshire.  I also examined the West Bend programmable slow-cooker, including disassembling the device that I purchased to analyze its internal structure.  I also consulted a document entitled: *Slow-cooker Specification Details*, 84386 *Oval Slow-cooker*, Revision A, dated as of November 28, 2004, bearing document production numbers WB 000286-364.  I understand that West Bend markets and sells other programmable slow-cookers, namely Model Nos. 84396; 84496 and 84596, accused of infringement in this case.  It is my understanding that except for minor cosmetic differences, these accused programmable slow-cookers have the same structure and function as the West Bend programmable slow-cooker Model No. 84386 which I have analyzed.  Therefore, my analysis and opinion applies to all of the accused West-Bend programmable slow cookers.

4.      I reviewed the transcript of the Court's *Markman* Hearing conducted on September 27, 2006.  I also reviewed the Declaration of Barry N. Feinberg and his expert reports of November 3, 2006 and November 21, 2006.  I have also considered the Court's rulings on *Summary Judgment* in the motion hearing transcript dated October 18, 2006.  I have reviewed

West Bend's Second Motion for Summary Judgment of Non-Infringement.  Upon my reading of the transcript of the Court's *Markman Hearing*, it is my understanding that certain terms of Claim 13 of the '483 patent and Claim 20 of the '855 patent have been construed by the Court and the Court has declined to modify its construction.

5.     I understand that the Court in the October 18, 2006 motion hearing granted West Bend partial summary judgment of non-infringement as to literal infringement.

6.     I find that each and every claim element or its equivalent of independent Claim 13 of the '483 patent is present in the structure and operation of the West Bend programmable slow-cooker.

7.     Claim 13 of the '483 patent recites "A method of using *a programmable slow-cooker appliance.*"  The Court construed the italicized portion of this claim element as "*a cooking device designed for cooking food at a constant relatively low cooking temperature for a relatively long period of time [being], being programmable to operate in a variety of different cooking modes and cooking times.*" (*Markman* Tr. p. 3, lines 7-12 (Exhibit E to Plaintiff's First Counter-Statement of Material Facts filed on October 12, 2006; hereinafter "Plaintiff's First Counter-Statement)).

8.     At page 4 of the Instruction Manual (Appendix B to my October 12, 2006 declaration), specific programming instructions are provided to the purchaser. As explained at p. 4, the user turns on the device by pressing the on/off button located on the control panel interface.  The user then presses the "TEMP" button on the control panel interface to select a cooking temperature.  The user then presses the time button to set a desired cooking time.  Once the time and temperature have been selected, the user presses the cook button to start the cooking cycle.  As stated in the Instruction Manual, when the cooking cycle is complete, the cooker

automatically shifts to the warm setting.  Additionally, pages 7-11 of the Instruction Manual

provide slow-cooker recipes for a method of using the programmable slow-cooker by cooking at

relatively low cooking temperatures for relatively long periods of time.  Thus, the first claim

element for a method of using a programmable slow-cooker appliance in Claim 13 of the '483

patent is literally met by West Bend's accused device and by the instructions for using this

device.

9.       The Court also construed the element *"a programmable controller"* appearing in

Claim 13, lines 6-7 of the '483 patent as *"a form of an electrical circuit or circuits including

input and output devices which permit an operator to select a cooking temperature and cooking

time."* (*Markman* Tr. p. 20, lines 19-22).

10.      The West Bend programmable slow-cooker Instruction Manual describes

selecting a cooking temperature and time using a programmable controller.  (Appendix B,

Instruction Manual, p. 4).

11.      The West Bend programmable slow-cooker includes *"a programmable

controller"* consistent with the Court's construction of this element for Claim 13 of the '483

patent.  Specifically, the West Bend programmable slow-cooker includes a programmable

electrical circuit (300) as shown in Appendix C, Photos 10 and 12, including input and output

devices, for example a microprocessor controller (302), Triac (304), thermistor (310), switches

(S1-S2) and light emitting diodes (LED's) (D3-D8), which permit an operator to select a cooking

temperature and cooking time.  Therefore, it is my opinion that the West Bend programmable

slow-cooker and the Instruction Manual included with the slow-cooker literally satisfies the

programmable controller limitation of Claim 13 as construed by the Court by providing an

electrical circuit including input and output devices which permit a user to select a cooking

temperature and time.

12.     As shown in Appendix C, Photos 4, 5, 8-10, 12 and 13, the West Bend
programmable slow-cooker satisfies the claim limitation of *"a programmable controller mounted
to a housing."* The West Bend slow-cooker includes an electrical circuit in the form of two
printed circuit boards (254 and 255), connected by wires as well as components mounted
external to the printed circuit boards (254 and 255). One of the printed circuit boards (254) of
the programmable circuit is positioned within the housing (210) mounted to the heating unit (12).
The other printed circuit board (255) is mounted within the heating unit (12). The thermistor
(310) and Triac (304) are both mounted externally to the printed circuit boards (254 and 255*),
within the heating unit interior space. (Appendix C, Photos 4, 5, 8-10, 12 and 13). Accordingly,
an electrical circuit including input and output devices for selecting a cooking time and
temperature, i.e., printed circuit board (254), is mounted to a housing (210) as set forth in Claim
13. Thus, the *programmable controller mounted to a housing* limitation is literally satisfied.

13.     The Court construed the element *"a housing fixedly mounted to a heating unit"* in
Claim 13 of the '483 patent, as *"[the housing is] mounted to and located on the outside of the
heating unit."* (*Markman* Tr. p. 20, lines 24-25). The Court further commented without
explicitly incorporating any further limitations into the construction that the housing is "*located
on the outside, or at least overwhelmingly or generally outside…of the heating unit." Id*. at p.
21, lines 2-3.

14.     The West Bend programmable slow-cookers literally include a housing (210)
fixedly mounted to a heating unit as defined in Claim 13, lines 7-8 of the '483 patent. As can be
seen in Appendix C, Photos 1, 2, 5, 10 and 12, both the *inner housing shell (210A)* and the *outer
housing shell (210B)* of the West Bend programmable slow-cooker are fixedly mounted by

screws to, and extend beyond, the outer surface of the sidewall (18) of the heating unit (12).  The entire *outer housing shell (210B)* and *a portion of the inner housing shell (210A)* extends outwardly from the outer sidewall and West Bend's programmable controller as construed by the Court is mounted to the housing (210) as shown below.  Accordingly, it is my opinion that the West Bend programmable slow-cooker literally includes a housing "*mounted to and located on the outside of the heating unit"* as interpreted by the Court.

  

15.     Any perceived differences in the West Bend structure are merely insubstantial. The function of the housing (210) is to provide an enclosure for at least a portion of the programmable circuit.  The way in which this function is accomplished is by providing housing portions which are fixedly mounted to the outer sidewall of the heating unit to form the enclosure (210).  The result is substantially the same since the enclosure (210) projects outwardly, and is located "generally outside" the outer surface of the sidewall (18) of the heating unit (12).

16.     The West Bend housing formed by the inner and outer shell portions is "generally outside" the outer sidewall.  The entire outer shell portion and part of the inner shell portion project outwardly beyond the outer surface of the heating unit.  Thus, contrary to West Bend's assertion that approximately 50% of the housing is inside and 50% is outside the heating unit, more than 50% of the inner and outer housing forming the housing (210) clearly extends beyond the outer sidewall; i.e., generally or largely outside the sidewall.

17.    To the extent that the West Bend slow-cooker housing does not literally meet the claim limitation, any perceived differences are clearly insubstantial.  Whether the housing extends from the outer sidewall 51%, 75% or 90% would not be considered a substantial difference by those skilled in the art and the function, way, result test is still met.

18.    The Court has commented that the housing is "*located on the outside, or at least overwhelmingly or generally outside...of the heating unit.*"  However, the "*located on the ...outside, or at least overwhelmingly or generally outside*" limitation is not specifically defined in the specification.  Beyond the ordinary interpretation of these words, there is no requirement in the specification for how far the housing must extend from the heating unit.  Accordingly, based on the foregoing analysis, it is my opinion that West Bend's accused structure, if not literally present, is clearly an insubstantial equivalent modification that functions in substantially the same way to achieve substantially the same result, thereby satisfying the requirement of this claim element.

19.    The West Bend programmable slow-cooker performs the step of automatically changing the heating unit temperature to a lower temperature after the expiration of the selected time.  (Appendix B, Instruction Manual, p. 4).  Thus, this limitation of Claim 13 is literally satisfied.

20.    In the '483 file history, applicants filed an amendment to the claims.  (Joint Appendix for *Markman* Briefing, MKM0092-98).  Following the amendment, the Examiner allowed the claims without further comment.  (MKM0099-0101).  It is clear from the specific claim language and the remarks made during the prosecution that the West Bend housing structure including an inner and outer housing shell was not disclaimed by Holmes.  By way of the amendment and remarks, Holmes, at best, disclaimed a (1) hinged controller housing, such as

disclosed in Skutt (MKM0546-54) and (2) a control module which is positioned entirely within the exterior surface of the heating unit, such as disclosed in Rivelli.  (MKM0291-96).

21.     The West Bend slow-cookers include a housing formed of inner and outer shell portions.  The entire outer shell portion and part of the inner shell portion extend outward from the outer sidewall and both housing portions are fixedly mounted to the outer sidewall.  Thus, the accused programmable slow-cooker housing structure does not fall within any potentially disclaimed subject matter since the housing is not hinged, nor is the entire housing positioned within the exterior surface of the heating unit.

22.     None of the amendments or remarks distinguished the claims over the structure of the West Bend slow-cooker programmable controller, i.e., an electrical circuit including input and output devices to program a cooking time and temperature mounted to a housing fixedly mounted to the outer sidewall, the housing including a portion extending outwardly from the outer surface of the heating unit and a portion extending inwardly.  No such structure is disclosed in the prior art.  Moreover, the West Bend slow-cookers literally include the elements added by amendment, namely a programmable controller *mounted to a housing fixedly* mounted to a heating unit.  Stated differently, the West Bend slow-cookers include an electrical circuit mounted in the housing which is, in turn, mounted to and located on the outer sidewall.

/ / /

/ / /

/ / /

/ / /

/ / /

23.    The West Bend housing structure and electrical circuit are not identical to Rivelli. Rivelli discloses a commercial deep fat fryer, not a slow-cooker, which does not include a housing mounted to and projecting outwardly from an outer sidewall of a heating unit. Furthermore, the control module 26 or housing for the electrical circuit as disclosed in Rivelli is located entirely within the deep fat fryer box-like outer housing 14 as shown below.



(MKM0292)                              (MKM0293)

To the contrary, as discussed previously, the West Bend slow-cooker includes an electrical circuit mounted to a housing, the housing having an inner shell and outer shell mounted to the outer housing. The entire outer housing shell and a portion of the inner housing shell extends outwardly from the outer sidewall of the heating unit. (See Photos in paragraph 14). Accordingly, the West Bend slow-cooker structure is significantly different from Rivelli and clearly closer in structure to the claimed invention in the '483 and '855 patents than the commercial fryer of Rivelli.

24.    Dependent Claim 14 of the '483 patent recites a method that requires all of the elements of the method of Claim 13 and adds the limitation "further comprising, notifying a user with illuminated indicators that the slow-cooker appliance is powered and that the time is active." Operation of the West Bend programmable slow-cooker as shown in Appendix C, Photos 1 and 6 uses illuminated indicators that are seen through the digital display window of the

control panel user interface (224) in the form of an LED digital display and LED's (D3-D8), to notify the user that the appliance is powered and that the timer is active. (*Also see* Appendix B, Instruction Manual, p. 4, program cooking, steps 3 and 5). Accordingly, it is my opinion that West Bend satisfies the limitations of Claim 14 of the '483 patent.

25.    Dependent Claim 17 of the '483 patent recites a method that requires all of the elements of the method of Claim 13 and further defines "wherein the temperature and time are set in increments." Operation of the West Bend programmable slow-cooker includes all of the elements of independent Claim 13, discussed above. Also, my analysis of the operation of the West Bend programmable slow-cooker confirms that the temperature and time are set in increments. (*Also see* Appendix B, Instruction Manual, p. 4, program cooking, steps 2 and 3.) Accordingly, it is my opinion that the West Bend programmable slow-cookers satisfy the limitations of Claim 17 of the '483 patent.

26.    Dependent Claim 19 of the '483 patent recites a method that requires all of the elements of the method of Claim 13, and adds the limitation of "further comprising, emitting a sound." Operation of the West Bend programmable slow-cooker includes all of the elements of independent Claim 13, as described above. The West Bend programmable slow-cooker emits a sound. (*See,* Instruction Manual, p. 5, Helpful Hints, bullet 3). A sound emitting electronic component is shown on printed circuit board (254) of West Bend's accused device. (Appendix C, Photo 8). Accordingly, it is my opinion that the West Bend programmable slow-cookers satisfy the limitations of Claim 19 of the '483 patent.

27.    Claim 20 of the '855 patent recites the structural elements of "*A programmable slow-cooker appliance*" which was construed by the Court to be the same as in Claim 13 of the '483 patent. For the same reasons set forth with respect to Claim 13 of the '483 patent, the West

Bend programmable slow-cookers satisfy this limitation.

28.    Claim 20 of the '855 patent defines "a heating unit including a bottom and a continuous sidewall extending from said bottom, said bottom and said continuous sidewall defining a well-like chamber, said continuous sidewall including an outer sidewall and an interior sidewall."  This limitation is literally present in West Bend's programmable slow-cooker. Specifically, West Bend's programmable slow-cookers include a heating unit (12) having an interior bottom and a continuous sidewall  extending from the bottom to define a well-like heating chamber (20).  The continuous sidewall includes an interior sidewall (17) and an outer sidewall (18).  (Appendix C, Photos 1 and 4).

29.    Claim 20 of the '855 patent further defines "a heating element mounted to said heating unit and disposed between said outer sidewall and said interior sidewall."  This limitation is literally present in West Bend's programmable slow-cookers which include a heating element (24) mounted to the heating unit (12) and positioned between an outer sidewall (18) and interior sidewall (17). (Appendix C, Photos 1 and 4).

30.    In Claim 20 of the '855 patent, the Court construed the claim limitation *"a housing fixedly mounted to and projecting outside said continuous sidewall of said heating unit"* as *"that it is [a housing] mounted to and largely outside the outer sidewall of the heating unit and extending at least beyond an outer surface of the sidewall of the heating unit." Markman* Tr. p. 35, lines 5-9.  The West Bend programmable slow-cookers literally include this limitation.  As can be seen in Appendix C, Photos 1, 2, 5, 10 and 12, both the *inner housing shell (210A)* and the *outer housing shell (210B)* of the West Bend programmable slow-cooker are fixedly mounted by screws to, and extend beyond, the outer surface of the sidewall (18) of the heating unit (12). Part of the *inner housing shell (210A)* and the entire *outer housing shell (210B)* extend outwardly

- 11 -

beyond the outer surface of outer sidewall (18). Therefore, the housing (210) comprising the *inner and outer housing shells (210A and 210B)* extends "largely" beyond the outer surface of outer sidewall (18). Accordingly, it is my opinion that the West Bend programmable slow-cookers literally include a housing fixedly mounted to and projecting outside the sidewall of the heating unit as interpreted by the Court.

31.    Should the Court determine that the housing limitation is not literally present in the West Bend programmable slow-cookers, any differences in the structure are merely insubstantial. The function of the housing (210) is to provide an enclosure for at least a portion of the programmable circuit. West Bend's housing clearly accomplishes this function since the first circuit board is mounted within the housing (210). The way in which this function is accomplished is by providing housing portions which are fixedly mounted to the outer sidewall of the heating unit to form the enclosure (210). The West Bend inner and outer housing portions which form the housing (210) are fixedly mounted to the outer sidewall and project outwardly from the sidewall as discussed above to accomplish the function in substantially the same way and achieve substantially the same result. Therefore, West Bend's two-part housing mounted to and projecting outwardly from the outer surface of the heating unit satisfies this limitation of the claim by at least providing an equivalent structure.

32.    The Court has included in its construction that the housing project "largely outside," the outer sidewall; however, this limitation is not defined in the specification. West Bend's housing is clearly mounted to the outer sidewall (both the inner and outer housing shells are fixedly fastened to the outer sidewall) and the entire outer housing and a portion of the inner housing extend beyond the outer surface of the sidewall. To the extent that the Court may determine that the West Bend housing is not "largely" outside, any such differences are clearly

insubstantial. Whether the housing extends 51% or 75% from the outer sidewall does not affect the function of the housing, i.e., to provide an enclosure for at least a portion of an electrical circuit. The way in which the function is accomplished is substantially the same as the claimed housing by providing housing portions which are fixedly mounted to the outer sidewall to form an enclosure. The result is substantially the same since the enclosure projects outwardly beyond an outer surface of the sidewall.

33.    The Court construed the claim element *"a programmable circuit positioned within said housing and configured to automatically switch said heating element from a cook mode to a lower temperature warm mode at the end of a set cooking time;"* of Claim 20 of '855 patent as *"a circuit, including an assemblage of electronic components, which allows the user to program both the temperature and desired time for cooking and which can automatically change the heating element from a cooking mode to a warm mode once the set cooking time has expired. The circuit, not just a portion of the circuit, is positioned within the housing. The programmable circuit does not include the heating element, the control panel, displays, and buttons."* (*Markman* Tr. p. 38, lines 12-21).

34.    West Bend's programmable slow-cookers, as shown in Appendix C, Photos 4, 5, 8-10, 12 and 13, include *"a programmable circuit,"* namely, a circuit (300), including an assemblage of electronic components (microprocessor controller (302), Triac (304), thermistor (310), switches (S1-S2), light emitting diodes (LED's)(D3-D8) and outer electronic components such as resistors, capacitors and transistors which allows the user to program both the temperature and desired time for cooking and which can automatically change the heating element (24) from a cooking mode to a warm mode once the set cooking time has expired. Components of the programmable circuit (300), namely switches (S1-S2), light emitting diodes

- 13 -

(LED's)(D3-D8)), surface mounted resistors, capacitors and electronic logic devices (IC's) connected to the other components of the programmable circuit (300) with traces on the surface of the printed circuit board (254) and by external wiring, which allow the user to program both the temperature and desired time for cooking are mounted on a printed circuit board (254) mounted to the housing (210). Accordingly, it is my opinion that the programmable circuit limitation of Claim 20 is literally satisfied by the accused slow-cookers.

35.    West Bend's programmable circuit (300) is not positioned entirely within the housing as set forth in by the Court's claim construction. The programmable circuit in the accused slow-cookers include a printed circuit board (254) having electronic components which permit a user to select a cooking time and temperature that is mounted within the housing (210). The programmable circuit (300) taken as a whole, including both printed circuit boards (254 and *255*), the thermistor (310) and Triac (304), works in exactly the same way as the programmable circuit (300) disclosed in the '855 patent. The only difference is that some electronic components are provided on a *second printed circuit board* (*255*) located within the heating unit rather than the housing (210). It is my opinion that splitting the printed circuit board components of the programmable circuit (300) into two circuit boards which are connected by wires (instead of traces connecting their respective circuit elements) is an insubstantial change readily apparent to a person of ordinary skill in the field of electronic digital control circuit design. The West Bend programmable circuit (300) performs all the claimed functions (selecting a cooking time and temperature and automatically changing the heating element from a cook mode to a warm mode once the set time has expired) in substantially the same way by providing an electrical circuit including an assemblage of electronic components to achieve substantially the same result. Merely splitting one circuit board component of the programmable circuit into two circuit

boards connected by wires, instead of traces does not change the function, way, or result of the programmable circuit (300). Thus, the West Bend device satisfies this limitation of Claim 20, as construed by the Court, by providing an equivalent structure in the form of a programmable circuit that operates in substantially the same way to achieve substantially the same result.

36.     Claim 20 of the '855 patent further includes the limitation of "a control panel mounted to said housing and including a user interface connected to said programmable circuit for selecting a cooking temperature and cooking time." This limitation is literally present in West Bend's programmable slow-cooker. Specifically, West Bend's programmable slow-cooker includes a control panel user interface (224) mounted to and forming a part of the front face of *outer housing sell (210B)* of circuit board housing (210). The control panel user interface (224) includes buttons (264, 266) and a digital display window for viewing the LED digital display and LED's connected to the programmable circuit for selecting a cooking time and temperature. (Appendix C, Photos 1, 4, 6 and 8, and Appendix B, Instruction Manual, p. 4, steps 1 and 2.)

37.     Claim 20 of the '855 patent also includes the limitation of "a cooking unit removably positioned in said well-like chamber." This limitation is literally present in West Bend's programmable slow-cooker. Specifically, West Bend's programmable slow-cooker includes a cooking unit (14), namely a ceramic cooking vessel, which is removably positioned in the well-like heating chamber (20). (Appendix C, Photos 1 and 3.)

38.     Based on the foregoing, it is my opinion that each element of Claim 20 of the '855 patent or its equivalent is present in the West Bend accused programmable slow-cookers.

39.     Dependent Claim 24 of the '855 patent recites a programmable slow-cooker as described in Claim 20 and further defines the housing as follows: "wherein said housing is

comprised of a thermoplastic material and said cooking unit is comprised of a ceramic material, said cooking unit being removably positioned in said well-like chamber." The West Bend programmable slow-cooker as shown in Appendix C, Photos 1, 3 and 4, literally includes a circuit board housing (210) made of a thermoplastic material and a cooking unit (14) made of ceramic, the cooking unit (14) is removably positioned in the well-like heating chamber (20). Accordingly, it is my opinion that West Bend's programmable slow-cookers satisfy the limitations of Claim 24 of the '855 patent.

40.     Dependent Claim 27 of the '855 patent recites a programmable slow-cooker as described in Claim 20 further including "a switch operatively associated with said control panel, said programmable circuit being configured such that subsequent pushes of said switch activates different cook modes." The West Bend programmable slow-cooker includes a programmable circuit (300) having a button labeled "TEMP" on the control panel user interface (224) operatively associated with a switch in the programmable circuit such that subsequent pushes of the switch sets different cook modes. (Appendix C, Photos 1, 6, 8 and 12; and Instruction Manual, p. 4, program cooking, step 1.) Accordingly, it is my opinion that West Bend's programmable slow-cookers satisfy the limitations of Claim 27 of the '855 patent.

41.     Dependent Claim 29 of the '855 patent recites a programmable slow-cooker as described in Claim 20 and further including "wherein said housing includes a thermoplastic portion adjoining and extending into said continuous sidewall of said heating unit." The West Bend programmable slow-cookers include a housing, namely *inner housing shell ( 210A)* having a thermoplastic portion which extends into the outer sidewall (18) of the heating unit (12). Accordingly, it is my opinion that West Bend's programmable slow-cookers satisfy the limitations of Claim 29 of the '855 patent.

42.     In response to an Office Action, Claim 20, i.e., Claim 53 in the original

application which, when allowed, was renumbered as issued Claim 20, was amended.  The

amendment to Claim 53 appears below with additions underlined and deletions stricken:

53.     (Currently Amended)  A programmable slow-cooker appliance
comprising:
a heating unit including a bottom and a continuous sidewall extending from said
bottom, said bottom and said continuous sidewall defining a well-like chamber, said continuous
sidewall including an outer sidewall and an interior sidewall;

a heating element mounted to said heating unit and disposed between said outer
sidewall and said interior sidewall;

a housing <u>fixedly</u> mounted to <u>and projecting outside</u> said continuous sidewall of
said heating unit;

a programmable circuit positioned within said housing ~~including means for
automatically switching~~ <u>and configured to automatically switch</u> said heating element from a cook
mode to a lower temperature warm mode <u>at the end of a set cooking time</u>;

~~means~~ <u>a control panel mounted to said housing and including a user interface
connected to said programmable circuit</u> for selecting a cooking temperature and cooking time;
<u>and</u>

~~means for ventilating said housing; and~~

a cooking unit removably positioned in said well-like chamber.

(MKM0242-43).

43.     In the amendment, the "means for ventilating said housing" limitation was

eliminated and, in the remarks, Holmes clearly states that "ventilation of the housing for the

programmable circuit is not an element of Claims 53 or 70."  (MKM0252).  Thus, no ventilation

or cooling function is associated with issued Claim 20 of the '855 patent.

44.     The amendment with respect to the housing also added the limitations "fixedly"

mounted and "projecting outside" the sidewall of the heating unit.  The housing in the accused

slow-cookers is both fixedly mounted to and projecting outside the outer sidewall.  Thus, these

amended limitations are literally present in the accused slow-cookers. Moreover, Holmes argued that "with respect to Claims 53, 64 and 70 and the claims dependent thereon, there is no suggestion [in the prior art Rivelli and Polster references] to provide a warming mode following a cooking mode in a slow-cooker as recited." (MKM0253). The accused West Bend slow-cookers include the claimed warming mode following the cooking mode in a programmed cooking cycle.

45.    Holmes did not make any amendment to the limitation "a programmable circuit positioned within the housing" during prosecution of the application. As can be clearly seen above in the text of amended Claim 20, the limitation with respect to the term "positioned within" was originally presented and not amended during prosecution.

I declare under penalty of perjury that the foregoing is true and correct and, as to matters stated to be alleged on information and belief, I believe them to be true.

Executed this _22nd_ day of December, 2006

David L. Trumper Ph.D.