**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| THE HOLMES GROUP, INC., | : | |
| | : | |
| Plaintiff/Counterclaim-Defendant, | : | Civil Action No. 1: 05-CV-11367 WGY |
| | : | (Alexander, M.J.) |
| v. | : | |
| | : | |
| WEST BEND HOUSEWARES, LLC and | : | |
| FOCUS PRODUCTS GROUP, L.L.C., | : | |
| | : | |
| Defendants/Counterclaim-Plaintiffs. | : | |

**HOLMES L.R. 56.1 COUNTER-STATEMENT OF MATERIAL FACTS AS TO WHICH A GENUINE ISSUE OF DISPUTE EXISTS IN OPPOSITION TO WEST BEND'S MOTION FOR SUMMARY JUDGMENT OF NON-WILLFULNESS**

Pursuant to Local Rule 7.1(d), Holmes respectfully requests oral argument.

**Holmes' Patents**

1.  Holmes is the owner of U.S. Patent Nos. 6,573,483 ("the '483 patent") issued on June 3, 2003 (J.A. MKM 0001-0017[1]) and 6,740,855 ("the '855 patent") issued on May 25, 2004 (J.A. MKM 0120-0138). Both patents are entitled "Programmable Slow-cooker Appliance."

2.  Holmes programmable slow-cooker was introduced into the market in 2000. Holmes Exhibit C filed in Support of Holmes' Opposition to West Bend's Summary Judgment Motion on Invalidity.

**West Bend's Programmable Slow Cooker**

3.  West Bend began working on the accused programmable slow-cooker in 2002. Carpenter Decl. ¶ 2[2]. In conjunction with a Chinese manufacturer, OEM, West Bend developed a programmable slow-cooker design having a keep warm feature. *Id*.

4.  OEM had worked with Holmes in developing various products including slow-cookers. Holmes Ex. A, pg. 59, lines 8-15[3].

5.  During the development process, both OEM and West Bend, through at least Bill Dobson, a product/marketing director of West Bend, were aware that Holmes had patents

---

[1] Reference is to the Joint Appendix to Markman briefing.
[2] Reference is made to the Declaration of Michael Carpenter in Support of West Bend's Motion for Summary Judgment of Non-Willfulness.
[3] Reference to Holmes' Exhibits A through C are attached to the Declaration of Alan M. Sack (Exhibit 1) in support of this opposition.

covering its programmable slow-cooker and still continued to pursue the design. WB Ex. A at WB 2831.

6.  In June 2003, the '483 patent issued. J.A. MKM 0001. West Bend, through its project development manager, Howard Kaney was aware of the '483 patent in 2003 and continued to develop the slow-cooker without seeking an opinion of counsel. Holmes Ex. B, pg. 11, lines 15-25; pg. 93, lines 16-20, pg. 32, lines 5 to 25; Holmes Ex. C, pg. 18, lines 14-17. Mr. Kaney became aware of the Holmes '483 patent at the time he became involved in the programmable cooker project, which was at the time West Bend changed ownership in 2003. *Id*.

7.  West Bend in its motion papers claims that it first became aware of the '483 patent in April of 2004, when OEM brought their concern to West Bend's attention. At this point, the West Bend slow-cooker was essentially fully designed. The renderings submitted to the patent counsel show a programmable slow-cooker very much like the device they brought to market. WB Ex. B at WB 003146-49. Mr. Carpenter, West Bend's president, testified that very few changes to the design took place. Holmes Ex. C, pg 41, lines 14-20.

8.  In April of 2004 OEM provided West Bend with a copy of Holmes '483 patent. For the first time in the development of the West Bend programmable slow-cooker, West Bend contacted a patent attorney, Martin L. Stern, regarding Holmes '483 patent. Carpenter Decl. ¶ 2.

**West Bend's Opinion of Counsel**

9. In April 2004, when the '483 patent was presented to the patent attorney, the design of the slow-cooker was essentially completed. See WB Ex. B.

10. Mr. Stern issued a written opinion in February of 2005 which stated that the proposed West Bend slow-cooker did not infringe either the '483 or '855 patents. The opinion included a discussion of the '483 patent and the '855 patent in view of West Bend's now accused slow-cooker. WB Ex. C at WB 2354-2380.

11. The opinion neglected various material portions of the file history and failed to properly construe and apply the claim terms. WB Ex. C at WB 2354-2380.

**The Analysis of the `483 Patent**

12. In the portion of the opinion reviewing the subject West Bend slow-cooker, a programmable controller is defined as containing "circuitry, such as a microprocessor, to allow a user to program desired cooking temperatures and times." WB Ex. C at WB 2359.[4]  The programmable controller, therefore, can include various circuit elements. *Id.*

13. The West Bend slow-cooker includes a control panel that has switches which permit a user to program desired cooking temperatures and times. *Id.* at WB 2358-59.

---

[4] Reference is to West Bend's Exhibit C, page WB 2359.

14.     The opinion further states that the "touch sensor" or push-button switches, and LED display "extend outside the outer sidewall." *Id*. at WB 2358. The touch sensors and LED display are circuit elements that clearly fall within the definition of a programmable controller since they are used to program "desired cooking temperatures and times." *Id.*

15.     When construing Claim 13 of the '483 patent, the term "programmable controller" is construed to comprise "a circuit board which includes circuitry and logic to allow the user to electronically control and program cooking cycles and temperature." WB Ex. C at WB 2366. The push button switches and LED display are not excluded from being a part of the programmable controller when applying this proposed construction. *Id.*

16.     In determining the issue of infringement, the opinion fails to address the fact that portions of West Bend's programmable controller, namely the push-button switches and LED display extend outwardly beyond the sidewall and are mounted in a housing which also extends from the sidewall. WB Ex. C at WB 2375.

17.     The `483 patent specification clearly shows various electronic components to the programmable circuit to be mounted external to the printed circuit board. For example, the `483 patent specification states that a thermister 310 which is part of the programmable unit 300 as shown in Figs. 5, 10 and 13, is connected externally to the circuit board to the underside of the bottom of the heating chamber. J.A. MKM 0001-0017, Col. 5, lines 19-22.

18.     The `483 patent specification states that the Triac 304 is preferably mounted "separately to one of the mounting holes on the center portion 256a of the heat sink 256 … ." *Id.* at Col. 5, lines 32-36.

### The Analysis of the '855 Patent

19.     With regard to the '855 patent, Stern's the opinion states that Claim 53 (issued Claim 20) "focused on the convection feature, describing …. 'means for ventilating said housing' for the programmable circuit.". WB Ex. C at WB 2372. However, the opinion fails to state that Claim 53 was amended to delete from the claim the "means for ventilating said housing" limitation. J.A. MKM 0243.

20.     The opinion fails to consider the applicants' statement in the amendment, which said "[v]entilation of the housing for the programmable circuit is not an element of Claims 53 or 70…" J.A. MKM 0252. The applicants clearly did not intend to include the ventilation feature, yet the opinion makes it appear as if ventilation was an important element of the claim. The applicants instead relied upon the keep warm feature as a basis for distinguishing over the prior art. *Id*.

21.     In construing Claim 20, the opinion lumps together the prosecution of the claims of the '855 patent with the claims of the '483 patent. WB Ex. at WB 2373, ("the specification and the prosecution history of both this and the parent application").

22.   In construing claims of the '855 patent, only a conclusory statement is made in the opinion.

> "With respect to the '855 claims, which require the controller's housing to be fixedly mounted to and projecting outside the sidewall of the heating unit (issued claims 1-36) . . . the specification and the prosecution history of both this and the parent application compel the conclusion that the claims are limited to a slow-cooker with a programmable controller that is mounted to a controller housing which is in turn mounted to the outside of the heating unit's sidewall."

WB Ex. C at WB 2373.

23.   Issued Claim 20 does not define a "programmable controller" as stated in the opinion. Instead, the claim includes a "programmable circuit," and there is no mention in the opinion as to how this term is to be construed. J.A. MKM 0137. The programmable circuit comprises an assembly of electronic components including those inside the housing and those outside of it, as shown in Figures 10 and 13 of the '855 patent. J.A. MKM 0129 and 0132. The circuit includes many electronic components including at least the thermistor which are clearly located outside of the housing. *Id.*

24.   West Bend's push-button switches and LED display which allow a user to electronically control and program cooking cycles and temperature are improperly excluded from the "programmable controller" as construed in the opinion. WB Ex. C at WB 2379. These electronic components are mounted in the housing that projects outwardly from the outer sidewall of the heating unit. WB Ex. at WB 2358.

### West Bend's Litigation Tactics

25.   Despite repeated requests, no documents have been produced relating to the development of West Bend's programmable slow-cooker between the time period when the accused slow-

cooker project was started in 2002 and April 2004 when the issue was purportedly first brought to the attention of West Bend's patent attorney. Sack Declaration ¶ 4.

26.    West Bend was admittedly working on the programmable slow-cooker for some time and even formed a "task force" to study the development of a programmable slow-cooker. Holmes Ex. A, pg. 28, lines 11 to 21.

27.    West Bend has produced numerous documents regarding its slow-cookers from dates even earlier than 2002 with regard to its asserted design patents. For example, West Bend has been able to produce numerous detailed development documents with respect to another slow-cooker project with OEM relating to West Bend's asserted design patents. Decl. of Sack ¶ 5.

28.    West Bend has refused to cooperate with Holmes in its efforts to obtain information and witnesses from OEM. Decl. of Sack ¶ 6.

|  |  |
|---|---|
|  | SUNBEAM PRODUCTS, INC., d/b/a JARDEN CONSUMER SOLUTIONS f/k/a THE HOLMES GROUP |
|  | By its Attorneys, |
| Dated:  December 22, 2006 | /s/Glenn T. Henneberger<br>Charles R. Hoffmann, Esq. (*Pro Hac Vice*)<br>CRHDocket@hoffmannbaron.com<br>Glenn T. Henneberger, Esq. (*Pro Hac Vice*)<br>GTHDocket@hoffmannbaron.com<br>Alan M. Sack, Esq. (*Pro Hac Vice*)<br>AMSDocket@hoffmannbaron.com<br>HOFFMANN & BARON, LLP<br>6900 Jericho Turnpike<br>Syosset, New York  11791-4407 |

- 9 -

        Telephone:  (516) 822-3550
        Facsimile:  (516) 822-3582

        and

        Nicholas J. Nesgos (BBO No. 553177)
        nnesgos@pbl.com
        Joseph W. Corrigan (BBO No. 647393)
        jcorrigan@pbl.com
        Posternak Blankstein & Lund LLP
        Prudential Tower, 800 Boylston Street
        Boston, Massachusetts  02199-8004
        Telephone:  (617) 973-6100
        Facsimile:  (617) 367-2315

**CERTIFICATE OF SERVICE**

  I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 22, 2006.

                  /s/ Glenn T. Henneberger
                  Glenn T. Henneberger