# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

THE HOLMES GROUP, INC.,  :
:
    Plaintiff/Counterclaim-Defendant,  :    Civil Action No.  1: 05-CV-11367 WGY
:    (Alexander, M.J.)
    v.  :
:
WEST BEND HOUSEWARES, LLC and  :
FOCUS PRODUCTS GROUP, L.L.C.,  :
:
    Defendants/Counterclaim-Plaintiffs.  :

**HOLMES' COUNTER-STATEMENT OF MATERIAL FACTS AS TO WHICH A
GENUINE ISSUE OF DISPUTE EXISTS IN SUPPORT OF HOLMES' RESPONSE TO
WEST BEND'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON INVALIDITY OF U.S. PATENT NOS. 6,573,483 AND 6,740,855**

Charles R. Hoffmann, Esq. (*Pro Hac Vice*)
Alan M. Sack, Esq. (*Pro Hac Vice*)
Glenn T. Henneberger, Esq. (*Pro Hac Vice*)
HOFFMANN & BARON, LLP
6900 Jericho Turnpike
Syosset, New York  11791-4407
Telephone:  (516) 822-3550

Nicholas J. Nesgos (BBO No. 553177)
Joseph W. Corrigan (BBO No. 647393)
POSTERNAK BLANKSTEIN & LUND LLP
Prudential Tower, 800 Boylston Street
Boston, Massachusetts  02199-8004
Telephone:  617-973-6100

*Attorneys for Plaintiff*

December 22, 2006

# TABLE OF CONTENTS

I.      **INTRODUCTION**......................................................................................1

    A.    **Background of This Action** ...............................................................1

    B.    **Related Proceedings**.........................................................................2

    C.    **The Evidence Presented** ...................................................................2

            i.      **West Bend's Expert Declaration should be excluded**...........................2

            ii.     **Dr. Feinberg Has Insufficient Education, Training or Experience to Testify as an Expert on Programmable Slow-Cookers** ...........................2

            iii.     **Dr. Feinberg Has Been Found Unqualified to Render Expert Testimony** ........................................................................................................3

    D.    **The Prior Art Relied Upon by West Bend**.........................................4

            i.      **The Weiss Patent Does Not Anticipate or Render Obvious Independent Claim 13 of The '483 Patent or Independent Claim 20 of the '855 Patent, either alone or in Combination With Other**.....................................5

    E.    **Holmes' Expert Testimony of Professor Robotham** ...........................6

            i.      **The Robotham Declaration Places West Bend's "Evidence" in Dispute** ..........................................................................................................6

            ii.     **The Slow-Cooking Process** ..................................................................6

             iii.     **The Weiss '287 Patent Does Not Describe a Cooking Appliance Consistent with a Slow-Cooking Process and Therefore Cannot Anticipate Claim 13 of the '483 Patent, or Render Claim 20 of the '855 Patent Obvious in Combination With Other References** ............................................................7

            iv.     **There is No Motivation to Combine the Disclosure of the Weiss '287 Patent with the Rival® Crock•Pot® or Patents Disclosing Slow-Cookers with** ...........8

            v.     **There is No Motivation for One Skilled in the Art to Combine the Disclosure of the Weiss '287 Patent with U.S. Patent No. 4,817,510 to Kowalics** ........8

            vi.     **There is No Motivation for One Skilled in the Art to Combine the Disclosure of the Weiss '287 Patent with U.S. Patent No. 4,345,145 to Norwood** ........9

           vii.      There is No Motivation for One Skilled in the Art to Combine the Disclosure of the Weiss '287 Patent with U.S. Patent No. . 6,191,393 to Park ............9

    F.      Holmes' Expert Testimony of Professor Trumper ...........................................10

         i.      Dr. Feinberg's Analysis of the Cited References is Flawed .................11

         ii.      The "Electric Cooking Appliance" of U.S. Patent No. 4,307,287 to Weiss      ..........................................................................................17

         iii.     The "Cooking Apparatus for Fluid Container" U.S. Patent No. 4,817,510 to Kowalics...................................................................................19

    G.     Mr. Hlava, an Inventor of the Holmes' Patent Testified That He Had No Motivation to Combine or Look at Other Devices...................................................24

    H.     Holmes Has Provided Overwhelming Evidence of Secondary Considerations of Non-Obviousness .............................................................................................25

III    CONCLUSION .....................................................................................................32

Pursuant to Rule 56.1 of the Local Rules for the United States District Court for the District of Massachusetts, Plaintiff submits that there exist genuine issues of material fact to be tried as set forth below:

## I.    INTRODUCTION

### A.    Background of This Action

1.    Plaintiff, The Holmes Group, Inc., now known as Sunbeam Products, Inc., d/b/a/ Jarden Consumer Solutions, (hereinafter "Holmes") brought this action against Defendants West Bend Housewares, LLC and Focus Products Group, LLC (collectively referred to as "West Bend") for infringement of Holmes' U.S. Patent Nos. 6,573,483 and 6,740,855 entitled "Programmable Slow-Cooker Applicant" ("the '483 Patent" and "the '855 Patent," respectively). A copy of the '483 patent was attached as Exhibit A to Plaintiff's Counter-Statement of Material Facts As To Which A Genuine Issue of Dispute Exists, docket number 48, filed on October 12, 2006, (hereinafter "Holmes' First Counter-Statement").  A copy of the '855 patent was attached as Exhibit B to Holmes' First Counter-Statement.

2.    The Holmes patents relate to a structure and method of using a programmable slow-cooker appliance.  (Ex. A, Col. 5, line 43 - Col. 6, line 27).

3.    Subsequent to the market introduction of a programmable slow-cooker by Holmes covered by the Holmes patents, West Bend began marketing and selling programmable slow-cookers (West Bend Housewares 6 Quart Oval Slow Cooker, Model 84386) which infringe the '483 and '855 patents.

4.    The '483 and '855 patents also disclose and claim novel structure for cooling the electrical circuit for the programmable slow-cooker.  However, Holmes has not asserted any claims directed to the cooling feature in this lawsuit.  (Ex. A, Col. 1, lines 31-49).

### B.    Related Proceedings

5.    On September 27, 2006, this Court held a Markman Hearing to construe claim limitations to which the parties could not agree. The Court rendered its opinion on claim construction at the Markman Hearing. A copy of the Markman Hearing transcript is attached as Exhibit E. A copy of the *Markman* Hearing transcript was attached as Exhibit E to Holmes' First Counter-Statement.

### C.    The Evidence Presented

#### i.    West Bend's Expert Declaration should be excluded

6.    As evidence in support of their motion, West Bend relies heavily upon the declaration of their Expert, Barry Feinberg (referred to hereinafter as "Dr. Feinberg"). However, it is the Court's gatekeeper function to determine whether Dr. Feinberg has the proper expertise to testify regarding the design and operation of programmable slow cookers. It is clear that Dr. Feinberg is not properly qualified as an expert to testify as to the level of ordinary skill or what was known at the time of the invention.

#### ii.    Dr. Feinberg Has Insufficient Education, Training or Experience to Testify as an Expert on Programmable Slow-Cookers

7.    One of the key elements being argued in the subject case is the design, programming and configuration of the programmable controller, and in particular the microprocessor-based programmable circuit of the slow cooker. However, Defendant's expert, Dr. Feinberg, is not qualified to testify as an expert on this subject matter.

8.    Dr. Feinberg's C.V. indicates he has a B.S. in electrical engineering and an unspecified doctorate in "engineering." (*See, Resume of Barry N. Feinberg, P.E. filed as Exhibit A of Exhibit M to Defendant's First Motion for Partial Summary Judgment of Non-infringement*).

In fact, when he received his degrees in 1962 and 1968 microprocessors were just being invented. Dr. Feinberg admitted that he has never taken or taught a course relating to the design or programming of microprocessors or the design of electronic appliances that are controlled by microprocessors (*See, Feinberg Dep. @ 12:20 - 14: 9 and 33:1-34:25, attached as Exhibit A to the Declaration of Alan M. Sack in Support of Holmes' Opposition to Defendants' Motion for Partial Summary Judgment on Invalidity filed as Exhibit 1 to this Statement*).

9.      Although Dr. Feinberg alleges his Ph.D. is in "systems analysis and biomedical engineering," his thesis related to the "detection and diagnosis of obstructive lung disease" (*Feinberg Dep. 18:15 - 19: 12*).

10.     Also, Dr. Feinberg has never published an article regarding the design of microprocessors or electronic appliances. Virtually all his published works relate to medicine, biology or the application of engineering science to the health care industry (see, *Feinberg CV and Feinberg Dep. 18:15 - 19:12; 60: 14-17*). He has no experience relating to programmable slow-cookers. (see, *Feinberg CV*).

### iii.    Dr. Feinberg Has Been Found Unqualified to Render Expert Testimony

11.     Dr. Feinberg has been found unqualified to render expert testimony in a number of cases. In particular, his testimony relating to the adequacy of product warning labels was not considered by the court in *Scaccianoce v. Hixon Manufacturing and Supply Co.*, 1994 WL 113069 (N.D.Ill. 1994).

12.      Similarly, he was twice found to lack "the knowledge, skill, experience, training, or education needed to testify" regarding penile implants. *John Doe and Jane Doe v. American*

*Medical Systems, Inc.*, 96 Fed.Appx. 758 (C.A.2 Conn 2004)(the district court went on to find that his methods were inherently unreliable); *York v. American Medical Systems, Inc.*, 166 F.3d 1216 (C.A.6 Ohio 1998).

13.     In the present case, he lacks the requisite education and experience to testify as an expert.

**D.     The Prior Art Relied Upon by West Bend**

14.     West Bend relies on the Weiss '287 Patent, alone or in combination with various other references, including the Rival® Crock•Pot® Slow Cooker Model No. 3350/2.  Additional references are asserted by West Bend with regard to alleged invalidity of certain features of the dependent claims, namely  Kowalics U.S. Patent No. 4,817,510; Norwood U.S. Patent No. 4,345,145; Holmes' U.S. Patent Nos. 3,806,701 and 3,881,090; and Park U.S. Patent No. 6,191,393.  (*See Defendants' Motion for Partial Summary Judgment on Invalidity* and *supporting Feinberg Declaration*).

15.     Holmes' evidence disputes West Bend's interpretation of these references and establishes by competent expert testimony that there are genuine issues of material fact as to teaching and interpretation of the references.

16.     For the purpose of this motion, Holmes will primarily rely on arguments with regard to the independent claims asserted in this case; namely, claim 13 of the '483 patent and claim 20 of the '855 patent.  While the features of the dependent claims may add novelty to these claims, Holmes will not rely upon them in responding to this summary judgment motion.

      **i.    The Weiss Patent Does Not Anticipate or Render Obvious Independent Claim 13 of The '483 Patent or Independent Claim 20 of the '855 Patent, either alone or in Combination With Other References**

17.    The Court has construed the preamble of claim 13 of the '483 patent "A method of using a programmable slow-cooker appliance." (*Markman* transcript @ p. 3, lines 8-12, Exhibit E to Holmes' First Counter-Statement.) and the same term in Claim 20 of the '855 patent, namely "A programmable slow-cooker," as a "*cooking device designed for cooking food at a constant, relatively low cooking temperature for relatively long period of time, being programmable to operate in a variety of different cooking modes and cooking times.*" (see, *Markman transcript @ p. 25, lines 8-15, Exhibit E to Holmes' First Counter-Statement*).

18.    Weiss, however, does not disclose a programmable slow-cooker. The Weiss device first heats up in its high power setting, up to 347°F (175°C) for a time interval D (about 5 minutes) and then cooks at an undisclosed "normal" cooking temperature. Weiss, therefore, teaches away from the use of the slow-cooking process.

E.     **Holmes' Expert Testimony of Professor Robotham**

    i.     **The Robotham Declaration Places West Bend's "Evidence" in Dispute**

19.     Professor Ronda J. Robotham, MAT, Holmes' Culinary expert has submitted a Declaration, in support of Holmes' opposition to this motion (*see, Declaration of Professor Ronda J. Robotham, MAT in Support of Holmes' Opposition to Defendants' Motion for Partial Summary Judgment on Invalidity filed as **Exhibit 2** to this Statement, hereinafter "Robotham Declaration").* Professor Robotham's Declaration explains the slow-cooking process in detail, and the difference between the slow-cooking process and the process utilized in the cooking device disclosed in the Weiss patent. Professor Robotham's testimony provides undisputed factual basis for denying summary judgment with regard to invalidity of both claim 13 of the '483 patent and the claim 20 of the '855 patent.

    ii.     **The Slow-Cooking Process**

20.     The principle of slow cooking is generally accepted as the cooking process of applying low heat to a (food) product for an extended period of time in order to render the product tender and flavorful. This low heat application is carried out in a moist environment so that in the case of certain proteins, the collagen present will effectively convert to gelatin yielding a succulent product. *(Exhibit 2, Robotham Declaration @ page 3, paragraph 12).*

21.     The extended cooking time at a low heat then allows the proteins to relax enough to redistribute the cooking liquid into the now loosened fibers resulting in the desired outcome. In considering doneness of a slow cooked product, the temperature and texture are of prime importance. Even though the slow cooking process is a relatively gentle cooking method, there is still the possibility of overcooking. The result is most often a tender but very dry product. *(Exhibit 2, Robotham Declaration @ page 3, paragraph 13).*

22.    It is important to note that the slow-cookers described in U.S. Patents 6,573,483 and 6,740,855 ("the '483 and '855 Patents") have the capability to be programmed to automatically switch from a cooking mode to a "keep warm" mode which ensures the user of the desired results by automatically switching to a lower temperature. The temperature still remains high enough to prohibit harmful bacterial growth, but not so high as to further dry proteins. *(Exhibit 2, Robotham Declaration @ page 3, paragraph 14).*

  **iii. The Weiss '287 Patent Does Not Describe a Cooking Appliance Consistent with a Slow-Cooking Process and Therefore Cannot Anticipate Claim 13 of the '483 Patent, or Render Claim 20 of the '855 Patent Obvious in Combination With Other References**

23.    U.S. Patent No. 4,307,287 to Weiss does not anticipate Claim 13 of the '483 Patent, or render Claim 20 of the '855 Patent obvious, as it structurally and functionally differs from the claims of the '483 and '855 Patents. The Weiss patent describes a cooking appliance which has a cooking range that exceeds that recommended in the slow cooking process. It can achieve temperatures that are sufficient for a deep frying technique. Weiss describes use in connection which temperature ranges from simmering up to175°C (Col. 4, ll. 43-46), which converts to approximately 347°F, a setting suitable for deep frying capabilities. The heating capabilities of the Weiss Patent also are described for potential browning of proteins prior to the low heat process. *(Exhibit 2, Robotham Declaration @ pages 3-4, paragraph 15).*

24.    In the background of the Weiss patent, col. 1, ll. 23-28, the statement that the items would cook correctly without supervision is a concern when working with temperatures reached in that method. In col. 1, ll. 56-61, it speaks of an initial cooking phase which causes accelerated heating allowing browning prior to prolonged cooking. While this is sometimes performed in braising or stewing, it is an additional step which differs from the '483 and '855 Patents where a relatively low heat is applied to the food product. *(Exhibit 2, Robotham*

*Declaration @ page 4, paragraph 16).*

25.    While accelerated heating to high temperatures that sear the food is accepted as a norm for many braised and stewed dishes, this process moves away from the simple slow cooker and the low conductive properties of the ceramic cooking vessel.  Weiss does not provide a specific temperature range to address the "hot" setting, which could also be a concern.  *(Exhibit 2, Robotham Declaration @ pages, paragraph 17).*

26.    Based on the interpretation of claim 13 of U.S. Patent No. 6,573,483 or claim 20 of U.S. Patent No. 6,740,855 the cooking process of a slow cooker is designed to use the benefits of a simple process using relatively low heat for a relatively long time.  Accordingly, a person seeking optimal temperature range for slow cooking would not look to a device which lists the temperatures identified nor look toward the Weiss '287 Patent to serve this purpose.  *(Exhibit 2, Robotham Declaration @ page 4, paragraph 18).*

      **iv.    There is No Motivation to Combine the Disclosure of the Weiss '287 Patent with the Rival® Crock•Pot® or Patents Disclosing Slow-Cookers with Ceramic Cooking Units**

27.    West Bend's Memoranda relies on paragraph 11 of Dr. Feinberg's Declaration, in which he stated that the material for the cooking vessel in the Weiss patent is not identified.  In paragraph 12, he states that the Rival® Crock•Pot® discloses the use of a ceramic cooking unit. One skilled in the art of slow cooking would be motivated to use ceramic because of its, relatively ineffective conductive properties.  Based on the information presented in the Weiss patent, the cooking device appears to be a metallic cooking vessel sitting on an electronic heating element, similar to an electric griddle, which could also be a negative factor when considering slow cookers.  *(Exhibit 2, Robotham Declaration @ pages 4-5, paragraph 19).*

     **v. There is No Motivation for One Skilled in the Art to Combine the Disclosure of the Weiss '287 Patent with U.S. Patent No. 4,817,510 to Kowalics**

28.    West Bend's Memoranda relies on paragraph 9 of Dr. Feinberg's Declaration regarding the motivation for combining Weiss with U.S. Patent No. 4,817,510 to Kowalics, this does not seem appropriate.  The Kowalics patent is for an apparatus used to heat fluids.  The device's documentation indicates that it reaches temperatures up to boiling (212°F) which is inappropriate for a slow cooker.  It is designed to heat a product to the boiling temperature (212°F), which would cause available liquid to evaporate and be drawn from proteins, rendering them dry and potentially tough.  *(Exhibit 2, Robotham Declaration @ page 5, paragraphs 20-21; also see, Declaration of Professor David L. Trumper, Ph.D. in Support of Holmes' Opposition to Defendants' Motion for Partial Summary Judgment on Invalidity filed as **Exhibit 3** to this Statement, hereinafter "Trumper Declaration," @ page 12, paragraphs 39-41 and page 13, paragraphs 41-44).*

### vi.    There is No Motivation for One Skilled in the Art to Combine the Disclosure of the Weiss '287 Patent with U.S. Patent No. 4,345,145 to Norwood

29.    West Bend's Memoranda relies on paragraph 9 of Dr. Feinbergs Declaration also relies on U.S. Patent No. 4,345,145 to Norwood, which is directed to a programmable toaster oven.  A toaster oven is a device that typically cooks, bakes and broils with dry heat, unlike the moist environment of a slow cooker.  In addition, toaster ovens typically cook, bake and broil at temperatures of up to 500°F, which are much higher than are used in slow cookers.  Accordingly, one would not look at toaster ovens for the design of slow cookers.  *(Exhibit 2, Robotham Declaration @ page 5, paragraph 22).*

### vii.    There is No Motivation for One Skilled in the Art to Combine the Disclosure of the Weiss '287 Patent with U.S. Patent No. . 6,191,393 to Park

30.    West Bend's Memoranda relies on paragraph 13 of Dr. Feinberg's Declaration also relies on U.S. Patent No. 6,191,393 to Park, which is directed to a double walled metallic roaster filled with synthetic oil, a device that is very different from a slow cooker.  Roasters

typically operate at temperatures between about 300-500°F and cook in a very hot, dry environment over relatively short periods of time, typically 1-3 hours. These conditions and temperatures are not compatible with slow cooking. Accordingly, one would not look to roasters in contemplating slow cooker design. *(Exhibit 2, Robotham Declaration @ page 6, paragraph 23).*

### F.    Holmes' Expert Testimony of Professor Trumper

31.    Weiss does not disclose a structure required for claims 13 of the '483 and specifically does not have a programmable circuit "a programmable circuit positioned within said housing and configured to automatically switch said heating element from a cook mode to a low temperature warm mode at the end of said cooking time" which the Court interpreted during its *Markman* Hearing transcript dated September 27, 2006. At page 38 the Court defined the programmable circuit as "a programmable circuit positioned within said housing means a circuit, including an assembly of electronic components, which allows the user to program both the temperature and the desired time for cooking and which can automatically change the heating element from a cooking mode to a warm mode once the set cooking time has expired. For claim 20, in particular, the Court's interpretation adds "The circuit, not just a portion of the circuit, is positioned within the housing. The programmable circuit does not include the heating element, the control panel, displays and buttons." For claim 13, the programmable controller is defined as "programmable controller as a form of electrical circuit or circuits including input and output devices which permit an operator to select a cooking temperature and cooking time. (*Markman Hearing* @ page 20, lines 19-22, Exhibit E to Holmes' First Counter-Statement.)

32.    As set forth in the Declaration of Professor of David L. Trumper in support of Plaintiff's response to this instant summary judgment motion, neither the Weiss, Kowalics nor

the Rival reference cited by West Bend, describe such a "programmable controller," as required in claim 13 of the '483 patent or a "programmable circuit," as required in claim 20 of the '855 patent.  Dr. Trumper has established the following material facts in controversy, which mitigate against summary judgment of invalidity of the patents-in-suit. (*Exhibit 3, Trumper Decl.*)

### i.    Dr. Feinberg's Analysis of the Cited References is Flawed

*33.*    Dr. Feinberg's invalidity analysis is flawed because it is based upon an incorrect interpretation of the terms "programmable controller" (`483 patent, claim 13), and "programmable circuit" (`855 patent, claim 20).  The requirement that these terms include a controller or circuit which is programmable is inherent in the language of the terms themselves, and made clear in the specification and prosecution histories of the `483 and `855 patents. Dr. Feinberg does not apply the requirement for programmability in his invalidity analysis, and thus he reaches the wrong conclusions.  (*Exhibit 3, Trumper Decl. @ page 4, paragraph 15*).

*34.*    The programmable controller and/or programmable circuit, as construed by the Court in the claims of the patents-in-suit:

        a)    is programmable, and

        b)    controls time and temperature.

Feature a) requires that the programmable circuit encompasses a microprocessor, microcontroller, or equivalent programmed computational capability in an integrated circuit. Feature b) requires that both time and temperature be measured and that control action be taken on the basis of these measurements. (*Exhibit 3, Trumper Decl. @ pp.4-5, paragraph 16*).

*35.*    The a) programmability and b) control requirements are clearly spelled out in the patent specifications and specified in the claims in suit. For example:

- 11 -

> The heating element 24 (not shown) may be powered on and off as necessary to supply heat at a maintained temperature to the cooking unit 39 and the heating chamber via a programmable control 200. (`483 patent, Col. 3, ll. 8-12)

and

> The circuit board 254 mounts circuitry and logic allowing the user of the appliance 10 to electronically control and program cooking cycles and temperature. (`483 patent, Col. 4, ll. 48-50)  (*Exhibit 3, Trumper Decl. @ page 5, paragraph 17*).

36.    This analysis is also consistent with the Court's Markman interpretation of the claim language.  Claim 13 of the '483 Patent recites "**A method of using *a programmable slow-cooker appliance***."  This element appears in Claim 13, lines 1-2 of the '483 Patent.  The Court construed the italicized portion of this claim element as "*a cooking device designed for cooking food at a constant relatively low cooking temperature for a relatively long period of time [being], being programmable to operate in a variety of different cooking modes and cooking times.*"  (*See, Markman* Transcript @ page 3, lines 7-12, Exhibit E to Holmes' First Counter-Statement.)  (*Exhibit 3, Trumper Decl. @ page 5, paragraph 18*).

37.    Dr. Feinberg also has an incorrect understanding of feedback control as it applies to the patents-in-suit and the cited prior art references. The terms "maintain temperature" and "control… temperature" refer to a feedback control process which is clearly described in the patent specification:

> "The temperature of the cooking appliance is measured using a thermistor 310, which is connected externally of the circuit board to the underside of the bottom of the heating chamber." (`483 patent, Col. 5, ll. 19-22)

and

"In all modes, the temperature is read periodically by the thermistor or other temperature element and relayed to the controller. The reading is checked at 4-second intervals. If the temperature is above or equal to the set point, power is removed. If it is below the set point, power is applied to the heating element 32. Of course, the circuitry can be modified as desired to achieve various program methods and modes." ('483 patent, Col. 7, ll. 3-9)

*(Exhibit 3, Trumper Decl. @ page 6, paragraph 19).*

38.    As specified above, temperature measurement and feedback control of temperature by application of power to the heating element is used in all modes of the invention. Accordingly, the control of temperature in the patents-in-suit requires measurement of temperature and a feedback control action on the basis of this measurement.  *(Exhibit 3, Trumper Decl. @ page 6, paragraph 20).*

39.    In addition, the patent specifies that temperature measurement and thus the associated control action take place on a periodic interval (for example, 4 seconds).  Such sampled control is characteristic of microprocessor systems, and confirms that the controller of the invention utilizes a microprocessor, microcontroller, or equivalent.  Accordingly, temperature sensor data are gathered in the programmable slow-cooker of the patents-in-suit. (`483 patent, Col. 7, ll. 3-9).  This data is gathered at a fixed time interval (e.g., 4 seconds) to facilitate real-time control (maintaining) of a user-programmed temperature and cooking time.  *(Exhibit 3, Trumper Decl. @ page 6, paragraph 21).*

40.    The programmable circuit of the patents-in-suit uses closed-loop feedback to control the cooking temperature.  The microprocessor controller of the programmable circuit achieves this function by measuring the temperature with a thermistor and then applying power to the heating element on the basis of this feedback.  *(Exhibit 3, Trumper Decl. @ page 6, paragraph 22).*

41.    By contrast, the Weiss `287 patent, in Figures 6 and 7 provides an open-loop

- 13 -

control where the heating element is driven with a fixed on/off timer-based pattern. This is confirmed by the observation that the "controller" 22 of Weiss (shown in Fig. 8) has no measurement input for a temperature sensor. It is an open-loop timer which sets the on/off pattern applied to the heating element without regard for the resulting temperature. The "controller" 22 of Weiss is open-loop; it is unable to exert control over the temperature of the cooking process, and thus is unable to control the quality of the cooking result. The responsibility for a correct cooking temperature and cooking result is left to the user of the device shown in Weiss. This is quite distinct from the closed-loop control of the patents-in-suit, in which temperature is maintained via feedback control. (*Exhibit 3, Trumper Decl. @ page 7, paragraph 23*).

42. Dr. Feinberg makes a significant error by failing to distinguish between open loop and closed loop control. Dr. Feinberg seems to view anything which affects temperature as being a form of programmable temperature control. This is simply incorrect in the context of the patents-in-suit. (*Exhibit 3, Trumper Decl. @ page 7, paragraph 24*).

43. Dr. Feinberg also makes a significant error in that he seems to view anything which can be set as a programming input to a programmable controller. For example, he views an oven with a manually-settable thermostat and mechanical timer to turn the oven on and off as a programmable controller within the scope of the claims in suit. (*Feinberg dep. 247:8-22, attached as Exhibit A to the Declaration of Alan M. Sack in Support of Holmes' Opposition to Defendants' Motion for Partial Summary Judgment on Invalidity filed as **Exhibit 1** to this Statement*.) In this incorrect view, the knobs of the thermostat and timer are programmable inputs. However, such oven thermostats and mechanical timers have been available on the market since the early part of the last century. They cannot be considered a programmable

controller within the context of the patents-in-suit. Dr. Feinberg asserts an unreasonable position, which is unsupportable in light of the specifications of the patents-in-suit and their file histories. (*Exhibit 3, Trumper Decl. @ page 7, paragraph 25*).

44.    Dr. Feinberg also takes inconsistent positions in two of the pending motions. In arguing non-infringement in his Declaration (signed on July 18th) filed on July 19, 2006, he indicates that the digital logic and circuitry of the accused West Bend device is not programmable. In Photo 9 of this declaration, he identifies the microprocessor of the West Bend device as the "programmable controller" and says that it is "the only component… that is programmed to operate the heating element in accordance with the selected cooking parameters (i.e., cooking time and temperature) and to automatically lower cooking temperature to a warm mode after the selected time elapses." Feinberg Non-Infringement Decl. at Para. 13. This is far different than the broad position taken in his subject declaration and in his deposition; for example under his interpretation, the interface logic and circuits in West Bend's first printed circuit board could seemingly constitute a programmable controller in their own right. (*Exhibit 3, Trumper Decl. @ page 8, paragraph 26*).

45.    This inconsistent analysis may be based upon Dr. Feinberg's lack of education or current expertise with regard to microprocessor based circuits. None of Dr. Feinberg's educational and teaching background relates to microprocessor control systems. (*Feinberg dep.* 14:5-15:6.) Dr. Feinberg's sole teaching and research background with regard to computer control appears to be more than 20 years old. In view of his lack of background in microprocessor controlled systems, Dr. Feinberg has apparently made an incorrect interpretation of the Court's Markman interpretation of the claims at issue. (*Exhibit 3, Trumper Decl. @ page 8, paragraph 27*).

46.     In addition, Dr. Feinberg takes an unrealistic position on the background of one of ordinary skill in the art.  In my view, one of ordinary skill in the art which pertains to the patents-in-suit as having a Bachelors degree in engineering, and with one or two years of experience designing electronic control circuits for slow-cookers, and who is familiar with the cooking process requirements of slow-cookers.  (*Exhibit 3, Trumper Decl. @ page 8, paragraph 28*).

47.     Dr. Feinberg believes that one of ordinary skill in the art does not even need an engineering degree.  (*See*, *Feinberg dep.*186:9-187:8)  Alternatively, Dr. Feinberg claims that an electrical engineer with no experience in the design or manufacture of cooking devices could be considered as one of ordinary skill in the art (*See, Feinberg dep.*187:9-19)  (*Exhibit 3, Trumper Decl. @ page 9, paragraph 29).*

48.     Given the inconsistencies and significant inaccuracies in his declarations and deposition, Dr. Feinberg has insufficient background to qualify as an expert in the fields relevant to the patents-in-suit.  Based upon a review of Dr. Feinberg's resume, his reports, his lack of publications (no journal publications for more than 20 years), and his deposition transcript, there is no evidence that Dr. Feinberg is an expert in the fields to which he is testifying.  Furthermore, he does not even qualify as one of ordinary skill in the art of this case.  Dr. Feinberg's education precedes modern microprocessor control, and he clearly has no clear idea of what constitutes a programmable controller.  Neither does Dr. Feinberg make any distinction between closed-loop and open-loop control.  Ignorance of this distinction is an overwhelming fault which renders his opinions flawed and unreliable.  (*Exhibit 3, Trumper Decl. @ page 9, paragraph 30*).

49.     Dr. Feinberg's analysis of the references cited in his Declaration is analyzed in the following paragraphs.  This analysis, which is supported by Dr. Trumper's Declaration, demonstrates that the patents are valid despite the flawed arguments set forth by Dr. Feinberg.

*(Exhibit 3, Trumper Decl. @ page 9, paragraph 31).*

>    **ii.     The "Electric Cooking Appliance" of U.S. Patent No. 4,307,287 to Weiss**

50.     The focus of this patent is a high-temperature cooker with a fixed timer-based controller. The unit has an initial cooking phase which starts automatically, and during which "the vessel 12 rapidly reaches a high temperature which, for example, enables the user suitably to brown pieces of meat in fat…"  Prof. Robotham's Declaration points-out that such high temperatures are not consistent with the processes required in a slow-cooker. The high-temperature cooker of Weiss is clearly not a slow-cooker, because in the initial high-power cooking phase it rapidly raises the temperature to a value only limited to 347 °F when the safety shutoff thermostat intervenes. Further, during normal cooking, nothing limits the temperature to values consistent with slow cooking.  *(Exhibit 3, Trumper Decl. @ page 9-10, paragraph 32).*

51.     The Weiss patent shows a metal cooking vessel in contact with a bottom-mounted heating element.  (Although the body of the Weiss patent does not explicitly state the cooking vessel material, it is clear from mechanical and thermal considerations that the vessel is made of metal.  For example, examining the cross-sectional view of Figure 2 of Weiss, the cooking vessel has thin walls which could not be made of a ceramic material; only a metal vessel could have this configuration.  The attachment of the handles confirms this; a ceramic vessel could not tolerate the associated mechanical stresses.   Finally, the high thermal gradients resulting from direct contact with the bottom-mounted heating elements would crack a ceramic vessel with such thin walls.) The high thermal conductivity of the configuration of Weiss creates direct heat transfer and rapid temperature rise of the items being cooked.  This high thermal conductivity also facilitates browning, which process is one of the key features of this device.  The cited high cooking temperatures of up to 347 °F are clearly far above the relatively low temperatures

typical of a slow-cooker.  Such high-temperature cooking processes and configuration do not correspond with and teach against the use of a ceramic cooking unit with less direct heat transfer and relatively low cooking temperatures characteristic of a slow-cooker.  (*Exhibit 3, Trumper Decl. @ page 10, paragraph 33*).

52.     The Weiss patent does not show a programmable controller or programmable circuit. The control circuit 22 is just a simple timer circuit.  Nothing in the patent suggests that it is programmable. The knobs 24, 26, 28 simply set the duration of timing signals emitted by the control circuit. Such a manually settable control circuit clearly cannot constitute a programmable controller.  Further, the Weiss "controller" 22 has no input for temperature measurement, and thus cannot control temperature.  It also has no input for measuring power either, and thus cannot control power.  It is an open-loop device. It is an incorrect interpretation to suggest that the fixed on/off timer signals somehow control temperature; there is no way to determine what temperature will result in the Weiss device.  In fact by using such a simple fixed timer circuit, this reference teaches away from the concept of using a programmable controller.  Dr. Feinberg's analysis of the Weiss patent incorrectly refers to the control circuit 22 as a programmable controller, when control circuit 22 clearly does not include the features of a programmable controller.  (*Exhibit 3, Trumper Decl. @ page 10, paragraph 34*).

53.     Dr. Feinberg's Declaration in Support of Defendant's Motion for Summary Judgement, paragraph 5 states: "U.S. Patent No. 4,307,287 to Weiss' ("Weiss") selection of cooking temperature and method of maintaintaining [sic] the cooking temperature through application of adjustable power to the heating element is the same method described in both the '483 and '855 patents, in which power is supplied to the heating element to select and maintain the cooking temperature.  ('483 patent, col. 3, ll. 9-12 and col. 6, ll. 1-12.)" (*Exhibit 3, Trumper*

*Decl. @ page 11, paragraph 35).*

54.    This paragraph of Dr. Feinberg's declaration has numerous factual misrepresentations. The Weiss patent does not discloses a means for selecting cooking temperature. Additionally, Weiss does not disclose means to maintain (control) temperature. Accordingly, since Weiss does not disclose cooking temperature selection means nor temperature control means, Weiss cannot describe the same methods as claimed in the patents-in-suit. The adjustable power in Weiss is set via the thumbwheels by the user; in this context the user functions as the temperature controller who must act to adjust the power to a suitable level. (*Exhibit 3, Trumper Decl. @ page 11, paragraph 36).*

55.    Considering the Weiss patent, there is no motivation to combine the teachings of this high-temperature cooker with a prior art slow-cooker or any of the other references to yield a programmable slow-cooker as described in claim 13 of the `483 patent, or claim 20 of the `855 patent, or the asserted dependent claims.  One of ordinary skill would not look to the Weiss patent for adapting to slow-cooker design.  (*Exhibit 3, Trumper Decl. @ page 11-12, paragraph 37).*

56.    Accordingly, Dr. Feinberg's analysis of the Weiss patent with respect to invalidity of the patents-in-suit is incorrect for at least the reasons cited above.  (*Exhibit 3, Trumper Decl. @ page 12, paragraph 38).*

### iii.    The "Cooking Apparatus for Fluid Container" U.S. Patent No. 4,817,510 to Kowalics

57.    The focus of the Kowalics patent is a cooking apparatus for cooking soup and similar food products, with an air-pumped mixing system.  Prof. Robotham's Declaration explains that the heating of the food items to the relatively high temperatures cited in the patent renders this device unsuitable for slow-cooking. As well, automatic stirring via heated air is not

consistent with the slow-cooker application.  (*Exhibit 3, Trumper Decl. @ page 12, paragraph 39*).

58.    The Kowalics patent shows a metal cooking vessel in contact with a bottom-mounted heating unit which is intended to create direct heat transfer facilitated by the air-driven stirring action.  This does not correspond with and teaches against the use of a ceramic cooking unit, relatively low cooking temperatures, and less direct heat transfer characteristic of a slow-cooker.  (*Exhibit 3, Trumper Decl. @ page 12, paragraph 40*).

59.    The temperature and timing controls shown in the Kowalics patent are based upon relays and hard-wired temperature controllers, or upon hard-wired electronic temperature controls and fixed timing, switching, and logic circuits (Col. 5, l. 57 – Col. 12, l. 46).  Such fixed electronic control and timing circuits are clearly not a programmable controller or circuit as defined in the claims at issue.  Nothing in the patent suggests that these circuits are programmable.  In fact, by using such simple fixed circuitry, this reference teaches away from the concept of using a programmable controller. Dr. Feinberg's analysis of the Kowalics patent incorrectly refers to the fixed electronic temperature control and timers as a programmable controller.  (*Exhibit 3, Trumper Decl. @ page 40, paragraph 41*).

60.    Considering the Kowalics patent, there is no motivation to combine the teachings of this soup cooker with a prior art slow-cooker or any of the other cited references to yield a programmable slow-cooker as described in claim 13 of the `483 patent, or claim 20 of the `855 patent, or the asserted dependent claims.  One of ordinary skill would not look to the Kowalics patent for adapting to slow-cooker design.  (*Exhibit 3, Trumper Decl. @ page 13, paragraph 42*).

61.    Therefore, Dr. Feinberg's analysis of the Kowalics patent with respect to invalidity of the patents-in-suit is incorrect for at least the reasons cited above.  (*Exhibit 3,*

*Trumper Decl. @ page 13, paragraph 43).*

62.    Accordingly, whether taking alone or combination, the references cited by West Bend do not anticipate nor render obvious either claim 13 of the '483 patent or claim 20 of the '855 patent.  Because those patents are not invalid, the dependent claims upon which they depend also are not invalid.

63.    The Defendant's Statement Of Material Facts As To Which There Are No Genuine Issues Of Dispute And Which Entitle Defendants To Summary Judgment Of Invalidity, of December 1, 2006 is also flawed by significant errors.  These are enumerated below with reference to paragraph numbers.  (*Exhibit 3, Trumper Decl. @ page 13, paragraph 43).*  As set forth in the Trumper Declaration beginning on page 13, at least the following are errors of fact in The Defendant's Statement of Material Facts:

**Paragraph 5 states: "**Weiss teaches a slow cooker in which the operator, using a "control circuit," sets "the average power [temperature]" and "duration [time]" of the cooking phase. *Id.* at col. 1, ll. 12-22.  After the normal cooking phase selected by the user, the control circuit automatically proceeds to "phase M, at reduced power [temperature], in which the food is kept hot."

- Weiss does not disclose a slow-cooker.  The control circuit only sets average power.  It does not set temperature.

**Paragraph 12 states: "**Weiss discloses such a programmable slow cooker that cooks food at a constant, relatively low cooking temperature for a relatively long period of time.  Ex. A, col. 1, ll. 23-28 and col. 4, ll. 47-54.**"**

- Weiss does not support this statement. Weiss is not programmable. Weiss is not a slow cooker. It does not maintain constant, relatively low cooking temperatures. Weiss does not meet the Court's programmable slow-cooker construction.

**Paragraph 13 states: "**Weiss discloses an "electronic control circuit 22" that permits an operator to select cooking temperature and cooking time. Ex. A at col. 2, ll. 61-68 and col. 4, ll. 47-57. Weiss has a control panel with regulating knobs that are used to select a cooking power (i.e., temperature) and to select a cooking time in hours and minutes. *Id.* at col. 2, ll. 61-68. Weiss' selection of cooking temperature and method of maintaining the cooking temperature through adjustable application of power to the heating element is the same method described in both the '483 and '855 patents, in which power is supplied to the heating element to select and maintain the cooking temperature. J.A. at MKM 0014, col. 3, ll. 9-12 and col. 6, ll. 1-12; Feinberg Decl., Nov. 30, 20063 ¶ 5.**"**

- The regulating knobs do not set temperature. The Weiss patent has no means to select cooking temperature. It also has no means to maintain (control) temperature. Since these means do not exist, they can not be the same as anything, much less a feature of the patents-in-suit.

**Paragraph 14 states: "**Weiss discloses that its entire programmable controller (control circuit 22) is mounted to a housing,…**"**

- Incorrectly refers to Weiss having a programmable controller.

**Paragraph 15 states that in Weiss: "**a selected cooking temperature is automatically lowered after a cooking time elapses. **"**

- There is no selected cooking temperature in Weiss, nor is there any temperature control. Temperature cannot be selected, nor can it be automatically lowered.

**Paragraph 16 states: "**In the Weiss cooker, the temperature control disc 24 is marked in ten power or temperature increments, and the time control discs 26, 28 are incrementally marked with time settings.  Ex. A at col. 3, ll. 62- 65.**"**

- The control disk 24 does not set temperature.  Temperature cannot be changed in increments.

**Paragraph 27 states: "**Weiss discloses an "electronic control circuit 22" that allows the user to program both the cooking temperature and desired time for cooking.  *Id.* at col. 2, ll. 61-68 and col. 4, ll. 47-57.  This control circuit 22 also automatically changes the heating element to an automatic warm mode once the set cooking time has expired.  When Weiss is set to its cooking mode "II," after the food is cooked at the selected time and temperature, referred to as "cooking phase C," this phase is automatically "followed by the phase M, at reduced power, in which the food is kept hot.  *Id.* at col. 4, ll. 66-68.  In other words, when the cooking time set by the user expires, Weiss' control circuit 22 reduces power to a warm mode during which the food is maintained at a predetermined temperature less than the cooking temperature.**"**

- The user cannot program anything in Weiss; it doesn't have a programmable controller.  The cooking temperature cannot be set in Weiss.  Weiss cannot maintain food at any predetermined temperature less than the cooking temperature.

**Paragraph 32 states: "**The user must select either between mode "I," in which cooking temperature and cooking time are selected, or mode "II," in which a user selects a cooking time and temperature and after the elapsed time the cooker is automatically switches to a lower temperature warm mode.**"**

- In error because cooking temperature cannot be selected in Weiss.

**Paragraph 33 states: "**In the Weiss programmable cooker, subsequent "turns" of the regulating discs, …**"**

- In error because Weiss is not a programmable cooker.

(*Exhibit 3, Trumper Decl. @ pages 13-16 @ paragraph 43*).

### G.    Mr. Hlava, an Inventor of the Holmes' Patent Testified That He Had No Motivation to Combine or Look at Other Devices

64.    The testimony of one of the inventors of the asserted Holmes patents, Mr. Lorens Hlava was taken pursuant to subpoena by West Bend's Counsel on Thursday, December 14, 2006 in Tulsa, Oklahoma.  West Bend's counsel examined Mr. Hlava with regard to other programmable units he looked at in making the invention. (pages 1 and 2 and 71-73 of the deposition transcript of Mr. Hlava are *attached as Exhibit B to the Declaration of Alan M. Sack in Support of Holmes' Opposition to Defendants' Motion for Partial Summary Judgment on Invalidity filed as* **Exhibit 1** *to this Statement*[1])

65.    Mr. Hlava, testified at page 71, line 12 to page 72, line 1, as follows:

p. 71
```
12     Q   Had you been aware of programmability as a
13  feature on other small appliances at the time you
14  started to work on this programmable slow cooker?
15     A   Not that I remember.
16     Q   And you didn't investigate or explore how
17  programmability might have been used on other small
18  appliances when you began your work on this project?
19     A   Again, I don't know that there were any
20  other programmable cooking units out there.
21     Q   And by programmable cooking units are you
22  referring to slow cookers specifically or are you
23  talking more broadly than that?
24     A   I think more broadly.
25     Q   So you're thinking of perhaps bread makers
```

[1] The Official Transcript delivered immediately preceding filing of this response differs from the original electronic copy relied upon above by 1 line.

p. 72

1  or coffee makers or other small appliances?

66.    Mr. Hlava testified that he had not looked other appliances because they were so different from slow-cookers, due both to the heat generated by slow cookers and, due to these appliances not being made to operate for 8, 10 or 12 hours continuously, as is the case with slow cookers.  See, Hlava deposition transcript at page 72, lines 11 to page 73, line 9, as follows:

p. 72

11    A   Well, a coffee maker or a bread maker is
12  in trying to take those units and compare them to a
13  slow cooker is like comparing apples and oranges.
14    Q   Okay.
15    A   I mean, they're both fruit but that's
16  where the similarity ends.
17    Q   Why wouldn't you have compared them?  What
18  are the differences --
19      MR. SACK:  Objection; asked and answered.
20    A   Excuse me?
21    Q   (By Mr. Sarskas) What are the differences
22  that prevent you from being able to make a
23  comparison?
24    A   Again, because they were unrelated
25  products.  And when we do that we would look at

p. 73

1  competitive products.
2    Q   I understand that you think that they're
3  unrelated products, but I'm wondering specifically
4  what differences between the products make the
5  comparison not very useful in your view?
6    A   Well, one aspect would be the heat
7  generated by those products.  Plus those products
8  are not made to operate for eight, ten, or twelve
9  hours continuously.

**H.    Holmes Has Provided Overwhelming Evidence of Secondary Considerations of Non-Obviousness**

67.    Contrary to West Bend's assertions, Holmes has provided documents showing overwhelming evidence of secondary consideration which support non-obviousness of the asserted claims of the '483 and '855 patents, namely claim 13 of the '483 patent and claim 20 of

the '855 patent.  Not only has Holmes provided the underlying documents supporting such

secondary considerations, but has also provided West Bend with a Declaration under oath of Mr.

Bart Plaumann, dated October 6, 2006, which was filed in the United States Patent and

Trademark Office during the prosecution of a related patent application.  Mr. Plaumann is the

former Senior Vice President and General Manager of Kitchen SBU of Jarden Consumer

Solutions, formerly known as The Holmes Group, (*A copy of Mr. Plaumann's Declaration, and*

*supporting Exhibits, provided to Defendants in discovery is attached as Exhibit C to the*

*Declaration of Alan M. Sack in Support of Holmes' Opposition to Defendants' Motion for*

*Partial Summary Judgment on Invalidity filed as **Exhibit 1** to this Statement*).  In addition, Mr.

Plaumann, was specifically designated by Holmes to testify under Rule 30(b)(6) on Holmes'

counterclaims regarding secondary considerations of non-obviousness.  Specifically to "**Topic**

**25**" of West Bend's deposition notice, namely:

> "Holmes contentions, if any, that there are secondary considerations of non-
> obviousness supporting the validity of the '483 and '855 patents including but not
> limited to any alleged commercial success of embodiments of the '483 and '855
> patents; any alleged long felt but unmet need for the inventions embodied in the
> '483 and '855 patents; any alleged failure of others to find a solution for the
> problems solved by the '483 and '855 patents; and any alleged licensing of the
> '483 and '855 patents."

See, Holmes' response to Defendants' Amended First Rule 30(b)(6) deposition notice, attached

as Exhibit 2 to the transcript of the examination of the Holmes Group under Rule 30(b)(6), in

which Mr. Plaumann testified (*a copy of Mr. Plaumann's deposition testimony, pages 1-5 and*

*23-29 under Rule 30(b)(6) as well as deposition Exhibits 2 and 19 are attached as Exhibit D to*

*the Declaration of Alan M. Sack in Support of Holmes' Opposition to Defendants' Motion for*

*Partial Summary Judgment on Invalidity filed as **Exhibit 1** to this Statement*).

      68.     Mr. Plaumann's Declaration was marked as Exhibit 19 to the deposition

transcript. Mr. Plaumann was extensively examined on his declaration over more than 100 pages of the transcript.

69.     In his Declaration, Mr. Plaumann explained that electric slow-cookers have been in the marketplace for at least 30 years. During this time the owner of the present application and its predecessors have been marketing slow-cookers under the trademarks Crock•Pot® and Rival®. In the past, as well as today, slow-cookers have been marketed with manual controls to set a cooking temperature such as low and high and off. *(Exhibit C to Exhibit 1; Plaumann Declaration @ page 2, paragraph 4).*

70.     Slow-cookers are viewed as generally imprecise cooking devices that did not need any form of exacting control. Since the amount of cooking time is relatively long and the food is cooked at a relatively low temperature, there was not seen a need for including a timer on a slow-cooker. If the cooking was started in the morning, the food would be cooked and ready to serve at dinner time. The Crock•Pot® brand has been, and continues to be, marketed under the slogan, "cooks all day while the cook's away." *(Exhibit C to Exhibit 1; Plaumann Declaration @ page 2, paragraph 5).*

*71.*     However, the inventors did recognize problems with the traditional prior art slow-cookers. Food if left too long in the slow-cooker could dry out or become overcooked. Also, users were showing a concern about leaving their slow-cookers on too long. The inventors recognized that there would be an advantage to having more control over the cooking process. Thus, there was a need in the marketplace for a programmable slow-cooker which more accurately controls a cooking time and temperature as well as provide a keep warm feature should the user not be available to attend to the appliance at the end of the set cooking time. *(Exhibit C to Exhibit 1; Plaumann Declaration @ page 2, paragraph 6).*

72.    In 2000, Jarden's predecessor, The Holmes Group LLC., introduced the first programmable slow-cooker into the marketplace.  The programmable slow-cooker gave the user the ability to set a cooking time and temperature.  At the end of the cooking time, the power to the heating element is automatically reduced to a warm setting such that the food would be kept at a proper serving temperature and prevent spoilage if the slow-cooker were left unattended.  Since its introduction, the programmable slow-cooker with auto keep warm feature has been a tremendous commercial sales success.  Since 2000, sales of programmable slow-cookers have steadily increased.  Today, programmable slow-cookers account for over 40% of Holmes' slow-cooker sales, which sales exceed one hundred million dollars ($100,000,000).  *(Exhibit C to Exhibit 1; Plaumann Declaration @ pages 2-3, paragraph 7).*

73.    Programmable slow-cookers are the same as traditional slow-cookers but for the programmable features which permit a user to set a cooking time and temperature and the temperature being automatically reduced at the end of the cook time to keep the food warm.  The programmable slow-cooker is a premium product which costs more that the traditional slow-cooker.  The success of the programmable slow-cooker in the marketplace is directly attributable the programmable features.  *(Exhibit C to Exhibit 1; Plaumann Declaration @ page 3, paragraph 8).*

74.    Once the programmable slow-cooker established itself as a success in the market, many competitors have attempted to copy it.  These competitors each market a programmable slow-cooker that permits a user to set a time and temperature and also includes an automatic warm feature after the expiration of the set timed cooking cycle.  Jarden has contacted nine (9) different competitors that have started marketing programmable slow-cookers, and is currently engaged in lawsuits with two (2) of those companies based on patents related to the pending

application.  The two pending lawsuits are:

75.    The *Holmes Group v. West Bend Housewares, LLC et al.*  05-cv-11367 pending in the District of  Massachusetts; and

*76.    The Holmes Group  v. Euro-Pro Operating, LLC* 05-cv-10504, pending in the District of  Massachusetts. *(Exhibit C to Exhibit 1; Plaumann Declaration @ page 3, paragraph 9).*

*77.*    Homes' competitors promote the automatic keep warm feature on their packaging, which demonstrates its significance in the market.  Exhibits A and B.  For example, Euro-Pro's product packaging prominently states, "Serve & Warm Automatically initiates the keep warm setting when cooking is complete…"  Exhibit A.  West Bend on its product packaging prominently states, "Electronic control automatically shifts to Keep Warm." Exhibit B.  *(Exhibit C to Exhibit 1; Plaumann Declaration @ pages 3-4, paragraph 10).*

78.    The significance of a slow cooker having the programmable features including the automatic keep warm mode has been recognized by the industry.  Eating Well magazine in its

79.    March 2006 issue praises the Rival® Smart-Pot programmable slow cooker by stating, "[b]ut perhaps our favorite feature is the automatic shift-to-warm setting, which allows your meal to cook for its predetermined time and then switch to a setting that keeps the food at a safe temperature until you're ready to eat." Exhibit C.   The importance of Jarden's Smart-Pot's automatic shift to warm feature is also indicated on Eating Well's web site.  Exhibit D.  Jarden's programmable slow cooker and its automatic keep warm feature was also highlighted in a February 2006 issue of Woman's Day magazine.  Exhibit E.  *(Exhibit C to Exhibit 1; Plaumann Declaration @ page 4, paragraph 11).*

80.    The significance of the automatic shift to a keep warm mode after a cooking time

has ended has been further recognized by the media.  The Akron Beacon Journal states:

> The improvements in the new generation of slow cookers are impressive:
> The most sophisticated programmable pots (about $70) can be set to cook in both
> hour and half-hour increments, plus they switch to a warm mode when the
> cooking time is up.

Exhibit F.

> The Miami Herald wrote:

> Several manufactures offer programmable slow cookers.  When cooking time is
> up, the pots automatically shift into 'warm' mode-- the perfect solution to an
> eight-hour recipe and a 10-hour workday.

Exhibit G.

81.    The media has clearly recognized the importance and benefits of the

programmable slow cooker that automatically shifts to a keep warm mode at the end of a

cooking time.  *(Exhibit C to Exhibit 1; Plaumann Declaration @ page4, paragraph 12).*

82.    During the deposition, Mr. Plaumann was examined regarding the correlation

between the claimed subject matter and the commercial success of the Holmes slow-cookers.  At

page 95 of the transcript, beginning at line 10, West Bend examined Mr. Plaumann who testified

that the overwhelming commercial success of the programmable slow cookers was due to the

programmable auto shift to keep warm feature.

> Q -    You said before that consumer research has
>        revealed to Holmes that the commercial
>        success of the programmable slow cooker is
>        due outstandingly to the auto shift to warm
>        feature; is that accurate?
> A -    That's accurate.
> Q -    What is that statement based on?
> A -    It's based on an accumulation of research
>        that we've done.  And it's also based on
>        just the facts of look at our business.  You
>        know, we went from zero in 1999 before the
>        introduction of any programmable slow
>        cookers to today it's 40 percent of our
>        business.  So the consumers have responded
>        very strongly to the programmable part of it.
>        And we have research that shows that
>        the automatic shift to keep warm is an

extremely important feature.

Q -   Do you equate automatic shift to warm and
       programmable as being the same thing?

A -   No. I mean they -- you can have other
       features on a programmable slow cooker that
       don't necessarily have that automatic shift
       to keep warm.  But all of our units that are
       programmable have that feature.

Q -   And what has the consumer research told you
       about some of the other features on
       programmable slow cookers besides automatic
       shift to warm?

A -   I can't specifically recall anything else to
       the programmable aspect of it besides that.

## III    CONCLUSION

83.    The declarations and testimony provided by Holmes establish a material issue of fact sufficient to preclude a finding of summary judgment of invalidity of U.S. Patent Nos. 6,573,483 and 6,740,855 (*see paragraphs 1-87 above*).

Respectfully submitted,

SUNBEAM PRODUCTS, INC.,
f/k/a THE HOLMES GROUP
By its Attorneys,

*/s/ Alan M. Sack/*

Charles R. Hoffmann, Esq. (*Pro Hac Vice*)
CRHDocket@hoffmannbaron.com
Alan M. Sack, Esq. (*Pro Hac Vice*)
AMDocket@hoffmannbaron.com
Glenn T. Henneberger, Esq. (*Pro Hac Vice*)
GTHDocket@hoffmannbaron.com
Hoffmann & Baron, LLP
6900 Jericho Turnpike
Syosset, New York  11791-4407
Telephone:  (516) 822-3550
Facsimile:  (516) 822-3582

and

Nicholas J. Nesgos (BBO No. 553177)
nnesgos@pbl.com
Joseph W. Corrigan (BBO No. 647393)
jcorrigan@pbl.com
Posternak Blankstein & Lund LLP
Prudential Tower, 800 Boylston Street
Boston, Massachusetts  02199-8004
Telephone:  (617) 973-6100
Facsimile:  (617) 367-2315

Dated:  December 22, 2006

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on December 22,

2006.

*/s/ Alan M. Sack/*
Alan M. Sack

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

THE HOLMES GROUP, INC.,                         :
                                                :
   Plaintiff/Counterclaim-Defendant,            :        Civil Action No.  1: 05-CV-11367 WGY
                                                :        (Alexander, M.J.)
            v.                                  :
                                                :
WEST BEND HOUSEWARES, LLC and :
FOCUS PRODUCTS GROUP, L.L.C.,       :
                                                :
   Defendants/Counterclaim-Plaintiffs.          :


### DECLARATION OF ALAN M. SACK IN SUPPORT OF HOLMES' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON INVALIDITY OF U.S. PATENT NOS. 6,573,483 AND 6,740,855

      I, Alan M. Sack, do hereby declare and state as follows:

      1.     I am a member of the law firm of Hoffmann & Baron, LLP, the counsel of record representing the Plaintiff, The Holmes Group, Inc. ("Holmes") in the above-identified litigation.

      2.     I am admitted and in good standing before the bars of the States of New York and New Jersey, and have been admitted *pro hac vice* in this Civil Action.

      3.     I submit this Declaration in support of Holmes' Opposition to Defendants' Motion for Partial Summary Judgment on Invalidity of U.S. Patent Nos. 6,573,483 and 6,740,855.

      4.     Attached as Exhibit A to this Declaration are the first three pages (1-3) and pages 12-15, 33-34, 18-19, 60, 186-187 and 247 of the deposition transcript of

Defendant's expert, Dr. Feinberg, taken by me on December 12, 2006, as supplied by the court reporter.

5.    Attached as Exhibit B to this Declaration are the first three pages (1-3) and pages 71-73 of the deposition transcript of Lorens G. Hlava taken pursuant to subpoena by West Bend's Counsel on Thursday, December 14, 2006 in Tulsa, Oklahoma, as supplied by the court reporter.

6.    Attached as Exhibit C to this Declaration is a true and complete copy of the Declaration of Mr. Bart Plaumann and supporting Exhibits, dated October 6, 2006, as provided to Defendants, which was filed in the United States Patent and Trademark Office during the prosecution of a related patent application.  Mr. Plaumann is the former Senior Vice President and General Manager of Kitchen SBU of Jarden Consumer Solutions, formerly known as The Holmes Group.

7.    Attached as Exhibit D to this Declaration  are the first five pages (1-5) and pages 23-129 of the Rule 30(b)(6) deposition transcript of Plaintiff, as well as Deposition Exhibits 2 and 19 referred therein, in which Mr. Bart Plaumann was examined on the subject of his Declaration by West Bend's Counsel on November 16, 2006, as supplied by the court reporter.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this twenty-second (22nd) day of December, 2006.

_____
Alan M. Sack

# EXHIBIT A

Page 1

                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MASSACHUSETTS


THE HOLMES GROUP, INC.,
          Plaintiff and
          Counter-Defendant,

     -vs-                     Case No. 05-CV-11367 WGY

WEST BEND HOUSEWARES, LLC and
FOCUS PRODUCTS GROUP, LLC,
          Defendants and
          Counter-Plaintiffs.
~~~~~~~~~~~~~~~~~~~~~~~~~~~


                         EXAMINATION OF

                BARRY NORMAN FEINBERG, PH.D., P.E.


                      December 12, 2006
                         9:06 a.m.


                  100 East Wisconsin Avenue
                    Milwaukee, Wisconsin


                  Jacqueline R. Rupnow, RPR

34f67cd4-4c0d-429d-b087-e2ddcf4511a1

Barry Norman Feinberg, Ph.D., P.E.                    December 12, 2006

Page 2

  1                      APPEARANCES

  2          .

  3      Appeared on Behalf of the Plaintiff/Counter-Defendant.

  4      HOFFMAN & BARON, LLP

  5      ALAN M. SACK, ESQUIRE

  6          6900 Jericho Turnpike,

  7          Syosset, New York 11791-4407,

  8          .

  9      Appeared on Behalf of the Plaintff/Counter-Defendant

 10      HOFFMAN & BARON, LLP

 11      TONY A. GAYOSO, ESQUIRE

 12          6900 Jericho Turnpike,

 13          Syosset, New York 11791-4407,

 14          .

 15      Appeared on Behalf of the

 16      Defendants/counter-plaintiffs.

 17      MICHAEL, BEST & FRIEDRICH, LLP

 18      JOSEPH T. MIOTKE, ESQUIRE

 19          100 East Wisconsin Avenue, Suite 3300,

 20          Milwaukee, Wisconsin 53202-4108,

 21          .

 22          .

 23          .

 24          .

 25          .

Barry Norman Feinberg, Ph.D., P.E.                    December 12, 2006

Page 3

1          Examination of

2      Barry Norman Feinberg, Ph.D., P.E.

3          December 12, 2006

4          BARRY NORMAN FEINBERG, Ph.D., P.E.,

5      called as a witness herein, having been first

6      duly sworn on oath, was examined and

7      testified as follows:

8      EXAMINATION

9      BY-MR.SACK:

10     Q.     Could you state your name for the

11     record, please, sir?

12     A.     Barry Norman Feinberg.

13     Q.     And where do you reside?

14     A.     In Chicago, Illinois.

15     Q.     Would you like me to call you Dr.

16     Feinberg, Mr. Feinberg?

17     A.     Whatever you're comfortable with.

18     Doctor is okay, Mr. is okay, whatever works

19     for you.

20     Q.     Do you know you're here testifying

21     today pursuant to a notice of deposition in

22     this case?

23     A.     I have received no notice.

24     Q.     I'd like to mark as Exhibit 1 the

25     notice of deposition of Dr. Feinberg.

Barry Norman Feinberg, Ph.D., P.E.                December 12, 2006

Page 12

1    look at the West Bend product and determine
2    whether the West Bend product infringes the
3    patents-in-suit.
4        BY MR. SACK:
5        Q.    Do you have expertise in doing
6    infringement analysis of patents?
7        A.    Well, I don't know what you mean
8    by expertise. I've done a lot of infringement
9    analysis, yes.
10       Q.    Let's turn to your CV, and let's
11   talk about your education a little bit.
12   After high school, what was your first
13   university experience?
14       A.    I went to the University of
15   Michigan.
16       Q.    When?  I don't believe there is a
17   date here.
18       A.    I went there between 1957 --
19   actually '58 and '62.
20       Q.    '57 or '58, I'm sorry?
21       A.    I was sort of one of these January
22   graduates, so I was kind of in the
23   Netherlands.  So say '57 to '62.
24       Q.    And University of Michigan?
25       A.    Correct.

Barry Norman Feinberg, Ph.D., P.E.                    December 12, 2006

Page 13

1       Q.    What degree did you receive from
2   the University of Michigan?
3       A.    I received two degrees.
4       Q.    And can you tell me what they are?
5       A.    I received a Bachelor of Science
6   in electrical engineering, and I received a
7   Bachelor of Science in engineering mathematics,
8   which is applied mathematics.
9       Q.    At that time were you familiar
10  with microprocessors?
11      A.    No, they hadn't been invented yet.
12      Q.    I didn't think so, but I wasn't
13  sure.
14      A.    I hate to say that.
15      MR. SACK:  Off the record.
16      (Discussion off the record.)
17  BY MR. SACK:
18      Q.    Now, after your studies at
19  University of Michigan, what did you do at
20  that point?
21      A.    I took a position at the
22  University of Louisville as an instructor of
23  mathematics, and at the same time began my
24  studies for a Master's of electrical
25  engineering.

Barry Norman Feinberg, Ph.D., P.E.                    December 12, 2006

Page 14

1    Q.    So you're a mathematics instructor,
2    so that was when?
3    A.    That was at the University of
4    Louisville from 1962 to 1964.
5    Q.    So is that in your CV down where
6    you have employment '62 to '64, you're in the
7    Master's program, also?
8    A.    Master's of electrical engineering,
9    yes.
10   Q.    And were programmable controllers
11   invented at that point?
12   A.    Yes, I believe so.
13   Q.    Did you study them at that point?
14   A.    Yes, I studied automatic control
15   systems.
16   Q.    For?
17   A.    What do you mean for what?
18   Q.    For what kind of devices.
19   A.    For any kind of automatic feedback
20   control.
21   Q.    And do you recall what kind of
22   microprocessor they used?
23   A.    Well, feedback control systems used
24   other aspects of electronics and mechanics,
25   also, so we didn't study one specific one,

Barry Norman Feinberg, Ph.D., P.E.                    December 12, 2006

Page 15

1    let's put it that way.  We studied the

2    general ideas of control systems, controllers,

3    and feedback.

4        Q.     Did you study microprocessors at

5    that time?

6        A.     Specifically, no.  We did solid

7    state electronics if that's helpful.

8        Q.     You mean like outbands and AND

9    gates and --

10        A.     Yes, we did that, and also got

11    into their composition, how they worked,

12    continued in the solid state physics.

13        Q.     How do they work?

14        A.     How does what work?

15        Q.     Solid state electronics.

16        A.     Do you really want to take the

17    time to go through that?

18        Q.     Sure.

19        A.     Well, when you say solid state,

20    are we talking take a basic idea of let's

21    say a transistor or are we talking integrated

22    circuits?

23        Q.     What about a logic device, such as

24    an AND gate?

25        A.     Well, I can tell you how that

Barry Norman Feinberg, Ph.D., P.E.                    December 12, 2006

Page 33

1    analyses, like stability analysis, for

2    instance.

3        Q.    Were computers controlling these

4    mechanical systems or was this a mechanical

5    feedback system?

6        A.    No, the computer was used in the

7    course, but not as part of the feedback loop.

8        Q.    The feedback loop was mechanical?

9        A.    Some of the systems we studied had

10   mechanical feedback, yes.  Some had hydraulic

11   feedback.

12       Q.    Now, what's the next course,

13   nonlinear feedback control systems?

14       A.    Well, the previous course that we

15   just talked about linear control systems,

16   basically systems based on linearative

17   operation, but there are nonlinear systems

18   where the control signals or part of the

19   signal are nonlinear, and that's a whole area

20   of study all by itself in terms of it's

21   ability to perform and be stable.

22       Q.    And what kind of mechanical systems

23   were you studying there?

24       A.    We studied, for instance, relay

25   systems, where the signal was basically a

Barry Norman Feinberg, Ph.D., P.E.                    December 12, 2006

Page 34

1    binary on/off system running through a

2    processing system to determine whether that

3    system could be stable or not.  I mean a

4    typical example of a nonlinear system is

5    let's just take a thermostat.  You set a

6    thermostat, all right, for a particular

7    temperature and the thermostat is either on

8    or off, and you have to regulate something

9    based on this on and off system.

10        Q.    Were you using microprocessors in

11   this course to regulate these systems?

12        A.    No, not in that course.

13        Q.    Were you using a computer in this

14   course to regulate the system?

15        A.    Not to regulate.  Computers were

16   used as a computation aid to analyze the

17   system.

18        Q.    Now, you said you had a list of

19   other courses that you taught.  Where is that

20   in your CV?

21        A.    Page .11.

22        Q.    Just going back, when did you

23   teach that nonlinear feedback control system?

24        A.    When I was Cleveland State

25   University.

Barry Norman Feinberg, Ph.D., P.E.                December 12, 2006

1    be.

2        Q.      Do they have memory?

3        A.      For instance, operational amplifiers

4    originally were discrete component amplifiers,

5    basically high gain amplifiers at one point,

6    so it just depends.

7        Q.      How about these days?

8        A.      Well, I would say generally

9    speaking most designs are done with solid

10   state electronics integrated circuits.

11       Q.      Do AND gates or NAND gates or

12   outbands have any memories?

13       A.      What do you mean by memory?

14       Q.      Well, how would you define memory?

15       A.      Well, in terms of solid state,

16   memory would be when a particular binary

17   pattern is put in that the pattern isn't

18   lost, it stays there, and can be retained,

19   obtained again.

20       Q.      Would you say that an AND or NAND

21   gate has memory?

22       A.      Well, from my perspective, I would

23   say no, probably doesn't have memory in the

24   sense that we talk about memory chips and

25   computer memory, et cetera.

34f67cd4-4c0d-429d-b087-e2ddcf4511a1

Barry Norman Feinberg, Ph.D., P.E.                    December 12, 2006

1    Q.    Were these devices that you stated

2    back in '62, '64, at the University of

3    Michigan in your Master's program?

4    A.    Well, my Master's program was at

5    the University of Louisville.

6    Q.    I'm sorry, University of

7    Louisville.  Were these devices that you

8    stated in the University of Louisville at

9    your Master's program?

10    A.    We studied some solid state

11    electronics, yes, but of course, in '62 and

12    '64, they didn't have the kind of integrated

13    circuits they have today.

14    Q.    After you got your degree from the

15    University of Louisville, excuse me, what

16    courses did you teach there as an instructor?

17    A.    At Louisville?

18    Q.    Yes.

19    A.    Calculus, differential equations and

20    statistics.

21    Q.    Did you teach any mechanical

22    engineering courses?

23    A.    No.

24    Q.    Electrical engineering courses?

25    A.    No.

Barry Norman Feinberg, Ph.D., P.E.                    December 12, 2006

Page 60

1    Q.    Is that the only project you had
2  for Kendall?
3    A.    No.
4    Q.    What other project did you have at
5  Kendall?
6    A.    I did one on localized hyperbaric
7  oxygen therapy.
8    Q.    And what specifically did you do
9  on that project?
10    A.    Basically developed the theory of
11  operation and designed the -- it was
12  basically a nonelectrical, it was a pneumatic
13  mechanical system, and had that built to
14  operate the system.
15    Q.    Was it using a microprocessor
16  control?
17    A.    No, relay logic.
18    Q.    What's relay logic?
19    A.    Well, used relay as a binary
20  device, because since we were using oxygen,
21  we didn't want anything electrical, so it
22  used pneumatic type relays and valves and
23  things.
24    Q.    Are relays programmable?
25    A.    I don't know about the current

Barry Norman Feinberg, Ph.D., P.E.                    December 12, 2006

Page 186

1   literal infringement and doctrine of

2   equivalents, these are their words as told to

3   me.

4      Q.      So their words, and then they told

5   you?

6      A.      They explained the whole mechanism

7   of doctrine of equivalents, they've explained

8   to me literal infringement.

9      Q.      Okay.  What's the level of

10  ordinary skill in the art with regard to the

11  Holmes patents-in-suit?

12     A.      Some of the -- someone with a

13  bachelor's degree, bachelor of science degree,

14  and/or designer having several years of

15  experience in design, development of cooking

16  or electrical, electronic operated appliances.

17     Q.      I see you're reading.  Are these

18  your words?

19     A.      Yes, these are mine.

20     Q.      You wrote -- you keyed this in?

21     A.      I did not key it in.  These are

22  my words, what I told them, what I thought

23  was ordinary skill in the art.

24     Q.      What does it mean and/or in this

25  definition?

Barry Norman Feinberg, Ph.D., P.E.                    December 12, 2006

Page 187

1    A.    Well, the person could have a
2    bachelor of science degree, let's say in
3    engineering, and also be a designer of
4    several years experience, or could simply be
5    a designer with several years experience or a
6    person with a bachelor of science degree,
7    let's say in electrical engineering, could do
8    all this, so.
9    Q.    So a person with bachelor of
10   science degree in electrical engineering with
11   no experience in the design or manufacture of
12   cooking items or slow cookers is one of
13   ordinary skill in the art under your
14   interpretation?
15   A.    Well, yes, because of the fact
16   that people with electrical engineering, if
17   you look at the particular device we're
18   talking about, it's a very simple,
19   straight-forward device.
20   Q.    Right out of college?
21   A.    Yes, and I taught these people so
22   I know what they know.  I taught them.  My
23   students would be typical of the kinds of
24   persons skilled in the art with a degree, so
25   I know what they know.

Barry Norman Feinberg, Ph.D., P.E.                    December 12, 2006

Page 247

1    toaster oven, for instance.

2         A.      Now, is this timer an integral

3    part of it or is this a separate unit?

4         Q.      Part of it.  Say it's part of it,

5    like your typical toaster oven and it goes

6    tick, tick and it clicks and it times.

7         A.      You have an old one.

8         Q.      How do you differentiate that from

9    a programmable circuit, a programmable control?

10        A.      Well, basically the programmable

11   circuit basically is a circuit that allows

12   the user to program, in this case, the time

13   and temperature.

14        Q.      So if you have an oven that you

15   can set the time on the clock --

16        A.      And the temperature, yes, you have

17   a programmable oven.

18        Q.      That's programmable?

19        A.      It is.  I set the temperature, and

20   I set the cook time, I can even set a delay

21   time if I wish.  I can even use it as a

22   slow cooker.

23        Q.      Without the delay time, is it

24   programmable?

25        A.      Yes.

# EXHIBIT B

Case 1:05-cv-11367-WGY    Document 78-4    Filed 12/22/2006    Page 2 of 7

Page 1
HOLMES GROUP v. WEST BEND, et. al.    LORENS HLAVA                    December 14, 2006

1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
2

3    THE HOLMES GROUP, INC.,          )
                                      )
4        Plaintiff/Counter-Defendant, )
                                      )
5    VS.                              )  Case No. 05-CV-11367-WGY
                                      )
6    WEST BEND HOUSEWARES, LLC and    )
     FOCUS PRODUCTS GROUP, LLC,       )
7                                     )
         Defendant/Counter-Plaintiffs.)
8

9        THE VIDEOTAPED DEPOSITION OF LORENS HLAVA,

10   taken on behalf of the Defendants, on the 14th day of

11   December, 2006, between 9:30 a.m. and 2:47 p.m., pursuant to

12   Oklahoma Code, at the Radisson Inn, 2201 N. 77th East

13   Avenue, Tulsa, Oklahoma, before Michele Vest, a Certified

14   Shorthand Reporter in and for the State of Oklahoma.

15

16                       APPEARANCES:

17

     For the Plaintiff:          MR. ALAN M. SACK
18                               Hoffmann & Baron, LLP
                                 6900 Jericho Turnpike
19                               Syosset, New York 11791-4407

20

21   For the Defendants:         MR. S. EDWARD SARSKAS
                                 Michael Best
22                               100 East Wisconsin Avenue
                                 Suite 3300
23                               Milwaukee, Wisconsin 53202-4108

24

25   Videographer:              MR. MARK VONLANKEN

```
 1                          INDEX

 2                                              PAGE NO.

 3   Direct Examination by Mr. Sarskas ----------------- 3

 4

 5                    * * * * *

 6   EXHIBITS MARKED:

 7   No. 1 --------------------------------------------- 78

 8   No. 2 --------------------------------------------- 79

 9   No. 3 ---------------------------------------------

10   No. 4 ---------------------------------------------133

11   No. 5 ---------------------------------------------135

12   PREVIOUSLY MARKED EXHIBITS THAT WERE REFERRED TO:

13   No. 5 --------------------------------------------- 89

14   No. 6 ---------------------------------------------106

15   No. 11 -------------------------------------------- 68

16   No. 17 -------------------------------------------- 76

17

18

19

20

21

22

23

24

25
```

```
 1            VIDEOGRAPHER:  We are now on the record.
 2      This is the deposition of the Holmes Group
 3      versus West Bend Housewares.  It is Thursday,
 4      December 14, 2006.  The time is approximately
 5      9:39.  You may swear in the witness.
 6                  LORENS HLAVA,
 7  after having been first duly sworn to tell the truth, the
 8  whole truth, and nothing but the truth, testified as
 9  follows:
10                  DIRECT EXAMINATION
11  BY MR. SARSKAS:
12      Q    Good morning, sir.  Could you please state
13  and spell your name for the record.
14      A    My name is Lorens spelled L-O-R-E-N-S,
15  Hlava spelled H-L-A-V-A.
16      Q    Do you understand why you're here this
17  morning, sir?
18      A    To give a deposition.
19      Q    Have you ever given a deposition before?
20      A    Yes.
21      Q    When did you last give a deposition?
22      A    Approximately 15 years ago.
23      Q    And what caused you to give that
24  deposition?  What kind of case was it?
25      A    It was a patent infringement lawsuit.
```

1    A    There was I think a five quart round unit,

2  and I think the model number on that was a 3355, but

3  that was the only other.

4    Q    And you looked at that one specifically

5  because marketing asked you to?

6    A    Right.

7    Q    And the reason they asked you to look at

8  that one specifically was because essentially they

9  wanted to take that and add programmability to it?

10    A    Right.

11    Q    Had you been aware of programmability as a

12  feature on other small appliances at the time you

13  started to work on this programmable slow cooker?

14    A    Not that I remember.

15    Q    And you didn't investigate or explore how

16  programmability might have been used on other small

17  appliances when you began your work on this project?

18    A    Again, I don't know that there were any

19  other programmable cooking units out there.

20    Q    And by programmable cooking units are you

21  referring to slow cookers specifically or are you

22  talking more broadly than that?

23    A    I think more broadly.

24    Q    So you're thinking of perhaps bread makers

25  or coffee makers or other small appliances?

1       MR. SACK:  Objection; the question

2   mischaracterizes the witness' testimony.

3       A    We did not look at any coffee makers,

4   bread makers that were programmable because those

5   products were totally unrelated from the slow

6   cookers or the heated cooking products per se, if

7   there were any out there at the time.

8       Q    When you say they're different, what do

9   you mean by that?

10      A    Well, a coffee maker or a bread maker

11  is -- in trying to take those units and compare them

12  to a slow cooker is like comparing apples and

13  oranges.

14      Q    Okay.

15      A    I mean, they're both fruit but that's

16  where the similarity ends.

17      Q    Why wouldn't you have compared them?  What

18  are the differences --

19      MR. SACK:  Objection; asked and answered.

20      A    Excuse me?

21      Q    (By Mr. Sarskas) What are the differences

22  that prevent you from being able to make a

23  comparison?

24      A    Again, because they were unrelated

25  products.  And when we do that we would look at

1  competitive products.

2    Q    I understand that you think that they're

3  unrelated products, but I'm wondering specifically

4  what differences between the products make the

5  comparison not very useful in your view?

6    A    Well, one aspect would be the heat

7  generated by those products.  Plus those products

8  are not made to operate for eight, ten, or twelve

9  hours continuously.

10    Q    Any other differences?

11    A    That's all that I can come up with at this

12  time.

13    Q    I'm putting in front of you a document

14  that identifies the Rival automatic rice cooker

15  steam model 2410.  Do you see that?

16    A    Yes.

17    Q    Are you familiar with that product?

18       MR. SACK:  Can I have a copy please?

19    A    Other than seeing it, that is the limit of

20  my familiarity with it.

21    Q    (By Mr. Sarskas) You didn't refer to it in

22  your course of designing the programmable slow

23  cooker?

24    A    No.

25    Q    On the second page under the heading

# EXHIBIT C

PATENT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Applicant(s) | : | DeCobert, et al. |
| Application No. | : | 11/091,047 |
| Filed | : | March 28, 2005 |
| Title | : | PROGRAMMABLE SLOW-COOKER APPLIANCE |
| TC/A.U. | : | 3742 |
| Examiner | : | Joseph Pelham |
| Conf. No. | : | 3586 |
| Docket No. | : | 717-675 CIP/CON |
| Dated | : | October 6, 2006 |

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

*I hereby certify this correspondence is being deposited with the United States Postal Service as first class mail, postpaid in an envelope, addressed to: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450*
*on* 10 – 6 – 2006
*Signed:* ~~Anthony C. Barrett~~

## DECLARATION UNDER 37 C.F.R §1.132 OF BART J. PLAUMANN

Sir:

I, Bart J. Plaumann, declare as follows:

1.    I am the Senior Vice President and General Manager Kitchen SBU of Jarden Consumer Solutions, the Owner of the above-identified patent application (hereinafter "Jarden").

2.    I have been in the position of Senior Vice President and General Manager for the last 4 years, and I have worked in the sales and marketing of slow-cookers since 2000.

3.    My position includes overseeing the sales and marketing of electric slow-cookers including programmable slow-cookers which are the subject of the above referenced patent application.

4.    Electric slow-cookers have been in the marketplace for at least 30 years. During this time the owner of the present application and it predecessors have been marketing slow-cookers under the trademarks Crock•Pot® and Rival®. In the past, as well as today, slow-cookers have been marketed with manual controls to set a cooking temperature such as low and high and off.

5.    Slow-cookers are viewed as generally imprecise cooking devices that did not need any form of exacting control. Since the amount of cooking time is relatively long and the food is cooked at a relatively low temperature, there was not seen a need for including a timer on a slow-cooker. If the cooking was started in the morning, the food would be cooked and ready to serve at dinner time. The Crock•Pot® brand has been, and continues to be, marketed under the slogan, "cooks all day while the cook's away."

6.    However, the inventors did recognize problems with the traditional prior art slow-cookers. Food if left too long in the slow-cooker could dry out or become overcooked. Also, users were showing a concern about leaving their slow-cookers on too long. The inventors recognized that there would be an advantage to having more control over the cooking process. Thus, there was a need in the marketplace for a programmable slow-cooker which more accurately controls a cooking time and temperature as well as provide a keep warm feature should the user not be available to attend to the appliance at the end of the set cooking time.

7.    In 2000, Jarden's predecessor, The Holmes Group LLC., introduced the first programmable slow-cooker into the marketplace. The programmable slow-cooker gave the user the ability to set a cooking time and temperature. At the end of the cooking time, the power to the heating element is automatically reduced to a warm setting such that the food would be kept

THG000008769

at a proper serving temperature and prevent spoilage if the slow-cooker were left unattended. Since its introduction, the programmable slow-cooker with auto keep warm feature has been a tremendous commercial sales success. Since 2000, sales of programmable slow-cookers have steadily increased. Today, programmable slow-cookers account for over 40% of our slow-cooker sales, which sales exceed one hundred million dollars ($100,000,000).

8.    Programmable slow-cookers are the same as traditional slow-cookers but for the programmable features which permit a user to set a cooking time and temperature and the temperature being automatically reduced at the end of the cook time to keep the food warm. The programmable slow-cooker is a premium product which costs more that the traditional slow-cooker. The success of the programmable slow-cooker in the marketplace is directly attributable the programmable features.

9.    Once the programmable slow-cooker established itself as a success in the market, many competitors have attempted to copy it. These competitors each market a programmable slow-cooker that permits a user to set a time and temperature and also includes an automatic warm feature after the expiration of the set timed cooking cycle. Jarden has contacted nine (9) different competitors that have started marketing programmable slow-cookers, and is currently engaged in lawsuits with two (2) of those companies based on patents related to the pending application. The two pending lawsuits are:

The *Holmes Group v. West Bend Housewares, LLC et al.* 05-cv-11367 pending in the District of Massachusetts; and

*The Holmes Group v. Euro-Pro Operating, LLC* 05-cv-10504, pending in the District of Massachusetts.

10.    Our competitors promote the automatic keep warm feature on their packaging, which demonstrates its significance in the market. Exhibits A and B. For example, Euro-Pro's product packaging prominently states, "Serve & Warm Automatically initiates the keep warm setting when cooking is complete..." Exhibit A. West Bend on its product packaging prominently states, "Electronic control automatically shifts to Keep Warm." Exhibit B.

11.    The significance of a slow cooker having the programmable features including the automatic keep warm mode has been recognized by the industry.  Eating Well magazine in its March 2006 issue praises the Rival® Smart-Pot programmable slow cooker by stating, "[b]ut perhaps our favorite feature is the automatic shift-to-warm setting, which allows your meal to cook for its predetermined time and then switch to a setting that keeps the food at a safe temperature until you're ready to eat."  Exhibit C.   The importance of Jarden's Smart-Pot's automatic shift to warm feature is also indicated on Eating Well's web site.  Exhibit D.  Jarden's programmable slow cooker and its automatic keep warm feature was also highlighted in a February 2006 issue of Woman's Day magazine.  Exhibit E.

12.    The significance of the automatic shift to a keep warm mode after a cooking time has ended has been further recognized by the media.  The Akron Beacon Journal states:

The improvements in the new generation of slow cookers are impressive: The most sophisticated programmable pots (about $70) can be set to cook in both hour and half-hour increments, plus they switch to a warm mode when the cooking time is up.

Exhibit F.

The Miami Herald wrote:

Several manufactures offer programmable slow cookers.  When cooking time is up, the pots automatically shift into 'warm' mode-- the perfect solution to an eight-hour recipe and a 10-hour workday.

Exhibit G.

The media has clearly recognized the importance and benefits of the programmable slow cooker that automatically shifts to a keep warm mode at the end of a cooking time.

I hereby declare that all statement made herein of my own knowledge are true and that all statements made on information and belief are believed to be true, that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment or both under Section 1001 of Title 18 of the United States Code, and that such willful statements may jeopardize the validity of the application or any patent issued thereon.

Respectfully submitted,

Dated: _10/6/06_

Bart J. Plaumann

Exhibit A



**EURO-PRO X**

Programmable Intelligent
# Gourmet Slow Cooker
## LARGE FAMILY SIZE • 6.5 QUART

**Slow Cooking is Easier than Ever!**
Simply set the time and
temperature and the slow cooker
will do the rest.



### Intelligent Controls
*Exclusive* electronic control
displays the current and set
temperature of the cooker.
No more guesswork.



### Programmable Setting
Program the desired cooking
hours and temperature for
precise cooking every time.



### Serve & Warm
Automatically initiates the
keep warm setting when
cooking is complete OR
choose the warm setting
when using the cooker as
a buffet server.

**BONUS**

**Stainless Steel
Slow Cooker**
Great for personal meals, hot fudge and more

AC2/03

4 Programmable settings • Wrap around even heat • Dishwasher safe removable stoneware

THG00008773



THG000008774



## Programmable Intelligent
# Gourmet Slow Cooker

### LARGE FAMILY SIZE • 6.5 QUART

## Slow Cooking is Easier than Ever!

**Simply set the time and temperature and the slow cooker will do the rest.**



### Intellligent Controls

*Exclusive* electronic control displays the current and set temperature of the cooker. No more guesswork.



### Programmable Setting

Program the desired cooking hours and temperature for precise cooking every time.



### Serve & Warm

Automatically initiates the keep warm setting when cooking is complete OR choose the warm setting when using the cooker as a buffet server.



**BONUS**

**Stainless Steel Slow Cooker**

Exhibit B



THG0000008775

THG00008776

Exhibit C

# 37 WINTER VEGGIE & FRUIT RECIPES—DELICIOUS & QU

Periodical circulates 14 days
Great Neck Library

# EATINGWELL

## THE MAGAZINE OF
## FOOD & HEALTH
### FEBRUARY/MARCH 2006

# 21 FAST
# & HEALTHY
# DINNERS

**art-
S art
ing**

F s to

F s to
id

# w & Easy:
## Pot Slow-Cooker Meals

# GO BANANAS!

S              6.95 CANADA



7470 56565 9

DISPLAY UNTIL MARCH 21, 2006

ETGN    0001
A/S 06    0001
P000123

K LIBRARY
BAYVIEW AVE
GREAT NECK NY 11023-1940

THG000008777



**Serves Two, page 18**
**To debeard a mussel (*above*):**
**Hold the mussel in one hand.**
**Firmly pull out the black fibrous**
**"beard" from the shell.**

**Take One... page 65**
**To skin a salmon fillet (*below*):**
**Place it on a clean cutting board,**
**skin-side down. Starting at the**
**tail end, slip the blade of a long**
**knife between the fish flesh and**
**the skin, holding the skin down**
**firmly with your other hand.**
**Gently push the blade along at a**
**30° angle, separating the fillet**
**from the skin without cutting**
**through either.**



**Healthy in a Hurry, page 14**
**To segment citrus (*below*): With**
**a sharp knife, remove the skin**
**and white pith from the fruit.**
**Working over a bowl, cut the**
**segments from their surrounding**
**membranes. Squeeze juice into**
**the bowl before discarding the**
**membranes.**



## TOOLS WE USE
## Programmable
## Slow Cooker

WHEN YOU SPEND every day cooking at work it's a relief to get home to a fully cooked, ready-to-serve meal once in a while. For many of us, the slow cooker has long been a secret weapon in the effort to have a relaxing evening. And while most slow cookers have basically the same cooking mechanism—a ceramic liner that sits in a heating unit—we discovered during testing ("*Slow & Easy*," *page 58*) that certain optional bells and whistles really are worth the extra money.

A perfectly adequate five- or six-quart slow cooker, which is big enough to cook



meals for a family of four with leftovers, can be purchased for as little as $30. The primary drawback with the basic cooker is that you need to manually time your cooking and then be there to turn it off. We found that the programmable six-quart Smart-Pot Slow Cooker from Crock Pot (*above*, $70) offers several features that justify the extra cost. A digital touchpad allows the user to control the heat settings and time the cooking in increments of 30 minutes up to 20 hours (it's not unheard of, for instance, for a brisket to cook for more than 12 hours). But perhaps our favorite feature is the automatic shift-to-warm setting, which allows your meal to cook for its predetermined time and then switch to a setting that keeps the food at a safe temperature until you're ready to eat. Put out the plates, pour a glass of wine and you're ready for dinner. Now if they only had one that cleaned itself...        —*J.R.*

## TIPS, NOTES & SOURCES

### KITCHEN TIPS & NOTES

**Page 10: SHAO HSING (OR SHAOXING):** A seasoned rice wine available in most Asian specialty markets and some larger supermarkets' Asian sections.

**Page 14:** Often a blend of cinnamon, cloves, fennel seed, star anise and Szechuan peppercorns, **FIVE-SPICE POWDER** was originally considered a cure-all miracle blend encompassing the five elements (sour, bitter, sweet, pungent, salty). Look for it in the supermarket spice section.

**Page 42: HARISSA:** A Tunisian chile paste. Harissa in a tube will be much hotter than that in a jar. You can substitute Chinese or Thai chili-garlic sauce for it.

**Page 52: CHIPOTLE PEPPERS:** Dried, smoked jalapeño peppers often used to add heat and a smoky flavor to foods. Ground chipotle can be found in the specialty-spice section of most supermarkets.

*continued on page 78*

NGWELL.™ The Magazine of Food & Health (ISSN: 1046-1639) is published bimonthly in Jan., Mar., May, July, Sep. and Nov by Eating Well, Inc., Ferry Road, Charlotte, VT 05445. (802) 425-5700. January 2006 printed by Quad/Graphics, Saratoga Springs, NY. Periodicals postage paid at otte, VT, and at additional entry offices. Subscription rates: U.S. $24.95 for 1 year, $34.95 for 2 years. Canada $29.95 for 1 year, $44.95 for 2 years ble in U.S. funds). Outside U.S. and Canada, $34.95 for 1 year, $54.95 for 2 years (payable in U.S. funds).
*TMASTER:* Send address changes to EatingWell, P.O. Box 1923, Marion, OH 43305-8023 Return undeliverable Canadian addresses to: IMEX, Box 4332, Station Rd., Toronto, ON M5W 3J4. EatingWell is a registered trademark of Eating Well, Inc. Copyright © 2006 by Eating Well, Inc. production without written permission of Eating Well, Inc.             **PRINTED IN THE USA**

THG000008778

Exhibit D



**THE EATINGWELL SERVES TWO COOKBOOK**
150 HEALTHY IN A HURRY SUPPERS... FOR TWO
Easy Planning – Smart Shopping – Step-By-Step Cooking For Two
PREVIEW OUR NEW COOKBOOK

SUBSCRIBE   SHOP   MY EATING WELL   CUSTOMER SERVICE

# EATINGWELL™
WHERE GOOD TASTE MEETS GOOD HEALTH

**SEARCH**  advanced recipe search

[_____]  GO ➤

⦿ RECIPES   ○ WEBSITE

📶 RSS CONTENT FEEDS:  Recipes & Menus

| RECIPES | HEALTH & DIET | NEWS & VIEWS | COMMUNITY | PROFESSIONALS | ABOUT US |

home » eat & drink » what's hot » programmable slow cookers

## EAT & DRINK · · · · · · · · · · · · · · · · · · · · ·

## Programmable Slow Cookers

ADD TO MY EATING WELL   EMAIL TO FRIEND   PRINT THIS ARTICLE

**Our Test Kitchen loves the innovations of the new generation of slow cookers**

Slow Cookers are not new, to be sure, but some of today's models boast features that makes them even more convenient for busy cooks than ever.

**Our pick:** A programmable 6 quart Smart-Pot Slow Cooker from Crock Pot ($70).

Advertisement
Ads by Google                                    Advertise on this site

**10 Diet Rules That Work**
Lose 9 Lbs Every 11 Days with these 10 Easy
Rules of Dieting & Fat Loss
FatLoss4Idiots.com

**Recipe**
Get free recipes, plan meals, print coupons & more
at Albertsons online
www.Albertsons.com

- **Kitchen Tips & Techniques**
- **Fresh & In Season**
- **Ingredients**
- **Drink**
- **What's Hot**

**RECEIVE OUR FREE NEWSLETTERS**

☑ EatingWell This Week
☑ EatingWell Diet
☑ EatingWell for Health

[enter email_____]
                    SUBMIT ➤

**ALSO OF INTEREST**

**EATINGWELL MARKET**
Products for Healthy Living
WIN MONTHLY GIVEAWAY!

Several bells and whistles make this one a winner: a digital touchpad that allows the user a to control the heat settings and time cooking in increments of 30 minutes up to 20 hours, and the automatic shift to warm setting which allows your meal to cook for its pre-determined time and then switch to a temperature that will keep the food at a safe temperature until you're ready to eat.

Check out **Irish Lamb Stew** for a delicious way to put your slow cooker to good use.

**« Back**

THG000008779

**Sugar Solution Online** - Lose Weight with the Sugar Solution
Online program. Free Diet Profile! www.SugarSolutionOnline.com

Ads by Google                                              Advertise on this site

© 2006 Eating Well, Inc   |   Privacy Policy

Home | Recipes | Health & Diet | Eat & Drink | News & Views | Community | Professionals | About Us | Customer Service

EatingWell, 823A Ferry Rd. PO Box 1010, Charlotte, VT 05445, USA    www.eatingwell.com    Tel. (802) 425-5700

website by propeller

THG000008780

Exhibit E



WOMAN'S DAY

FEBRUARY 01, 2006

DET OZ

How to Save Your Life

# Woman's Day

FREE
Chicken
Recipe
Cards

## Slow-Cooker Suppers

## Walk Off Your Belly

Find
Happiness
In the Little
Things
PAGE 116

## 40 Chores
In 5 Minutes or Less

## 33 Big Ideas
For Small Spaces

## Diseases Doctors Miss

## 18 Clever Ways
To Reuse
Almost Anything

#BXBDLLQ ****** 5-DIGIT 11753

JERICHO PUBLIC LIBRARY
Respect The Rights of Others
- PHOTOCOPY -
Please Do Not Damage
This Periodical

womansday.com
100s of Recipes

FEBRUARY 1, 2006 U.S. $2.49 CANADA $3.49

THG000008781

## moroccan lamb stew

**Serves 6  Active: 15 min/Total: 7 to 9 hr on low**

- 3 cups chopped onions
- 2¼-lb lamb shoulder, cut in 1½-in. chunks
- 2 sweet potatoes, peeled and cut in 1½-in. chunks
- 2 cinnamon sticks (each about 3 in. long)
- 1 cup each dried apricots and pitted prunes
- 1 Tbsp each minced garlic and fresh ginger
- ½ tsp salt
- ¼ tsp ground red pepper (cayenne)
- 1 can (14 oz) chicken broth
- 1 box (10 oz) couscous
- ⅓ cup slivered almonds, toasted

**1.** Layer onions, lamb, sweet potatoes, cinnamon sticks, apricots and prunes in a 4½-qt or larger slow-cooker. Top with garlic, ginger, salt and pepper; add broth.
**2.** Cover and cook on *low* 7 to 9 hours until lamb and potatoes are tender.
**3.** Remove solids with a slotted spoon to a serving bowl. Pour liquid into a bowl, skim off fat and add juices to stew.
**4.** Prepare couscous as package directs. Serve with the stew, and sprinkle stew with the almonds.

Per serving: 742 cal, 46 g pro, 104 g car, 10 g fiber, 16 g fat (5 g sat fat), 112 mg chol, 471 mg sod



MOROCCAN LAMB STEW

## the envelope, please

We tested six new 6-qt slow-cookers with our Chunky Beef Chili (see recipe at right). Set on low, some cooked much faster than others, more on a low boil than the preferred simmer. For slow, even cooking and ease of operation, our top three picks are:



**Westbend Crockery Cooker** ● Easy-to-use manual controls. $44.49

**Rival Crock-Pot Versaware** ● The stoneware crock can be used on the stovetop and in conventional and microwave ovens. $59.99

**Rival Crock-Pot Smart-Pot** ● Digitally programmable, it switches to warm setting after cooking, so your dinner is OK even if you're late. $69.99

## chunky beef chili

**Serves 8  Active: 10 min/Total: 7 to 9 hr on low**

- 2 lb lean beef chuck, cut for stew
- 1 can (28 oz) chunky-style tomatoes in purée, undrained
- 1½ cups chopped onions
- 12 oz beer or 1½ cups water
- 1 can (4.5 oz) chopped green chiles
- ¼ cup tomato paste
- 3 Tbsp chili powder
- 1½ Tbsp minced garlic
- 2 tsp ground cumin
- 1½ tsp salt
- ¼ tsp ground cinnamon
- ¼ cup smooth peanut butter
- 3 cans (15 to 16 oz each) Roman or pinto beans, rinsed
- ⅓ cup chopped cilantro
- Serve with: sour cream, chopped red onion, shredded Cheddar cheese

**1.** Mix all ingredients except peanut butter, beans and cilantro in a 4-qt or larger slow-cooker.
**2.** Cover and cook on *low* 7 to 9 hours until beef is tender. Stir in peanut butter until blended, then stir in beans.
**3.** Cover and cook 5 minutes, or until beans are hot. Stir in cilantro.

Per serving: 377 cal, 32 g pro, 32 g car, 8 g fiber, 14 g fat (4 g sat fat), 74 mg chol, 1,145 mg sod

*Please turn to page 92*

THG000008

Ham Ling

Exhibit F

13 of 1000 DOCUMENTS

Akron Beacon Journal (Ohio)

**February 8,** 2006 Wednesday

# Slow cooker to the rescue;
# Black beans, kielbasa combine for dish that's hearty and easy to make

**BYLINE:** Beverly Mills and Alicia Ross, United Feature Syndicate

**SECTION:** E; Pg. 3

**LENGTH:** 718 words

If you don't like your **slow cooker,** there's a good chance it's the same one Aunt Mildred gave you as a wedding gift way back when. **Slow cookers** have come a long way in the past couple of years, and we highly recommend you give them another chance.

The improvements in the new generation of **slow cookers** are impressive:

The most sophisticated **programmable** pots (about $70) can be set to cook in both hour and half-hour increments, plus they switch to a warm mode when the cooking time is up. Some pots even contain a recipe database.

Other, less expensive models (about $40 to $50) can be programmed to cook for four, six, eight or 10 hours before automatically switching to the warming mode.

Most of today's **cooker** inserts are an oval shape, allowing more surface space for even cooking.

**Slow cooker** stoneware inserts are larger than they used to be -- most crocks have a capacity of 6 quarts. This extra space makes the **cooker** more versatile, cooking enough to feed a family of six and allowing you to cook a 5-pound roast or brisket.

Almost all of the new pots contain a removable stoneware insert that's dishwasher-safe.

Reynolds now makes a **slow cooker** liner bag (similar to a turkey baking bag) for even faster cleanup. Just serve the food, lift out the bag and throw it away. Talk about fast! A box of four liners retails for $2.49.

Some pots (about $50 to $60) have inserts that can stand extreme temperatures so you can brown meat right in the crock on your stovetop or even put the insert into a conventional oven.

We'll revisit **slow cookers** next week to talk about how they can transform a busy family's dinner dilemma. In the meantime, we especially recommend recipes like today's Slow-Cooked Black Beans and Kielbasa that require very little preparation -- just put in the food, go away, and come home hours later to a house that smells like you've hired a professional chef.

SLOW-COOKED BLACK

BEANS AND KIELBASA

2 cans (15 oz. each) black beans

1 can (14 ½ oz.) stewed tomatoes

1 cup frozen yellow corn kernels

THG000008783

2 tsp. bottled minced garlic

1   tsp. chili powder

½  tsp. ground cumin

1 lb. reduced-fat turkey kielbasa sausage

Cooked rice, for serving, optional

Shredded Cheddar cheese, or other Mexican-blend cheese, optional garnish

Rinse and drain one can of the black beans, and pour the beans into the **slow cooker.** Add the second can of black beans with their juices to the **cooker.** Add the tomatoes with their juices and the frozen corn.

Sprinkle the garlic, chili powder and cumin over the mixture and stir gently, so as not to break up the beans.

Cut the sausage link into 6 pieces, and prick each piece with a fork. Place the sausage pieces over the bean mixture, but do not stir. Place the lid on the **slow cooker,** turn the **cooker** to low and cook for at least 6 hours or up to 10 hours. (The bean-sausage mixture also can be cooked on high for 3 hours or up to 4 hours.)

Before serving, if rice is desired, cook it according to the package directions. To serve, ladle the bean mixture over a bed of rice (if desired) or ladle the beans into soup bowls (if not using rice). Top each serving with a piece of sausage. Sprinkle shredded cheese over each serving to taste, if desired. Serve at once. (Leftovers will keep in an airtight container in the refrigerator for up to three days.)

Serves 6.

**Alternative stovetop directions:**Follow the directions above, but instead of adding the ingredients to a **slow cooker,** place them over medium heat in an extra-deep, 12-inch nonstick skillet that has a lid. Bring the mixture to a **slow** boil, reduce the heat to low, then cover the skillet. Simmer, stirring gently from time to time, until the sausage has heated through and the flavors develop, about 45 minutes. Remove the skillet from the heat and serve as directed above.

Each serving has about 296 calories (33 percent from fat), 12 grams fat (4 grams saturated), 47 milligrams cholesterol, 21 grams protein, 33 grams carbohydrates, 10 grams dietary fiber and 1,252 milligrams sodium.

Send desperate tales of woe or everyday success stories and your favorite quick recipes to:

**Desperation Dinners**

c/o United Media

200 Madison Ave.

New York, NY 10016

Or e-mail bev-alicia@desperationdinners.com.

Beverly Mills is a former food editor for the Miami Herald. Alicia Ross is a former food columnist for the Raleigh News and Observer.

**LOAD-DATE:** February 9, 2006

**LANGUAGE:** ENGLISH

**PUBLICATION-TYPE:** Newspaper

Copyright 2006 Akron Beacon Journal

THG000008784

Exhibit G

1 of 1000 DOCUMENTS

The Miami Herald

**February** 23, 2006 Thursday

# Slow cookers can help hurry up dinner

**BYLINE:** GAIL BORELLI, Knight Ridder News Service

**SECTION:** E; Pg. 19

**LENGTH:** 664 words

If your **slow cooker** has been gathering dust in a dark cupboard, it's time to drag it out and get reacquainted. In 2006, **slow** cooking is hip and happening. Need proof? Turn on the television, where celebrity chefs such as Emeril Lagasse and Alton Brown share **slow-cooker** recipes. Stroll through the supermarket, where you'll find new products made specifically for **slow cookers.** Visit the bookstore, where the new releases include a slew of **slow-cooker** titles. And check out the newest generation of **slow cookers,** which have been updated to maximize their convenience and good looks.

"The appeal to **slow cookers** is the same as it's always been: Set it and forget it," says Victoria Matranga, design programs coordinator for the International Housewares Association in Rosemont, Ill. But the hands-off cooking style has gained even more fans as family time becomes ever more fractured.

When Rival introduced the electric Crock-Pot in 1971, it turned the appliance into a kitchen staple by marketing it as a helpmate for the new legions of working women. The Crock-Pot allowed busy families to come home to the enticing aroma of a simmering meal made from fresh ingredients.

For years **slow cookers** were the steady Eddie of kitchen appliances. In the 70s, although nearly 80 percent of households had **slow cookers** and they were the No. 2 item on bridal registries, interest in them kind of died, says Julie Kay, who writes a weekly column on **slow** cooking for The Advocate newspaper in Baton Rouge, La.

**Slow cookers** were perceived as perfect for making pot roast, stew and chili but not much else. As the appliance spotlight turned to more glamorous food processors, stand mixers and espresso machines, many fuddy-duddy harvest-gold **slow cookers** were shoved into cabinets and forgotten.

But times have changed. At Rival, sales of **slow cookers** have jumped about 20 percent the last four years, says Diane Coffey, a communications coordinator at the Holmes Group, which owns Rival. The resurgence, she says, is all about comfort food and getting dinner on the table.

In addition, the explosion of cooking and decorating shows on television has given a new cachet to homemaking skills, Matranga says. Instead of being just another chore to check off the list, cooking now is perceived as hip and entertaining.

Part of the fun is experimenting with ingredients and recipes. In the beginning, **slow cooker** recipes were seasoned mostly with onion soup mix and condensed soups, Wyss says. But today's cooks are experimenting with a world of bolder flavors.

Most ethnic cuisines include **slow**-simmered soups and stews, such as Moroccan tagine, that are easily adapted to electric **slow cookers.** And recipes abound in books and on the Web for nontraditional **slow-cooker** fare such as chutneys, cakes, risottos, roasted vegetables, oatmeal and cereal snack mixes.

Manufacturers of **slow cookers** have responded to renewed consumer interest with smart new features. The Versaware Crock-Pot from Rival, for example, is made from patented stoneware that endures temperature extremes. Cooks can use the stoneware to brown meat on the stove, store leftovers in the freezer and then reheat them in the microwave -- true one-pot cooking. Versaware and most other stoneware inserts also are dishwasher-safe.

THG000008785

Several manufacturers offer **programmable slow cookers.** When cooking time is up, the pots automatically shift into "warm" mode -- the perfect solution to an eight-hour recipe and a 10-hour workday. "Auto-shift" pots cook at high for the first hour to lift the food's temperature out of the danger zone, then automatically shift to the low setting.

Slow cooking also has gotten a boost from new supermarket products aimed at streamlining prep time and cleanup. Slow Cooker Helper from Betty Crocker and frozen Crock-Pot Classics from Banquet eliminate the need to peel and chop vegetables. Several companies make spice blends specifically for **slow cookers,** while Reynolds sells liners that keep crocks mess-free.

**LOAD-DATE:** February 23, 2006

**LANGUAGE:** ENGLISH

**PUBLICATION-TYPE:** Newspaper

Copyright 2006 The Miami Herald
All Rights Reserved

# EXHIBIT D

00001

1

2

3      IN THE UNITED STATES DISTRICT COURT
       FOR THE DISTRICT OF MASSACHUSETTS

4
               C.V. No: 05-CV-11367WGY
5

6

7
        * * * * * * * * * * *
8                           *
    THE HOLMES GROUP,           *
9           Plaintiff,          *
                                *
10   vs.                        *
                                *
11    WEST BEND HOUSEWARES and FOCUS   *
    PRODUCTS GROUP, LLC.         *
12          Defendants.     *
                                *
13    * * * * * * * * * * * *

14        30(b)6 DEPOSITION OF THE HOLMES GROUP,

15   a witness called on behalf of the

16   Defendants, pursuant to the Massachusetts

17   Rules of Civil Procedure, before Janet

18   Chase, a Certified Shorthand Reporter and

19   Notary Public in and for the Commonwealth of

20   Massachusetts, at the Radisson Hotel, 11

21   Beaver Street, Milford, Massachusetts, on

22   Thursday, November 16, 2006, commencing at

23   9:05 a.m.

24

**30(b)6**                                    **Page 1**

00002

1

2    APPEARANCES:

3

4    HOFFMAN & BARRON, LLP

5        (By Alan M. Sack, Esq.)

6        6900 Jericho Turnpike

7        Syosset, NY 11791-4407

8        For the Plaintiff

9

10

11        MICHAEL BEST & FRIEDRICH, LLP

12        (By Michael E. Husmann, Esq.)

13        100 East Wisconsin Avenue, Suite 3300

14        Milwaukee, WI 53202-4108

15        For the Defendants

16

17

18        MICHAEL BEST & FRIEDRICH, LLP

19        (By S. Edward Sarskas, Esq.)

20        100 East Wisconsin Avenue, Suite 3300

21        Milwaukee, WI 53202-4108

22        For the Defendants

23

24

**30(b)6**                                        **Page 2**

00003

```
 1          I N D E X

 2

 3     DESCRIPTION                    PAGE

 4

 5

 6

 7     Examination of Mr. Plaumann

 8

 9         By Mr. Husmann          6

10         By Mr. Sarskas         71

11

12

13     Examination of Charles Thrasher, Jr.

14

15

16         By Mr. Husmann       145, 208

17         By Mr. Sack           206

18

19

20

21

22

23

24
```

**30(b)6**                                      **Page 3**

00004

1          E X H I B I T S

2
         No.   Description
3
         2     Defendants' Amended First Rule
4              30(b)6 Deposition Notice

5        5     Document Bate Stamped MKM001
               through MKM0017
6
         7     Crock Pot Owner's Guide
7
         10    Document Bate Stamped
8              THG000008688 through THG000008669

9        10A   Crock Pot Information Sheet

10       11    Document Bate Stamped
               THG000001682 through THG000001684
11
         12    Document Bate Stamped THG000008692
12
         14    Holmes Group Price List of Products
13
         15    Document Bate Stamped THG000008244
14
         16    Document Bate Stamped THG000008677
15             through THG000008680

16       17B   Document Bate Stamped THG000007905

17       19    Declaration Under 37 C.F.R. 1.132
               of Bart J. Plaumann
18
         20    Document Bate Stamped THG000004405
19             through THG000004406

20       21    Document Bate Stamped THG000008788
               through 87890
21
         22    Document Bate Stamped THG000008692
22
23       23    Document Bate Stamped THG000008382
               through THG000008388
24
         24    Rival Crock Pot

**30(b)6**                                          **Page 4**

00005

```
 1              P R O C E E D I N G S

 2              THE VIDEOGRAPHER:  This is the

 3    video operator speaking, Bill Slater of

 4    Esquire Deposition Services.  Today's date

 5    is November 16, 2006.  The time is 9:05

 6    a.m.

 7              We're here at the Radisson Hotel

 8    located at 11 Beaver Street, Milford,

 9    Massachusetts to take the videotaped

10    deposition of Bart Plaumann in the matter of

11    the Holmes Group, Incorporated, versus West

12    Bend Housewares, et al, in the United States

13    District Court for the District of

14    Massachusetts, civil action No.

15    05-CV-11367WGY.

16              Will counsel please voice identify

17    yourselves and say who you represent.

18              MR. SACK:  Alan Sack.  I represent

19    the plaintiffs, the Holmes Group.

20              MR. HUSMANN:  Mike Husmann and Ed

21    Sarskas for the Defendants.

22              THE VIDEOGRAPHER:  Will the court

23    reporter please swear in the witness.

24              BART JONATHAN PLAUMANN, a witness
```

**30(b)6**                                    **Page 5**

00023

1    that was closed down and everything was set

2    up here in Milford, there were a lot of

3    files that were either deposed of or, you

4    know, not transferred.  So I can't tell you

5    any -- if we have anything on this.

6 Q.  Okay.

7 A.  But anything we looked for, you would have

8    had.

9 Q.  Okay.  And you did look through the

10     archives, I believe you said?

11 A.  Uh-huh, yes.

12 Q.  Okay.

13           (Discussion off the record)

14 Q.  Does Holmes contend that there are any

15     secondary considerations of non-obviousness

16     supporting the validity of the patents in

17     suit in this case?

18           MR. SACK:  Objection.  The question

19     calls for a legal conclusion.  The witness

20     is a layperson.

21           MR. HUSMANN:  We asked for that

22     topic area, and you --

23           MR. SACK:  I understand.

24           MR. HUSMANN:  -- responded to --

**30(b)6**                                    **Page 23**

00024

1    that he would testify to that.

2            MR. SACK:  I think he could.  I

3    think you need to ask him the question in

4    lay terms as opposed to giving him the legal

5    test.  I don't know if he --

6  Q.  Well, do you know what secondary

7    considerations of non-obviousness are?

8  A.  I think Alan makes a good point.  So if you

9    would explain how you mean.

10  Q.  All right.  Let's -- if you would look at

11    Exhibit 2.  I believe that Holmes's response

12    to our 30(b)6 designation.

13  A.  Okay.

14  Q.  And if you would turn to topic 25, please.

15  A.  Okay.

16  Q.  What did you do in order to prepare yourself

17    to testify as to topic 25 in this 30(b)6

18    deposition?

19  A.  I'm going to read this.  Okay.  Can you

20    repeat your question?

21  Q.  What did you do in order to prepare yourself

22    to testify as to topic 25?

23  A.  I looked at the patents.  But in general

24    it's just from my knowledge of the business.

**30(b)6**                                            **Page 24**

00025

 1  Q.  Okay.  And did you come to any conclusion

 2      whether or not Holmes had any secondary

 3      consideration of the non-obviousness?

 4          MR. SACK:  The objection is on the

 5      record.  You can answer the question to the

 6      extent you understand it.

 7  A.  Yeah, and I'm -- I don't quite understand

 8      what the secondary consideration aspect

 9      means.  Now, I've had a conversation before

10      on this subject, but I'm not -- I don't

11      quite understand what that means.

12  Q.  So sitting here today, you cannot tell me

13      whether or not Holmes has any contentions

14      that there are or are not any secondary

15      considerations of non-obviousness; is that

16      correct?

17  A.  Well, the way I understand non-obviousness

18      -- and I'm not sure if that's what the

19      secondary consideration part of it means --

20      is that the patent that we have today on the

21      product that was developed, nothing like

22      that existed before.  And so it was -- you

23      know, it was novel, it was new.  It was

24      non-obvious in that those didn't exist in

**30(b)6**                                    **Page 25**

00026

1     slow cooking.  So I'm not sure if that

2     answers the question, but --

3  Q. All right.  And you say the product we

4     developed, are you talking about the product

5     that's the 3850?

6  A. Correct.  And that base.  That was the first

7     product.  Then we did the 3860, and we --

8     several other skus

9  Q. Okay.  What's the difference between the 50

10     and the 60?

11  A. The 50 was a five quart and the 60 was a six

12     quart.

13  Q. Okay.  If it's a -- do you talk about 3800

14     series of products or something like that?

15  A. Not really.

16  Q. Okay.

17  A. We will usually identify it specifically --

18  Q. To the product?

19  A. -- to the skus.

20  Q. I talked over you.  I'm sorry.

21  A. It's okay.

22  Q. What's your understanding of what was new

23     and novel about the 3850?

24  A. That there were no programmable slow cookers

00027

1    before on the market, and so it was unique.

2  Q.  What do you mean by programmable?

3  A.  Previous to the introduction of the 3850 and

4      the 3860 all slow cookers had -- had to be

5      manually adjusted to set them on high or low

6      or a keep warm setting, and the programmable

7      unit automatically shifted after a certain

8      period of time to the keep warm setting.

9  Q.  The 3850 you have to put it on high, don't

10     you?

11 A.  You put it high or low.

12 Q.  Right.

13 A.  And after a period of time it automatically

14     shifts to the keep warm setting.

15 Q.  If a cooker does not have an automatic keep

16     warm function, would you consider it to be a

17     programmable cooker?

18 A.  If it does not have it?

19 Q.  Yes.

20 A.  No.

21 Q.  And you believe that the 3850 was the first

22     cooker with an automatic warm feature; is

23     that correct?

24 A.  I believe it was the first slow cooker --

**30(b)6**                                    **Page 27**

00028

1 Q. Okay.

2 A. -- that had that feature that would

3    automatically shift without having to

4    manually do anything.

5 Q. And what research did you do to come to that

6    conclusion?

7        MR. SACK:  Objection, lack of

8    foundation.

9        MR. HUSMANN:  I'm trying to get the

10   foundation for his testimony.  I don't

11   understand your objection.

12       MR. SACK:  Well, your question

13   assumes research.

14       MR. HUSMANN:  Well, if he didn't do

15   any research to do it, that's fine.  Then

16   that's the question.

17 A. I joined the company after they had already

18   decided to introduce this product.

19 Q. Okay.

20 A. So I don't know how much was done, you know,

21   in terms of researching.

22 Q. Okay.

23 A. And those people are no longer with the

24   company.  But I know from being in the

**30(b)6**                                    **Page 28**

00029

1    company for six years there was nothing else

2    on the market previous to our introduction

3    of it.

4  Q.  So the basis for your opinion, as I

5    understand it then, would be your knowledge

6    of what was in the market during the period

7    of time after you joined the Holmes Group?

8  A.  Correct, from the point I joined forward.

9  Q.  Okay.

10        THE WITNESS:  Alan, can you get me

11      some more water, please.

12        MR. SACK:  Sure.

13  Q.  Other than the feature of automatic -- the

14      automatic warm function, did you consider --

15        (Discussion off the record)

16  Q.  Other than the automatic warm feature, would

17      you consider the 3850 to have any other

18      novel features?

19  A.  Well, at the time it was introduced, it was

20      the only unit that had the electronic

21      displays in slow cookers.  Previous to that

22      all the units had knobs, and there would be

23      words that would be on the wrapper that said

24      off, high, low, keep warm.  And this one had

**30(b)6**                                    **Page 29**

00030
1     -- it was electronic.  You know, as you

2     pushed the buttons, it would go from high to

3     low, which was different.

4  Q.  It would light up LEDs --

5  A.  Correct.

6  Q.  -- as you went from high to low, correct?

7  A.  That's correct.

8  Q.  And by it, I mean the 3850.

9  A.  That is correct.

10 Q.  And are you saying you didn't think any

11    other slow cookers prior to the 3850 used

12    LEDs to identify the temperature settings?

13 A.  I don't know if -- I'd never seen before

14    then LEDs's being used.  But what I mean by

15    being different is there was this electronic

16    aspect to it where you pushed these buttons

17    and it changed versus a knob.

18 Q.  The difference was pushing the knob as

19    opposed to turning the switch, is that what

20    you're saying?

21 A.  No, the difference was it's electronic, so

22    it was a touch pad.  And as you would touch

23    it, it would move from -- from high to low

24    to off to keep warm.  And before you would

**30(b)6**                                    **Page 30**

00031

1    have a knob.  So it's -- it was a different

2     way to accomplish that function.

3  Q.  What do you mean by a touch pad?

4  A.  You're familiar with the unit, the 3850?

5  Q.  Yes.

6  A.  There's a -- on the housing you've got a

7     touch pad to the control panel.  And you can

8     press the touch pad, and it will light up

9     for high or for low and for the amount of

10    hours that you would to run it.

11  Q.  Would you look at Exhibit 7, I believe.

12  A.  I'm there.  What do you want me to look at?

13  Q.  Do you know what that manual is for?  Is

14     that for a 3850?

15  A.  It would be for that, and it would be for it

16     appears any of the other programmables we

17     had at the time.

18  Q.  Okay.  On page 4 of that manual does that

19     show the touch pad you're talking about?

20  A.  Yes.  This control panel --

21  Q.  Okay.

22  A.  -- when you press it, you know, it moves the

23     hours and the high and the low.

24  Q.  When you push cook, an LED lights up under

00032

1    the circle that says four, correct?

2  A.  Correct.

3  Q.  And you push it again, and it goes to six?

4  A.  Correct.

5  Q.  Okay.  And what was different about that

6    than the prior -- than what was previously

7    known in your opinion?

8  A.  Previously there was no -- you couldn't set

9    hours at all, so that was new.  But also it

10    was a knob on all of our other units.  So

11    you would turn it to high or low.

12  Q.  Okay.  And you didn't think any other slow

13    cookers were out where you could push a

14    button and you would go from high to low --

15  A.  There aren't any --

16  Q.  -- as opposed to turning a switch?

17  A.  Excuse me.  See I did it that time.

18  Q.  Okay.

19  A.  There aren't any that I'm aware of.

20  Q.  Okay.

21  A.  Or there weren't any that I'm aware of.

22  Q.  Okay.  Any other -- are you aware of any

23    other features that you have not discussed

24    regarding the 3850 that you believe were

00033

1    novel?

2  A.  Well, I'm aware that we also have a patent

3    regarding the heat dissipation.

4  Q.  And --

5  A.  The chimney effect patent.

6  Q.  Are those the patents that are in suit here?

7  A.  I'm not certain if that's part of this suit.

8    I don't think it is.  I think -- I think

9    it's just the one regarding the keep warm

10    setting and the automatic shifting.

11  Q.  Okay.  So you think that the use of a

12    chimney effect for cooling in a slow cooker

13    that the 3850 was the first product to do

14    so?

15  A.  I believe so, because it's linked to having

16    a PCP board.  You know, having an electronic

17    assembly to it.

18  Q.  What do you mean by a PCB board?

19  A.  The computer board that's inside the unit.

20  Q.  And that creates heat?

21  Q.  Okay.

22  A.  And our engineers came up with the design

23    that allows it to -- with the venting to

24    dissipate the heat.

**30(b)6**                                          **Page 33**

00034

1  Q.  And you believe that was novel with the 3850

2     as far as you know?

3  A.  As far as I know, yes.

4  Q.  Mr. Plaumann, I want show you an exhibit we

5     marked as Exhibit 19 and ask if you could

6     identify that, please.

7  A.  It's a declaration of myself.

8  Q.  Okay.  Your signature appears on the last

9     page of that document, correct?

10 A.  That's correct.

11 Q.  Okay.  If you would turn to paragraph 5 of

12    that document.  I'm referring to the second

13    sentence.  It says, Since amount of cooking

14    time is relatively long, and the food is

15    cooked at a relatively low temperature,

16    there was not seen a need for including a

17    timer on a slow cooker.  Do you see that?

18 A.  Yes, I do.

19 Q.  What was the basis for that statement?

20 A.  That the units are at a low temperature.

21    Slow cookers also are different than other

22    cook devices in that they run at a slow

23    temperature for a long period of time, sort

24    of the name slow cooking.  And, because of

**30(b)6**                                   **Page 34**

00035

1    that, there's not a specific -- if you cook

2    for six hours versus seven hours, it's not

3    necessarily as critical to the product as it

4    is in skillet.

5        For example, if you cook 30 minutes

6    versus an hour, you know, you'd burn up your

7    food.  So that's what that means.

8  Q.  Okay.  But you say that -- as I understand

9    this, you're saying that no one recognized a

10    need for including a timer, correct?

11  A.  That's correct, that it wasn't a necessity.

12  Q.  Okay.  And what research did you do in order

13    to determine that no one else recognized

14    this need?

15  A.  I can't say that no one else recognized the

16    need.  You know, competitors, etc.  But when

17    we did some consumer research that said it

18    wasn't as important as some other things.

19  Q.  What research are you talking about?

20  A.  Consumer research.  The company went out,

21    and -- they did this a little before I

22    joined the company, so I can't tell you the

23    company they hired.

24  Q.  Okay.

00036

  1  A.  But we hired a research firm that went out

  2      and qualified consumers and had focus groups

  3      and asked a -- you know, variety of

  4      questions and things that came out of that

  5      are the ones that said what we thought would

  6      be the most important things if we were

  7      going to make changes to slow cooking.

  8  Q.  And how do you know about this research if

  9      you weren't there?

10  A.  They videotaped it.  And I saw some of it

11      shortly after I joined the company.

12  Q.  Have you referred to it recently in

13      preparation for this declaration at all?

14  A.  No, only from my knowledge of it.

15  Q.  Okay.  Did you look to see whether or not

16      any documents regarding that research are

17      still at Holmes?

18  A.  Yes.

19  Q.  Is there?

20  A.  Anything we would have, we would have given

21      to you.  So I personally don't know if we

22      came across that information.

23  Q.  Who -- if that information -- where would

24      that information be kept?

00037

1  A.  That -- it would have been kept in files.

2  Q.  Whose files?

3  A.  Our marketing people in the marketing

4      department for slow cooking.

5  Q.  And those files were searched?

6  A.  Yes.

7  Q.  Any other basis for your statement that

8      there was not seen a need for a timer on

9      slow cooker?

10  A.  No, that would be it.

11  Q.  It was based on this research as you recall

12      it --

13  A.  Correct.

14  Q.  -- that consumers were requesting or thought

15      that would be a good idea?

16  A.  Again, this is going back quite a ways.

17  Q.  Yes.

18  A.  But my recollection of this is that that's a

19      good thing, but it wasn't as important as

20      being able to have it automatically shift to

21      keep warm.

22  Q.  And this information was developed during

23      these focus group meetings?

24  A.  Yes.

**30(b)6**                                          **Page 37**

00038

1 Q. Okay. And this was developed prior to

2   designing the 3580, correct?

3 A. The 3850.

4 Q. 3850, I'm sorry.

5 A. That's okay. I do that a lot. Because it

6   was -- I joined the company after a lot of

7   that was done. So I can only go off of what

8   I believe to be the case is there were some

9   ideas the company had on making changes to

10   slow cooking, and this consumer research

11   helped validate it and also helped direct

12   the company in what they were developing.

13 Q. Did you talk to any of the people at Holmes

14   that were involved in these market studies

15   in preparation for this deposition?

16 A. None of those people are at Holmes anymore.

17 Q. Who directed the studies for Holmes then?

18 A. That would probably have been directed by a

19   gentleman named Greg White.

20 Q. And do you know where this gentleman is now?

21 A. He works for a company called i Robot.

22 Q. And where is i Robot located?

23 A. It's in Massachusetts.

24 Q. Can you narrow it down any further?

**30(b)6**                                              **Page 38**

00039

1  A.  Oh, yeah, it's in Burlington, I believe.

2  Q.  Burlington, Massachusetts?

3  A.  Yes.

4  Q.  And it's called i Robot?

5  A.  Uh-huh.

6  Q.  Is that like the apple with a small I?  They

7     do --

8  A.  Yes.

9  Q.  Okay.

10  A.  Yeah, and capital R.

11  Q.  Okay.

12  A.  They manufacture those robotic vacuums.

13  Q.  Oh, okay.  The ones that run around your

14     house in circular --

15  A.  Yup.

16  Q.  When is the last time you've talked to any

17     of the inventors on the patent at issue?

18  A.  Yesterday, I spoke to Chuck Thrasher.

19  Q.  Okay.  Did you ever talk to Mr. Hlava,

20     recently talk to Mr. Hlava?

21  A.  I don't know who that is.

22  Q.  Okay.

23  A.  Other than knowing his name is on the --

24  Q.  How about Mr. DeCobert?  DeCobert I believe

**30(b)6**                          **Page 39**

00040

1    is how you say it.  Have you talked to him

2    recently?

3  A.  No, I haven't.

4  Q.  Okay.  Have you ever talked to him?

5  A.  Yes.

6  Q.  And when was the last time?

7  A.  Sometime before he left the company.

8  Q.  Approximately when did he leave?

9  A.  I am not certain what the date is of that.

10    It's been quite a while.

11  Q.  Did you believe there was a need in the

12    marketplace for a programmable controller at

13    the time back in let's say in 2000?

14  A.  Well, when I joined the company they already

15    developed this idea.  It hadn't gone to

16    market yet.

17  Q.  Right.

18  A.  And I certainly thought the idea was a good

19    one.  I would have wished I had thought of

20    it, because it's been very successful.  But

21    it did not exist before I joined the company

22    at retail.

23  Q.  Okay.

24  A.  So when it was brought to my attention, you

00041

1    know, upon joining the company, I thought

2    that -- I just thought it made a lot of

3    sense.

4  Q.  And just so I'm clear, when you say it was

5    not available, are you talking about a slow

6    cooker that had an automatic warm feature on

7    it?

8  A.  The terms that we used was manual and

9    programmable.  And there was no programmable

10    unit out on the market when I joined the

11    company.  It -- the unit we had, the 3850

12    and the 3860, they were have in development.

13  Q.  Okay.

14  A.  But they had not been yet sold into retail.

15  Q.  When you say manual as opposed to

16    programmable, would you describe again what

17    that means?

18  A.  Yes, it means that you have to make any

19    changes to the unit by physically going up

20    to unit and turning it.

21  Q.  Were you aware of any products that Holmes

22    sold that did have some automatic settings?

23  A.  Yes.

24  Q.  What were they?

**30(b)6**                                          **Page 41**

00042

1  A.  They were not in the kitchen business.  They

2      were in the home environment business.

3  Q.  What products were those?

4  A.  Heaters.

5  Q.  Heaters.  You mean like space heaters?

6  A.  Yup.

7  Q.  Okay.

8          (Discussion off the record)

9  A.  Yeah, like space heaters.

10 Q.  Okay.  And I would -- okay.

11         (Discussion off the record)

12 A.  I would assume only because I wasn't -- I'm

13     not as familiar with the home environment

14     side as I am with the kitchen, but I would

15     assume we had programmable also in the

16     humidifiers that we had and the air

17     purification.  The home environment business

18     was known for having electronic products.

19 Q.  To your knowledge did Holmes when you joined

20     them have any cooking appliances that had

21     some automatic features?

22 A.  Not to my knowledge.

23 Q.  Do they currently sell any products in the

24     cooking side of the business that have some

**30(b)6**                                    **Page 42**

00043

1    automatic features other than these

2    programmable slow cookers?

3 A.  Yes.

4 Q.  What are they?

5 A.  The roaster oven.

6 Q.  Okay.

7 A.  I'm going to think through our categories.

8 Q.  Sure.

9 A.  We've had fryers.

10 Q.  Okay.

11 A.  And we have some skillets and griddles that

12    have some digital and electric technology

13    that allows them to be set to temperature

14    and -- and they scroll up and scroll down,

15    and they beep and do some things.

16 Q.  Does Holmes sell a rice cooker that has

17    automatic features to it?

18 A.  Not that I'm familiar with.

19 Q.  Did they at any time, do you know?

20 A.  No, not that I'm familiar with.

21 Q.  You don't know of any rice cookers that

22    Holmes sold?

23 A.  Not that have programmable features to it.

24 Q.  What was automatic about the roaster oven or

00044

1    is automatic about the roaster oven?

2  A.  We took some of the same technology that we

3     had from the slow cooker and applied it to

4     the roaster oven.  So it can be set time and

5     temperature, and it has a count down feature

6     so you can see it.

7  Q.  Okay.  And what's automatic about the

8     fryers?

9  A.  Well, I have to admit I'm not as up to speed

10    today as I used to be on some of them.  So

11    I'm not sure if we have a fryer today like

12    one that we introduced about three or four

13    years ago where -- the same thing you could

14    press a touch pad and take it up in

15    increments up to a temperature.  And then

16    when it starts, it would then count down and

17    autobolize (sic) when you -- when it hits

18    that -- when it hits the proper temperature

19    and when the time is done.

20  Q.  And was that technology also the technology

21    that was developed for the slow cooker?

22  A.  I can't say that it really was.  You know, I

23    don't know if those two were linked.

24    Because we've had -- you know we started

**30(b)6**                                          **Page 44**

00045

1    with the slow cooker with programmable.  And

2    as successful as it was, obviously we are

3    going to say what can we apply this type of

4    thing to.  But I can't tell you that we

5    automatically linked that to that fryer that

6    I just mentioned.

7 Q.  What features of the programmable controller

8    did you attribute the success of the product

9    in the marketplace?

10 A.  Well, overwhelmingly the automatic shift to

11    keep warm was what's successful about that.

12 Q.  Okay.

13 A.  The consumer loves that feature, and it

14    presents -- I don't know if you have a slow

15    cooker at home, but -- especially if you

16    have kids and the schedules aren't as you

17    would like them to be.  After it reaches the

18    length of time that's been set like the four

19    or six or eight hours, it automatically

20    shifts to keep warm so it doesn't overcook

21    the food.  And that's been, you know, an

22    astounding success for us.

23 Q.  And what's the basis for your conclusion

24    that that feature is the overwhelming

**30(b)6**                                    **Page 45**

00046

1    feature that led to the success of the

2    programmable cooker?

3  A.  The consumer research referred to earlier

4    that said they liked that idea.

5  Q.  Okay.

6  A.  And subsequently, you know, we have done

7    other research with consumers about the

8    product who reflect on that as being such a

9    key feature.

10  Q.  Okay.  The research that you talked about --

11    you said earlier research that was done

12    correct, and then you did subsequent

13    research also?

14  A.  Correct.

15  Q.  Okay.  I want to focus on the earlier one.

16    This is the research that we didn't get any

17    documents on.  So I assume you don't have

18    that research.

19  A.  If you didn't get any, we must not have it.

20  Q.  Right.  So you haven't looked at it,

21    correct?

22  A.  Not for a long, long time.

23  Q.  Okay.  And that was done before the product

24    was put on the market, correct?

00047

1  A.  Correct.

2  Q.  Okay.  Now, what research was done after the

3      product was put on the market?

4  A.  We have done a lot of consumer research on

5      slow cookers --

6  Q.  All right.

7  A.  -- just for, you know, new ideas and new

8      concepts.

9  Q.  Okay.

10  A.  And in some cases we have, you know,

11      reviewed our current product with the

12      consumer, and they talk about that being an

13      excellent feature that we have out there.

14  Q.  Okay.  And does Holmes keep those research

15      -- documents relating to those researches in

16      its files?

17  A.  We should have that information.

18  Q.  Okay.  If you have that information, would

19      it have been produced to us?

20  A.  It should have been.

21  Q.  And if we don't have it, you don't have, it,

22      correct.

23  A.  That would be correct.  We should have

24      produced it to you if we had it.

**30(b)6**                                      **Page 47**

00048

1  Q.  Well, okay.  You said the overwhelming

2     feature was the -- the overwhelming feature

3     that led to the success of Holmes'

4     programmable controller was the keep warm

5     feature.

6  A.  Yes.

7  Q.  Was there any other features that led to the

8     success?

9  A.  I'm now going to state my opinion, because I

10     can't recall if we had, you know, data that

11     said this was our favorite feature, this was

12     our next and our next on what we have.  But

13     the consumer, as you can see in electronics

14     and all other kinds of products, has gotten

15     -- VCRs and now, you know, DVDs and al that

16     stuff, have gotten very comfortable with

17     digital and programmable things.  And so I

18     think they like the fact that we have that

19     type of technology in a slow cooker.

20          And the fact that they can set with

21     -- we have another unit besides the 3850 and

22     60 that form which is programmable, but also

23     you can set the time and temperature of it.

24     And then it scrolls down, and they like

**30(b)6**                                    **Page 48**

00049

1    that.

2         But the key feature -- and every time

3    we had talked to consumers was the keep

4    warm, the automatic shift to keep arm.

5         And it's not that keep warm didn't

6    exist in the past with manual, but you would

7    have to physically at some time go over and

8    switch it from low or high and go turn it to

9    keep warm.

10         And the biggest thing we had with our

11    3850 and 3860 is that you don't have to do

12    that.

13   Q. Okay. Well, is it true then that the

14    overwhelming success of the product was

15    because of the automatic keep warm feature

16    as opposed to just the keep warm feature?

17   A. Yes.

18   Q. Okay. In your declaration which we marked

19    as Exhibit 19, that paragraph 9, you say --

20    and this is the first sentence of paragraph

21    9, Once the programmable slow cooker

22    established itself as a success in the

23    market, many competitors have attempted to

24    copy it. Do you see that?

**30(b)6**                                    **Page 49**

00050

1 A.  Yes.

2 Q.  What do you mean by copy?

3 A.  Come -- by copy I mean they've come out with

4     slow cookers that have the same features

5     that we have that are covered in our

6     patents.

7 Q.  Okay.  You're not saying these people took

8     your product and tore it apart and copied it

9     like that, are you?

10 A.  I don't know that they did that.

11 Q.  Okay.  What you're saying is that the same

12     features appeared on the market?

13 A.  That's correct.

14 Q.  It's possible that those competitors could

15     have independently developed their products,

16     correct?  You just don't know?

17 A.  It's possible.

18 Q.  Yes.

19 A.  But we were the first on the market, and

20     then other products came out that had the

21     our features, so I would say it's not

22     probable.

23 Q.  But it is possible?

24 A.  But it is possible.

**30(b)6**                                          **Page 50**

00051

1  Q.  Okay.  Do you know who these nine companies

2     are?  There's two of them identified here, I

3     assume, West Bend and Europro?

4  A.  Correct.

5  Q.  Okay.  And do you know who the other seven

6     are?

7  A.  I'll see if I can remember them.  There's

8     All-Clad, which is an SEB company.  There is

9     or was Ultrex.  A company Innova, they have

10    sense gone out of the business.  There's

11    Hamilton Beach.  There's a company called

12    Toastess.

13 Q.  I'm sorry?

14 A.  Toastess.

15 Q.  Toastess, okay.

16 A.  The word toast and then E-S-S.

17 Q.  Uh-huh.

18 A.  There's a company that -- well, you'd call

19    J.C. Penny.  They buy direct with the

20    programmable.

21 Q.  Okay.

22 A.  Wolfgang Puck.  How many is that?

23 Q.  I think you got them all.  Nope, I've got

24    six.  Hamilton Beach, Ultrex, All-Clad,

**30(b)6**                                              **Page 51**

00052

1       Toastess, J.C. Penny and Wolfgang.

2   A.  I'm missing one.

3   Q.  Okay.

4   A.  Oh, Select Brands.  They market their

5       product under that name but mainly under

6       Corningware which they license.

7   Q.  Is it your understanding that the product of

8       all of the companies you've named, the seven

9       companies that you have named infringed the

10      patents that we're dealing with in this

11      lawsuit?

12  A.  That's my understanding.

13  Q.  Okay.  And that understanding is based upon

14      what?

15  A.  It's based upon our legal counsel.

16  Q.  Okay.  In the complaint in this case Holmes

17      has alleged that West Bend is willfully

18      infringing Holmes's patents.  What is the

19      basis for the allegation of willfulness?

20  A.  We know that they were aware that our

21      product existed.

22  Q.  Okay.

23  A.  And we know that they were aware that we had

24      patents on our products.

**30(b)6**                                          **Page 52**

00053

1  Q.  Okay.

2  A.  And that they were informed of that --

3  Q.  Okay.

4  A.  -- by us.

5  Q.  All right.

6  A.  And that they still came out with the

7     product.

8  Q.  Any other basis?

9  A.  I think that's it.  I'd have to defer most

10    to legal counsel on that one if there's

11    anything more than that.

12  Q.  Okay.  What did you do to prepare yourself

13    for -- to answer questions regarding the

14    basis of Holmes's allegation of willfulness

15    in this case?

16  A.  Other than having discussion with our legal

17    representation, with Alan?

18  Q.  Okay.

19  A.  I just, you know, reminded myself of what we

20    did.

21  Q.  Okay.  And that was the fact that West Bend

22    knew of your patents and started marketing

23    its product.

24  A.  Correct.

**30(b)6**                                    **Page 53**

00054

 1  Q.  What was the basis of the Holmes suing Focus

 2      Group, Inc., in this case?

 3  A.  They own West Bend.

 4  Q.  Any other basis?

 5  A.  I can't think of --

 6  Q.  Do you know Focus Group, Inc., itself?

 7  A.  Do I know them?

 8  Q.  Yes.

 9  A.  I know of the company and that they buy

10      other companies.

11  Q.  Do you know whether or not they manufacture

12      or sell any slow cookers at all?

13  A.  The Focus Group?

14  Q.  The Focus Group, Inc..

15  A.  I do not.  I know that they own West Bend.

16  Q.  That's it, okay.  So the basis for that

17      allegation is simply that they own West Bend

18      as far as you know?

19  A.  As far as I know, yes.

20  Q.  What research did you do in order to prepare

21      yourself to answer questions regarding the

22      basis for Holmes' claim of infringement

23      against Focus Group, Inc.?

24  A.  Just that I know that they own West Bend.  I

00055

1    mean it's just my general knowledge.  I know

2    that own West Bend, and there isn't really

3    West Bend to sue, because Focus Group bought

4    them.

5  Q.  Yes.  So you don't think there's any West

6    Bend to sue?

7  A.  Well, that would be like suing Rival.  Rival

8    is not a company.  You would sue Jarden now.

9  Q.  Okay.  When did Holmes first learn of West

10    Bend's product?

11  A.  I was made aware that they were developing a

12    programmable slow cooker at least a year

13    before the product came out.

14  Q.  And can you give me some dates on that?

15  A.  I can't here.  I could go back and find that

16    information and follow up with you.

17  Q.  What information would you look at?

18  A.  I'd just have to go look at -- to be

19    accurate I'd have to go back to the

20    houseware show that I was made aware that

21    they were developing one.  So I knew exactly

22    which show that was and what the date was.

23  Q.  Do you have some documents?

24  A.  No, I'd just have to look at a calendar and

**30(b)6**                                **Page 55**

00056

1     go back and figure out when -- what year

2     that was.

3  Q.  Okay.  So I take it you learned of it at a

4     houseware show?

5  A.  That's correct.

6  Q.  How did you learn about it?

7  A.  We were meeting with the suppliers that we

8     also did business with that was going to

9     make that product for them.

10  Q.  And who was that supplier?

11  A.  It's -- what's the word, epineminous?  No,

12     that's not wrong.  OEM is the name of the

13     company --

14  Q.  Okay.

15  A.  -- which is what you call suppliers, OEM?

16  Q.  Where was this housewares show at?

17  A.  Chicago.

18  Q.  And who were you talking to from OEM?

19  A.  A gentleman named Hugh McKay.

20  Q.  Okay.  And what did Mr. McKay tell you?

21  A.  In the course of our meeting he mentioned or

22     we became aware during our meeting that they

23     were working on programmable slow cookers

24     for West Bend.

**30(b)6**                                    **Page 56**

00057

1  Q.  And did he tell you what that product was

2    going to be?

3  A.  Not the details.

4  Q.  Did he tell you who designed it?

5  A.  I don't believe he did at that time.

6  Q.  Did he later?

7  A.  Yeah, later when we talked to him about the

8    fact that we have a patent on programmable

9    slow cookers, he said that the designs were

10    by West Bend and that he was not held

11    liable.

12  Q.  When did this second conversation with Mr.

13    McKay occur?

14  A.  It was around the time of the letter that we

15    gave them, because I personally delivered

16    the letter to them on a trip to the Orient.

17  Q.  This was a letter to them saying what?

18  A.  To OEM that just said we want to notify you

19    that we have patents on our programmable

20    slow cookers.

21  Q.  Okay.  Now, at the housewares show where you

22    first learned of this product, was that the

23    first time Holmes had learned of West Bend's

24    intention to come out with a new slow

**30(b)6**                              **Page 57**

00058

1    cooker?

2 A.  Yes.

3 Q.  And what did you say to Mr. McKay when he

4    told you this?

5 A.  Not much at that point.  It was just

6    information we took back to evaluate.

7 Q.  Okay.  And then was the next time you talked

8    to Mr. McKay about this topic area when you

9    delivered the letter that you talked about?

10 A.  I don't believe it was.  I believe that I

11    had conversation, and we had conversation --

12    we being my sourcing team -- with them in

13    between them.

14 Q.  Okay.  And what did you tell them?  What did

15    you and Mr. McKay discuss about the fact

16    that West Bend was coming out with a

17    programmable controller or programmable

18    cooker?

19 A.  Just in general the status.

20 Q.  Timing, that type of a thing?

21 A.  Is it still going forward.

22 Q.  Yes.  Right, okay.  No details about what

23    the product would be?

24 A.  No.

**30(b)6**                                    **Page 58**

00059

1  Q.  Okay.  Now, you said there was some type of

2      a relationship between OEM and Holmes?

3  A.  Yes.

4  Q.  And was that -- as at that time was OEM

5      supplying Holmes product?

6  A.  Some of our product, yes.

7  Q.  And what were they supplying?

8  A.  They were supplying a griddle, a skillet and

9      at that time I think two slow cookers manual

10      slow cookers, no programmable.

11  Q.  Okay.

12  A.  And we were -- excuse me.  We were

13      developing some the slow cookers with them.

14  Q.  With OEM?

15  A.  Yes.

16  Q.  Does OEM currently supply any products to

17      Holmes?

18  A.  I think technically they do.  But we have

19      moved out of there.

20  Q.  And by moving out of there, you mean moving

21      out of OEM?

22  A.  Yes.

23  Q.  When did Holmes do that?

24  A.  Let's see, we're in November of '06.  It's

**30(b)6**                                    **Page 59**

00060

1    been going on for over a year.

2  Q.  Okay.  Why did Holmes move the products from

3    OEM?

4  A.  That's not uncommon to do.  It depends on

5    product quality, availability, pricing, etc.

6  Q.  Sure.  There's all kinds of reasons.

7  A.  Yeah.

8  Q.  But what was Holmes' reason?

9  A.  Well, those were some of the reasons.  The

10    availability -- they were not a very good

11    supplier for us.  So we -- they weren't --

12    we do rankings, and they were not very high

13    on the list.  But another reason for it was

14    that, you know, those they were

15    manufacturing a programmable competitive

16    slow cooker.  And we told them we were not

17    happy with that.

18  Q.  When you delivered this letter we talked

19    about to Mr. --

20  A.  McKay.

21  Q.  -- McKay, I believe, you said, you delivered

22    it to him, did you not?

23  A.  Yes, I did.

24  Q.  And what was the conversation you had with

**30(b)6**                                          **Page 60**

00061

1    him at that time?

2  A.  I told him that I want to make you are aware

3      that we had patents as this letter says.

4  Q.  Right.

5  A.  We also have given a letter to West Bend --

6  Q.  Right.

7  A.  -- to make them aware of this.

8  Q.  Yes.

9  A.  And we want you to know that to the extent

10      that it infringes on our patents, we will,

11      you know, take as aggressive legal action as

12      we think is proper.

13  Q.  What did Mr. McKay say?

14  A.  He said that -- and I'm paraphrasing,

15      because I don't remember the specific, you

16      know, exact words.  But that he's talked to

17      West Bend, and they assure him that they're

18      -- they assure him that they're okay and

19      that he can make the product.

20  Q.  Okay.  Is there anything else you remember

21      about any conversations you had with Mr.

22      McKay concerning West Bend's introduction of

23      a programmable slow cooker?

24  A.  Not more than what I've told you.

**30(b)6**                                      **Page 61**

00062

1 Q.  Okay.

2 A.  Would it be a good time for us to take a

3   break?

4 Q.  Sure.

5       THE VIDEOGRAPHER:  The time is

6   10:14.  We are off the record.

7       (Recess)

8       THE VIDEOGRAPHER:  Back on the

9   record.  The time is 10:26.

10 Q.  Mr. Plaumann, when did Holmes first learn of

11   West Bend's design patents that have been

12   asserted against Holmes in this case?

13 A.  When West Bend filed claims against us.

14 Q.  Okay.  And what did Holmes do when it found

15   out about those patents?

16 A.  We read through what the claims were and

17   determined that there was no merit.

18 Q.  Okay.  Well, how did you determine there was

19   no merit?

20 A.  Because we didn't know of the West Bend

21   designs.

22 Q.  Okay.

23 A.  And had developed our product independent of

24   those.

**30(b)6**                    **Page 62**

00063

1   Q.  Did you get an opinion from counsel, your

2       patent counsel, as to whether or not Holmes'

3       product infringed the West Bend design

4       patents?

5   A.  By that do you mean a written opinion?

6   Q.  Any opinion.

7   A.  I would have to get this confirmed, but my

8       understanding is verbally yes.  But we don't

9       have a written opinion.

10  Q.  What was the opinion?

11          MR. SACK:  Objection.  The opinion

12      is privileged.

13          MR. HUSMANN:  Okay.  You're going

14      to instruct your answer not to answer?

15          MR. SACK:  Yes.

16  Q.  And will you follow the instruction of your

17      counsel?

18  A.  Yes.

19  Q.  Has Holmes made any changes to the -- to its

20      products in response to the allegation of

21      infringement by West Bend?

22  A.  No, we haven't.

23  Q.  If you would turn to Exhibit 12, please.

24      These are some sales figures from Holmes

**30(b)6**                                    **Page 63**

00064

1     regarding an item 4310 and 4350, correct?

2  A.  That's correct.

3  Q.  And this document shows sales in the 4310

4     under 1999.  Do you see that?

5  A.  Yes.

6  Q.  Do you know when the first date of sale of

7     the 4310 was?

8  A.  No.

9  Q.  What did you do to find out what the first

10     date of sale of the 4310 was?

11  A.  We looked at the records that we have

12     available to us, and we are not able to

13     determine when it was introduced.

14  Q.  When this says 1999, is that calendar year?

15  A.  Yes.

16  Q.  And it says ship year.  Okay.  Shipped from

17     -- does that mean that it was shipped from

18     Holmes to a customer?

19  A.  Yes.

20  Q.  Okay.  And during 1999 there was 2007 units

21     shipped?

22  A.  Not very impressive, but the answer is yes.

23  Q.  There was more than 2000, was it not?

24  A.  2007.

**30(b)6**                                      **Page 64**

00065

1  Q.  I'm sorry.  It was more than -- forget that.

2      Is this as far back as the sales that Holmes

3      keeps goes?

4  A.  This is the year that Holmes acquired Rival.

5  Q.  Okay.

6  A.  And as I had mentioned earlier, our records

7      previous to the acquisition are pretty weak.

8      You know, there are some things we have, and

9      some things we don't.

10  Q.  Okay.  Because this starts at '99 does not

11      mean this was the first year that the 4310

12      was sold, correct?

13  A.  That is correct.

14  Q.  Okay.  And is it correct that these sales

15      figures were sales after Holmes purchased

16      Rival?

17  A.  That's a good assumption.

18  Q.  Okay.

19  A.  But I can't guarantee that.  We bought Rival

20      in February of '99.

21  Q.  Okay.

22  A.  So this may be, you know, from February on

23      and not count January.  Or they could have

24      had data that has the full year.

**30(b)6**                                    **Page 65**

00066

1 Q. Okay. And Holmes simply does not have any

2   data for 1998 at least as to the 4310 and

3   4350 products; is that correct?

4 A. I don't know if that's correct.

5 Q. Well, how could you find out?

6 A. Whoever produced this document I would have

7   to find out from them if they went back

8   further, if they tried to capture any, you

9   know, previous information.

10 Q. And how would you find out who prepared this

11   document?

12 A. Well, I would probably have to talk with our

13   legal department to see -- you know, they

14   would have some track of who sent it to

15   them, and then I could find out.

16 Q. I'm sorry if I asked you this before. I

17   don't remember if I did. What did you do to

18   try to figure it out when the first date of

19   sale of the 4310 was?

20 A. We looked at our -- whatever data we had

21   available. If you specifically asked us to

22   do that, we would have looked back and

23   looked at what data we had available to see

24   when the product was introduced.

**30(b)6**                                    **Page 66**

00067

1 Q.  And did you check to see if that had been

2    done?

3 A.  I can't tell you right now if that -- if

4    that had been done.

5 Q.  Look at Exhibit 14.  Could you identify what

6    this document is?

7 A.  Is everything in 14 the same document?

8 Q.  I think there's three pages to that exhibit.

9    It's how it was produced to us.

10 A.  Okay.  This would have been a price list of

11    the products we had to offer.

12 Q.  Okay.  And it says up on the top, Effective

13    January 1, 1995.  Do you see that?

14 A.  Yes, I do.

15 Q.  And this is -- that would be the price list

16    effective that date is the way you

17    understand this document?

18 A.  That's how I would understand it.

19 Q.  Okay.  And then in the -- when it says,

20    Automatic Steamer/Rice Cookers, do you see

21    that on the first page?

22 A.  Yes.

23 Q.  And there's one called the 4450.  Do you see

24    that?

**30(b)6**                                  **Page 67**

00068

1  A.  Yes.

2  Q.  And it says, Shuts off when food is cooked.

3    Do you know how that was done?

4  A.  No, I don't.

5  Q.  And below that there's the 4310.  Do you see

6    that?

7  A.  Yes.

8  Q.  And it says it has a keep warm feature?

9  A.  Yes.

10  Q.  Do you know how that feature operated?

11  A.  From the sell sheet that we had on this --

12  Q.  Yes.

13  A.  Not from a -- I can't tell you from the

14    physical product in my mind, because the

15    product doesn't exist anymore.

16  Q.  Uh-huh.

17  A.  But it has a button you press or some device

18    you press to put it on keep warm.

19  Q.  So it's your understanding it was not

20    automatic keep warm?

21  A.  From automatic meaning it would go from a

22    higher temperature to a keep warm

23    temperature automatically?

24  Q.  Yes.

**30(b)6**                                    **Page 68**

00069

1  A.  It's my understanding it didn't do that.

2     But I am not familiar with these products

3     because they don't exist, and they haven't

4     for quite some time.

5  Q.  Okay.  Would you look at Exhibit 15, please.

6     Could you identify what Exhibit 15 is,

7     please?

8  A.  Yes, it says that these are show specials.

9  Q.  Is the Gourmet Show of 1999 correct?

10  A.  That is correct.

11  Q.  And when is the Gourmet show held?

12  A.  The dates moved around a bit, but it

13     probably would have been late spring.

14  Q.  Okay.  1999?

15  A.  Correct.

16  Q.  And this type of flier is what Holmes would

17     prepare for use at the Gourmet show; is that

18     correct?

19  A.  For this show --

20  Q.  Yeah.

21  A.  -- that's what we prepared?

22  Q.  Yeah, okay.

23  A.  Now, I will say I say that based on this

24     document I'm looking at, because I wasn't

**30(b)6**                                    **Page 69**

00070

1    with the company at the time. But based on

2    what it says, clearly we must have handed

3    that out at the show.

4  Q.  Okay. Mr. Plaumann, I'm going to turn the

5    deposition over to my partner, Mr. Sarskas,

6    who is going to cover some different topic

7    areas --

8  A.  Okay.

9  Q.  -- in regard to sales, I think.

10       MR. SACK:  Now, I'd like to object

11    on the record to tag teaming the witnesses

12    with two attorneys. I don't think it's

13    necessary. I'm not going to require the

14    witness not to answer, but I think it's

15    prejudicial. It exhausts the witness where

16    the examining attorney isn't doing work to

17    ask questions.

18       And under this environment with no air

19    conditioning or air flow here, it's

20    extremely prejudicial. Also in view of the

21    numerous categories I think almost 80

22    categories to testify to -- are you okay?

23       MR. HUSMANN:  Yeah, I'm fine.

24       MR. SACK:  It creates an atmosphere

**30(b)6**                                    **Page 70**

00071

1    that's oppressive to the witness.

2          MR. HUSMANN:  All right.  For the

3    record we raised this point with counsel at

4    the deposition of Mr. Trumper and then

5    verified it again later after that

6    deposition.  And at that time they said they

7    had agreed to this procedure, and we have

8    prepared for the deposition in accordance

9    with that agreement.

10          MR. SACK:  I believe we took this

11    -- your statement under advisement at the

12    time.

13          MR. HUSMANN:  That is a

14    mischaracterization of what was done.

15          MR. SACK:  No, I don't think -- it

16    wasn't something that we would have filed a

17    motion on to stop.  And, as I said, I'm not

18    instructing the witness not to answer the

19    question, but I think it's prejudicial to

20    the witness.

21    EXAMINATION BY MR. SARSKAS

22  Q.  If at any point, Mr. Plaumann, you feel like

23    you're unable to continue because of your

24    health, simply let us know, and we will

**30(b)6**                                    **Page 71**

00072

1    figure out what to do as a result.  Do you

2    feel like there's any reason you can't give

3    your best testimony today based on how you

4    feel?

5  A.  No.  However --

6  Q.  Are you under medication or --

7  A.  No.

8  Q.  -- impaired in any way?

9  A.  No, I'm just uncomfortable because we don't

10    have the air conditioning.

11  Q.  If you feel at any time point in time like

12    you can't continue, like your testimony is

13    impaired, you should let me know

14    immediately, please.

15        MR. SACK:  Well, maybe we can put

16    the air conditioning on.  It's very hot in

17    here.  I mean, I'm not very comfortable.  I

18    don't think there's any reason why we can't

19    have the air condition on.

20        THE WITNESS:  I would like to have

21    it on if we can, just because it is --

22    because I'm not feeling that well, the heat

23    is not making me feel that good.

24        MR. SARSKAS:  I have no objection

**30(b)6**                                    **Page 72**

00073

1    to trying it with the air conditioning on so

2    long as the equipment is functioning.

3        (Discussion off the record)

4  A.  Okay.

5  Q.  Mr. Plaumann, earlier you talked a little

6    bit about the patents that have been

7    asserted against West Bend in this lawsuit.

8    And you also talked a little bit about the

9    programmable slow cookers.

10       I'd like to focus your attention to

11    the patents and the programmable slow

12    cookers.  It is Holmes' contention that

13    patents in suit apply to only programmable

14    slow cookers?

15  A.  That's my understanding.

16  Q.  Is there any feature on a manual slow cooker

17    that relates to the patents in suit?

18  A.  Not that I'm aware of.

19  Q.  Besides the automatic shift to warm feature

20    that you spoke about earlier, is there any

21    other feature that is covered by the patents

22    in suit here?

23  A.  Well, I mentioned the chimney effect of the

24    heat dissipation prior.

**30(b)6**                                    **Page 73**

00074

1  Q.  Do you believe that the chimney effect of

2      heat dissipation applies to patents in suit?

3  A.  That's not my understanding.

4  Q.  Okay.  It's a different patent that that

5      chimney effect applies to, a patent not

6      asserted in this lawsuit, correct?

7          MR. SACK:  I'd like to object to

8      the question.  Mr. Plaumann is not a patent

9      attorney.  He's not a technical person.  And

10     I don't think he's been designated to

11     testify about the patents and about the

12     infringement subject matter.

13         Our expert has testified about

14     infringement.  We designated our expert on

15     infringement questions.  And you're asking a

16     marketing person with no technical

17     background legal issues and legal questions

18     that he has no training or background in.

19     So I would like to object to those

20     questions.

21         MR. SARSKAS:  Could we try to keep

22     the objections sort of succinct?

23         MR. SACK:  Well, I need to say it

24     fully for the record.  So I'll keep it as

00075

1    succinct as possible --

2          MR. SARSKAS:  Thanks.

3          MR. SACK:  -- but I have to put the

4    entire objection in.  Go ahead, and you can

5    answer the question.

6 A.  You would have to repeat that question.

7          (Testimony read)

8          MR. SACK:  I'd like to object to

9    the question again, because Mr. Plaumann was

10    not designated for that question.  Although

11    if you could show to me where it was

12    designated --

13          MR. SARSKAS:  I'm talking about his

14    earlier testimony, Alan.  He gave earlier

15    testimony about the chimney effect and

16    whether or not that feature relates to the

17    patents in suit.

18 Q.  I simply want to make sure that you're clear

19    on that point so that we move forward

20    communicating correctly and accurately.

21 A.  And this really is not my area of expertise,

22    so I have to be careful on how I -- I don't

23    want to misstate.

24 Q.  And if your answer is you don't know, that's

00076

1    a perfectly fine answer.  I'm not asking you

2    to testify to something that you don't know.

3  A.  Okay.  All I can tell you is there's

4    something mentioned in the patent regarding

5    the chimney effect, but I really don't know

6    if that's in play here.

7  Q.  Fair enough.  You talk about the automatic

8    shift to warm feature being commercially

9    successful and being a feature that's

10    related to the patents in suit, correct?

11  A.  Yes.

12  Q.  I'd like to talk about some of the other

13    features on the programmable slow cooker.  I

14    think earlier you talked about a countdown

15    feature.  Can you tell me what that is?

16  A.  That's not -- that feature is not in the

17    3850 or 3860.  It's a different programmable

18    unit.

19  Q.  Is the count down feature something that

20    relates only to the programmable slow

21    cookers?

22  A.  Let me think about that question for a

23    second.

24        THE WITNESS:  Can you repeat that

**30(b)6**                                    **Page 76**

00077

1    question?

2            (Testimony read).

3  A.  No, we have that feature in the roaster oven

4    I mentioned.

5  Q.  And so the count down feature is available

6    on both the manual slow cooker and a

7    programmable slow cooker?

8  A.  No, it's only --

9  Q.  Only in the programmable?

10  A.  Correct.

11  Q.  But it's also available on a roaster is what

12    you're saying?

13  A.  Yes, not all roaster ovens, but on a

14    particular roaster oven.

15  Q.  Okay.  What about Versaware, what is

16    Versaware?

17  A.  Versaware is -- the reason I laugh is

18    because it's been something I've been

19    working on for many, many years.  It's very

20    hard to bring to market.  And it almost

21    killed me and -- on the marketing thing.  It

22    just took forever to get to market.

23            But Versaware is designation.  It's a

24    trademark that we have on a slow cooker that

**30(b)6**                                    **Page 77**

00078

1    has a specific type of material to the

2    crockery.

3  Q.  So Versaware can be removable or

4    non-removable, would that be true?

5  A.  No, it's only removable.

6  Q.  And what's special about Versaware?

7  A.  The type of material that allows you to put

8    this on a stovetop as well as in a microwave

9    and in a freezer and in an oven.

10  Q.  And is that feature of Versaware only

11    available on programmable slow cookers?

12  A.  No.

13  Q.  It's available on non-programmable --

14  A.  Yes.

15  Q.  -- or manual?

16  A.  Yes.

17  Q.  What is Smart Set?

18  A.  Smart Set is a trademark that we have

19    assigned to a highly programmable slow

20    cooker.  By that I mean it's got a lot of

21    different programmable features to it.

22  Q.  What are some of the different programmable

23    features?

24  A.  You can designate the type of meat, whether

00079

1    it's pork or chicken or beef.  Excuse me.

2    And it also has two cycles on it.  So you

3    can set it for four hours on low and two

4    hours on high.  You can set that and walk

5    away from it and it will do that

6    automatically.

7  A.  There's no other unit on the market that

8    does that.  It has a temperature probe in it

9    that you place into the meat, and you set it

10    for the appropriate time.

11        When the meat gets to a preprogrammed

12    temperature that your meat needs to be set

13    at, that will override whatever length of

14    time you have on the unit and automatically

15    shift it to keep warm, so you don't overcook

16    your meat.  I think that's it, but there's a

17    lot to that unit.

18  Q.  What about the built-in recipes, is that

19    part of Smart Set?

20  A.  No.

21  Q.  That's different?

22  A.  Yes.

23  Q.  How is that referred to?

24  A.  We had a unit -- I believe the item number

**30(b)6**                                                **Page 79**

00080

1    was 4865, but I'm not certain of that.  But

2    it was a recipe crock pot slow cooker, a

3    different unit than this.

4  Q.  Was that a programmable unit?

5  A.  Yes.

6  Q.  Did it have any of the programmable features

7    in addition to the built in recipes?

8  A.  Yes, it had the same features that the 3850

9    and 3860 units have, and it has the recipes

10     that were already programmed into the unit.

11  Q.  Aside from the automatic shift to warm and

12     the built-in recipes, what other features of

13     3850 and the 3860 did it have?

14  A.  You could set the hours that you wanted to

15     run before it shifts to keep warm.

16  Q.  Do you think that setting hours is covered

17     by the patents in suit?

18        MR. SACK:  Objection, calls for a

19     legal conclusion.

20  A.  Yeah, I don't believe I can answer that.

21  Q.  You just don't --

22  A.  I don't know.

23  Q.  -- know one way or the other?

24  A.  Yes.

**30(b)6**                                                    **Page 80**

00081

1  Q.  I think you did say earlier -- and please

2      correct me if I'm wrong -- that you believe

3      the automatic shift to warm feature is

4      covered by the patents in suit?

5  A.  That's my understanding, yes.

6  Q.  Is it your undertanding that there's any

7      other feature of a programmable slow cooker

8      that is covered by the patents in suit

9      besides the automatic shift to warm?

10         MR. SACK:  Same objection.

11  A.  I don't believe I'm -- I have enough

12      knowledge to answer that question.

13  Q.  So as you understand it, sitting here today,

14      the only feature that you're aware of that

15      would be covered by the patents in suit is

16      the automatic shift to warm; is that true?

17  A.  No, I don't know if there are other things

18      that covered, but the marketing side of it,

19      the most important feature that we have is

20      the automatic shift to keep warm.  And

21      that's what we -- that's how we marketed the

22      product with the programmable, you know,

23      aspects to it.

24  Q.  My question was a little bit different.  I'm

00082

1    trying to understand what you believe to be

2    covered by the patents in suit.  And I think

3    you said that the automatic shift to warm

4    feature is covered by the patents in suit,

5    correct?

6  A.  That's correct.

7  Q.  Are you aware of any other features that are

8    covered by the patents in suit?

9         MR. SACK:  Again, same objection.

10  A.  I am not aware of any other specific issues

11    that are in this discussion other than that.

12    And I had mentioned the chimney effect, but

13    I'm not sure that's in this one.

14  Q.  And I'm clear on that.  I just -- besides

15    the chimney effect and besides the automatic

16    shift to warm feature, you're not aware of

17    any other feature that would be covered by

18    the patents in suit that you've asserted

19    against West Bend?

20  A.  I'm not aware of that.

21  Q.  What is extreme temperature cookware?

22  A.  That's Versaware.

23  Q.  Just another time for the same thing?

24  A.  More of an internal name.  Versaware became

**30(b)6**                                    **Page 82**

00083

1    what we market it as.

2 Q.  Okay.  What is a removable stoneware?

3 A.  It's stoneware that sets into a wrapper or

4    base that you can take out of the wrapper or

5    base.

6 Q.  What is Rinse Clean?

7 A.  It's a designate for the product being easy

8    to clean, the crockery being easy to clean.

9 Q.  What is Nestled Crock?

10 A.  I'm not sure.  I'm just trying to understand

11    all the features of it.

12 A.  I'm not sure what Nestled Crock is.

13 Q.  What is Duet?

14 A.  Duet?  What are you referring to?

15 Q.  I'm just referring to the documents that

16    you've provided us.  They list a number of

17    features that are contained on slow cookers?

18 A.  Okay.

19 Q.  Sold, marketed by the Holmes Group.

20 A.  Okay.  That helps me in understanding your

21    context.

22 Q.  Fair enough.

23 A.  Duet was a slow cooker that we introduced

24    that the ceramic had a divider in the center

00084

1    of it that was non-removable. It was all

2    ceramic. So you could put two different

3    types meats or vegetables or something, and

4    they didn't mix in there.

5  Q. Was that feature offered on both

6    programmable and non-programmable?

7  A. I believe it was only on non-programmable.

8    I'm sorry. That's not correct. We ended up

9    doing a pack in product for I think it was

10    Sam's Club where it was a programmable unit

11    that had regular crockery, and we also had

12    packed in the box a -- the Duet crockery.

13  Q. So was the Duet crockery then just another

14    pot able to fit in to the same base?

15  A. Yes.

16  Q. So you could use it either as a single pot

17    or a duel pot?

18  A. That's correct.

19  Q. And it was programmable?

20  A. Correct.

21  Q. In the case of the Sam's Club cooker?

22  A. That's correct.

23  Q. What is Auto Cook?

24  A. I don't know.

00085

1   Q.  Are there crock pots or slow cookers that

2       are used for travel or portability?

3   A.  Yes.

4   Q.  Is that different than a unit that's meant

5       to be used in a single location, aa kitchen?

6   A.  No, it just includes a bag.

7   Q.  So a travel bag is the only difference?

8   A.  On our units, yes.

9   Q.  Is it marketed any differently?

10  A.  Just that it has a bag inside, you know, a

11      packet.

12  Q.  But it's not different in any other way?

13  A.  No.

14  Q.  There are different finishes on slow

15      cookers, correct?

16  A.  That's correct.

17  Q.  Some of them are stainless steel.  Some of

18      them are white.  And that's true with both

19      programmable and manual slow cookers, you

20      can get them with different finishes?

21  A.  That's correct.

22  Q.  How do all of those different features get

23      studied by Holmes when it's deciding how to

24      advertise or market its slow cookers or

00086

1   develop its slow cookers?

2 A.  Well, there are a variety of things that are

3   are considered when you do that.  One is

4   what's currently on the market today and if

5   there is premiums to certain types of

6   things.

7        One of the things we know is consumers

8   recognize that stainless steel is more

9   expensive than a regular painted wrapper.

10   They don't think of it as a painted wrapper

11   of stainless steel, but they know stainless

12   steel costs more.

13        And they way you know that is looking

14   at other what's called white goods, you

15   know, refrigerators, appliances, those types

16   of things.  And so there's a premium in

17   terms of price for that.  And you look at --

18   part of it is driven by how much it costs us

19   to us manufacturer.

20        There are some finishes that you might

21   not as a consumer give a lot of credit to,

22   but they cost us more money.  So we have to

23   determine whether or not we can charge more

24   money for that product or not.

**30(b)6**                                      **Page 86**

00087

1 Q.  And what kinds of features has the Holmes

2    Group determined it can increase its margins

3    on because consumers are willing to pay more

4    than it costs Holmes to put in the slow

5    cooker?

6 A.  That's a very broad question.  I can't

7    really answer that definitively.  There are

8    certain -- we know programmable cost more

9    because it costs us a lot more to make that

10    programmable feature in a slow cooker than

11    it does to have a manual knob.

12        But then there are other things that,

13    you know, might be no additional cost in

14    terms of the manufacturing of a product that

15    we think we can get a premium for anyway.

16    You know, so we can -- we can take the price

17    up in the market and, you know, you do

18    consumer research and try to get a sense

19    what have a customer thinks is valuable and

20    what's not.

21 Q.  Is programmable something that's viewed by

22    Holmes as a product that's able to generate

23    a larger margin than a manual?

24 A.  Absolutely, yes.

**30(b)6**                                **Page 87**

00088

1 Q.  What -- today what's the relative -- roughly

2     the relative share of manual versus

3     programmable slow cookers that Holmes sells?

4 A.  Today we have -- about 40 percent of our

5     business in slow cookers are done in the

6     programmable slow cooker.

7 Q.  Is it fair to say that the emphasis on

8     trying to increase that percentage of

9     programmables versus manual?

10 A.  That's fair to say, yes.

11 Q.  And why is that?

12 A.  Because it's a higher profit margin, and

13     it's a higher sale price.  So we get more

14     revenue.

15 Q.  Is there any competitive reason?

16 A.  Well, the fact that we were the only ones

17     out there that had programmable for a period

18     of time and that, you know, that we had IP.

19     So people could not copy us.  So we wanted

20     to emphasize things that are unique to us.

21 Q.  Do you think that that IP covers the fact

22     that the slow cooker is programmable?

23 A.  I think it IP covers the automatic shift to

24     warm.

**30(b)6**                                    **Page 88**

00089

1 Q. But not necessarily that the slow cooker is

2    programmable?

3 A. Not necessarily in the way we'd find define

4    that. It's my understanding a competitor

5    could have a digital unit that could set the

6    hours and the time, and that's fine, but not

7    that it would automatically shift to keep

8    warm.

9 Q. Are you aware of any slow cookers on the

10    market today that are just as you described,

11    in other words they're programmable because

12    they have a digital display or a touch pad

13    but do not have the auto shift to warm

14    feature?

15 A. No, I'm not.

16 Q. So all of the nine manufacturers that you

17    talked about earlier as being infringing,

18    you're not aware of any products offered by

19    any of those that would fall into that

20    category that don't have the auto shit to

21    warm?

22 A. That's correct. All those nine I mentioned

23    have an automatic shift to keep warm

24    setting.

**30(b)6**                                    **Page 89**

00090

1 Q. Have you ever heard the Auto Protect Safety

2    System Serve Setting?

3 A. Can you repeat that?

4 Q. I thought that I read in one of the

5    documents that Holmes produced a reference

6    to a patented Auto Protect Safety System

7    Serve Setting?

8 A. I'm aware of everything you said up until

9    the serve setting.

10 Q. Okay. What do you understand is the

11    patented Auto Protect Safety System?

12 A. We don't today produce that product, and

13    it's about been a while. My understanding

14    of it is that we had a -- we had built into

15    the unit a fuse that is there was a surge of

16    power in your home, it would shut the unit

17    off. So it was an auto protect safety

18    system.

19 Q. And why is that no longer used?

20 A. We -- we had an abundance of returns because

21    it would pop the fuse in the unit because

22    its surprising how much you can get at home

23    where you'll have surges in your power.

24 Q. Right.

**30(b)6**                                          **Page 90**

00091

1  A.  And sometimes you'll notice it the power

2    failure symbolling something at home, but

3    you didn't realize it while you were at

4    work, but you have to set that fuse to blow,

5    you know, at a certain level so that it has

6    some value to it.  And they were blowing a

7    lot.  So we deemed that it wasn't practical

8    for us to continue to do that.

9  Q.  Okay.  Why would a customer in market for

10    programmable slow cooker by a Rival instead

11    of a competitors?

12  A.  Because -- oh, why would a customer?

13  Q.  Today.

14  A.  Today.  This is recognizing that there are

15    units on the market that we believe infringe

16    on our patent.

17  Q.  I understand that that's you view, so I

18    understand you'll build that into your

19    answer.  Go ahead.

20  A.  I mean in this context, it's hard for me to

21    answer that just because I don't there there

22    should be others -- from what I know I don't

23    think there should be other units on the

24    market, so they would only buy ours.  And

**30(b)6**                                                    **Page 91**

00092

1    that's why they would buy Rival.  That's the

2    only one that you could buy that has that

3    feature.

4  Q.  Are you saying that the only thing that a

5    consumer cares about is the auto shift to

6    warm feature?

7  A.  No, but, I'm saying based on my

8    understanding of our patents, we should be

9    the only ones on the market with that

10    feature.  So by default that's all the

11    consumer should be buying.

12  Q.  Because in your view none of those other

13    products have a right to be on the shelf

14    with yours?

15  A.  Correct.

16  Q.  Other than the auto shift to warm feature,

17    what other features do consumers care about

18    when they're looking to buy a programmable

19    slow cooker?

20  A.  Well, one of the things that we have is a

21    very strong brand name, Crock Pot.  And that

22    is something that the consumer is aware of

23    and has a preferred opinion of.

24  Q.  How do you know that?

**30(b)6**                                    **Page 92**

00093

1  A.  We've done research that shows that, but

2     also just practically if you look on the

3     shelf, we dominate the shelf.  So the

4     retailers recognize the value of the Crock

5     Pot brand as well.

6  Q.  When you think of your customer, the Holmes

7     Group customer, do you think of the

8     retailer, or do you think of the consumer?

9  A.  Repeat that, please.

10  Q.  When you think about who your customer is,

11     do you think about the retailer, Wal-Mart,

12     Kohl's, Target, or do you think about the

13     consumer?

14  A.  It depends on what our -- what our objective

15     is.  We think about both of them, so it

16     depends on what the situation is.

17  Q.  Who decides what slow cooker ends up on the

18     shelf?  Is it the buyer at the store, or is

19     it Holmes Group or some combination?

20  A.  It's the buyer at the store.  We try to

21     influence them, but they are the ones that

22     make the final decision on what they should

23     put on the shelf.

24  Q.  When you say you try to influence them, do

**30(b)6**                                    **Page 93**

00094

1    you use consumer research to try to explain

2    to the buyer what consumers will like about

3    your slow cooker?

4  A.  Yes, that's one thing we do.

5  Q.  What kind of consumer research do you use?

6  A.  We use the two -- there qualitative and

7    quantitative.

8  Q.  Okay.

9  A.  And we use both of them.

10  Q.  How do you gather that qualitative and

11    quantitative research?

12  A.  We hire some independent company.

13  Q.  Who do you higher?

14  A.  It varies.

15  Q.  Who is the last company that you hired?

16  A.  Unfortunately the name escapes me, but we

17    can get that easily for you.

18  Q.  Do you know whether you've produced the most

19    recent consumer research that you've done on

20    slow cookers?

21  A.  I believe we have.

22  Q.  And how would you use that research?

23  A.  Well, we start by giving some objectives to

24    the research company.  And that varies on

**30(b)6**                                **Page 94**

00095

1   what we're trying to do.  And so then that

2   person will help guide us or that company on

3   whether it should be qualitative or

4   quantitative.  And then, you know, we come

5   to a price on what's that going to cost us,

6   and then they go out and do that research

7   for us.  We take that information back and

8   make some determinations based on what we

9   got back from the research.

10  Q.  You said before that consumer research has

11      revealed to Holmes that the commercial

12      success of the programmable slow cooker is

13      due outstandingly to the auto shift to warm

14      feature; is that accurate?

15  A.  That's accurate.

16  Q.  What is that statement based on?

17  A.  It's based on an accumulation of research

18      that we've done.  And it's also based on

19      just the facts of look at our business.  You

20      know, we went from zero in 1999 before the

21      introduction of any programmable slow

22      cookers to today it's 40 percent of our

23      business.  So the consumers have responded

24      very strongly to the programmable part of

**30(b)6**                                        **Page 95**

00096

1  it.

2       And we have research that shows that

3  the automatic shift to keep warm is an

4  extremely important feature.

5  Q.  Do you equate automatic shift to warm and

6  programmable as being the same thing?

7  A.  No.  I mean they -- you can have other

8  features on a programmable slow cooker that

9  don't necessarily have that automatic shift

10  to keep warm.  But all of our units that are

11  programmable have that feature.

12  Q.  And what has the consumer research told you

13  about some of the other features on

14  programmable slow cookers besides automatic

15  shift to warm?

16  A.  I can't specifically recall anything else to

17  the programmable aspect of it besides that.

18  Q.  So you're saying that the consumer research

19  has taught Holmes that the automatic shift

20  to warm feature is the most important

21  feature.  Do you recall what the second or

22  third most important features are?

23  A.  No.

24  Q.  Can you think of any documents that you

**30(b)6**                                    **Page 96**

00097

1    would look to to find the answer to that

2    question?

3  A.  It would have to be in the consumer research

4    findings that we had.

5  Q.  Can you think of any ways that Holmes has

6    behaved in the marketplace that would reveal

7    that it finds some other feature of a

8    programmable slow cooker to be important

9    besides the auto shift to warm?

10 A.  Only in some of the new products.  The Smart

11    Set that you referred to earlier -- excuse

12    me.  We have talked to consumers about these

13    ideas we had, and they liked the ideas a

14    lot, being able to specifically set it to

15    two different cycles, which we don't have

16    today on the market.

17 Q.  Why not?

18 A.  I'm trying --

19 Q.  You said it's not on the market today.  Why

20    not?

21 A.  Yeah, I'm -- you can't see this, but I'm

22    thinking --

23 Q.  Okay.

24 A.  -- to determine if it's actually shipped

**30(b)6**                                    **Page 97**

00098
1     yet.  And we can go back and look for it.

2     We're right at where we could have shipped

3     the product, and I'm not sure if we have.

4          MR. SACK:  Counsel, I'd like you

5     not to interrupt the witness in the middle

6     of his answers.  He has to wait till you

7     finish, and you need to wait till he

8     finishes before you ask questions in the

9     middle of of his discussions.

10 Q.  And I apologize for cutting you off.

11          MR. SACK:  Yeah, I'm sure you

12     didn't do it on purpose.  I just need to

13     caution you.

14 A.  Can I please take a short break?

15 Q.  Sure.

16          THE VIDEOGRAPHER:  The time is

17     11:09.  We're off the record.

18          (Recess)

19          THE VIDEOGRAPHER:  This is the

20     beginning of tape No. 2 in the deposition of

21     of Bart Plaumann.  The time is 10:13, and we

22     are on the record.

23 Q.  Mr. Plaumann, does Holmes contend that it

24     ever marked with the patents in suit any of

**30(b)6**                                    **Page 98**

00099

1    its programmable slow cookers?

2  A.  I don't know if Holmes contends that.

3  Q.  Do you know as a matter of fact whether any

4    programmable slow cookers sold by Holmes

5    contains the marking of the patents in suit?

6  A.  I believe they do.

7  Q.  You believe they do today?

8  A.  Yes.

9  Q.  Do you know when that would have began?

10  A.  No.

11  Q.  Do you know whether they were marked before

12    the lawsuit was filed?

13  A.  I believe they were.

14  Q.  What's that belief based on?

15  A.  I recollect a discussion about marking our

16    product in general at some point in the

17    past.

18  Q.  And do you know when that discussion took

19    place?

20  A.  No, I don't.

21  Q.  Do you know with whom that discussion took

22    place?

23  A.  Specifically, no.  I know it was with my

24    marketing department through discussion that

**30(b)6**                    **Page 99**

00100

1    they had with legal.

2  Q.  Did you ever discuss marking with anybody in

3    legal?

4  A.  I know I have had a conversation about

5    marking product, not specifically to a

6    product of ours but just in general.

7  Q.  Other than what we've talked about, do you

8    have any other basis for your belief that

9    Holmes has marked its programmable slow

10    cooker with the patents in suit?

11  A.  Other than that, no.

12  Q.  Does Holmes contend that it's been damaged

13    by West Bend --

14  A.  Yes.

15  Q.  -- as a result of infringemeant?

16  A.  Yes.

17  Q.  And tell me what that damage is.

18  A.  What the contention is?

19  Q.  Correct.

20  A.  Excuse me.  The contention is that by West

21    Bend coming out with a product that

22    infringes on our patents, they have secured

23    business that otherwise we would have had.

24  Q.  And when you say infringes on the patents,

**30(b)6**                                    **Page 100**

00101

1    you're talking again about the automatic

2    shift to warm?

3  A.  That's correct.

4  Q.  Other than the automatic shift to warm, is

5    there anything else that you contend

6    infringes?

7        MR. SACK:  Objection, asked and

8    answered several times.

9  Q.  You can go ahead and answer.

10  A.  I'm not certain.  That is the contention

11    that I know that we are pursuing.

12  Q.  So as of today, you're not aware of any

13    other basis for an assertion of infringement

14    besides the automatic shift to warm feature,

15    correct?

16        MR. SACK:  Objection.

17  A.  Yeah, I believe that's what I said.

18  Q.  Okay.  But you're not sure that that's what

19    you said?

20  A.  No.  That is -- my contention is it's

21    because of the automatic shift to keep warm

22    and that it's not due to other features that

23    we may have patents that cover.

24  Q.  Other than the automatic shift to warm

**30(b)6**                    **Page 101**

00102
1    feature, which you talked about as having

2    been commercially successful, are there any

3    other features on a programmable slow cooker

4    that have been commercially successful?

5  A.  It's hard for me to separate what you just

6    said, because all of our programmable slow

7    cookers have had the automatic keep warm.

8    And we know that to be -- from the research

9    I've talked about earlier, we know that to

10    be a very important feature.  So I can't

11    really with any -- any certainty say there's

12    other parts of the programmable aspects that

13    the consumers think is a great value.

14  Q.  What is Smart Part?

15  A.  The Smart Part was a product that we

16    introduced that was an accessory that you

17    plug into the wall and convert a manual unit

18    into a programmable unit.

19  Q.  How exactly does that work?

20  A.  You would need to talk to an engineer to get

21    the specifics that way.  What I can tell you

22    is what I understand from, you know,

23    marketing the product.

24  Q.  I understand.

00103

1  A.  Is it plugs into the wall and then you take

2      the plug from your manual slow cooker plug

3      that into the smart part, and you then -- it

4      then operates in similar fashion as the

5      regular programmable slow cooker.  Excuse

6      me -- as a regular programmable slow cooker.

7  Q.  Does the Smart Part incorporate the

8      automatic shift to warm feature?

9  A.  I believe it does, but I can't tell you that

10     with a certainty.  It's been awhile since I

11     was familiar with that product.

12  Q.  Does Smart Part -- strike that.  The Smart

13     Part currently being sold?

14  A.  Not as an active sku.

15  Q.  When did that change?

16  A.  Quite sometime ago.  It's been at least two

17     years, maybe longer since we discontinued

18     it.

19  Q.  Why did it get discontinue?

20  A.  It didn't perform well.  We didn't sell a

21     lot.  It performed great.  We didn't sell a

22     lot of them.

23  Q.  Is there any consumer research that deals

24     with the Smart Part?

**30(b)6**                                    **Page 103**

00104

1  A.  I'm not -- excuse me.  I'm not certain.

2  Q.  Do you have any understanding as to why it

3     didn't sell well?

4  A.  My belief is it was -- we priced it a little

5     bit higher.

6  Q.  What's your believe about how it was priced

7  A.  See now you're testing me.  I think that was

8     -- it went out at $19.99 at retail.

9        But I also have an opinion, being with

10    the company for the length of time I have,

11    that that being integrated into the union

12    was real important, having a fully

13    integrated programmable slow cooker versus

14    having an accessory that converts your unit

15    that you have at home.

16 Q.  And why do you think that?  In essence I

17    think what you're saying is that a consumer

18    faced with the purchase decision of a fully

19    integrated programmable slow cooker or this

20    Smart Part for $19.99 to upgrade their

21    existing manual slow cooker would be more

22    likely to choose the fully integrated unit.

23    Is that what you're saying?

24 A.  That's my personal belief.

**30(b)6**                    **Page 104**

00105

1  Q.  What's that based on?

2  A.  My personal -- just my knowledge of the

3     business and waht I see happens.

4  Q.  Is it based on any of the consumer research

5     you've talked about today?

6  A.  No.

7  Q.  Did Holmes ever do any research to find out

8     why?

9  A.  I don't believe we did.

10  Q.  Do you know why you didn't?

11  A.  In this scheme of all of our business, I

12     would say it's because it wasn't that

13     important.  You know, with all products we

14     introduced, we were disappointed, but not

15     enough to go back and do an audit.

16  Q.  Was it a -- was the Smart Part a profitable

17     on a per unit basis product to sell?

18  A.  At the price we originally sold it at, yes.

19  Q.  So the problem was that it wasn't selling,

20     not that it wasn't profitable when it did

21     sell?

22  A.  Correct.

23  Q.  Do you remember what the margin was?

24  A.  No, I just can tell you that it was high.

**30(b)6**                              **Page 105**

00106

1 Q. And when you say it was high, do you mean

2    high relative to a slow cooker on a

3    percentage basis?

4 A. Yes.

5 Q. So on a percentage basis it would have been

6    higher than a slow cooker?

7 A. Yes.

8 Q. Do you remember --

9 A. It would have been higher than our slow

10    cooker category.

11 Q. What do you mean by that?

12 A. If you've seen -- looked at all the

13    documents we sent you, we sell a whole lot

14    of slow cookers.

15 Q. Right.

16 A. And so it's the aggregate that I'm talking

17    about. When you do the margin for the whole

18    slow cooker category, than you have the

19    Smart Part I remember being higher.

20 Q. And do you recall what the gross margin

21    number of the full slow cooker category is

22    approximately?

23 A. Yes.

24 Q. What is it?

**30(b)6**                                    **Page 106**

00107

1  A.  This year it will be approximately 43

2    percent.

3  Q.  Is that all slow cookers?

4  A.  Yes.

5  Q.  Do you know what the breakdown is between

6    programmable and manual?

7  A.  We have that information.

8  Q.  But you don't know it offhand?

9  A.  Not off the top of my head, but I do know

10    the programmable slow cooker categories is

11    higher margin thant he non-programmable.

12  Q.  Okay.  And the Smart Part had a higher

13    margin than even the programmable slow

14    cooker margin, do you think?

15  A.  That's my recollection --

16  Q.  Okay.

17  A.  -- at the price we originally quoted it at.

18    We ended up closing out some product.  So I

19    don't recall what those prices were, but I

20    know they were less.

21  Q.  Do you know whether Holmes ever made the

22    decision to lower the prior to try to sell

23    more Smart Parts?

24  A.  I think we did, but I'm not certain.  I'm

**30(b)6**                              **Page 107**

00108

1    pretty sure we did.

2 Q.  Okay.  You touched on this briefly this

3    morning.  Is there any convention to the

4    model numbers?  Convention to the way you

5    set your model numbers?  Some of them appear

6    to have the size built into the number.

7    Sometimes it's toward the end.  It's a

8    little hard to tell.

9 A.  Yes, it is.

10 Q.  Is there any rational way to figure it out?

11        MR. SACK:  Is there a a question

12    right now?

13        THE WITNESS:  I believe his

14    question is is there any rational way to

15    figure out the sizes and the description

16    based on the model numbers.

17 Q.  Or otherwise tell what a model is based on

18    the number.

19        MR. SACKS:  I'd like to object to

20    the form of the question.  Can you ask one

21    question.

22 Q.  Is there any way to tell based on the slow

23    cooker model number what product that model

24    number refers to?

**30(b)6**                              **Page 108**

00109

1　A.　Usually.

2　Q.　What does that mean?

3　A.　That means that there was an attempt to make

4　　　sense with the model number, but it doesn't

5　　　always work.

6　Q.　Okay.  Sometimes there are letter at the end

7　　　of a model number.

8　A.　Correct.

9　Q.　What do those refer to?

10　A.　A variety of things.

11　Q.　Such as?

12　A.　It could mean a color.  It could mean a

13　　　customer.

14　Q.　Okay.

15　A.　And it could be something more than that.

16　Q.　Oh, like a finish.  Okay.  Does Holmes view

17　　　other products besides slow cookers as

18　　　competitive products, such as rice cookers

19　　　or steamers or other products?

20　A.　Yes.

21　Q.　Explain how.

22　A.　Holmes, the kitchen business that I ran is

23　　　in a lot of different categories of kitchen

24　　　electrics.  So anybody else that

**30(b)6**　　　　　　　　　　　　　　　　**Page 109**

00110

1    manufactured a product in that category

2    would be considered a competitive company.

3 Q.  But would it be competitive in the sense

4    that it competes with Holmes' slow cookers?

5 A.  No.

6 Q.  So you wouldn't view a a rice cooker sold by

7    a competitor to be competing with a slow

8    cooker?

9 A.  No.

10 Q.  Okay.  And the same would be true of a

11    steamer, that would not be competition for a

12    Holmes' slow cooker, correct?

13 A.  That's correct.

14 Q.  What is Holmes' manufacturing capability?

15 A.  That's not an area of expertise for me to

16    tell you that.

17 Q.  Who is the person who has that expertise?

18 A.  It would be somebody in our -- that heads up

19    our manufacturing.

20 Q.  Do you have any knowledge about Holmes'

21    ability to change manufacturing capacity?

22 A.  Yes.

23 Q.  What do you know about that?

24 A.  Can be more specific with that question?

**30(b)6**                              **Page 110**

00111

1 Q. Yeah. I'm trying to understand how Holmes

2    can adjust manufacturing capacity or

3    capability.

4 A. We provide the factories with forecasts on

5    -- which is what we think we're going to

6    buy. And depending on what they forecasts

7    are, the factory makes adjustments to what

8    they're going to manufacture.

9 Q. How many factories are we talking about?

10 A. Quite a few. In all the products that I was

11    responsible for.

12 Q. Now, I'm talking about just slow cookers,

13    are you?

14 A. No.

15 Q. Okay. Let's talk about just slow cookers.

16 A. Okay.

17 Q. How many factories are we talking about?

18 A. Today I believe it's just two.

19 Q. Which two?

20 A. A factory that is owned 100 percent by our

21    company and then an OEM -- not OEM, but an

22    original equipment manufacturer.

23 Q. What is the name of the factory that is 100

24    percent owned by Holmes?

**30(b)6**                                    **Page 111**

00112

1  A.  It's been known under the name Esteem,

2    E-S-T-E-E-M.  Like high esteem, poor esteem.

3  Q.  And when did Holmes acquire that

4    manufacturing facilty?

5  A.  I believe we started it in 1989.

6  Q.  Do you produce only Holmes products at that

7    facility?

8  A.  Yes.  Today we do.

9  Q.  Was that different in the past?

10  A.  A couple of years ago we were manufactured a

11    product for Proctor & Gamble.

12  Q.  What kind of product?

13  A.  An air freshener.

14  Q.  Any other exceptions to that being the

15    facility where only Holmes products are

16    produced?

17  A.  Not that I'm aware of.

18  Q.  Is their role limited to manufacturing, or

19    do they do any design or engineering or more

20    than just manufacturing?

21  A.  You're referring to Esteem?

22  Q.  Yes.

23  A.  They do some design, you know, directed by

24    the U.S. based business.  And they do a lot

**30(b)6**                                    **Page 112**

00113

1    of engineering.

2  Q.  Do you know what capacity Esteem typically

3    runs at?

4  A.  No.

5  Q.  Would you have the ability to get that

6    information?

7  A.  Yes.

8  Q.  What would you do to get the information?

9  A.  I would contact our engineering head and ask

10    him.

11  Q.  What's his name?

12  A.  Jerry Lizinksi.

13  Q.  And where he is based?

14  A.  He's based in Boca Raton, Florida.

15  Q.  And that's not information that would be

16    difficult to get?

17  A.  I can't really answer that.

18  Q.  You don't know one way or the other?

19  A.  Correct.

20  Q.  Do you have any sense for whether Esteem is

21    running at 100 percent capacity or 80 or 50?

22  A.  No, I don't.

23  Q.  Okay.  The other facility that does

24    manufacturing for you, what is the name of

**30(b)6**                                                **Page 113**

00114

1    that OEM?

2  A.  The name of that OEM that I'm referring to

3      is Yida, Y-I-D-A.

4  Q.  And what is its relationship with Holmes?

5  A.  They manufacturer slow cooker bases for us,

6      and they assemble slow cookers into the

7      finished product.

8  Q.  Both manual and programmable?

9  A.  They only manufacturer -- or they only

10     manufacture bases for the manual and only

11     assemble bases for the manual.

12 Q.  So Yida doesn't do anything relating to

13     programmable cookers?

14 A.  Not that I'm aware of.

15 Q.  So all of the manufacturing for programmable

16     cookers takes place at Esteem?

17 A.  That's my understanding.

18 Q.  Do you know what changes in manufacturing at

19     Esteem do or how they affect costs of

20     programmable slow cookers?

21 A.  Can you be more specific on that?

22 Q.  If there's an increase in manufacturing of

23     programmable slow cooker by Esteem, do you

24     know that how that impacts upon Holmes cost

**30(b)6**                              **Page 114**

00115

1    for slow cookers?

2  A.  You're asking if there's an increase in

3     manufacturing costs?

4  Q.  Correct.

5  A.  Yes.

6  Q.  And what do you base that answer on?

7  A.  They communicate to us the change in the

8     cost.

9  Q.  And those get directly passed on to Holmes?

10  A.  Yes.

11  Q.  And that pass-on is immediate?

12  A.  Not -- not always.

13  Q.  Can you give me an example of what you mean?

14  A.  Yeah, we set prices even from our -- our own

15     factory that says this is what they're going

16     to charge us.  And then there are variances

17     that come across, you know, daily and as

18     commodities go up and down or there's a

19     change in the labor rate or something like

20     that.

21  Q.  Right.

22  A.  And those go through as variances, that hit

23     into my P&L, but not neccessarily on the

24     material cost side.

**30(b)6**                                    **Page 115**

00116

1  Q.  So for some of those variances Esteem might

2      take the hit, for example, if there's an

3      increase in labor costs.  And on others,

4      Holmes might see the increased cost come

5      through.  Is what what you're saying?

6  A.  No, I'll get the hit.  Holmes will get the

7      hit no matter what, or the benefit.

8  Q.  Okay.

9  A.  It just may not be in the material costs.

10  Q.  Where would it show up?

11  A.  In a variance line.

12  Q.  I see.  And if it shows up in the variance

13      line, how would you determine what was the

14      cause?

15  A.  If there is a big enough variance, we

16      investigate it a little bit more than if

17      it's a minimal variance.  And you notice

18      that monthly with the monthly P&L review.

19  Q.  Do you know whether those monthly P&Ls were

20      produced in this litigation?

21  A.  I don't know.  I can tell you that before we

22      were bought by Jarden, we didn't have that.

23      It was aggregate into the Holmes Group.

24  Q.  And how specific are those P&Ls?  Will they

**30(b)6**                                      **Page 116**

00117

1     drill down to slow cookers and particular

2     models or --

3  A.  No.

4  Q.  -- is it aggregate?

5  A.  It's an aggregate of my whole business.

6  Q.  And there's no way to separate out slow

7     cookers or particular models?

8  A.  I don't know if there is or not.

9  Q.  But you don't do that?

10  A.  No.

11  Q.  Do you have any understanding as you sit

12     here today whether or not Esteem could

13     increase its manufacturing capability to

14     produce more slow cookers?

15  A.  My belief is they can.

16  Q.  What is that belief based on?

17  A.  Discussions I've had with Esteem about the

18     ability to manufacturer our products.

19  Q.  Who at Esteem has told you that they have

20     the ability to increase manufacturing?

21  A.  This discussion goes back -- this discussion

22     goes back quite a while, I'm going to say a

23     year or more.  And it's the manufacturing

24     head of the Esteem.

**30(b)6**                                              **Page 117**

00118

1  Q.  What's his name?

2  A.  Tony Lee.

3  Q.  And where is he?

4  A.  He's in Tang Xia, China.

5  Q.  How is that spelled?

6  A.  T-A-N-G.  That's one word.  And X-I-A is the

7     other.

8  Q.  Earlier we talked a little bit about

9     retailers making the decision as to what

10     products appear on their shelves.  Are you

11     aware of any retailers where Rival

12     competitors were selling programmable slow

13     cookers but Rival is not?

14  A.  I believe Sears is not carrying any of our

15     programmables.

16  Q.  Do you know why Sears isn't carrying them?

17  A.  Yes.

18  Q.  Why?

19  A.  Because they purchased Europros programmable

20     slow cooker.

21  Q.  And why does that mean they're not willing

22     to sell yours?

23  A.  They replaced ours with theirs.

24  Q.  Do you know why?

**30(b)6**                                    **Page 118**

00119

1  A.  I believe it's because they offered them a

2     lower price than what they were paying us

3     and a little bit different feature set.

4  Q.  Do you now what feature set?

5  A.  This is going back a little bit.  I believe

6     that it was a 7 quart size, and our unit was

7     five-and-a-half or six.

8  Q.  And you said that the price was another

9     consideration?

10  A.  Yes, we were informed by the buyer that they

11     were able to make more margin at the price

12     that Europro quoted them.

13  Q.  Do you -- did you, when you found this out,

14     compare the Europro versus the slow cooker

15     that you were trying to sell to Sears?

16  A.  We had been selling to Sears.

17  Q.  Okay.  Did you do a comparison of --

18  A.  Yes.

19  Q.  And what did that comparison reveal?

20  A.  The only which I just mentioned, I recall

21     the 7 quart versus our smaller size.  I

22     don't recall if there were any other

23     features.

24  Q.  Okay.  So size and price were the two main

**30(b)6**                                    **Page 119**

00120

1    reasons that Sears decided to stop selling

2    the Rival --

3 A.  Yes.

4 Q.  -- slow cooker and go with the Europro?

5 A.  Yeah.  I think I have to --

6         MR. SACK:  Excuse me, Mr. Plaumann.

7    Could you just wait till the question is

8    over.

9         THE WITNESS:  I was just going to

10    apologize.

11         MR. SACK:  Oh, okay.

12         THE WITNESS:  Because I cut him

13    off, as I did you to tell you that.

14         MR. SARSKAS:  We'll all be very

15    proficient at the end of the day.

16         THE WITNESS:  That's right.

17 Q.  Are you aware of any other circumstances

18    such as the one with Sears where there was

19    discussion about replacing one slow cooker

20    for another because of the size or price or

21    any other feature?

22 A.  No, not as a replacement.

23 Q.  Has Holmes done anything to try to repair

24    that relationship with Sears?

**30(b)6**                                    **Page 120**

00121

1  A.  Well, the relationship was not damaged with

2     Sears.  And Alan doesn't like it when I then

3     try to interpret what you said, but if you

4     mean have we tried to get back on the shelf,

5     of course we have.

6  Q.  What have you tried to do?

7  A.  Well, for one thing we sued Europro.  And

8     we've also tried to go back in to the

9     customer and, you know, tell them the value

10     of our products and the fact that that unit

11     infringes in our opinion.

12  Q.  Have you made any progress with Sears?

13  A.  Not at this point.

14  Q.  When you explained to them the value of the

15     Holmes product, what kinds of things did you

16     explain to them?

17  A.  Well, in addition to what we believe to be

18     an infringing product, we talked about the

19     Crock Pot brand.

20  Q.  Anything else?

21  A.  Yes, we generally talk about our quality,

22     our product of delivery, those types of

23     things.

24  Q.  Does Holmes pay product placement fees to

**30(b)6**                                    **Page 121**

00122

1     retailers?

2  A.  It depends on how you want to determine

3     product placement fees.  There are some

4     customers, yes, it's part of their program

5     and some that there aren't.

6  Q.  Can you explain what you mean by that?

7  A.  Kohl's we have a slotting allowance, which

8     is probably the same thing as product

9     placement fees.

10  Q.  How does that work?

11  A.  They have that as a part of their -- their

12     -- I don't know if company policy is the

13     right thing to say, but if you get a new sku

14     in at Kohl's, you have to pay 25 -- I'm

15     making this number up, because I'm not sure

16     if it's right.  But you pay them $25,000 for

17     that -- that slot.

18  Q.  And what is that designed to cover?

19  A.  For them it's designed to cover the cost of

20     exiting whatever other product, you know,

21     you're replacing on the shelf.

22  Q.  And so that fee is paid at the beginning of

23     a relationship with the retailer or at least

24     a transition of a new product into that

**30(b)6**                                    **Page 122**

00123

1   retailer's stores?

2  A.  I'm not certain when they take that

3    deduction for that payment.  It's agreed to

4    prior to the product shipping.

5  Q.  Okay.  What about advertising?  Is there any

6    reimbursement for payments made for

7    advertising, or does the retailer do all of

8    their own?

9  A.  It varies by retailer.

10  Q.  Can you explain what you mean by that?

11  A.  Some retailers require a high percentage

12    than others.  Some don't require any.

13  Q.  So in some cases a retailer might ask you to

14    participate in their advertising that

15    includes your product?

16  A.  Correct.

17  Q.  And that varies by advertiser?

18  A.  That varies by customer.

19  Q.  By customer, okay.  How does Holmes factor

20    in the product placement fees or advertising

21    assistance in its pricing policies,

22    marketing policies, if at all?

23  A.  We have what is known -- what we -- is a

24    profromer that we work on in our company.

**30(b)6**                                    **Page 123**

00124

1  Q.  And how does that information get put on the

2      proformer and then used by Holmes?

3  A.  It starts with the sales manager and the

4      customer talking.  They communicate back to

5      our sales coordination department if you

6      want to call it that, a marketing person.

7      Who then goes into the system and, you know,

8      there's a proformer for a customer.  So

9      we'll keep with Kohl's.  You pull up the

10     Kohl's proformer and plug in the different

11     terms and conditions that they require and

12     the sell price of the product, and then it

13     calculates the bottom line.  And then we

14     make a determinion on whether that's

15     acceptable or not.

16 Q.  And so those fees end up being factored into

17     your gross margin numbers?

18 A.  Yes.

19 Q.  Essentially in the way that you've

20     described, you end up with a net number?

21 A.  Correct.

22 Q.  Okay.  How does Holmes track market share

23     for programmable slow cookers?

24 A.  There's not one specific source that you can

**30(b)6**                                    **Page 124**

00125

1    go to that has the entire country.  So

2    there's never 100 percent.  You have to

3    extrapolate some.  But A.C. Nielson is one.

4    Customer POS is another.

5  Q.  Are there any other sources for market share

6    information?

7  A.  I'm not certain if we use anything else

8    besides that.

9  Q.  Do you independently of A.C. Nielson or

10    Customer POS try to gather that kind of

11    information?

12  A.  Can we take a break for just a minute?

13  Q.  Sure.

14        THE VIDEOGRAPHER:  The time is

15    10:48.  We are off the record.

16        (Recess)

17        THE VIDEOGRAPHER:  Back on the

18    record.  The time is 11:56.

19  Q.  Mr. Plaumann, if you would be kind enough to

20    get the binder that I handed you earlier,

21    which is the second of the two.  You got the

22    cord wrapped in that.  Don't pull it out.

23    If you would be kind enough to turn to the

24    document at tab 51, please.

**30(b)6**                              **Page 125**

00126

1 A.  I'm there.

2          MR. SARSKAS:  We're going mark this

3    as the next exhibit.

4 Q.  If you would be kind enough to identify this

5    document for me, please?

6          MR. SACK:  Excuse me.  Are these

7    exhibits -- just for the record, do these

8    exhibits go along with the tab numbers, so

9    they're Exhibit 51?  Or are they Exhibits 1,

10   2, 3, 4, 5?

11         MR. SARSKAS:  I am not going to

12   mark all of the tabbed pages as exhibits.

13         MR. SACK:  Okay.  Could you get us

14   -- usually in the past these things have

15   been marked as exhibits in order.  Could you

16   get me some sort of document which tells me

17   which tab is which exhibit, you know, in a

18   relatively quick time?

19         MR. SARSKAS:  Sure.

20         MR. SACK:  So I could do that.

21         MR. SARSKAS:  Absolutely.

22         MR. SACK:  Because I thought you

23   were talking about -- those were the exhibit

24   numbers also.

**30(b)6**                                    **Page 126**

00127

1  A.  This appears to be a portion of a P&L

2     statement.

3  Q.  You seem to be uncertain.

4  A.  Well, because there's -- we don't have the

5     rest of the SG&A.  And where you see a

6     staple, and there's not a second page.

7  Q.  Okay.

8  A.  So that's why.

9  Q.  What would be contained on the second page?

10  A.  I would have to really look at a P&L to make

11     sure what I'm telling you is accurate, but

12     underneath this cost of goods, then we would

13     have the SG&A --

14         (Discussion off the record).

15  A.  Selling general and administrative costs,

16     which include selling, marketing some of the

17     those things.

18  Q.  Is this for the entire kitchen business

19     unit?

20  A.  Yes.

21  Q.  And you don't keep this kind of data broken

22     down further beyond the kitchen business

23     unit; is that correct?

24  A.  Can you be more specific in that question?

**30(b)6**                                    **Page 127**

00128

1  Q.  You don't do profit -- I think you said

2      earlier that Holmes doesn't prepare profit

3      and loss statements further down beyond the

4      kitchen business unit.  That's the lowest

5      level of a profit and loss statement; is

6      that true?

7  A.  That is correct.

8  Q.  What is the coop category?

9  A.  That is amount of money that we give to our

10      customers to advertise our products.

11  Q.  And what about the intercompany markup

12      category?

13  A.  Where do you find that line?  I don't see

14      that on here.

15  Q.  I don't either.  I'll withdraw the question.

16  A.  Okay.

17  Q.  What about the licensing income, what is

18      that based on?

19  A.  That is based on a contract that we have

20      with a company that licenses our Crock Pot

21      brand.

22  Q.  Which company is that?

23  A.  The division is Banquet.  The company is

24      Conagra

**30(b)6**                              **Page 128**

00129

1  Q.  And although it doesn't show up on this

2     document, has there been other licensing

3     revenue, interbrand revenue in the past?

4  A.  Yes.

5  Q.  What does that attribute to?

6  A.  We have received royalties on our Crock Pot

7     brand for cookbooks.

8  Q.  Anything else?

9  A.  Nothing that I can recall.

10  Q.  Is this the kind of document that Holmes

11     creates and keeps in the ordinary course of

12     its business?

13  A.  It is now since we were acquired by -- from

14     -- by Jarden.

15  Q.  But it wasn't prior to the acquisition?

16  A.  Correct.

17  Q.  Can you turn to tab 49, please.

18  A.  I'm there.

19        MR. SARSKAS:  We'll mark that as

20     the next in line.

21  Q.  Can you identify this document for me,

22     please.

23  A.  This appears to be a document that shows all

24     of our programmable slow cooker sales by

**30(b)6**                                    **Page 129**



## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

THE HOLMES GROUP, INC.,

    Plaintiff,

    v.

WEST BEND HOUSEWARES, LLC and
FOCUS PRODUCTS GROUP, LLC,

    Defendants.

Civil Action No. 05-CV-11367 WGY
(Alexander, M.J.)

### HOLMES' RESPONSES AND OBJECTIONS TO DEFENDANTS'
### AMENDED FIRST RULE 30(B)(6) DEPOSITION NOTICE

The Holmes Group, Inc. ("Holmes") hereby objects as follows to Defendants' Amended

Rule Notice 30(b)(6) Deposition Notice to Holmes.

### GENERAL OBJECTIONS

The following Objections are made to the entirety of Defendants' Amended 30(b)(6)

Notice of Deposition to Holmes:

1.    Holmes objects to the Notice to the extent West Bend intends to exceed the

maximum duration of seven (7) hours prescribed by Fed.R.Civ.P. 30(d)(2).

2.    Holmes objects to the Notice to the extent that any topic for testimony purports,

through definitions or otherwise, to impose obligations beyond those contained in the Federal

Rules of Civil Procedure.

3.    Holmes objects to each of the topics for testimony insofar as they are

unnecessary, burdensome and vexatious in that they are cumulative and/or duplicative of

documents or information already requested in Defendants' production requests and

interrogatories.

1

4.      Holmes objects to each of the topics for testimony insofar as it lacks the reasonable particularity required by Rule 30(b)(6), or are vague, overly broad, oppressive, harassing or vexatious; impose burden or expense that outweighs their likely benefit; seek a legal conclusion or expert testimony; and/or seek information no relevant to the subject matter of this litigation.

5.      Holmes objects to each of the topics for testimony insofar as it is overly broad, unduly burdensome, and not relevant to the extent that any topic for testimony is unlimited in temporal scope or otherwise not limited to a time frame relevant to this litigation.

6.      Holmes objects to each of the topics for testimony insofar as it seeks information protected against disclosure by the attorney client-privilege, the work-product doctrine, or any other applicable privilege or rule of confidentiality.

7.      Holmes objects to each of the topics for testimony insofar as it seeks disclosure of information that would violate the privacy rights of individuals or request disclosure of confidential commercial information, trade secrets, and/or proprietary information.

## SPECIFIC DESIGNATIONS

**TOPIC 1:** Holmes' document gathering efforts in this litigation.

**RESPONSE 1:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 2:** The conception dates for the alleged inventions of claims 13, 14, 17 and 19 of U.S. Patent No. 6,573,483 ("the '483 patent") and the individuals involved in such conception, including the identification of any documents supporting these dates.

**RESPONSE 2:** - Holmes designates Mr. Thrasher to testify as to this category.

2

**TOPIC 3:** The first reduction to practice for the alleged inventions of claims 13, 14, 17, and 19 of the '483 patent and the individuals involved in such reduction to practice, including the identification of documents supporting these dates.

**RESPONSE 3:** - Holmes designates Mr. Thrasher to testify as to this category.

**TOPIC 4:** The diligence, if any, in reducing to practice the alleged inventions of claims 13, 14, 17, and 19 of the '483 patent and the individuals involved in such diligent reduction to practice, including the identification of documents supporting these dates.

**RESPONSE 4:** - Holmes designates Mr. Thrasher to testify as to this category.

**TOPIC 5:** The conception dates for the alleged inventions of claims 20, 24, 26, 27, and 29 of U.S. Patent No. 6,740,855 ("the '855 patent") and the individuals involved in such conception, including the identification of documents supporting these dates.

**RESPONSE 5:** - Holmes designates Mr. Thrasher to testify as to this category.

**TOPIC 6:** The reduction to practice for the alleged inventions of claims 20, 24, 26, 27, and 29 of the '855 patent and the individuals involved in such reduction to practice, including the identification of documents supporting these dates.

**RESPONSE 6:** - Holmes designates Mr. Thrasher to testify as to this category.

**TOPIC 7:** The diligence, if any, in reducing to practice the alleged inventions of claims 20, 24, 26, 27, and 29 of the '855 patent and the individuals involved in such diligent reduction to practice, including the identification of documents supporting these dates.

**RESPONSE 7:** - Holmes designates Mr. Thrasher to testify as to this category.

**TOPIC 8:** The reasons for and factual basis of the inclusion of Mary K. Barrow on U.S. provisional application nos. 60/189,443 and 60/196,273.

**RESPONSE 8:** - Holmes designates Mr. Thrasher to testify as to this category.

3

**TOPIC 9:** The reasons for and factual basis of the removal of Mary K. Barrow as an inventor from U.S. provisional application nos. 60/189,443 and 60/196,273.

**RESPONSE 9:** - Holmes designates Mr. Thrasher to testify as to this category.

**TOPIC 10:** The reasons for and factual basis of the addition of James DeCorbert, Lorens Hlava, and Mr. Thrasher as inventors for U.S. provisional application nos. 60/189,443 and 60/196,273.

**RESPONSE 10:** - Holmes designates Mr. Thrasher to testify as to this category.

**TOPIC 11:** The ownership of Holmes HTC in Dongguan, PRC.

**RESPONSE 11:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 12:** The ownership of the Holmes Group, Inc.

**RESPONSE 12:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 13:** The common ownership, if any, between Holmes HTC in Dongguan, PRC and the Holmes Group, Inc.

**RESPONSE 13:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 14:** Sales and offers to sell between the Holmes Group, Inc. and Holmes HTC of products embodying any claim of the '483 and '855 patent, including the dates of the first such sale and offer to sell and including the identification of documents supporting these sales, offers to sell, and dates.

**RESPONSE 14:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 15:** The involvement, if any, of Holmes HTC in the design of any electronic slow cookers including the identification of any documents related to such involvement.

**RESPONSE 15:** - Holmes designates Mr. Plaumann and Mr. Thrasher to testify as to this category.

4

**TOPIC 16:** The involvement, if any, of Holmes HTC in the design of any product embodying the alleged inventions claimed in the '483 and '855 patents including the identification of any documents related to such involvement.

**RESPONSE 16:** - Holmes designates Mr. Plaumann and Mr. Thrasher to testify as to this category.

**TOPIC 17:** The reasons for and factual basis of Holmes' decision, if any, whether to assert claims from its '483 or '855 patent against any third party or third party product including but not limited to:

- the Corningware SC-40PL slow cooker;

- the All-Clad programmable slow cooker; and

- the Innova, Inc. Ultrex digital slow cooker.

**RESPONSE 17:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 18:** All licenses granted by Holmes, to any third party under the '483 or '855 patents or any agreement with any third party regarding the '483 or '855 patent including the dates such licenses or agreements were granted, the parties to the license or agreement, the products covered by the license or agreement, and the terms of the licenses or agreements, including but not limited to those licenses or agreements with the parties noted in topic 17 supra.

**RESPONSE 18:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 19:** Knowledge or awareness of the Rival Model No. 3350/2 slow cooker within the Holmes Group, Inc., or its predecessors-in-interest of the Rival Crock Pot slow cookers, including the identity of individuals with such knowledge or awareness and the dates such individuals were employed by the Holmes Group, Inc. or its predecessors-in-interest.

**RESPONSE 19:** - Holmes designates Mr. Plaumann to testify as to this category.

5

**TOPIC 20:** The reasons why the Rival Model No. 3350/2 slow cooker was not disclosed to the patent office during the prosecution of the patents-in-suit.

**RESPONSE 20:** - Holmes designates Mr. Thrasher to testify as to this category.

**TOPIC 21:** The design, construction, and operation of Rival Model No. 3350/2.

**RESPONSE 21:** - Holmes designates Mr. Thrasher to testify as to this category.

**TOPIC 22:** The model number, design, construction, manufacture and date of first sale of the slow cooker circled in red below and underneath the "1974" title as shown on the http://www.crockpot.com/aboutus.aspx website ("circled slow cooker") and the identification of all documents which show such design, construction, manufacture and date of first sale.



**RESPONSE 22:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 23:** Knowledge or awareness of the circled slow cooker depicted in topic 22 supra within the Holmes Group, Inc. or its predecessors-in-interest of the Rival Crock Pot slow cookers, the identity of individuals with such knowledge or awareness, and the dates such individuals were employed by the Holmes Group, Inc. or its predecessors-in-interest and identification of all documents which identify such individuals and dates.

**RESPONSE 23:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 24:** The design, construction, and operation of the circled slow cooker depicted in topic 22 supra.

**RESPONSE 24:** - Holmes designates Mr. Plaumann and Mr. Thrasher to testify as to this category.

**TOPIC 25:** Holmes contentions, if any, that there are secondary considerations of non-obviousness supporting the validity of the '483 and '855 patents including but not limited to any alleged commercial success of embodiments of the '483 and '855 patents; any alleged long felt but unmet need for the inventions embodied in the '483 and '855 patents; any alleged failure of others to find a solution for the problems solved by the '483 and '855 patents; and any alleged licensing of the '483 and '855 patents.

**RESPONSE 25:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 26:** The reasons for and factual bases of Holmes' allegations that West Bend's alleged infringement of the '483 and '855 patents is willful.

**RESPONSE 26:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 27:** The bases for Holmes' response to West Bend's Interrogatory No. 1 and the reasons for and factual bases of Holmes' allegations that West Bend infringes the '483 and '855 patents.

**RESPONSE 27:** - Objection - Premature. Holmes' Technical Expert will testify as to this category.

**TOPIC 28:** The reasons for and factual bases of Holmes filing this lawsuit against Focus Products Group, LLC.

**RESPONSE 28:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 29:** The bases for and investigation into Holmes' claim of infringement against West Bend's slow cooker, including but not limited to any opinions from counsel regarding West Bend's alleged infringement of the '483 and '855 patents and the validity or invalidity of the 483 and '855 patents.

**RESPONSE 29:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 30:** Holmes' first awareness of the West Bend slow cooker accused of infringing the '483 and '855 patents and the first time Holmes' concluded that West Bend's accused slow cooker infringed these patents.

**RESPONSE 30:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 31:** Holmes' discussions with any third party regarding the West Bend slow cooker accused of infringing the '483 and '855 patent, including but not limited to OEM, WalMart, K-Mart, and Target.

**RESPONSE 31:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 32:** Any and all efforts by Holmes to license the Patents-in-Suit or any other technology relating slow cooker appliances, including all offers related to licensing, all negotiations relating to licensing, and the terms of all executed license agreements. In this Notice, the phrase "Patents-in-Suit" shall mean the '483 patent '855 patent, including the applications and prosecution histories leading to those patents, as well as all patents claiming priority to or

8

relating to the Patents-in-Suit, including, without limitation, reexaminations, divisionals, continuations, continuations-in-part, foreign counterpart patents, and foreign counterpart patent applications whether pending or abandoned.

**RESPONSE 32:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 33:** Royalties paid to, or by, Holmes pursuant to all licenses related to the Patents-in-Suit and all other licenses related to slow cooker appliances.

**RESPONSE 33:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 34:** Holmes' claim for a reasonable royalty in this case, including all bases for Holmes' claim, any established royalty rate, and the factors set forth for ascertaining a reasonable royalty rate pursuant to *Georgia Pacific Corp. v. United States Plywood Corp,* 318 F. Supp. 1116 (S.D.N.Y. 1970).

**RESPONSE 34:** - Premature. Holmes Damages Expert will testify as to this category.

**TOPIC 35:** The unit and dollar volume of Holmes' sales of all embodiments of the patents-in-suit.

**RESPONSE 35:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 36:** The gross and net profits earned by Holmes on its sales of all embodiments of the patents-in-suit, including the calculation of gross and net profits, sales prices, revenues, costs of goods sold, marginal costs, incremental costs, variable costs, standard costs, fixed costs, and variances.

**RESPONSE 36:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 37:** The market for the sale of all embodiments of the Patents-in-Suit, including the identity of customers, competitors, competing products, sales prices, elasticity of supply and demand, the size of the market, and the absolute and relative market shares of competitors.

9

**RESPONSE 37:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 38:** Holmes' claim that it is entitled to recover lost profits, including Holmes' definition of the relevant market, the availability of non-infringing substitute products in the relevant market, the amount of Holmes' claimed lost profits, and all bases for Holmes' claim for lost profits.

**RESPONSE 38:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 39:** Holmes' ability and capacity to manufacture, market, and sell all of its embodiments of the patents-in-suit.

**RESPONSE 39:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 40:** Identification and quantification (in units and dollars) of any convoyed or derivative sales and profits, arising from the sale of all embodiments of the Patents-in-Suit.

**RESPONSE 40:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 41:** Holmes' marketing and promotion of all embodiments of the Patents-in-Suit, including Holmes' marketing of the features of all embodiments of the Patents-in-Suit such as advertising of those features and communications with customers regarding the alleged advantages or benefits of those features.

**RESPONSE 41** - Objection - vague. To the extent understood, Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 42:** Identification of and the factual bases for all of the documents produced by Holmes relating to damages, including but not limited to, documents produced in response to Request for Production Nos. 4, 5, 10 through 14, 18, 20, 66 through 69, 72, and 74 through 82.

**RESPONSE 42:** - Holmes designates Mr. Plaumann to testify as to this category.

10

**TOPIC 43:** The factual bases for Holmes' responses to Defendants' Interrogatory Nos. 9 and 11.

**RESPONSE 43:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 44:** The reasons and factual bases for Holmes' contention that the West Bend design patents are not valid pursuant to Sections 101, 102, 103, and 112 of the Patent Act as alleged in Paragraphs 8, 13, and 18 of Holmes' Counterclaims to West Bend's Counterclaims dated October 4, 2005 and as alleged in Holmes' response to West Bend Interrogatory No. 13. In this Notice, the phrase "West Bend design patents" shall mean United States Patent Nos. D 434,266 ("the '266 patent"), D 444,664 ("the '664 patent"), and D 444,993 ("the '993 patent").

**RESPONSE 44:** - Premature. Holmes' Design Expert will testify as to this category.

**TOPIC 45:** Holmes' reliance on opinion of counsel concerning West Bend's charge of infringement of the West Bend design patents.

**RESPONSE 45:** - Privileged - Holmes designates Mr. Plaumann to testify as to this category to the extent such testimony falls outside the attorney-client privilege.

**TOPIC 46:** Identification of all prior art that Holmes contends anticipates or renders obvious the West Bend design patents and an explanation of how such prior art anticipates or renders obvious the West Bend design patents.

**RESPONSE 46:** - Premature. Holmes' Design Expert will testify as to this category.

**TOPIC 47:** Holmes' contention regarding the level of ordinary skill in the art relevant to the West Bend design patents, including the factual bases for such contention.

**RESPONSE 47:** - Premature. Holmes' Design Expert will testify as to this category.

**TOPIC 48:** Holmes' contentions, if any, that there are no secondary considerations of non-obviousness supporting the validity of the West Bend design patents. Secondary considerations include the commercial success of embodiments of the West Bend design patents; long felt but unmet need for the inventions embodied in the West Bend design patents; the failure of others to find a solution for the problems solved by the West Bend design patents; and licensing of the West Bend design patents.

**RESPONSE 48:** - Premature. Holmes' Design Expert will testify as to this category.

**TOPIC 49:** Holmes' contention that its accused products, the Holmes Slow Cookers, do not infringe the West Bend design patents, including Holmes' response to West Bend Interrogatory No. 14. In this Notice, the phrase "Homes Slow Cookers" refers to certain slow cooker appliances, made, sold, or offered for sale by Holmes that are covered by any of the claims of the West Bend design patents, including but not limited to products bearing model numbers 3730 and 37351 as identified in West Bend's response to Holmes' Interrogatory No. 8.

**RESPONSE 49:** - Premature. Holmes' Design Expert will testify as to this category.

**TOPIC 50:** Holmes' knowledge of and awareness of the West Bend design patents, including the date and circumstances under which Holmes first learned of the West Bend design patents.

**RESPONSE 50:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 51:** The gross and net profits earned by Holmes on its sales of the Holmes Slow Cookers, including the calculation of gross and net profits, sales prices, revenues, costs of goods sold, marginal costs, incremental costs, variable costs, standard costs, fixed costs, and variances.

**RESPONSE 51:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 52:** The unit and dollar volume of Holmes' sales of the Holmes Slow Cookers.

**RESPONSE 52:** - Holmes designates Mr. Plaumann to testify as to this category.

12

**TOPIC 53:** Holmes' contentions regarding the amount of reasonable royalty damages owed to West Bend if it is determined that Holmes has infringed the West Bend design patents.

**RESPONSE 53:** - Premature. Holmes' Damages Expert will testify as to this category.

**TOPIC 54:** The market for the sale of the Holmes Slow Cookers, including the identity of customers, competitors, competing products, sales prices, elasticity of supply and demand, the size of the market, and the absolute and relative market shares of competitors.

**RESPONSE 54:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 55:** Identification and quantification (in units and dollars) of any convoyed or derivative sales and profits arising from the sale of the Holmes Slow Cookers.

**RESPONSE 55:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 56:** Holmes' marketing and promotion of the Holmes Slow Cookers, including Holmes' marketing of the features of the Holmes Slow Cookers such as advertising of those features and communications with customers regarding the alleged advantages or benefits of those features.

**RESPONSE 56:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 57:** The reasons and factual bases for Holmes' contention that its alleged infringement of the West Bend design patents has not been willful.

**RESPONSE 57:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 58:** Knowledge or awareness of the Rival Model No. 4350W rice cooker within the Holmes Group, Inc., or its predecessors-in-interest, including the identity of individuals with such knowledge or awareness and the dates such individuals were employed by the Holmes Group, Inc. or its predecessors-in-interest.

**RESPONSE 58:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 59:** The date the Rival Model No. 4350W rice cooker was first sold or offered for sale in the United States, including the entity to which such sale or offer for sale was made.

**RESPONSE 59: -** Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 60:** The date the Rival Model No. 4350W rice cooker was first publicly displayed in the United States, including the entity to whom this display was made.

**RESPONSE 60:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 61:** The identify of the individuals involved in the design of the Rival Model No. 4350W rice cooker and the role of each individual in this design.

**RESPONSE 61: -** Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 62:** The identity of the individuals involved in the marketing of the Rival Model No. 4350W rice cooker and the role of each individual in this marketing.

**RESPONSE 62: -** Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 63:** The identity of the individuals involved in the sales of the Rival Model No. 4350W rice cooker and the role of each individual in these sales.

**RESPONSE 63: -** Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 64:** Identification of any patents or patent applications directed to any aspect of the Rival Model No. 4350W rice cooker, including the date(s) such patent applications were filed and date of patent issuance.

**RESPONSE 64: -** Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 65:** The reasons why the Rival Model No. 4350W was not disclosed to the patent office during the prosecution of the '483 and '855 patents (collectively the "patents in suit").

**RESPONSE 65: -** Holmes designates Mr. Thrasher to testify as to this category.

**TOPIC 66:** The design, construction, and operation of the Rival Model No. 4350W rice cooker.

**RESPONSE 66:** - Holmes designates Mr. Thrasher to testify as to this category.

**TOPIC 67:**  Knowledge or awareness of the Rival Model No. 4310 rice cooker within the Holmes Group, Inc., or its predecessors-in-interest, including the identity of individuals with such knowledge or awareness and the dates such individuals were employed by the Holmes Group, Inc. or its predecessors-in-interest.

**RESPONSE 67:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 68:**  The date the Rival Model No. 4310 rice cooker was first sold or offered for sale in the United States, including the entity to which such sale or offer for sale was made.

**RESPONSE 68:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 69:**  The date the Rival Model No. 4310 rice cooker was first publicly displayed in the United States, including the entity to whom this display was made.

**RESPONSE 69:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 70:**  The identify of the individuals involved in the design of the Rival Model No. 4310 rice cooker and the role of each individual in this design.

**RESPONSE 70:** - Holmes designates Mr. Thrasher to testify as to this category.

**TOPIC 71:**  The identity of the individuals involved in the marketing of the Rival Model No. 4310 rice cooker and the role of each individual in this marketing.

**RESPONSE 71:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 72:**  The identity of the individuals involved in the sales of the Rival Model No. 4310 rice cooker and the role of each individual in these sales.

**RESPONSE 72:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 73:** Identification of any patents or patent applications directed to any aspect of the Rival Model No. 4310 rice cooker, including the date(s) such patent applications were filed and date of patent issuance.

**RESPONSE 73:** - Holmes designates Mr. Thrasher to testify as to this category.

**TOPIC 74:** The reasons why the Rival Model No. 4310 was not disclosed to the patent office during the prosecution of the patents in suit.

**RESPONSE 74:** - Holmes designates Mr. Thrasher to testify as to this category.

**TOPIC 75:** The design, construction, and operation of the Rival Model No. 4310 rice cooker.

**RESPONSE 75:** - Holmes designates Mr. Thrasher to testify as to this category.

**TOPIC 76:** The identity of any other rice cookers sold by the Holmes Group, Inc., or its predecessors-in-interest, besides the Rival Model Nos. 4530W and 4310, that include a control housing mounted or affixed to, or projecting from, the outside of the appliance and were first publicly displayed, sold, or offered for sale prior to January 1, 2000.

**RESPONSE 76:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 77:** The design, construction, and operation of the rice cookers identified in topic 76 supra.

**RESPONSE 77:** - Holmes designates Mr. Thrasher to testify as to this category.

**TOPIC 77:** The identity of all slow cookers, roasters, and steamers sold by the Holmes Group, Inc., or its predecessors-in-interest, that include a control housing mounted or affixed to, or projecting from, the outside of the appliance and were first publicly displayed, sold, or offered for sale prior to January 1, 2000.

**RESPONSE 78:** - Holmes designates Mr. Plaumann to testify as to this category.

**TOPIC 79:** The design, construction, and operation of the slow cookers, roasters, and steamers identified in topic 78 supra.

**RESPONSE 79:** - Holmes designates Mr. Thrasher to testify as to this category.

Dated: October 30, 2006                    Respectfully submitted,


By:    /s/ Alan M. Sack
       HOFFMANN & BARON, LLP
       6900 Jericho Turnpike
       Suite 200
       Telephone: 516-822-3550
        Facsimile: 516-822-3582

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

THE HOLMES GROUP, INC.

        Plaintiffs,

    v.

WEST BEND HOUSEWARES, LLC and
FOCUS PRODUCTS GROUP, LLC

        Defendants.

No. 05-CV-11367-WGY
(Alexander, M.J.)

**CERTIFICATE OF SERVICE**

I, Alan M. Sack, hereby declare under penalty of perjury that on October 30, 2006, I caused to be served a true and correct copy of the following documents by email on the person listed below:

1.    Holmes' Responses and Objections to Defendants'
       Amended First Rule 30(b)(6) Deposition Notice

Joseph T. Miotke, Esq.
Michael Best & Friedrich LLP
100 East Wisconsin Avenue
Suite 3300
Milwaukee, WI 53202-4108

/s/ Alan M. Sack
Alan M. Sack

18



**PATENT**

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Applicant(s) | : | DeCobert, et al. |
| Application No. | : | 11/091,047 |
| Filed | : | March 28, 2005 |
| Title | : | PROGRAMMABLE SLOW-COOKER APPLIANCE |
| TC/A.U. | : | 3742 |
| Examiner | : | Joseph Pelham |
| Conf. No. | : | 3586 |
| Docket No. | : | 717-675 CIP/CON |
| Dated | : | October 6, 2006 |

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

*I hereby certify this correspondence is being deposited
with the United States Postal Service as first class mail,
postpaid in an envelope, addressed to:
Commissioner for Patents, P.O. Box 1450,
Alexandria, Virginia 22313-1450*
*on* 10 - 6 - 2006
*Signed:*

## DECLARATION UNDER 37 C.F.R §1.132 OF BART J. PLAUMANN

Sir:

I, Bart J. Plaumann, declare as follows:

1.    I am the Senior Vice President and General Manager Kitchen SBU of Jarden Consumer
Solutions, the Owner of the above-identified patent application (hereinafter "Jarden").



2.    I have been in the position of Senior Vice President and General Manager for the last 4 years, and I have worked in the sales and marketing of slow-cookers since 2000.

3.    My position includes overseeing the sales and marketing of electric slow-cookers including programmable slow-cookers which are the subject of the above referenced patent application.

4.    Electric slow-cookers have been in the marketplace for at least 30 years. During this time the owner of the present application and it predecessors have been marketing slow-cookers under the trademarks Crock•Pot® and Rival®. In the past, as well as today, slow-cookers have been marketed with manual controls to set a cooking temperature such as low and high and off.

5.    Slow-cookers are viewed as generally imprecise cooking devices that did not need any form of exacting control. Since the amount of cooking time is relatively long and the food is cooked at a relatively low temperature, there was not seen a need for including a timer on a slow-cooker. If the cooking was started in the morning, the food would be cooked and ready to serve at dinner time. The Crock•Pot® brand has been, and continues to be, marketed under the slogan, "cooks all day while the cook's away."

6.    However, the inventors did recognize problems with the traditional prior art slow-cookers. Food if left too long in the slow-cooker could dry out or become overcooked. Also, users were showing a concern about leaving their slow-cookers on too long. The inventors recognized that there would be an advantage to having more control over the cooking process. Thus, there was a need in the marketplace for a programmable slow-cooker which more accurately controls a cooking time and temperature as well as provide a keep warm feature should the user not be available to attend to the appliance at the end of the set cooking time.

7.    In 2000, Jarden's predecessor, The Holmes Group LLC., introduced the first programmable slow-cooker into the marketplace. The programmable slow-cooker gave the user the ability to set a cooking time and temperature. At the end of the cooking time, the power to the heating element is automatically reduced to a warm setting such that the food would be kept

at a proper serving temperature and prevent spoilage if the slow-cooker were left unattended. Since its introduction, the programmable slow-cooker with auto keep warm feature has been a tremendous commercial sales success. Since 2000, sales of programmable slow-cookers have steadily increased. Today, programmable slow-cookers account for over 40% of our slow-cooker sales, which sales exceed one hundred million dollars ($100,000,000).

8.    Programmable slow-cookers are the same as traditional slow-cookers but for the programmable features which permit a user to set a cooking time and temperature and the temperature being automatically reduced at the end of the cook time to keep the food warm. The programmable slow-cooker is a premium product which costs more that the traditional slow-cooker. The success of the programmable slow-cooker in the marketplace is directly attributable the programmable features.

9.    Once the programmable slow-cooker established itself as a success in the market, many competitors have attempted to copy it. These competitors each market a programmable slow-cooker that permits a user to set a time and temperature and also includes an automatic warm feature after the expiration of the set timed cooking cycle. Jarden has contacted nine (9) different competitors that have started marketing programmable slow-cookers, and is currently engaged in lawsuits with two (2) of those companies based on patents related to the pending application. The two pending lawsuits are:

The *Holmes Group v. West Bend Housewares, LLC et al.* 05-cv-11367 pending in the District of Massachusetts; and

*The Holmes Group v. Euro-Pro Operating, LLC* 05-cv-10504, pending in the District of Massachusetts.

10.    Our competitors promote the automatic keep warm feature on their packaging, which demonstrates its significance in the market. Exhibits A and B. For example, Euro-Pro's product packaging prominently states, "Serve & Warm Automatically initiates the keep warm setting when cooking is complete…" Exhibit A. West Bend on its product packaging prominently states, "Electronic control automatically shifts to Keep Warm." Exhibit B.

11.    The significance of a slow cooker having the programmable features including the automatic keep warm mode has been recognized by the industry. Eating Well magazine in its March 2006 issue praises the Rival® Smart-Pot programmable slow cooker by stating, "[b]ut perhaps our favorite feature is the automatic shift-to-warm setting, which allows your meal to cook for its predetermined time and then switch to a setting that keeps the food at a safe temperature until you're ready to eat." Exhibit C. The importance of Jarden's Smart-Pot's automatic shift to warm feature is also indicated on Eating Well's web site. Exhibit D. Jarden's programmable slow cooker and its automatic keep warm feature was also highlighted in a February 2006 issue of Woman's Day magazine. Exhibit E.

12.    The significance of the automatic shift to a keep warm mode after a cooking time has ended has been further recognized by the media. The Akron Beacon Journal states:

    The improvements in the new generation of slow cookers are impressive:
    The most sophisticated programmable pots (about $70) can be set to cook in both
    hour and half-hour increments, plus they switch to a warm mode when the
    cooking time is up.

Exhibit F.

    The Miami Herald wrote:

    Several manufactures offer programmable slow cookers. When cooking time is
    up, the pots automatically shift into 'warm' mode-- the perfect solution to an
    eight-hour recipe and a 10-hour workday.

Exhibit G.

    The media has clearly recognized the importance and benefits of the programmable slow cooker that automatically shifts to a keep warm mode at the end of a cooking time.

I hereby declare that all statement made herein of my own knowledge are true and that all statements made on information and belief are believed to be true, that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment or both under Section 1001 of Title 18 of the United States Code, and that such willful statements may jeopardize the validity of the application or any patent issued thereon.

Dated: 10/6/06

Respectfully submitted,

Bart J. Plaumann

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

```
-----------------------------------------------------X
THE HOLMES GROUP, INC.,               :
                                      :
                  Plaintiff,          :      Civil Action No.  05-CV-11367 WGY
          v.                          :      (Alexander, M.J.)
                                      :
WEST BEND HOUSEWARES, LLC and         :
FOCUS PRODUCTS GROUP, L.L.C.,         :
                                      :
                  Defendants.         :
-----------------------------------------------------X
```

**DECLARATION OF PROFESSOR RONDA J. ROBOTHAM IN SUPPORT OF**
**PLAINTIFF`S RESPONSE TO DEFENDANTS`**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**
**ON INVALIDITY OF U.S. PATENT NOS. 6,573,483 AND 6,740,855**

I, Professor Ronda J. Robotham, MAT, make the this declaration based upon my personal knowledge, experience and expertise, and declare as follows:

1.      I have been retained by THE HOLMES GROUP, INC. ("Holmes") as a Culinary Expert in this case. My qualifications as an expert and my educational and professional background are set forth in my curriculum vitae, which was attached as Exhibit A.

2.      I am an Assistant Professor of Culinary Arts at Johnson & Wales University, and have been teaching in the Culinary Arts for 11 years with a total of 16 years in the foodservice profession.

3.      I am a participating member of Women Chefs and Restaurateurs, and a past member of the American Culinary Federation and the International Foodservice Executives Association.

4.      I earned a Master of Arts degree in Teaching Vocational Secondary Education (in the Culinary Arts) from the Alan Shawn Feinstein Graduate School of Johnson & Wales University in 2002; a Bachelor of Science in Foodservice Management from Johnson & Wales College in 1983; and, an Associate in Science in Culinary Art from Johnson & Wales College in 1981.

5.      I began teaching culinary arts at Johnson & Wales College in 1983 and left in 1985 to serve in the United States Navy.  I returned to teaching culinary arts at Johnson & Wales University in 1997 as an instructor (Johnson & Wales College had since then become a University).  I was then promoted to the rank of Assistant Professor in 2002.

6.      Some of my current responsibilities as an Assistant Professor at Johnson & Wales University include; development of curriculum, lectures, demonstrations and assessment of student skills as related to cooking methods discussed.

7.      My areas of expertise are in teaching techniques of stewing, braising, stocks, sauces and soups.

8.      Aside from teaching the Culinary Arts, I have worked in various foodservice operations as a cook and then chef in small independent operations, such as the Bee & Thistle Inn and in large scale establishments, such as the Lake Buena Vista Club in Walt Disney World.

9.      I have owned and used a Rival slow cooker, Model 3120 for approximately 10 years, and find that for achieving the results of tender, flavorful products, combined with ordinarily one step use, it is extremely efficient.

10.      I have reviewed Dr. Feinberg's Declaration in support of West Bend's Summary Judgment Motion on Invalidity of U.S. Patent Nos. 6,573,483 and 6,740,855 and disagree with his Declaration for the following reasons:

11.    I believe that someone skilled in the technique of slow cooking would not have combined the patents and publications that Dr. Feinberg has used in his report as they differ, sometimes greatly, from the slow cooking process and would negatively affect the outcome of the items prepared.

12.    The principle of slow cooking is generally accepted as the cooking process of applying low heat to a product for an extended period of time in order to render the product tender and flavorful.  This low heat application is carried out in a moist environment so that in the case of certain proteins, the collagen present will effectively convert to gelatin yielding a succulent product.

13.     The extended cooking time at a low heat then allows the proteins to relax enough to redistribute the cooking liquid into the now loosened fibers resulting in the desired outcome. In considering doneness of a slow cooked product, the temperature and texture are of prime importance.  Even though the slow cooking process is a relatively gentle cooking method, there is still the possibility of overcooking.  The result is most often a tender but very dry product.

14.    I think it is important to note that U.S. Patents 6,573,483 and 6,740,855 ("the '483 and '855 Patents") have the capability to be programmed to automatically switch from a cooking mode to a "keep warm" mode which ensures the user of the desired results by automatically switching to a lower temperature.  The temperature still remains high enough to prohibit harmful bacterial growth, but not so high as to further dry proteins.

15.    With respect to U.S. Patent No. 4,307,287 to Weiss, I disagree with the selection of this patent as it differs from the '483 and '855 Patents.  The Weiss patent describes a cooking appliance which has a cooking range that exceeds that recommended in the slow cooking process.  It can achieve temperatures that are sufficient for a deep frying technique.  Weiss

- 3 -

describes use in connection which temperature ranges from simmering up to175°C (Col. 4, ll. 43-46), which converts to approximately 347°F, a setting suitable for deep frying capabilities. The heating capabilities of the Weiss Patent also are described for potential browning of proteins prior to the low heat process.

16.     In the background of the Weiss patent, col. 1, ll. 23-28, the statement that the items would cook correctly without supervision is a concern when working with temperatures reached in that method.  In col. 1, ll. 56-61, it speaks of an initial cooking phase which causes accelerated heating allowing browning prior to prolonged cooking.  While this is sometimes performed in braising or stewing, it is an additional step which differs from the '483 and '855 Patents where a relatively low heat is applied to the food product.

17.     While accelerated heating to high temperatures that sear the food is accepted as a norm for many braised and stewed dishes, this process moves away from the simple slow cooker and the low conductive properties of the ceramic cooking vessel.  I find no temperature range listed in the Weiss Patent to address "hot" which could also be a concern.

18.     Based on the interpretation of claim 13 of U.S. Patent No. 6,573,483 or claim 20 of U.S. Patent No. 6,740,855 the cooking process of a slow cooker is designed to use the benefits of a simple process using relatively low heat for a relatively long time.  Accordingly, a person seeking optimal temperature range for slow cooking would not look to a device which lists the temperatures identified nor look toward the Weiss '287 Patent to serve this purpose.

19.     In reference to paragraph 11 of Dr. Feinberg's Declaration, he stated that the material for the cooking vessel in the Weiss patent is not identified.  In paragraph 12, he states that the Rival Crock Pot discloses the use of a ceramic cooking unit.  One skilled in the art of slow cooking would be motivated to use ceramic because of its, relatively ineffective conductive

properties. I feel that based on the information presented in the Weiss patent, the cooking device appears to be a metallic cooking vessel sitting on an electronic heating element, similar to an electric griddle, and that could also be a negative factor when considering slow cookers.

20.    I also disagree with Dr. Feinberg's assertion regarding the motivation of combining Weiss with U.S. Patent No. 4,817,510 to Kowalics, this does not seem appropriate. The Kowalics patent is for an apparatus used to heat fluids. The device's documentation indicates that it reaches temperatures up to boiling (212°F) which is inappropriate for a slow cooker. It is designed to heat a product to the boiling temperature (212°F), which would cause available liquid to evaporate and be drawn from proteins, rendering them dry and potentially tough.

21.    Likewise, its listed temperature for simmering (210°F), shown in Fig. 2 of the Kowalics patent, is high for slow cooking. The apparent Kowalics design is also limiting in that it would not seem suited to preparing solid food items. The Kowalics design, by introducing heated air into the cooking chamber as a means of mixing the contents, would not be appropriate in slow cooking. In the preparation of solid items, such as a "Pot Roast," the stirring capacity seems as though it would be ineffective and possibly not practical depending on the size of the product.

22.    Dr. Feinberg also relies on U.S. Patent No. 4,345,145 to Norwood, which is directed to a programmable toaster oven. A toaster oven is a device that typically cooks, bakes and broils with dry heat, unlike the moist environment of a slow cooker. In addition, toaster ovens typically cook, bake and broil at temperatures of up to 500°F, which are much higher than are used in slow cookers. Accordingly, one would not look at toaster ovens for the design of slow cookers.

23.     Dr. Feinberg also relies on U.S. Patent No. 6,191,393 to Park, which is directed to a double walled metallic roaster filled with synthetic oil, a device that is very different from a slow cooker. Roasters typically operate at temperatures between about 300-500°F and cook in a very hot, dry environment over relatively short periods of time, typically 1-3 hours. These conditions and temperatures are not compatible with slow cooking. Accordingly, one would not look to roasters in contemplating slow cooker design.

24.     Having reviewed the Dr. Feinberg Declaration and the references relied upon; I disagree with the combinations of patents selected. I also disagree with his conclusion that the claims of the '483 and '855 Patents are invalid as being anticipated or obvious in view of the prior art considered.

25.     I believe that one familiar with slow cooking devices and techniques seeking to make improvements in such devices would not use these patents cited by Dr. Feinberg in combination with a traditional slow cooker, as their mode of operation greatly differ from the slow cooking principles and cooking techniques.

I declare under penalty of perjury that the foregoing is true and correct and, as to matters stated to be alleged on information and belief, I believe them to be true.

Executed this 20th day of December, 2006

Ronda J. Robotham, MAT

# EXHIBIT A

CURRICULUM VITAE

# Ronda J. Robotham

528 Smithfield Road, Apt. # 206                    Email rrobotham@jwu.edu
North Providence, Rhode Island  02904       Phone (w) 401-598-2821
Phone  (h) 401-354-8635                             Fax 401-598-1856

## EDUCATION
May 2005, Emergency Care I and II, Bristol Community College, *4.0 GPA*
June 2002, MAT, Johnson & Wales University, Providence, Rhode Island, *4.0 GPA*
June 1983, BS Food Service Management, *Magna Cum Laude*, Johnson & Wales University
June 1981, AS Culinary Arts, *Summa Cum Laude,* Johnson & Wales University

## AWARDS
2004, Teacher of the Year
2002, Outstanding Service Award

## WORK EXPERIENCE
*1997-Present, Assistant Professor, Johnson & Wales University, Providence, Rhode Island*

| *Classes taught:* | | |
|---|---|---|
| Fundamentals of Foodservice Production | 3 years |
| New World Cuisine | 4 years |
| Nutrition  and Sensory Analysis | 2 years |
| Stocks, Sauces, & Soups | 10 years |
| Traditional European Cuisine | 4 years |

Responsible for the development of curriculum, lectures, and demonstrations for undergraduate classes.  Primarily teaching the fundamentals of various culinary techniques such as braising, stewing, frying, grilling, roasting, and stock, sauce and soup techniques. Class size is usually 20 students.

*1989-1996, Front Desk Supervisor– Accounts Receivable Supervisor, Ritz-Carlton, Naples, Florida*

*1985-2002, Boatswain Mate Chief, United States Navy, Navy Reserve*
Served in United States Navy on active duty and with the Reserve component in various capacities:
NSSF HQ Det 101, New London, Connecticut
Inshore Boat Unit Two Two,  New Haven, Connecticut
Naval Weapons Station, Charleston, South Carolina
Naval Control of Shipping, New Haven, Connecticut
Naval Station Roosevelt Roads, Ceiba, Puerto Rico

*1977-1980, Chef, Bee & Thistle Inn, Old Lyme, Connecticut*
Responsible for menu planning, meal preparation, sanitation and training of kitchen staff.

## VOLUNTEER WORK
*1998-2004*, Operation Stand-Down, Cumberland, Rhode Island
  Prepared and served meals to homeless veterans
*1999-2004 Various,* Operation Front Line, Various, Rhode Island
  Working with children, teaching them to make healthy foods for themselves and their families

## MEMBERSHIPS/CLUBS
*1999- Present,* Women Chefs and Restaurateurs
*1999- Present,* Judge for secondary and post-secondary Skills USA/VICA competition
*2005 - Present,* Co-advisor for the Club of Culinary Excellence
*1999- 2006,* Naval Enlisted Reserve Association

## ARTICLES
"The Kitchen Knives Every Cook Needs." <u>Bottom Line Personal</u>, 27 (2006): 12.
Chappell, Mary Margaret and Kanner, Ellen. "Chop Chop or Look Sharp." <u>Vegetarian Times</u>,
    Interviewed January 2006, running postponed.

## LICENSES AND CERTIFICATES
EMT-B, Rhode Island;  #13294 exp. 9/30/2009
EMT-B, Massachusetts;  #869677 exp. 4/1/2008
NREMT-B; #B1669198 exp. 3/31/2008
Food Service Safety Manager, Rhode Island; #FMC06582 exp. 1/31/2007

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

-------------------------------------------------------X
THE HOLMES GROUP, INC.,         :
                                               :
                   Plaintiff,     :     Civil Action No.  05-CV-11367 WGY
         v.                  :     (Alexander, M.J.)
                                               :
WEST BEND HOUSEWARES, LLC and :
FOCUS PRODUCTS GROUP, L.L.C.,  :
                                             :
               Defendants.    :
-------------------------------------------------------X

**DECLARATION OF PROFESSOR DAVID L. TRUMPER
IN SUPPORT OF PLAINTIFF`S RESPONSE TO DEFENDANTS`
MOTION FOR PARTIAL SUMMARY JUDGMENT
<u>ON INVALIDITY OF U.S. PATENT NOS. 6,573,483 AND 6,740,855</u>**

     I, Professor David L. Trumper, Ph.D., make the this declaration based upon my personal knowledge, experience and expertise, and declare as follows:

     1.     I earned a Ph.D. degree in Electrical Engineering Computer Science from the Massachusetts Institute of Technology ("MIT") in Cambridge, Massachusetts in 1990, a Masters of Science Degree in Electrical Engineering Computer Science from MIT in 1984, and a Bachelor of Science in Electrical Engineering Computer Science from MIT in 1980.

     2.     I am a full Professor at MIT's Department of Mechanical Engineering, and have been employed by MIT's Department of Mechanical Engineering from September 1993 to the present.  I was appointed a full Professor in July 2004.  Prior to my appointment as a full Professor, I was an Associate Professor with tenure from July 2000 through June 2004; a Rockwell International Career Development Associate Professor from March 1998 through June

2000 and Assistant Professor from March 1995 through June 1996; and, an Assistant Professor from September 1993 through March 1995.

3.      I was an adjunct Professor of Electrical Engineering at the University of North Carolina-Charlotte from 1993 through 1998; and an Assistant Professor of Electrical Engineering prior to my appointment at MIT from 1990 through 1993, also at the University of North Carolina, Charlotte.

4.      Prior to my faculty appointments, I held a position of Engineer at the Waters Division of Millipore Corporation from 1986 through 1987; and served as an Engineer at Hewlett-Packard Co. from 1980 to 1982.  I was a student employee at Teradyne, Inc. in 1979 while completing my undergraduate studies at MIT.

5.      I have served on professional and academic associations and was the President of the American Society of Precision Engineers (ASPE) from 2005-2006; Vice President from 2004-2005; and a member of the ASPE Board of Directors from 2004 to the present.  I have also been a Director-at-Large for ASPE from 1995-1998; a Guest Editor for the *Precision Engineering* Journal from 1997-1998; an Associate Editor at *Precision Engineering* from 1998-present.  I am also a member of the American Society of Mechanical Engineers (ASME), the Institute of Electrical and Electronic Engineers (IEEE), and the International Academy of Production Engineering (CIRP).

6.      I have received numerous awards and honors including the Keenan Award for Innovation in Undergraduate Education 2006; Spira Award for Excellence in Teaching in 2002; 3M Innovation Award in 2001; ASME Leonardo da Vinci Award in 1999; Spira Award for Excellence in Teaching in 1998; Rockwell International Career Development Chair in 1995-

1998; NSF Presidential Young Investigator in 1991-1996; IBM Graduate Fellowship in 1984-

1986; and the Hewlett-Packard Master's Fellowship in 1982.

7.      Currently, I have eleven (11) issued United States patents, and four (4) pending

United States patent applications.  I have authored or coauthored twenty-three (23) articles

published in refereed journals.  I have also published sixty-nine (69) papers in proceedings of

refereed conferences.

8.      I have served as a professional consultant to a number of companies and law

firms.

9.      I have conducted research, lectured extensively and taught courses at MIT from

1993 to the present on the subjects of Analysis and Design of Digital Control Systems;

Mechatronics; Dynamics and Vibration; Modeling Dynamics and Control; Designing Smart

Machines; Systems Modeling And Control.

10.     I have studied, programmed, used, and taught courses involving computer control

of machines and systems. These include controllers using microprocessors, microcontrollers, and

digital signal processors. My research and consulting work centers on the design of precision

motion control systems, with a significant component of work focused on the associated

computer-based controllers and control algorithms. The topics of my research and teaching also

include the sensors, actuators, analog-, and digital-electronics associated with computer-based

controllers. Accordingly, I am considered an expert in the field of the design of computer

controlled systems and machines, including those using microprocessors and microcontrollers.

11.     A copy of my *Curriculum Vitae* has been filed with the Court and was attached as

Appendix A to my October 12, 2006 Declaration.

12.     In preparing this Declaration I have considered the patents-in-suit (U.S. Patent

No. 6,573,483 (the `483 patent) and U.S. Patent No. 6,740,855 (the `855 patent)), the prosecution histories of the patents-in-suit, including the prior art cited on the face of the patents-in-suit, and the Declaration of Dr. Feinberg on Invalidity of the '483 and '855 Patents, and references cited therein.  I have read and analyzed Defendants' Statement of Material Facts as to Which There Are No Genuine Issues of Dispute and Which Entitle Defendants to Summary Judgment of Invalidity.  I have also read and rely upon the Declaration of Holmes' culinary expert Prof. Robotham, which is incorporated by reference.

13.    Upon my reading of the transcript of the Court's *Markman Hearing* conducted on September 27, 2006, it is my understanding that certain terms of Claim 13 of the '483 Patent have been construed by the Court.  In addition, it is my understanding that similar corresponding terms of Claim 20 of the '855 Patent have been construed by the Court, as well.

14.    I have reviewed the Declaration prepared by Dr. Feinberg in Support of Defendant's Motion for Partial Summary Judgment on Invalidity of U.S. Patent Nos. 6,573,483 and 6,740,855, and disagree with his Declaration for at least the following reasons:

15.    Dr. Feinberg's invalidity analysis is flawed because it is based upon an incorrect interpretation of the terms "programmable controller" (`483 patent, claim 13), and "programmable circuit" (`855 patent, claim 20).  The requirement that these terms include a controller or circuit which is programmable is inherent in the language of the terms themselves, and made clear in the specification and prosecution histories of the `483 and `855 patents. Dr. Feinberg does not apply the requirement for programmability in his invalidity analysis, and thus he reaches the wrong conclusions.

16.    The programmable controller and/or programmable circuit as construed by the Court in the claims of the patents-in-suit:

> a)  is programmable, and

> b)  controls time and temperature.

Feature a) requires that the programmable circuit encompasses a microprocessor, microcontroller, or equivalent programmed computational capability in an integrated circuit. Feature b) requires that both time and temperature be measured and that control action be taken on the basis of these measurements.

17.  The a) programmability and b) control requirements are clearly spelled out in the patent specifications and specified in the claims in suit. For example:

> The heating element 24 (not shown) may be powered on and off as necessary
> to supply heat at a maintained temperature to the cooking unit 39 and the
> heating chamber via a programmable control 200. (`483 patent, Col. 3, ll. 8-12)

and

> The circuit board 254 mounts circuitry and logic allowing the user of the
> appliance 10 to electronically control and program cooking cycles and
> temperature. (`483 patent, Col. 4, ll. 48-50)

18.  This analysis is also consistent with the Court's Markman interpretation of the claim language.  Claim 13 of the '483 Patent recites "**A method of using *a programmable slow-cooker appliance*.**"  This element appears in Claim 13, lines 1-2 of the '483 Patent.  The Court construed the italicized portion of this claim element as "*a cooking device designed for cooking food at a constant relatively low cooking temperature for a relatively long period of time [being], being programmable to operate in a variety of different cooking modes and cooking times.*"  (*See,* the Court's *Markman* Hearing Transcript @ page 3, lines 7-12.)

19.     Dr. Feinberg also has an incorrect understanding of feedback control as it applies to the patents-in-suit and the cited prior art references. The terms "maintain temperature" and "control… temperature" refer to a feedback control process which is clearly described in the patent specification:

> "The temperature of the cooking appliance is measured using a thermistor 310, which is connected externally of the circuit board to the underside of the bottom of the heating chamber." (`483 patent, Col. 5, ll. 19-22)

and

> "In all modes, the temperature is read periodically by the thermistor or other temperature element and relayed to the controller. The reading is checked at 4-second intervals. If the temperature is above or equal to the set point, power is removed. If it is below the set point, power is applied to the heating element 32. Of course, the circuitry can be modified as desired to achieve various program methods and modes." ('483 patent, Col. 7, ll. 3-9)

20.     As specified above, temperature measurement and feedback control of temperature by application of power to the heating element is used in all modes of the invention. Accordingly, the control of temperature in the patents-in-suit requires measurement of temperature and a feedback control action on the basis of this measurement.

21.     In addition, the patent specifies that temperature measurement and thus the associated control action take place on a periodic interval (for example, 4 seconds).  Such sampled control is characteristic of microprocessor systems, and confirms that the controller of the invention utilizes a microprocessor, microcontroller, or equivalent.  Accordingly, temperature sensor data are gathered in the programmable slow-cooker of the patents-in-suit. (`483 patent, Col. 7, ll. 3-9).  This data is gathered at a fixed time interval (e.g., 4 seconds) to facilitate real-time control (maintaining) of a user-programmed temperature and cooking time.

22.     The programmable circuit of the patents-in-suit uses closed-loop feedback to control the cooking temperature. The microprocessor controller of the programmable circuit

- 6 -

achieves this function by measuring the temperature with a thermistor and then applying power to the heating element on the basis of this feedback.

23.     By contrast, in the Weiss `287 patent, Figures 6 and 7 provide an open-loop control where the heating element is driven with a fixed on/off timer-based pattern.  This is confirmed by the observation that the "controller" 22 of Weiss (shown in Fig. 8) has no measurement input for a temperature sensor. It is an open-loop timer which sets the on/off pattern applied to the heating element without regard for the resulting temperature. The "controller" 22 of Weiss is open-loop; it is unable to exert control over the temperature of the cooking process, and thus is unable to control the quality of the cooking result. The responsibility for a correct cooking temperature and cooking result is left to the user of the device shown in Weiss. This is quite distinct from the closed-loop control of the patents-in-suit, in which temperature is maintained via feedback control.

24.     Dr. Feinberg makes a significant error by failing to distinguish between open loop and closed loop control.  As near as I can understand, he views anything which affects temperature as being a form of programmable temperature control.  This is simply incorrect in the context of the patents-in-suit.

25.     Dr. Feinberg also makes a significant error in that he seems to view anything which can be set as a programming input to a programmable controller.  For example, he views an oven with a manually-settable thermostat and mechanical timer to turn the oven on and off as a programmable controller within the scope of the claims in suit (*Feinberg dep.* 247:8-22).  In this incorrect view, the knobs of the thermostat and timer are programmable inputs. However, such oven thermostats and mechanical timers have been available on the market since the early part of the last century.  They cannot be considered a programmable controller within the context

of the patents-in-suit.  Dr. Feinberg asserts an unreasonable position, which is unsupportable in light of the specifications of the patents-in-suit and their file histories.

26.     Dr. Feinberg also takes inconsistent positions in two of the pending motions.  In arguing non-infringement in his Declaration (signed on July 18th) filed on July 19, 2006, he indicates that the digital logic and circuitry of the accused West Bend device is not programmable.  In Photo 9 of this declaration, he identifies the microprocessor of the West Bend device as the "programmable controller" and says that it is "the only component… that is programmed to operate the heating element in accordance with the selected cooking parameters (i.e., cooking time and temperature) and to automatically lower cooking temperature to a warm mode after the selected time elapses."  Feinberg Non-Infringement Decl. at Para. 13.  This is far different than the broad position taken in his subject declaration and in his deposition; for example under his interpretation, the interface logic and circuits in West Bend's first printed circuit board could seemingly constitute a programmable controller in their own right.

27.     This inconsistent analysis may be based upon Dr. Feinberg's lack of education or current expertise with regard to microprocessor based circuits.  None of Dr. Feinberg's educational and teaching background relates to microprocessor control systems (*Feinberg dep.* 14:5 - 15:6).  Dr. Feinberg's sole teaching and research background with regard to computer control appears to be more than 20 years old.  In view of his lack of background in microprocessor controlled systems, Dr. Feinberg has apparently made an incorrect interpretation of the Court's Markman interpretation of the claims at issue.

28.  In addition, Dr. Feinberg takes an unrealistic position on the background of one of ordinary skill in the art.  In my view, one of ordinary skill in the art which pertains to the patents-in-suit as having a Bachelors degree in engineering, and with one or two years of experience

designing electronic control circuits for slow-cookers, and who is familiar with the cooking process requirements of slow-cookers.

29.    Dr. Feinberg believes that one of ordinary skill in the art does not even need an engineering degree.  (*See*, *Feinberg dep.*186:9-187:8)  Alternatively, Dr. Feinberg claims that an electrical engineer with no experience in the design or manufacture of cooking devices could be considered as one of ordinary skill in the art (*See, Feinberg dep.*187:9-19).

30.    Given the inconsistencies and significant inaccuracies in his declarations and deposition, I do not believe that Dr. Feinberg has sufficient background to qualify as an expert in the fields relevant to the patents-in-suit.  Based upon a review of Dr. Feinberg's resume, his reports, his lack of publications (no journal publications for more than 20 years), and his deposition transcript, I do not see evidence that Dr. Feinberg is an expert in the fields to which he is testifying.  Furthermore, I do not believe he even qualifies as one of ordinary skill in the art of this case. Dr. Feinberg's education precedes modern microprocessor control, and he clearly has no clear idea of what constitutes a programmable controller.  Neither does Dr. Feinberg make any distinction between closed-loop and open-loop control.  Ignorance of this distinction is an overwhelming fault which renders his opinions flawed and unreliable.

31.    In the following sections I respond to Dr. Feinberg's analysis of the references cited in his Declaration, and indicate my view that the patents are valid despite the flawed arguments set forth by Dr. Feinberg.

**Weiss, "Electric Cooking Appliance", U.S. Patent No. 4,307,287**

32.    The focus of this patent is a high-temperature cooker with a fixed timer-based controller.  The unit has an initial cooking phase which starts automatically, and during which "the vessel 12 rapidly reaches a high temperature which, for example, enables the user suitably

to brown pieces of meat in fat…"  As I understand from Prof. Robotham's Declaration, such high temperatures are not consistent with the processes required in a slow-cooker. The high-temperature cooker of Weiss is clearly not a slow-cooker, because in the initial high-power cooking phase it rapidly raises the temperature to a value only limited to 347 °F when the safety shutoff thermostat intervenes.  Further, during normal cooking, nothing limits the temperature to values consistent with slow-cooking.

33.    The Weiss patent shows a metal cooking vessel in contact with a bottom-mounted heating element.  (Although the body of the Weiss patent does not explicitly state the cooking vessel material, it is clear from mechanical and thermal considerations that the vessel is made of metal.  For example, examining the cross-sectional view of Figure 2 of Weiss, the cooking vessel has thin walls which could not be made of a ceramic material; only a metal vessel could have this configuration.  The attachment of the handles confirms this; a ceramic vessel could not tolerate the associated mechanical stresses.  Finally, the high thermal gradients resulting from direct contact with the bottom-mounted heating elements would crack a ceramic vessel with such thin walls.)  The high thermal conductivity of the configuration of Weiss creates direct heat transfer and rapid temperature rise of the items being cooked.  This high thermal conductivity also facilitates browning, which process is one of the key features of this device. The cited high cooking temperatures of up to 347 °F are clearly far above the relatively low temperatures typical of a slow-cooker.  Such high-temperature cooking processes and configuration do not correspond with and teach against the use of a ceramic cooking unit with less direct heat transfer and relatively low cooking temperatures characteristic of a slow-cooker.

34.    The Weiss patent does not show a programmable controller or programmable circuit.  The control circuit 22 is just a simple timer circuit.  Nothing in the patent suggests that it

is programmable. The knobs 24, 26, 28 simply set the duration of timing signals emitted by the control circuit. Such a manually settable control circuit clearly cannot constitute a programmable controller. Further, the Weiss "controller" 22 has no input for temperature measurement, and thus cannot control temperature. It also has no input for measuring power either, and thus cannot control power. It is an open-loop device. It is an incorrect interpretation to suggest that the fixed on/off timer signals somehow control temperature; there is no way to determine what temperature will result in the Weiss device. In fact by using such a simple fixed timer circuit, this reference teaches away from the concept of using a programmable controller. Dr. Feinberg's analysis of the Weiss patent incorrectly refers to the control circuit 22 as a programmable controller, when control circuit 22 clearly does not include the features of a programmable controller.

35.    Dr. Feinberg's Declaration in Support of Defendant's Motion for Summary Judgement, paragraph 5 states: "U.S. Patent No. 4,307,287 to Weiss' ("Weiss") selection of cooking temperature and method of maintaintaining [sic] the cooking temperature through application of adjustable power to the heating element is the same method described in both the '483 and '855 patents, in which power is supplied to the heating element to select and maintain the cooking temperature. ('483 patent, col. 3, ll. 9-12 and col. 6, ll. 1-12.)"

36.    This paragraph of Dr. Feinberg's declaration has numerous factual misrepresentations. The Weiss patent does not discloses a means for selecting cooking temperature. Additionally, Weiss does not disclose means to maintain (control) temperature. Accordingly, since Weiss does not disclose cooking temperature selection means nor temperature control means, Weiss cannot describe the same methods as claimed in the patents-in-suit. The adjustable power in Weiss is set via the thumbwheels by the user; in this context the

user functions as the temperature controller who must act to adjust the power to a suitable level.

37.     Considering the Weiss patent I see no motivation to combine the teachings of this high-temperature cooker with a prior art slow-cooker or any of the other references to yield a programmable slow-cooker as described in claim 13 of the `483 patent, or claim 20 of the `855 patent, or the asserted dependent claims.  One of ordinary skill would not look to the Weiss patent for adapting to slow-cooker design.

38.     Accordingly, Dr. Feinberg's analysis of the Weiss patent with respect to invalidity of the patents-in-suit is incorrect for at least the reasons cited above.

**Kowalics, "Cooking Apparatus for Fluid Container," U.S. Patent No. 4,817,510**

39.     The focus of the Kowalics patent is a cooking apparatus for cooking soup and similar food products, with an air-pumped mixing system.  As I understand from Prof. Robotham's Declaration, the heating of the food items to the relatively high temperatures cited in the patent renders this device unsuitable for slow-cooking.  As well, automatic stirring via heated air is not consistent with the slow-cooker application.

40.     The Kowalics patent shows a metal cooking vessel in contact with a bottom-mounted heating unit which is intended to create direct heat transfer facilitated by the air-driven stirring action.  This does not correspond with and teaches against the use of a ceramic cooking unit, relatively low cooking temperatures, and less direct heat transfer characteristic of a slow-cooker.

41.     The temperature and timing controls shown in the Kowalics patent are based upon relays and hard-wired temperature controllers, or upon hard-wired electronic temperature controls and fixed timing, switching, and logic circuits (Col. 5, l. 57 – Col. 12, l. 46).  Such fixed electronic control and timing circuits are clearly not a programmable controller or circuit as

defined in the claims at issue.  Nothing in the patent suggests that these circuits are programmable.  In fact, by using such simple fixed circuitry, this reference teaches away from the concept of using a programmable controller.  Dr. Feinberg's analysis of the Kowalics patent incorrectly refers to the fixed electronic temperature control and timers as a programmable controller.

42.    Considering the Kowalics patent I see no motivation to combine the teachings of this soup cooker with a prior art slow-cooker or any of the other cited references to yield a programmable slow-cooker as described in claim 13 of the `483 patent, or claim 20 of the `855 patent, or the asserted dependent claims.  One of ordinary skill would not look to the Kowalics patent for adapting to slow-cooker design.

43.     Dr. Feinberg's analysis of the Kowalics patent with respect to invalidity of the patents-in-suit is incorrect for at least the reasons cited above.

44.    The Defendant's Statement Of Material Facts As To Which There Are No Genuine Issues Of Dispute And Which Entitle Defendants To Summary Judgment Of Invalidity, of December 1, 2006 is also flawed by significant errors.  These are enumerated below with reference to paragraph numbers.  At least the following are errors of fact in this document:

**Paragraph 5 states: "**Weiss teaches a slow cooker in which the operator, using a "control circuit," sets "the average power [temperature]" and "duration [time]" of the cooking phase. *Id.* at col. 1, ll. 12-22.  After the normal cooking phase selected by the user, the control circuit automatically proceeds to "phase M, at reduced power [temperature], in which the food is kept hot."

- Weiss does not disclose a slow-cooker.  The control circuit only sets average power.  It does not set temperature.

- 13 -

**Paragraph 12 states:** "Weiss discloses such a programmable slow cooker that cooks food at a constant, relatively low cooking temperature for a relatively long period of time. Ex. A, col. 1, ll. 23-28 and col. 4, ll. 47-54."

- Weiss does not support this statement. Weiss is not programmable. Weiss is not a slow cooker. It does not maintain constant, relatively low cooking temperatures. Weiss does not meet the Court's programmable slow-cooker construction.

**Paragraph 13 states:** "Weiss discloses an "electronic control circuit 22" that permits an operator to select cooking temperature and cooking time. Ex. A at col. 2, ll. 61-68 and col. 4, ll. 47-57. Weiss has a control panel with regulating knobs that are used to select a cooking power (i.e., temperature) and to select a cooking time in hours and minutes. *Id.* at col. 2, ll. 61-68. Weiss' selection of cooking temperature and method of maintaining the cooking temperature through adjustable application of power to the heating element is the same method described in both the '483 and '855 patents, in which power is supplied to the heating element to select and maintain the cooking temperature. J.A. at MKM 0014, col. 3, ll. 9-12 and col. 6, ll. 1-12; Feinberg Decl., Nov. 30, 20063 ¶ 5."

- The regulating knobs do not set temperature. The Weiss patent has no means to select cooking temperature. It also has no means to maintain (control) temperature. Since these means do not exist, they cannot be the same as anything, much less a feature of the patents-in-suit.

**Paragraph 14 states:** "Weiss discloses that its entire programmable controller (control circuit 22) is mounted to a housing,…"

- Incorrectly refers to Weiss as having a programmable controller.

**Paragraph 15 states that in Weiss:** "a selected cooking temperature is automatically lowered

after a cooking time elapses. **"**

- There is no selected cooking temperature in Weiss, nor is there any temperature control. Temperature cannot be selected, nor can it be automatically lowered.

**Paragraph 16 states: "**In the Weiss cooker, the temperature control disc 24 is marked in ten power or temperature increments, and the time control discs 26, 28 are incrementally marked with time settings.  Ex. A at col. 3, ll. 62- 65.**"**

- The control disk 24 does not set temperature.  Temperature cannot be changed in increments.

**Paragraph 27 states: "**Weiss discloses an "electronic control circuit 22" that allows the user to program both the cooking temperature and desired time for cooking.  *Id.* at col. 2, ll. 61-68 and col. 4, ll. 47-57.  This control circuit 22 also automatically changes the heating element to an automatic warm mode once the set cooking time has expired.  When Weiss is set to its cooking mode "II," after the food is cooked at the selected time and temperature, referred to as "cooking phase C," this phase is automatically "followed by the phase M, at reduced power, in which the food is kept hot.  *Id.* at col. 4, ll. 66-68.  In other words, when the cooking time set by the user expires, Weiss' control circuit 22 reduces power to a warm mode during which the food is maintained at a predetermined temperature less than the cooking temperature.**"**

- The user cannot program anything in Weiss; it doesn't have a programmable controller.  The cooking temperature cannot be set in Weiss.  Weiss cannot maintain food at any predetermined temperature less than the cooking temperature.

**Paragraph 32 states: "**The user must select either between mode "I," in which cooking temperature and cooking time are selected, or mode "II," in which a user selects a cooking time and temperature and after the elapsed time the cooker is automatically switches to a lower

temperature warm mode."

- In error because cooking temperature cannot be selected in Weiss.

**Paragraph 33 states:** "In the Weiss programmable cooker, subsequent "turns" of the regulating discs, …"

- In error because Weiss is not a programmable cooker.

I declare under penalty of perjury that the foregoing is true and correct and, as to matters stated to be alleged on information and belief, I believe them to be true.

Executed this 22nd day of December, 2006

David L. Trumper Ph.D.

# EXHIBIT A

MASSACHUSETTS INSTITUTE OF TECHNOLOGY

School of Engineering Faculty Personnel Record

Date:  August, 2006                          Name:      David L. Trumper
                                             Department: Mechanical Engineering

1.  Date of Birth:        August 24, 1957

2.  Citizenship:          USA

3.  Education:

| School | Degree | Date |
|--------|--------|------|
| Massachusetts Institute of Technology | B.S. - EECS | June 1980 |
| Massachusetts Institute of Technology | M.S. - EECS | June 1984 |
| Massachusetts Institute of Technology | Ph.D. - EECS | Sept. 1990 |

4.  Title of Thesis for Most Advanced Degree:

    Magnetic Suspension Techniques for Precision Motion Control

5.  Principal Fields of Interest:

    Mechatronics; Precision Engineering; Design of Precision Electromechanical
    Systems; Applications of Continuous- and Discrete-Time Control;
    Instrumentation; Electromechanics and Electric Machines; Magnetic Suspensions
    and Bearings; Control of Fluid Systems; Analog Circuit Design; Analog and
    Digital Signal Processing

6.  Name and Rank of Other M.E. Faculty in Same Field:

    Stephen Dubowsky, Professor
    Ian Hunter, Professor
    Alexander Slocum, Professor
    Kamal Youcef-Toumi, Professor
    Sanjay Sarma, Associate Professor

7.  Name and Rank of Faculty of Other Departments in Same Field:

    Jeffrey Lang, Professor of Electrical Engineering and Computer Science

Markus Zahn, Professor of Electrical Engineering and Computer Science
Steven Leeb, Professor of Electrical Engineering and Computer Science

8.  Non-MIT Experience (including military service):

| Employer | Position | Beginning | Ending |
|---|---|---|---|
| Teradyne, Inc. | Student employee | 1979 | 1979 |
| Hewlett-Packard Co. | Engineer | 1980 | 1982 |
| Waters Division of Millipore | Engineer | 1986 | 1987 |
| University of North Carolina - Charlotte | Assistant Professor of Electrical Engineering | 1990 | 1993 |
| University of North Carolina - Charlotte | Adjunct Professor of Electrical Engineering | 1993 | 1998 |

9.  History of MIT Appointments:

| Rank | Beginning | Ending |
|---|---|---|
| Assistant Professor | Sept. 1993 | March 1995 |
| Rockwell International Career Development | | |
|    Assistant Professor | March 1995 | June 1996 |
|    Associate Professor | July 1996 | Feb. 1998 |
| Associate Professor | March 1998 | June 2000 |
| Associate Professor with tenure | July 2000 | June 2004 |
| Professor | July 2004 | present |

10.  Industrial Consulting Record:

| Firm | Beginning | Ending |
|---|---|---|
| Berlyn Corp. | 1987 | 1987 |
| Waters Div. of Millipore | 1989 | 1989 |
| Boreas, Inc. | 1989 | 1991 |
| GCA Unit Of General Signal | 1990 | 1993 |
| Lincoln Laboratory, Control Systems Group | 1990 | 1997 |
| Sematech | 1992 | 1993 |
| Anorad Corp. | 1993 | 2000 |
| Polaroid Corporation | 1993 | 2000 |
| Summit Technology | 1994 | 2000 |
| Electroglas, Inc. | 1995 | 1998 |
| Integrated Solutions, Inc. | 1995 | 1999 |
| Amex Inc. | 1995 | 1997 |
| Applied Materials Technology, Inc. | 1995 | 1996 |
| Synkinetics, Inc. | 1997 | 1997 |

| | | |
|---|---|---|
| Silicon Valley Group, Inc. | 1997 | 1997 |
| 3M Corp. | 1999 | 2001 |
| Landis Gardner | 2000 | 2001 |
| Ultratech Stepper | 2000 | 2001 |
| Lawrence Livermore Laboratory | 2000 | 2000 |
| FluidSense Corp. | 2001 | 2001 |
| Sughrue Mion | 2001 | 2002 |
| AGFA Corp. | 2001 | 2002 |
| Codem Systems, Inc. | 2002 | 2002 |
| Hale and Dorr | 2002 | 2004 |
| Raven Technologies | 2005 | 2005 |
| Sughrue Mion | 2005 | 2006 |
| Lincoln Laboratory, Control Systems Group | 2004 | present |
| Greenberg Traurig | 2006 | 2006 |
| Aerotech | 2005 | present |
| ASML | 2006 | present |

11.  Department and Institute Committees, Other Assigned Duties:

| Activity | Beginning | Ending |
|---|---|---|
| LMP Space Committee | 1994 | 1999 |
| Graduate Policy Committee | 1994 | 1999 |
| Graduate Admissions Committee | 1994 | 2000 |
| Design Faculty Search Committee | 1995 | 1995 |
| Manufacturing Faculty Search Committee | 1995 | 1995 |
| IAP Coordinator | 1996 | 2000 |
| EIP Coordinator | 1997 | 2000 |
| Ad Hoc Tenure Committee | 2000 | 2000 |
| Committee on Academic Performance | 2001 | 2002 |
| Ligo Oversight Committee | 2002 | 2002 |
| Sophomore Registration Officer | 2004 | 2005 |
| Junior Registration Officer | 2005 | present |
| Department Education Council | 2005 | present |
| Undergraduate Education Committee | 2005 | present |
| School of Engineering Committee on Underrepresented Minority Graduate Student Enrollment | 2005 | present |
| Graduate Admissions Committee | 2006 | present |

12. Professional Service:

| Activity | Date |
|---|---|
| ASPE Tutorial Course<br>"Perspectives on PID Control," Santa Fe, | October, 1991 |
| Panel review member<br>National Science Foundation Small Business Incentives for<br>Research (SBIR) Proposals, Washington, D.C. | January 1992 |
| Steering committee member<br>3rd International Symposium on Magnetic Bearings,<br>Alexandria, VA | July 1992 |
| Session chairman<br>3rd International Symposium on Magnetic Bearings,<br>Alexandria, VA | July 1992 |
| Panel review member<br>National Science Foundation, Div. of Design and Manufacturing<br>Systems, unsolicited proposals, Washington, D.C. | January 1993 |
| Steering committee member<br>2nd International Symposium on Magnetic Suspension<br>Technology, Seattle, WA | July 1993 |
| Steering committee member<br>4th International Symposium on Magnetic Bearings, Zurich,<br>Switzerland | August 1994 |
| ASPE Tutorial Course<br>"Actuators and Bearings for Precision Rectilinear Motion,"<br>Cincinnati, OH | Oct. 3, 1994 |
| Industrial Tutorial Course<br>"Applied Control System Design", Summit Technology,<br>Waltham, MA | December 1994 |
| MIT Summer Session Course<br>"Digital Control System Design for Applications," MIT | June 19-23, 1995 |
| ASPE Tutorial Course, "Actuators and Bearings for<br>Precision Rectilinear Motion," Austin, TX | October 1995 |

| | |
|---|---|
| Session Chairman, ASME International Mechanical Engineering Congress and Exhibition, San Francisco, CA | November 1995 |
| Session Chairman, 3rd International Symposium on Magnetic Suspension Technology, Tallahassee, FL | December 1995 |
| Panel Review Member, Career Awards, National Science Foundation Washington, DC | December 1995 |
| Steering committee member 3rd International Symposium on Magnetic Suspension Technology, Tallahassee, FL | December 1995 |
| Director at Large, American Society for Precision Engineering | December 1995-December 1998 |
| Session Chairman, IEEE Intermag Conference, Seattle, WA | April 1996 |
| Steering committee member 5th International Symposium on Magnetic Bearings, Kanazawa, Japan | August 1996 |
| Session Chairman, 5th International Symposium on Magnetic Bearings, Kanazawa, Japan | August 1996 |
| ASPE Tutorial Course, "Actuators and Bearings for Precision Rectilinear Motion," Monterey, CA | November 1996 |
| Panel Review Member, Unsolicited Proposals, National Science Foundation Washington, DC | April 1997 |
| MIT Summer Session Course, "Digital Control System Design for Applications," MIT, June 16-20, 1997 | June 1997 |
| ASPE Tutorial Course, "Actuators and Bearings for Precision Rectilinear Motion," Norfolk, VA | October 1997 |
| Steering committee member 4th Int. Symposium on Magnetic Suspension Technology, Gifu, Japan | November 1997 |
| Panel Review Member, Unsolicited Proposals, National Science Foundation, Washington, DC | June 1998 |

| | |
|---|---|
| *Co-chairman*, 6th International Symposium on Magnetic Bearings, MIT, Cambridge, MA, August 5-7, 1998. | August 1998 |
| Member, Organizing and Technical Program Committee, ASPE 1998 Annual Meeting, St. Louis, MO, Oct. 1998. | October 1998 |
| Guest editor, *Precision Engineering,* American Society for Precision Engineering | 1997-1998 |
| ASPE Tutorial Course, "Actuators and Bearings for Precision Rectilinear Motion," St. Louis, MO | October 1998 |
| Associate Editor, *Precision Engineering,* American Society for Precision Engineering | 1998 – present |
| MIT Summer Session Course, "Digital Control System Design for Applications," MIT, June 21-25, 1999. | June 1999 |
| ASPE Tutorial Course, "Precision Mechatronics," Monterey, CA | October 1999 |
| Reviewer, NSF proposals, DMII Div. | November 1999 |
| MIT Summer Session Course, "Digital Control System Design for Applications," MIT, July 31-Aug. 4, 2000. | August 2000 |
| Member, International Advisory Committee, 7th International Symposium on Magnetic Bearings, August 24-25, 2000, Swiss Fed. Inst. of Tech., Zurich. | August 2000 |
| Member, Steering Committee, Mechatronics 2000 | September 2000 |
| ASPE Tutorial Course, "Precision Mechatronics," Scottsdale, AZ | October 2000 |
| Co-chairman, ASPE Spring Topical Meeting: Control of Precision Systems | April 2001 |
| MIT Summer Session Course, "Digital Control System Design for Applications," MIT, July 30-Aug. 3, 2001. | August 2001 |
| Member, Editorial Board, *Mechatronics*, pub. by Elsevier Science | 1999-present |

| | |
|---|---|
| Member, International Advisory Committee, 6th International Symposium on Magnetic Suspension Technology | October 2001 |
| Member, International Advisory Committee, Third International Symposium on Linear Drives for Industry Applications | October 2001 |
| ASPE Tutorial Course, "Precision Mechatronics," Crystal City, Washington, DC | November 2001 |
| Review panel, NSF proposals, DMII Div. | April 2002 |
| Member, Steering Committee, Euspen 3rd International Conf. Eindhoven University of Technology, Netherlands | May 2002 |
| Member, International Scientific Advisory Board, MOVIC 2002 Saitama, Japan. | August, 2002 |
| University of Delft Summer Session Course, "Digital Control System Design for Applications," University of Delft, Netherlands,  June 17-21, 2002. | June 2002 |
| Member, International Advisory Committee, 8th International Symposium on Magnetic Bearings, August 26-28, 2002, Mito, Japan. | August 2002 |
| Conference section organizer, National Academy of Engineering German-American Frontiers of Engineering Conference | May 2003 |
| ASPE Tutorial Course, "Precision Mechatronics, Parts 1 and 2," Portland, OR | October 2003 |
| *Co-Chairman*, ASPE Spring Topical Meeting, "Control of Precision Systems," MIT, Cambridge, MA. | April 2004 |
| *Co-chairman*, 9th International Symposium on Magnetic Bearings, University of Kentucky, Lexington, KY. | August 2004 |
| ASPE Tutorial Course, "Precision Mechatronics, Parts 1 and 2," Orlando, FL | October 2004 |
| Reviewer, NSF proposals, DMII Div. | May 2005 |
| International Steering Committee, Linear Drives for Industry Applications, Awaji Island, Japan | September 2005 |

| | |
|---|---|
| ASPE Tutorial Course, "Precision Mechatronics, Parts 1 and 2," Norfolk, VA | October 2005 |
| Editorial Advisory Board, *Mechatronics*, International Federation of Automatic Control | 2000-2005 |
| Organizing Committee, ASPE Spring Topical Meeting, "Challenges at the Intersection of Precision Engineering and Vacuum Technology", Pittsburgh, PA | April 2006 |
| International Steering Committee, International Conference on Precision Engineering, Kobe, Japan | August 2006 |
| ASPE President | 2005 |
| Member, ASPE Board of Directors | 2004-present |
| University of Delft Summer Session Course, "Digital Control System Design for Applications," University of Delft, Netherlands,  June 13-16, 2006. | June 2006 |

13.  Awards and Honors Received:

| Award | Date |
| --- | --- |
| Hewlett- Packard Master's Fellowship | 1982 |
| IBM Graduate Fellowship | 1984 - 1986 |
| NSF Presidential Young Investigator | 1991 - 1996 |
| Rockwell International Career Development Chair | 1995 – 1998 |
| Spira Award for Excellence in Teaching | 1998 |
| ASME Leonardo da Vinci Award | 1999 |
| 3M Innovation Award | 2001 |
| Spira Award for Excellence in Teaching | 2002 |
| Keenan Award | 2006 |

14.  Current Organization Membership:

Organization

Corresponding Member, International Institution for Production Engineering
       Research (CIRP)
Institute of Electrical and Electronics Engineers (IEEE)
American Society for Precision Engineering (ASPE)
        Director-at-Large, 1995-1998
        Guest editor, *Precision Engineering,* 1997-1998
        Associate Editor, *Precision Engineering,* 1998-present
        Vice-President, 2004-2005
         President, 2005-2006
American Society of Mechanical Engineers (ASME)

15.  Patents and Patent Applications Pending:

U.S. Issued:

1.  Trumper, D.L. and Dourdeville, T., "Fluid Composition and Volumetric Delivery Control," #4,767,279, August 30, 1988.

2.  Trumper, D.L., "Bearing for Use in High Resolution Precision Control Device," #5,157,296, October 20, 1992. Licensed to Ultratech Stepper.

3.  Trumper, D.L., "Magnetic Positioning Device," #5,196,745, March 23, 1993. Licensed to Ultratech Stepper.

4.  Trumper, D.L., "Bearing for Use in High Resolution Precision Control Device," #5,294,854,  March 15, 1994. Licensed to Ultratech Stepper.

5.  Trumper, D.L.,  Kim, Won-jong, Williams, Mark E., "Magnetic Arrays," #5,631,618, May 20, 1997.

6.  Trumper, D.L., Williams, M.E., "Positioner with Long Travel in Two Dimensions," #5,699,621, December 23, 1997.

7.  Trumper, D.L. and Kim, W.-J., "Magnetic Positioner Having a Single Moving Part," #6,003,230, December 21, 1999.

8.  Trumper, D.L. and Schwartz, L., "Magnetic Actuator With Long Travel in One Direction," #6066998, May 23, 2000.

9.  Trumper, D.L., and Liebman, M.J., "Method and Apparatus for Cooling Current Carrying Coil," #6262503, July 17, 2001.

10. Trumper, D.L. and Ludwick, S.J., "Precision High Speed Turning Machine," #6237452, May, 2001.

11. Trumper, D.L., and Konkola, P., "Methods and Apparatus Involving Selectively Tailored Electromagnetic Fields," #6316849, November, 2001.

 U.S. Pending

1.  Trumper, D.L., and Kendale, Amar, "Mechanisms and Control Techniques for Soft Contact Lithography," provisional application submitted January 11, 2002; full application submitted January 10, 2003.

2.  Montesanti, R., and Trumper, D.L., "Micro-Rotary Fast Tool Servo," application submitted June, 2003.

3.  Montesanti, R., and Trumper, D.L., "Flux-Steering Rotary Fast Tool Servo," application submitted September, 2003.

4.  Lu, X-L., and Trumper, D.L., "Ultrafast Tool Servos", application submitted October, 2004.

16.  Professional Registration:

None.

17.  Major New Products, Processes, Designs, or Systems (most developed in collaboration with graduate students):

Developed novel pump flow control method, used in liquid chromatography pumping systems. Used in commercial product line of Waters Chromatography for interfacing liquid chromatographs with mass spectrometer detectors. Improved flow control by a factor of 50 over previous commercial device. Received my first patent for this work.

Designed world's highest resolution magnetic suspension stage (position resolution of 50 picometers RMS). First scanning tunneling microscope images taken with a magnetic suspension stage. Work extended to include levitation with linear motors in oil, greatly extending travel range of stage.

Designed family of magnetic suspension lithography stages; the first use of this technology for photolithography systems. Technology licensed to US supplier of lithography equipment.

Designed new class of magnetic suspension actuators for mirror scanning in FTIR spectrometers using novel *super-hybrid* magnetic circuit topology.

Designed novel fast-tool servomechanism and control strategy for diamond turning of lenses for the ophthalmic industry. Rotary direct-drive tool axis achieves better than 50 g accelerations on the tool, over a travel of 40 mm, with micrometer-scale positioning accuracy. We can thereby produce eyeglass lenses with 10 times better form accuracy in half the time as compared with present commercial equipment.

Designed new cooling methods for linear motors which allow a factor of five increase in force density over conventional designs.

Developed novel low-fringing-field linear motors for use in electron beam lithography. Demonstrates for first time feasibility of using linear motors in low-fringing-field applications.

Designed and experimentally demonstrated new class of machines for implementing automation of microcontact printing, and for automated production of microcontact stamps.

Designed new class of electromagnetically-driven fast tool servos as replacements for piezoelectically-driven devices. Experimentally demonstrated bandwidth in excess of 20 kHz, with tool acceleration of 500 g's. Acceleration up to 2000 g within design capabilities.

1. Teaching Record

| Term | Subject Number | Title | Role | Course Type | Course Evaluation Survey Given |
|---|---|---|---|---|---|
| FT 91 | EEGR 2111 (UNCC) | Circuit Theory | Instructor | UG | N.A. (not MIT) |
| ST 91 | EEGR 4112 (UNCC) | Digital Control System Design | Instructor | UG | N.A. (not MIT) |
| FT 92 | EEGR 4111 (UNCC) | Classical Control System Design | Instructor | UG | N.A. (not MIT) |
| ST 92 | EEGR 5112 (UNCC) | Nonlinear Control Design | Instructor | G | N.A. (not MIT) |
| ST 92 | EEGR 6090 (UNCC) | Special Topics: Electromechanical Systems | Instructor | G | N.A. (not MIT) |
| FT 93 | EEGR 4111 (UNCC) | Classical Control System Design | Instructor | UG | N.A. (not MIT) |
| ST 93 | EEGR 4112 (UNCC) | Digital Control System Design | Instructor | UG | N.A. (not MIT) |
| FT 93 | 2.73 | Design Projects | Recitation Instructor | UG | Yes |
| ST 94 | 2.171 | Analysis and Design of Digital Control Systems | Instructor | H | Yes |
| FT 94 | 2.02 | Introduction to System Dynamics | Co-Instructor | UG | Yes |
| ST 95 | 2.171 | Analysis and Design of Digital Control Systems | Instructor | H | Yes |
| FT 95 | 2.737 | Designing Smart Machines | Instructor | H | Yes |
| ST 96 | 2.737 | Designing Smart Machines | Instructor | H | Yes |
| FT 96 | 2.737 | Mechatronics | Instructor | H | Yes |
| ST97 | 2.171 | Analysis and | | H | Yes |

|  |  | Design of Digital Control Systems |  |  |  |
|---|---|---|---|---|---|
| Term | Subject Number | Title | Role | Course Type | Course Evaluation Survey Given |
| FT97 | 2.737 | Mechatronics | Instructor | H | Yes |
| ST98 | 2.171 | Analysis and Design of Digital Control Systems | Instructor | H | Yes |
| FT98 | 2.737 | Mechatronics | Instructor | UG | Yes |
| ST99 | 2.737 | Mechatronics | Instructor | UG | Yes |
| FT99 | 2.737 | Mechatronics | Instructor | UG | Yes |
| ST00 | 2.003 | Systems Modeling and Control I | Co-instructor | UG | Yes |
| ST00 | 2.171 | Analysis and Design of Digital Control Systems | Instructor | H | Yes |
| FT00 | N/A | family leave | N/A | N/A | N/A |
| ST01 | N/A | sabbatical | N/A | N/A | N/A |
| FT01 | 2.003 | Modeling Dynamics and Control I | Instructor | UG | Yes |
| ST02 | 2.003 | Modeling Dynamics and Control I | Lab Instructor | UG | Yes |
| FT02 | 2.003 | Modeling Dynamics and Control I | Instructor | UG | Yes |
| ST03 | 2.003 | Modeling Dynamics and Control I | Instructor | UG | Yes |
| ST03 | 2.998 | Advanced topics: Digital Control | Instructor | G | No |
| FT 03 | 2.003 | Modeling Dynamics and Control I | Instructor | UG | No |
| ST04 | 2.003 | Modeling Dynamics and Control I | Recitation Instructor | UG | Yes |
| FT04 | 2.003 | Modeling Dynamics and Control I | Instructor | UG | Yes |

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| ST 05 | 2.003 | Modeling Dynamics and Control I | Instructor | UG | Yes |
| FT 05 | 2.003 | Dynamics and Vibrations | Instructor | UG | Yes |
| ST 06 | 2.737 | Mechatronics | Instructor | G | Yest |
| FT 06 | 2.171 | Analysis and Design of Digital Control Systems | Instructor | G |  |

2. Other Educational Contributions
   a) Developed new syllabus and associated lab experiences for revised offering of 2.003 Modeling Dynamics and Control I. Supervised graduate students to design and implement 10 new sets of lab hardware experiments, with associated software, electronics, and supporting documentation.  Each experiment implemented on 12 lab stations.
   b) Implemented web site documenting new 2.003 course offering and laboratories. Web site includes details of lab operation and supporting information to allow other faculty to duplicate lab experiments.

Record of Research Funding for
David L. Trumper

1. Books:
    None.

2. Papers in Refereed Journals:

    2.1.  Trumper, D.L., "An Electronically-Controlled Pressure Regulator," *ASME Journal of Dynamic Systems, Measurement, and Control*, Vol. 111, No. 1, March 1989, pp. 75-82.

    2.2.  Williams, M.E. and Trumper, D.L., "Magnetic Bearing Stage for Photolithography," *CIRP Annals*, Vol. 42/1/1993, pp. 607-610. **

    2.3.  Poovey, T., Holmes, M., and Trumper, D.L., "A Kinematically-Coupled Magnetic Bearing Test Fixture," *Precision Engineering*, vol. 16, No. 2, April 1994, pp. 99-108. **

    2.4.  Holmes, M.L., Trumper, D.L., and Hocken, R.J., "Atomic-Scale Precision Motion Control Stage (The Angstrom Stage)," *CIRP Annals*, Vol. 44/1/1995, pp. 455-460. **

    2.5.  Holmes, M.L. and Trumper, D.L., "Magnetic/Fluid Bearing Stage for Atomic-Scale Motion Control," *Precision Engineering*, vol. 18, No. 1, Jan. 1996, pp. 38-49.**

    2.6.  Trumper, D. L., Kim, W-J, Williams, M. E., "Design and Analysis Framework for Linear Permanent Magnet Machines," *IEEE Transactions on Industry Applications,* Vol. 32, No. 2, March/April 1996, pp. 371-379.**

    2.7.  Ludwick, S.J., Trumper, D.L. and Holmes, M.L., "Modeling and Control of a Six Degree of Freedom Magnetic/Fluidic Motion Control Stage," *IEEE Transactions on Control Systems Technology, Special Issue on Magnetic Bearing Control,* Vol. 4, No. 5, September 1996, pp. 553-564.**

    2.8.  Subrahmanyan, P.K., Olson, S. M., and Trumper, D.L., "Linearizing Control of Magnetic Suspension Systems," *IEEE Transactions on Control Systems Technology*, Vol. 5, No. 4, July 1997, pp. 427-438.**

    2.9.  Kim, W-J, Trumper, D.L. and Bryan, J., "Linear Motor Levitated Stage for Photolithography," *CIRP Annals*, Vol. 46/1/1997, pp. 447-450.**

    2.10. Nohavec, D.R., and Trumper, D.L., "Super-Hybrid Magnetic Suspensions for Interferometric Scanners," *JSME International Journal*, Series C, Vol. 40, No. 4, Dec, 1997, pp. 570-583, Special Issue on Magnetic Bearings. **

Record of Research Funding for
David L. Trumper

2.11. Kim, W-J, Trumper, D.L, "High-Precision Magnetic Levitation Stage for Photolithography," *Precision Engineering,* Vol. 22, No. 2, April 1998, pp. 66-77.**

2.12. Kim, W-J, Trumper, D.L, Lang, J.H., "Modeling and Vector Control of a Planar Magnetic Levitator," *IEEE Transactions on Industry Applications,* Vol. 34, No. 6, Nov./Dec., 1998, pp. 1254-1262.**

2.13. Ludwick, S.J., Chargin, D.A., Calzaretta, J.A., and Trumper, D.L., "Design of a Rotary Fast Tool Servo for Ophthalmic Lens Fabrication," *Precision Engineering*, Vol. 23, No. 4, September, 1999.**

2.14. Holmes, M.L., Hocken, R.J., and Trumper, D.L., "The Long-Range Scanning Stage: a Novel Platform for Scanned-Probe Microscopy," *Precision Engineering*; Vol. 24, No. 3, July, 2000.**

2.15. Wang, C-H., Hocken, R.J., and Trumper, D.L., "Dynamics and Control of the UNCC/MIT Subatomic Measuring Machine," *CIRP Annals,* Vol. 50/1/2001, pp. 373-376.

2.16. Lu, X., Weng, M.C., and Trumper, D.L., "Vibration Control of Flexible Structures Using Sensor Averaging and Actuator Averaging Methods," IEEE Transactions on Control Systems Technology, Volume 10, Issue 4, July, 2002.**

2.17. Sato, Y., Trumper, D. L., "A Vibration Isolation Platform," *Mechatronics*, Volume 12, Issue 2, February, 2002.

2.18. Chen, K-S, "Trumper, D.L., and Smith, S.T., Design and Control for an Electromagnetically Driven X-Y-Theta Stage," *Precision Engineering,* Vol. 26, No. 4, October, 2002.**

2.19. Konkola, P., Trumper, D.L., "Electromagnetic Design of a Low-Fringing-Field Magnetic Bearing Stage for Electron Beam Lithography," *JSME International Journal, Special Issue on Magnetic Bearings*, Series C, Vol. 46, No. 2, June 2003.**

2.20. Byl, M.F., Ludwick, S.J., and Trumper, D.L., "A Loop-Shaping Perspective for Tuning Adaptive Feedforward Controllers," *Precision Engineering: Journal of the International Societies for Precision Engineering,* Vol. 29, Issue 1, January, 2005, pp. 27-40.**

2.21. Stein, A.J., Hocken, R.J., and Trumper, D.L., "A Metrological Atomic Force Microscope," accepted for publication with mandatory revisions for *Precision*

Record of Research Funding for
David L. Trumper

*Engineering: Journal of the International Societies for Precision Engineering,*
currently in revision.**

2.22. Lu, X-L, and Trumper, D.L., "Ultrafast Tool Servos for Diamond Turning,"
*CIRP Annals,* Vol. 54/1/2005, pp. 383-388.**

2.23. Trumper, D.L., "Levitation Linear Motors for Precision Positioning," IEEJ
Transactions on Electronics, Information and Systems, No.10, 2006.**

3.  Proceedings of Refereed Conferences:

3.1.  Trumper, D.L. and Slocum, A.H., "Five Degree of Freedom Control of an Ultra-
Precision Magnetically-Suspended Linear Bearing," NASA Workshop on
Aerospace Applications of Magnetic Suspension Technology, Sept. 25-27,
1990.

3.2.  Trumper, D.L., "Nonlinear Compensation Techniques for Magnetic Suspension
Systems," NASA Workshop on Aerospace Applications of Magnetic
Suspension Technology, Sept. 25-27, 1990.

3.3.  Trumper, D.L. and Queen, M.A., "Precision Magnetic Suspension Linear
Bearing," NASA International Symposium on Magnetic Suspension
Technology, Aug. 19-23, 1991. **

3.4.  Trumper, D.L., Sanders, J.C., Nguyen, T.H., and Queen, M.A., "Experimental
Results in Nonlinear Compensation of a One-Degree-of-Freedom Magnetic
Suspension," NASA International Symposium on Magnetic Suspension
Technology, Aug. 19-23, 1991. **

3.5.  Trumper, D.L. and Slocum, A.H., "Nanometer Motion Control via Magnetic
Suspension," Proceedings of the 6th Annual Meeting of the American Society
for Precision Engineering, Oct. 13-18, 1991.

3.6.  Trumper, D.L. and Queen, M.A., "Control and Actuator Design for a Precision
Magnetic Suspension Linear Bearing," SPIE OE/Aerospace Sensing
Symposium, Conference No. 1696, Controls for Optical Systems, Orlando, FL,
April 20-24, 1992. **

3.7.  Trumper, D.L., Nguyen, T., and Williams, M., "Power-Efficient Linear Motor
for Precision Motion Control," Proceedings of the 7th Annual Meeting of the
American Society for Precision Engineering, Oct. 20-23, 1992. **

Record of Research Funding for
David L. Trumper

3.8.  Poovey, T., Holmes, M., and Trumper, D.L., "A Kinematically Coupled Magnetic Bearing Test Fixture," Proceedings of the 7th Annual Meeting of the American Society for Precision Engineering, Oct. 20-23, 1992. **

3.9.  Trumper, D.L., Williams, M.E., and Nguyen, T.H., "Magnet Arrays for Synchronous Machines," IEEE Industry Applications Society Annual Conference, Toronto, Canada, Oct. 3-8, 1993.

3.10. Trumper, D.L., Williams, M.E., and Nguyen, T., "Magnetic Linear Bearing: Theory and Experiment," 7th International Precision Engineering Seminar (IPES-7), Kobe, Japan, May, 1993. **

3.11. Williams, M.E. and Trumper, D.L., "Materials for Efficient High-Flux Magnetic-Bearing Actuators," Proceedings of the 2nd International Symposium on Magnetic Suspension Technology, Seattle, WA, Aug. 11-13, 1994, NASA Conference Publication #3247, Part 1, pp. 135-145. **

3.12. Kuzin, A.V., Holmes, M.L., Behrozjou, R., and Trumper, D.L., "Analysis of Achievable Disturbance Attenuation in a Precision Magnetically-Suspended Motion Control System," Proceedings of the 2nd International Symposium on Magnetic Suspension Technology, Seattle, WA, Aug. 11-13, 1994, NASA Conference Publication #3247, Part 2, pp. 653-665. **

3.13. Trumper, D.L., Holmes, M., Behrozjou, R., and Batchelder, D., "Magnetic/Fluid-Bearing Stage for Atomic-Scale Motion Control," 1994 ASPE Spring Topical Meeting, Tucson, AZ, April 6-8, 1994. **

3.14. Trumper, D.L., Holmes, M., Behrozjou, R., and Batchelder, D., "Atomic-Scale Motion Control via Hybrid Fluid/Magnetic Bearings," 4th International Symposium on Magnetic Bearings, Zürich, Switzerland, August 25, 1994. **

3.15. Trumper, D.L., Kim, W-J. and Williams, M.E., "Design & Analysis Framework for Linear Permanent Magnet Machines," 1994 IEEE Industry Applications Society Annual Meeting, Denver, CO, October 2-7, 1994. **

3.16. Williams, M.E. and Trumper, D.L., "Precision Magnetic Bearing Six Degree of Freedom Stage," Proceedings of the 9th Annual Meeting of the American Society for Precision Engineering, October 2-7, 1994, pp. 65-68. **

3.17. Chen, K.S., Montero, A., Trumper, D.L., Smith, S.T., and Williams, M.E., "Spring Dominated Design of a High Load Capacity Electromagnetically Driven X-Y-  Stage," 1995 ASPE Annual Meeting, October, 1995.**

Record of Research Funding for
David L. Trumper

3.18. Ludwick, S.J., Trumper, D.L., and Holmes, M.L., "Design and Control of a Six
Degree of Freedom Magnetic/Fluidic Motion Control Stage," ASME 1995
International Mech. Eng. Congress and Exposition, San Francisco, CA, DSC
Volume 57-1, pp. 511-518, November 12-17, 1995. **

3.19. Ludwick, S.J., Trumper, D.L., and Holmes, M.L., "Feedback Linearization in a
Six Degree-of-Freedom Mag-Lev Stage," Third International Symposium on
Magnetic Suspension Technology, Tallahassee, FL, December 13-15, 1995. **

3.20. Williams, M.E. and Trumper, D.L., "Precision Magnetic Bearing Six Degree of
Freedom Stage," Third International Symposium on Magnetic Suspension
Technology, Tallahassee, FL, Dec. 13-15, 1995. **

3.21. Kim, W.-J. and Trumper, D.L., "Force Ripple in Surface-Wound Permanent-
Magnet Linear Motors", IEEE Intermag '96, Seattle, WA, April 9-12, 1996.**

3.22. Schwartz, L.S. and Trumper, D.L., "Magnetic Optical Bearing Design for Minor
Wavelength Scans in a Spaceborne Interferometer," 5th International
Symposium on Magnetic Bearings, Kanazawa, Japan,  August 28-30, 1996.**

3.23. Kim, W.-J., Berhan, M.T., Trumper, D.L., and Lang, J.H., "Analysis and
Implementation of a Tubular Motor with Halbach Magnet Array, " 1996 IEEE-
IAS Annual Meeting, San Diego, CA, October 5-10, 1996.**

3.24. Ludwick, S. J. and Trumper, D.L., "Noise Optimal Control of a Fluid-Floated
Magnetic Positioner," Proceedings of the 1996 ASME Int'l Mechanical
Engineering Congress and Exposition, Atlanta, GA, November 1996, DSC-Vol.
58, pp. 309-316.**

3.25. Holmes, M.L., Hocken, R.J., and Trumper, D.L., "A Long-Range Scanning
Stage (The LORS Project)," Proceedings of 1996 ASPE Annual Meeting,
November 1996.**

3.26. Hocken, R., Holmes, M.L., and Trumper, D.L., "Progress on the Long Range
Magnetic Stage," Proceedings of the 9th International Precision Engineering
Seminar, Braunschweig, Germany,  May 26-30, 1997.**

3.27. Kim, W.-J., Lang, J., and Trumper, D.L., "Modeling and Vector Control of a
Planar Magnetic Levitator, " IEEE IAS 32nd Annual Meeting, October 9,
1997.**

3.28. Kim, W-J, and Trumper, D.L., "High-Precision Magnetic Levitation Stage for
Photolithography," Proceedings of 1997 ASPE Annual Meeting, Norfolk, VA,
Oct. 7-9, 1997.**

Record of Research Funding for
David L. Trumper

3.29. Holmes, M.L., Hocken, R.J., and Trumper, D.L., "A Long-Range Scanning Stage (The LORS Project)," Proceedings of 1997 ASPE Annual Meeting, October 7-9, 1997, Norfolk, VA.**

3.30. Williams, M.E., Subrahmanyan, P.K., and Trumper, D.L., "Six Axis Active Vibration Isolation and Payload Reaction Force Compensation System," Proceedings of 1997 ASPE Annual Meeting, October 7-9, 1997, Norfolk, VA.**

3.31. Kim, W-J, and Trumper, D.L., "Six-Degree-of-Freedom Planar Positioner with Linear Magnetic Bearings/Motors," 6th International Symposium on Magnetic Bearings, MIT, Cambridge, MA, Aug. 5-7, 1998.**

3.32. Holmes, M. L., Trumper, D.L., Hocken, RJ., "Magnetically-Suspended Stage for Accurate Positioning of Large Samples in Scanned Probe Microscopy," 6th International Symposium on Magnetic Bearings, MIT, Cambridge, MA, Aug. 5-7, 1998.**

3.33. Subrahmanyan, P.K., Williams, M.E., and Trumper, D.L., "Active Vibration Isolation Design for a Photolithographic Stepper," 6th International Symposium on Magnetic Bearings, MIT, Cambridge, MA, Aug. 5-7, 1998.**

3.34. Gibbons, K.A., Borenstein, J.T., Nokes, D.S., Weinberg, M.S., and Trumper, D.L., "The Design, Fabrication, and Testing of a Micromechanical Silicon Oscillating Accelerometer," AIAA Conference on Guidance and Control, Boston, MA, August 10-12, 1998.**

3.35. Ludwick, S.J., Ma, D.C., and Trumper, D.L., "A Rotary Arm Based Turning Machine for Ophthalmic Lenses," proceedings of the 1998 ASPE Annual Meeting, October 25-30, 1998, St. Louis, MO.**

3.36. Liebman, M.J., and Trumper, D.L., "Pushing the Thermal Limit in Linear Motors," proceedings of the 1998 ASPE Annual Meeting, October 25-30, 1998, St. Louis, MO.**

3.37. Subrahmanyan, P.K., and Trumper, D.L., "Eigenstructure Assignment Techniques for Precision Motion Control," proceedings of the 1998 ASPE Annual Meeting, October 25-30, 1998, St. Louis, MO.**

3.38. Kim, W-J, and Trumper, D.L., "Precision Control of Planar Magnetic Levitator," proceedings of the 1998 ASPE Annual Meeting, October 25-30, 1998, St. Louis, MO.**

Record of Research Funding for
David L. Trumper

3.39. Kim, W-J, and Trumper, D.L., "Velocity Regulation Limits in a Precision Two-Dimensional Magnetic Levitator," IEEE 1999 International Magnetics Conference (INTERMAG 99), May 18-21, 1999, Kyongju, Korea.**

3.40. Subrahmanyan, P.K, and Trumper, D.L., "Eigenvector Assignment", received best presentation award in session TM-10, 1999 American Control Conference, June 2-4, 1999, San Diego, CA.**

3.41. Weng, M-C., Ritter, R.J., and Trumper, D.L., "Magnetic Suspension and Vibration Control of Beams for Non-Contact Processing," 1999 IEEE Conference on Control Applications, Kohala Coast-Island of Hawaii, USA, August 22-26, 1999.**

3.42. Trumper, D.L., and Ludwick, S.J., "Development of 2.737 Mechatronics at MIT," *invited paper* for special session on Teaching Mechatronics, proceedings of IEEE/ASME Conference on Advanced Intelligent Mechatronics (AIM `99), Atlanta, GA, September 19-23, 1999, pp. 446-451.

3.43. Ludwick, S.J., Chargin, D.A., Calzaretta, J.A., and Trumper, D.L., "Calibration and Control of a Rotary Fast Tool Servo," 1999 ASPE Annual Meeting, Monterey, CA, Oct. 31-Nov. 4, 1999.**

3.44. Weng, M.C., and Trumper, D.L., "A Design Method for Magnetic Suspension and Vibration Control of Levitated Beams for Noncontact Processing," Proceedings of the 5th International Symposium on Magnetic Suspension Technology, December 1-3, 1999.**

3.45. Trumper, D.L., and Ludwick, S.J., "Development of dSPACE Tools for 2.737 Mechatronics at MIT," dSPACE User's Conference, Detroit, MI, May 1-2, 2000.**

3.46. Trumper, D.L., and Sato, T., "A Vibration Isolation Platform," Mechatronics 2000, the 7th Mechatronics Forum International Conference, Atlanta, GA, Sept. 6-8, 2000.

3.47. Calzaretta, J., Ludwick, S.J., and Trumper, D.L., "Repetitive Control of a Fast-Tool Servo for Asymmetric Diamond Turning," Mechatronics 2000, the 7th Mechatronics Forum International Conference, Atlanta, GA, Sept. 6-8, 2000.**

3.48. Trumper D.L., Weng, M-C, and Lu, X., "Magnetic Suspension of Flexible Elements," 7th International Symposium on Magnetic Bearings, Zurich, Switzerland, Aug., 2000.**

Record of Research Funding for
David L. Trumper

3.49. Calzaretta, J., Ludwick, S., Byl, M., Trumper, D., "Repetitive Control of a Rotary Fast Tool Servo," ASPE Spring Topical Meeting on Control of Precision Systems, Sheraton Rittenhouse Hotel, Philadelphia, PA, April 18-20, 2001.**

3.50. Sato, Y., Trumper, D.L., "A Novel Single Degree-Of-Freedom Active Vibration Isolation System," 2001 Annual Meeting of the ASPE, Crystal City, VA, Nov 13-16, 2001.

3.51. Liebman, M., Trumper, D.L., "Rotary-Linear Hybrid Axes for Meso-Scale Machining," 2001 Annual Meeting of the ASPE, Crystal City, VA, Nov 13-16, 2001.

3.52. Byl, M.F., Calzaretta, J.A., Ludwick, S.J., and Trumper, D.L., "Tuning Controllers with Multiple Adaptive Feed-Forward Cancellation Resonators," 2002 Annual Meeting of the EUSPEN, University of Eindhoven, May 26-30, 2002.

3.53. Konkola, P., and Trumper, D.L., "Magnetic Bearing Stages for Electron Beam Lithography," Eighth International Symposium on Magnetic Bearings (ISMB-8), Hotel Lake View Mito, Japan, August 26-28, 2002.

3.54. Sato, T., and Trumper, D.L., "A Novel Single Degree-of-Freedom Active Vibration Isolation System," Eighth International Symposium on Magnetic Bearings (ISMB-8), Hotel Lake View Mito, Japan, August 26-28, 2002. (this work is an extension/revision of paper #50 above, with some portions in common)

3.55. Shilpiekandula, V., Trumper, D. L. , Liebman, M. K., and Vona, M. A, "A Laser Speckle Sensor for Compound Rotary-linear Motion Metrology, 2003 Annual Meeting of the ASPE, Portland, OR, October, 25-30, 2003.**

3.56. Trumper, D.L., and Lu, X-D, "Electromagnetically-Driven Ultrafast Tool Servo," 2003 Annual Meeting of the ASPE, Portland, OR, October, 25-30, 2003.**

3.57. Montesanti, R. C., and Trumper, D.L., "High-Bandwidth Short-Stroke Rotary Fast Tool Servo," 2003 Annual Meeting of the ASPE, Portland, OR, October, 25-30, 2003.**

3.58. Cattell, J.H., and Trumper, D.L., "Adaptive Feedforward Cancellation Viewed from an Oscillator Amplitude Control Perspective," 2003 Annual Meeting of the ASPE, Portland, OR, October, 25-30, 2003.**

Record of Research Funding for
David L. Trumper

3.59. Montesanti, R. C., and Trumper, D.L., "A 10 kHz Short-Stroke Rotary Fast
Tool Servo," 2004 Annual Meeting of the ASPE, Orlando, FL, October, 23-28,
2004.**

3.60. Lu, X-L., and Trumper, D.L., "Electromagnetically-Driven Ultrafast Tool
Servo," 2004 Annual Meeting of the ASPE, Orlando, FL, October, 23-28,
2004.**

3.61. Yang, H.; Buice, E. S.; Peruru, H; Smith, S. T.; Hocken, R. J. (University of
North Carolina-Charlotte); Smith, R. M. (National Institute of Standards and
Technololgy); and Trumper, D. L.; Otten, D. (Massachusetts Institute of
Technology), "Multi-degree-of-freedom Ultra-precision Motion Control
Platform for Measurement of Nano-structures: A Coarse/fine Approach," 2004
Annual Meeting of the ASPE, Orlando, FL, October, 23-28, 2004.**

3.62. Lu, X-L., and Trumper, D.L., "An Ultra-Fast Tool Servo for Diamond Turning
of Contoured Surfaces," 2005 Annual Meeting of the ASPE, Norfolk, VA,
October, 10-14, 2005.**

3.63. Byl, M.F., and Trumper, D.L., "A Long Stroke Fast Tool Servo with Integral
Balance Mass," 2005 Annual Meeting of the ASPE, Norfolk, VA, October, 10-
14, 2005.**

3.64. Mazzeo, A., Trumper, D.L., Stein, A.J., and Hocken, R.J., "Atomic Force
Microscope for Accurate Dimensional Metrology," 2005 Annual Meeting of the
ASPE, Norfolk, VA, October, 10-14, 2005.**

3.65. Montesanti, R.C., and Trumper, D.L., "System Dynamics and Control System
for a High Bandwidth Rotary Actuator and Fast Tool Servo," 2005 Annual
Meeting of the ASPE, Norfolk, VA, October, 10-14, 2005.**

3.66. Barton, A., and Trumper, D.L., "Rubber Bearings and Their Applicability in
Precision Machines," 2005 Annual Meeting of the ASPE, Norfolk, VA,
October, 10-14, 2005.**

3.67. Buice, E. S., Yang, H., Smith, S. T., Hocken, R. J., Trumper, D. L., Otten, D.,
and Seugling, R., "Early Testing of a Coarse/Fine Precision Motion Control
System," 2005 Annual Meeting of the ASPE, Norfolk, VA, October, 10-14,
2005.**

3.68. Trumper, D.L., "Low Stray Field Maglev Stages for Vacuum Applications,"
ASPE Spring Topical Meeting, Pittsburgh, PA, May 1-2, 2006.**

- 24 -

Record of Research Funding for
David L. Trumper

3.69. Trumper, D.L., and Lu, X-D., "Fast Tool Servos: Advances in Precision, Acceleration, and Bandwidth," 11th International Conference on Precision Engineering, Tokyo, Japan, August, 2006.**

4.    Other Major Publications

4.1.   Trumper, D.L. and Roberge, J.K., problem-solution manual for MIT video course, "Electronic Feedback Systems," MIT's Center for Advanced Engineering Study, 1986.

4.2.   Course notes for 6.302/16.30 on classical control system design; joint with J. Roberge, L. Gould, W. Markey. Notes also used in Course 2.737. Notes used from 1993 to present.

4.3.   Proceedings of the Sixth International Symposium on Magnetic Bearings (D. Trumper, P. Allaire, eds.), MIT, Cambridge, MA, August 1998.

4.4.   Course notes for 2.003 Modeling, Dynamics, and Control I. Notes in development as a textbook.

4.5.   Lundberg, K.H., Miller, H.R., and Trumper, D.L., "Troubles at the Origin: Consistent Usage and Properties of the Unilateral Laplace Transform," submitted to IEEE Control Systems Magazine, August, 2004.

5.    Internal Memoranda and Progress Reports:

     None.

6.    Invited Lectures:
March 1992, "Analysis and Design of a Novel Magnetic Suspension Linear Motor," MIT Laboratory of Electromagnetic and Electronic Systems, Cambridge, MA; also at Lincoln Laboratory, Lexington, MA.

November 1992, "Electromagnetic Bearings and Drives for Nanometer-Scale Motion Control," Carnegie Mellon University, Pittsburgh, PA, also at Stanford University, Palo Alto, CA.

January 1993, "Precision Control System Design," Polaroid Corp., Cambridge, MA, also at MIT Leaders for Manufacturing, Cambridge, MA (half-day seminar at Polaroid, full-day seminar for LFM).

Record of Research Funding for
David L. Trumper

August 1993, "Magnetic Suspension Lithography Stage Design", University of
Tokyo, Tokyo, Japan; also at Ibaraki University, Hitachi City, Japan; also at
Ritsumeikan University, Kyoto, Japan.

August 1994, "Magnetic Linear Bearing: Theory and Experiment," Physikalisch-
Technische Bundesanstalt, Braunschweig, Germany.

August 1994, "Atomic-Scale Motion Control via Hybrid Fluid/Magnetic Bearings,"
Physikalisch-Technische Bundesanstalt, Braunschweig, Germany.

October 1994, "Design of Fluidic/Magnetic Suspension Systems for Atomic-Scale
Positioning," MIT Mechanical Engineering Colloquium, Cambridge, MA.

February 1995, "Magnetic Suspension Systems for Atomic-Scale Positioning,"
seminar for IEEE Control Systems Society, Boston, MA.

April 1995, "Precision Mechatronic Systems", Allen-Bradley, Milwaukee, WI.

August 1996, "Atomic-Resolution Magnetic Suspension Design", University of
Tokyo, Tokyo, Japan.

October 1996, "Magnetic Bearing Stages for Lithography and Scanned Probe
Microscopy," Draper Laboratory, Cambridge, MA.

November 1996, "Possibilities for Maglev Positioners for E-Beam Lithography,"
ETEC Corporation, Hayward, CA.

November 1996, "The Application of Magnetic Suspension Technology to Precise
Positioning Systems," Sandia National Labs, Livermore, CA; also at Lawrence
Livermore National Labs, Livermore, CA.

November 1996, "The Development of Precision Magnetically-Suspended Stages for
Lithographic Systems", Departmental Colloquium, Sibley School of Mechanical and
Aerospace Engineering, Cornell University, Ithaca, NY.

April 1997, "Design and Control of Precision Magnetic Suspension Stages," George
W. Woodruff School of Mechanical Engineering, Georgia Institute of Technology,
Atlanta, GA.

April 1997, "Mechatronic System Design Elements," a three-hour tutorial, George W.
Woodruff School of Mechanical Engineering, Georgia Institute of Technology,
Atlanta, GA.

Record of Research Funding for
David L. Trumper

October 1997, "An Overview of Magnetic Suspension Stage Design," 1997 ASPE Annual Conference, Norfolk, VA, *invited presentation*.

April 1998, "Magnetically-Levitated Positioning Systems With Sub-Nanometer Resolution," Mechanical Engineering Department, University of Wisconsin-Madison, Madison,WI

October, 1998, "Mechatronics: A Focus for Research and Teaching in Mechanical Engineering," MIT Mechanical Engineering Colloquium, Cambridge, MA.

October, 1998, "Precision Mechatronic Systems," Mechanical Engineering Dept. Seminar Series, Univ. of Illinois, Urbana-Champaign, IL.

February, 1999, "Precision Mechatronic Systems," Mechatronics Seminar, Mechanical Engineering Dept., Clemson University, Clemson, SC.

April, 1999, "Magnetic Bearing Positioning Systems for Semiconductor Manufacturing," *invited presentation* at the National Academy of Engineering 2$^{nd}$ German - American Frontiers of Engineering Symposium, Irvine, CA.

April, 1999, "Precision Mechatronic Systems," Jones Seminar, Thayer School of Engineering, Dartmouth College, Hanover, NH.

April, 1999, "Precision Magnetic Suspensions for Manufacturing," Dept. of Aerospace and Mechanical Engineering, Cornell University, Ithaca, NY.

September, 1999, "Development of 2.737 Mechatronics at MIT," *invited paper* for special session on Teaching Mechatronics, IEEE/ASME Conference on Advanced Intelligent Mechatronics (AIM `99), Atlanta, GA.

November, 1999, "Fast Tool Servo for Diamond Turning of Asymmetric Optics," Mechanical Engineering Dept., University of Rhode Island.

January, 2000, "A New Rotary Fast Tool Servo for Diamond Turning of Asymmetric Optics," Mechatronics Seminar, Institute of Robotics, Swiss Federal Institute of Technology, Zurich, Switzerland.

March 2000, "Precision Mechatronic Systems," Mechanical Engineering Departmental Seminar, University of Minnesota, Minneapolis, MN

August 2000, "Precision Motion Control Research at MIT," Mechanical Engineering Dept., Swiss Federal Institute of Technology, Lausanne, Switzerland.

Record of Research Funding for
David L. Trumper

March, 2001, "Mechatronics at MIT," Inaugural Symposium for the Professorship of Jan van Eijk, Delft University, Delft, Netherlands.

May, 2002, "Magnetic Bearings with Atomic-Scale Precision," invited presentation, Precision Engineering Group, Physikalisch-Technische Bundesanstalt (German National Standards Laboratory), Braunschweig, Germany.

June, 2002, "Projects for Teaching Mechatronics at MIT," invited Plenary Session Paper, Mechatronics 2002, University of Twente, Enschede, Netherlands.

August, 2002, "Combined Force/Position and Moment/Slope Control of Levitated Continua," invited paper at the 8th International Symposium on Magnetic Bearings, Mito, Japan.

March, 2004, "Viewpoints on Teaching Modelling, Dynamics, and Control at MIT," RPI, Troy, NY.

May, 2004, "From Wafer Steppers to Flying Broomsticks," Departmental Seminar, University of Massachusetts, Amherst, MA.

December, 2004, "Precision Mechatronics Research at MIT," Departmental Seminar, Mechanical Engineering Department, Columbia University, New York, NY.

January, 2005, "Ultrafast Tool Servos: Electromagnetics and Control," Departmental Seminar, Mechanical Engineering Department, University of British Columbia, Vancouver, BC, Canada.

October, 2005, "Levitation Linear Motors," invited Keynote Paper, Linear Drives for Industry Applications Conference, Awaji Island, Japan.

August, 2006, "Fast Tool Servos: Advances in Precision, Acceleration, and Bandwidth," invited Keynote Paper, International Conference on Precision Engineering, Tokyo, Japan.

Theses supervised by David L. Trumper

Summary

| | Total | Completed | In Progress |
|---|---|---|---|
| Bachelor's | 25 | 25* | 0 |
| Master's | 44 | 39 | 5 |
| Engineer's | – | – | – |
| Doctoral | | | |
| As Supervisor | 11 | 10 | 1 |
| As Reader | 14 | 13 | 1 |

[* 6 students used Master's Theses to satisfy S.B. requirements.]

Bachelor's Theses:  (also see Master's theses)

Aggarwal, Sanjay, "High-Bandwidth Magnetic Bearing System," June 1995.

Sheppard, Dean, "Lightweight Structures for Magnetic Suspension," December 1995.

Rohatgi, Gaurav, "Implementation of Digital Control Techniques with Application to a Flexible Manipulator," February 1996.

Ma, David, "Modelling and Control of a Three Degree of Freedom Flexural Stage", June 1996.

Irigoyen, Esteban, "Servo Motor Test Bed," June 1996.

Workeneh, Yedilakil, "Vibration Isolation Platform Design and Control," June, 1998.

St. Michel, Nathan, "Computer-Modeling of a Force-Magnifying Beam Structure," June, 1998.

Stevens, Duane, "Independent Study in Control Systems Design," January, 1999.

Lillienkamp, Katie, "Dynamic Signal Analyzer Implemented on dSPACE System", January, 1999.

Perry, Michael, "Electronics Design for Magnetic Suspension of a Flexible Beam," June, 1999.

Theses supervised by David L. Trumper

Stimac, Andrew, "Controller for Inverted Pendulum Classroom Demonstration," June, 1999.

Hollerman, Peggy, "Weightlessness Demo for 8.01," June, 2000.

Wang, Evelyn, "Momentum Demo for 8.01," June, 2000.

Salzman, Rhonda, "Satellite Capture Device," Feb., 2000.

Wu, Ming, "Instrumentation for Los Alamos Physics Group," Feb. 2000.

Hawe, Larry, "Medical Device Weaving Machine,", June, 2004.

Rosales, Evencio, "Ball-on-Beam Balancer,", June, 2004.

Chou, Danielle, "Friction Modeling Techniques," June, 2004.

Baranowski, Robert, "Magnetic Suspension Sensor," June, 2006.

Master's Theses:

Poovey, Tony, "A Kinematically-Coupled Magnetic Bearing Test Fixture," UNC-Charlotte, Mechanical Engineering and Engineering Science, December 1992.

McMahill, Daniel R., "A High Dynamic Range Capacitive Displacement Sensor," MIT, Electrical Engineering and Computer Science, June 1993.

Batchelder, David, "Analysis and Design of High-Resolution Capacitance Probes For Use in a Precision Motion Control Stage," UNC-Charlotte, Electrical Engineering, May 1994.

Heine, Travis, "The Development of a Three-Degree of Freedom Vibration Control Test Facility," MIT, Mechanical Engineering, May 1994 (also used for B.S. degree).

Holmes, Michael, "Analysis and Design of a Magnetically-Suspended Precision Motion Control Stage", UNC-Charlotte, Electrical Engineering, May 1994.

Olson, Sean, "Nonlinear Compensation of a Single Degree of Freedom Magnetic Suspension System," MIT, Mechanical Engineering, May 1994 (also used for B.S. degree).

Nguyen, Tiep H., "Automatic Controls for a Precision Magnetic Suspension Linear Motor," UNC-Charlotte, Electrical Engineering, February 1995.

Theses supervised by David L. Trumper

Chen, Kuo-Shen, "A Spring-Dominated Regime Design of a High Load Capacity, Electromagnetically Driven X-Y- Stage," MIT, Mechanical Engineering, May 1995.

Schwartz, Lawrence, "Magnetic Optical Bearing (MOB) Design for Mirror Wavelength Scans in a Spaceborne Interferometer," MIT, Mechanical Engineering, May 1995 (also used for B.S. degree).

Behrouzjou, Roxana, "Analysis and Control of a Magnetically Suspended Scanning Tunneling Microscope," UNC-Charlotte, Electrical Engineering, June 1995.

Ludwick, Stephen, "Modeling and Control of a Six Degree of Freedom Magnetic/Fluidic Motion Control Stage," MIT, Mechanical Engineering, February 1996.

Berhan, Michael, "Implementation of a Halbach Array in a Tubular Linear Motor," MIT, Mechanical Engineering, May 1996.

Gibbons, Kevin, "A Micromechanical Silicon Oscillating Accelerometer," MIT, Mechanical Engineering, February 1997.

Nohavec, Donald, "Magnetic Bearing Designs for Interferometric Mirror-Scanning Mechanisms," MIT, Mechanical Engineering Dept., June 1997.

Bibler, Jared, "Effects of Imbalance and Geometric Error on Precision Grinding Machines," MIT, Mechanical Engineering, June 1997 (also used for B.S. degree).

Hoctor, John, "The Measurement of Automotive Wheel Loads at the Bearing Cup," MIT, Mechanical Engineering, February, 1998 (also used for B.S. degree).

Konkola, Paul, "Magnetic Bearing Stages for Electron-Beam Lithography," MIT, Mechanical Engineering, February, 1998.

Liebman, Michael, "Thermally Efficient Linear Motor Analysis and Design," MIT, Mechanical Engineering, February, 1998.

Ma, David, "Novel Lens Cutting Machine," MIT, Mechanical Engineering , June, 1998.

Garcia, Fermin, "Spacecraft Attitude Control System," MIT, Mechanical Engineering,  June 1998.

Salvatore, Claudio, "Linear and Nonlinear Compensation Techniques for Control of a Single Degree of Freedom Magnetic Bearing," MIT, Mechanical Engineering, June 1998.

Theses supervised by David L. Trumper

Trapp, Thomas, "Modeling and Control of a Fish-Like Vehicle," MIT, Mechanical Engineering,  June 1998.

Wong, Sai Bun, "Integrated-Circuit Capacitive Displacement Gages," MIT, Electrical Engineering Dept.,  June, 1998.

Ritter, Robin, "Sensor Designs for Magnetic Suspension Material Processing Systems," MIT, Mechanical Engineering, February, 1999.

Chargin, David, "Rotational Servomechanisms for Precision Turning Machines," MIT, Mechanical Engineering, June, 1999.

Cunningham, Rachel, "Thermal System Design for the PHENIX Experiment," MIT, Mechanical Engineering, June 1999 (also used for B.S. degree).

St. Michael, Nathan, "Design and Fabrication  of Silicon Oscillating Accelerometers," MIT, Mechanical Engineering, June, 2000.

Vona, Marty, "Metrology Techniques for Compound Rotary Linear Motion," MIT, Computer Science, June, 2001.

Kendale, Amar, "Novel Stamp Generation and Printing Techniques for Soft Contact Lithography," February, 2002.

Garcia, Christian, MIT, Mechanical Engineering,  "Magnetic Levitation for Down-Hole Submersible Pumps," June 2002.

Stein, Andrew, "A Metrological Atomic-Force Microscope," MIT, Mechanical Engineering, September, 2002.

Lilienkamp, Katie, "A Modular System for Lab-Based Teaching in Modeling, Dynamics, and Control," February, 2003.

Cattell, Joseph, "Adaptive Feedforward Cancellation Viewed from an Oscillator Amplitude Control Perspective," MIT, Mechanical Engineering, June 2003.

Yi, Xie, "Magnetic Suspension Demonstration System,", MIT, Electrical Engineering, June, 2003.

Shilpiekandula, Vijay, "Speckle-Based Rotary-Linear Sensor," MIT, Mechanical Engineering, February, 2004.

Barton, Augusto, "Rubber Bearings for Precision Positioning Systems", MIT, Mechanical Engineering, September, 2005.

Theses supervised by David L. Trumper

Mazzeo, Aaron, "Accurate Capacitance Metrology for Atomic Force Microscopy," MIT, Mechanical Engineering, September, 2005.
Hawe, Larry, "Control of a Fast Steering Mirror for Laser-Based Communication," January, 2006.

Cuff, David, "Magnetic Nanopositioners," June, 2006.

Kluk, Dan, "Electromagnetic Fast Steering Mirror," work started September, 2005.

Albert, Kevin, "Flexible Robotics," work started September, 2005.

Miu, Kevin, "Advanced Active Vibration Isolation," work started June, 2006.

Ljubicic, Dean, "Accurate, Fast Atomic Force  Microscope," work started June, 2006.

Boulet, Michael, work started June, 2006.


Doctoral Theses, Supervisor:

Kim, Won-Jong, "High-Precision Planar Magnetic Levitation," MIT, Electrical Engineering and Computer Science, June 1997.

Williams, Mark E., "Precision Six Degree of Freedom Magnetically-Levitated Photolithography Stage," MIT, Mechanical Engineering, February, 1998.

Holmes, Michael, "Long-Range Scanning Stage," UNC-Charlotte, Electrical Engineering, June 1998.

Ludwick, Stephen, "High-Speed Lens Cutting Machine", MIT, Mechanical Engineering, June, 1999.

Subrahmanyan, Pradeep, "Magnetic Suspension Vibration Isolation Systems," MIT, Mechanical Engineering, September, 1999.

Weng, Ming-Chih, "Tube Suspension", MIT, Mechanical Engineering, February, 2000.

Liebman, Michael, "Rotary-Linear Axes for High Speed Machining," MIT, Mechanical Engineering, September, 2001.

Byl, Marten, "High-Accuracy Fast Tool Servo for Asymmetric Turning," MIT, Mechanical Engineering, June, 2005.

Theses supervised by David L. Trumper

Lu, Xiaodong, "Ultra-Fast Tool Servos for Nano-Surfaces," MIT, Mechanical Engineering, September, 2005.

Montesanti, Rick, "Fast Tool Servos for High Spatial Frequency Part Generation," MIT, Mechanical Engineering, September, 2005.

MacKenzie, Ian, "Magnetic Suspension Positioners," work started June, 2006.

Doctoral Theses, Reader:

van Doren, Matthew, "Precision Machine Design Methodology for the Semiconductor Industry", MIT, Mechanical Engineering, June 1995.

Yeh, T.J., "Dynamics and Control of High Precision Magnetic Bearing Systems," MIT, Mechanical Engineering, June 1996.

Ofori, John, "Direct-Drive Motor for Electric Vehicle Propulsion," MIT, Electrical Engineering and Computer Science, September 1996.

Nayfeh, Samir, "Design and Application of Damped Machine Elements," MIT, Mechanical Engineering, June 1998.

Valjavec, Marko, "Die Forming Control", MIT, Mechanical Engineering, February, 1999.

Robinson, David, "Design and Analysis of Series Elasticity in Closed-loop Actuator Force Control," June 2000.

Ottensmeyer, Mark, "A Surgical Haptic Device", February, 2001.

Roberts, David, "Micro-Hydraulic Transducer Systems," February, 2002.

Konkola, Paul, "Interference Lithography," June, 2003.

Kwangduk Douglas Lee, "Load Monitoring of Electrical Systems," June, 2003.

Steve Buerger, "Force Reflecting Actuators," June, 2005.

Kripa Varanasi, "Low Wave Speed Damping of Structures," June, 2005.

Lei Zuo, "Vibration  Dynamics and Control," June, 2005.

Theses supervised by David L. Trumper

Golda, Dariuz, expected completion December, 2006.